## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **JUSTIN O'CONNOR, STANISLAW ZIELINSKI, DANIEL FAIR, BRYAN SMITH, JASON STEEN, WILLIAM FIEDLER, MICHAEL BARCELONA, ROBERT MARINO, BRIAN DOUGHERTY, SUSAN HELLER, VICTOR M. ORNDORFF, and MICHAEL MCDONALD** on behalf of themselves and all others similarly situated, | **Case No. 1:19-cv-05045**<br><br>**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**<br><br>**Before the Honorable Robert M. Dow, Jr.**<br><br>**Demand for Jury Trial** |
|                **Plaintiffs,**<br><br>    **v.**<br><br>**FORD MOTOR COMPANY,**<br><br>               **Defendant.** | |

## CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

## INTRODUCTION

I.      NATURE OF THE CASE ..................................................................................1

II.      PARTIES ........................................................................................................3

III.      JURISDICTION AND VENUE ......................................................................6

## FACTUAL ALLEGATIONS

I.      THE NATURE OF THE TRANSMISSION DEFECT ....................................7

II.      PLAINTIFFS' EXPERIENCES ...................................................................10

         A.      Plaintiff Justin O'Connor (Illinois)..................................................10

         B.      Plaintiff Stanislaw Zielinski (Illinois)..............................................12

         C.      Plaintiff Daniel Fair (California) .....................................................14

         D.      Plaintiff Bryan Smith (California) ...................................................16

         E.      Plaintiff Jason Steen (California).....................................................18

         F.      Plaintiff William Fiedler (Florida)..................................................21

         G.      Plaintiff Michael Barcelona (Massachusetts) ................................23

         H.      Plaintiff Robert Marino (Massachusetts) ......................................28

         I.      Plaintiff Brian Dougherty (New Jersey) ........................................30

         J.      Plaintiff Susan Heller (New York) ..................................................32

         K.      Plaintiff Victor M. Orndorff (Pennsylvania) ................................35

         L.      Plaintiff Michael McDonald (Texas) ............................................37

III.      DEFENDANT KNEW OR SHOULD HAVE KNOWN OF THE
         TRANSMISSION DEFECT PRIOR TO PLAINTIFFS' PURCHASES .............41

         A.      Ford Knew of and Refused to Remedy the Transmission
                Defect. .............................................................................................41

B.     Customers Repeatedly Complained About Harsh and Erratic Shifting and Vehicle Lunging, Hesitation, and Jerking. ............................43

C.     Ford Misrepresented and Actively Concealed the Defect. ........................50

## TOLLING ARGUMENTS

I.    TOLLING OF THE STATUTE OF LIMITATIONS .........................................................52

A.     Discovery Rule Tolling ............................................................52

B.     Fraudulent Concealment Tolling ................................................53

C.     Estoppel ....................................................................54

II.    CLASS ACTION ALLEGATIONS ..................................................................54

## CAUSES OF ACTION

FIRST CAUSE OF ACTION:  BREACH OF EXPRESS WARRANTY....................................58

SECOND CAUSE OF ACTION:  BREACH OF IMPLIED WARRANTY ...............................61

THIRD CAUSE OF ACTION: VIOLATION OF MAGNUSON-MOSS WARRANTY ACT..........................................................................................................63

FOURTH CAUSE OF ACTION:  NEGLIGENCE......................................................65

FIFTH CAUSE OF ACTION:  FRAUD/FRAUDULENT CONCEALMENT ...........................67

SIXTH CAUSE OF ACTION:  UNJUST ENRICHMENT ...........................................70

SEVENTH CAUSE OF ACTION:  ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT ("CFA") ...................................71

EIGHTH CAUSE OF ACTION:  SONG-BEVERLY CONSUMER WARRANTY ACT (Express Warranties)....................................................................73

NINTH CAUSE OF ACTION:  SONG-BEVERLY CONSUMER WARRANTY ACT (Implied Warranties)....................................................................76

TENTH CAUSE OF ACTION: BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (Cal.) ........................................................80

ELEVENTH CAUSE OF ACTION:  CONSUMER LEGAL REMEDIES ACT........................82

TWELFTH CAUSE OF ACTION: CALIFORNIA UNFAIR COMPETITION LAW ...............88

THIRTEENTH CAUSE OF ACTION:  FLORIDA DECEPTIVE AND UNFAIR
    TRADE PRACTICES ACT................................................................................92

FOURTEENTH CAUSE OF ACTION:  BREACH OF IMPLIED WARRANTY OF
    MERCHANTABILITY (Mass.)......................................................................96

FIFTEENTH CAUSE OF ACTION:  BREACH OF IMPLIED WARRANTY OF
    FITNESS FOR A PARTICULAR PURPOSE (Mass.) ....................................97

SIXTEENTH CAUSE OF ACTION: MASSACHUSETTS CONSUMER
    PROTECTION LAW.......................................................................................99

SEVENTEENTH CAUSE OF ACTION: NEW JERSEY CONSUMER FRAUD
    ACT..............................................................................................................102

EIGHTEENTH CAUSE OF ACTION:  NEW YORK GENERAL BUSINESS LAW
    § 349...........................................................................................................104

NINETEENTH CAUSE OF ACTION:  NEW YORK GENERAL BUSINESS LAW
    § 350...........................................................................................................107

TWENTIETH CAUSE OF ACTION:  UNFAIR TRADE PRACTICE AND
    CONSUMER PROTECTION LAW (Penn.)..................................................109

TWENTY-FIRST CAUSE OF ACTION: IMPLIED WARRANTY OF
    MERCHANTABILITY (Tex.) ......................................................................114

TWENTY-SECOND CAUSE OF ACTION:  IMPLIED WARRANTY OF FITNESS
    FOR A PARTICULAR PURPOSE (Tex.) ....................................................116

TWENTY-THIRD CAUSE OF ACTION: TEXAS DECEPTIVE TRADE
    PRACTICES AND CONSUMER PROTECTION ACT ...............................118

REQUESTS FOR RELIEF ...................................................................................120

DEMAND FOR JURY TRIAL ............................................................................121

## INTRODUCTION

Plaintiffs Justin O'Connor, Stanislaw Zielinski, Daniel Fair, Bryan Smith, Jason Steen, William Fiedler, Michael Barcelona, Robert Marino, Brian Dougherty, Susan Heller, Victor M. Orndorff, and Michael McDonald ("Plaintiffs"), by and through counsel, bring this Consolidated Amended Class Action Complaint against Defendant Ford Motor Company ("Defendant" or "Ford"), on behalf of themselves and all others similarly situated, and allege, upon personal knowledge as to their own actions and their counsel's investigations, and upon information and belief as to all other matters, as follows:

### I.     NATURE OF THE CASE

1.      Plaintiffs bring this case individually and on behalf of all similarly situated persons ("Class Members") who purchased or leased Model Year 2017-2020 Ford F-150 vehicles ("Class Vehicles" or "Vehicles") that were designed, manufactured, distributed, marketed, sold, and leased by Defendant or Defendant's parent, subsidiary, or affiliates thereof.

2.      Defendant designed, manufactured, distributed, marketed, sold, and leased Model Year 2017-2020 Ford F-150 Vehicles equipped with the 10R80, a 10-speed automatic transmission ("Transmission") designed and manufactured by Ford.

3.      Defendant knew or should have known that the Vehicles contain one or more design and/or manufacturing defects, including but not limited to defects contained in the Vehicles' 10R80, a 10-speed automatic transmission that can shift harshly and erratically, causing the vehicle to jerk, lunge, and hesitate between gears.

4.      An automatic transmission is essentially an automatic gear shifter. Instead of manually shifting the gears with a clutch, the automatic transmission does it on its own. The transmission acts as a powertrain to convert the vehicle engine's force into a controlled source of

power. Accordingly, drivers need a properly functioning automatic transmission in order to safely and reliably accelerate and decelerate their Vehicles.

5.      A common design and/or manufacturing defect in Ford's 10R80 transmissions is a potentially life-threatening safety issue, and Ford has refused to recall or replace the defective Transmissions.

6.      Ford's warranty states that "dealers will, without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship."[1]

7.      Upon information and belief, and based on interactions between Plaintiffs and Ford authorized dealers and Ford refuses to replace or repair the Transmissions and merely states that the abrupt and harsh shifting is normal.

8.      Prior to purchasing or leasing the Class Vehicles, Plaintiffs and other Class Members did not know that the Class Vehicles would abruptly and harshly shift due to the Transmission Defect and cause their vehicle to unexpectedly surge, hesitate, and jerk.

9.      Upon information and belief, Plaintiffs allege that Defendant knew or should have known that the Class Vehicles are defective and suffer from the Transmission Defect and are not fit for their intended purpose of providing consumers with safe and reliable transportation. Nevertheless, Defendant failed to disclose this defect to Plaintiffs and Class Members at the time of purchase or lease and thereafter.

10.     Had Plaintiffs and Class Members known about the Transmission Defect at the time of sale or lease, as well as the associated costs related to the Transmission Defect, Plaintiffs

---

[1]Source:   http://www.fordservicecontent.com/Ford_Content/Catalog/owner_information/2018-Ford-Car-Lt-Truck-version-5_frdwa_EN-US_01_2018_3.pdf (last viewed July 30, 2019).

and the Class Members would not have purchased the Class Vehicles or would have paid less for them.

11.     As a result of their reliance on Defendant's omissions and/or misrepresentations, Plaintiffs and other owners and/or lessees of the Class Vehicles have suffered ascertainable loss of money, property, and/or loss in value of their Class Vehicles.

12.     The first priority of an auto manufacturer should be to ensure that its vehicles are safe and operate as intended to prevent or minimize the threat of death or serious bodily harm. In addition, an auto manufacturer must take all reasonable steps to ensure that, once a vehicle is running, it operates safely, and its mechanical systems (such as the transmission) work properly. Moreover, an auto manufacturer that is aware of dangerous design defects that cause its vehicles to jerk, hesitate, surge, or slip gears must promptly disclose and remedy such defects.

13.     This case arises from Defendant's breach of its obligations and duties, including Defendant's omissions and failure to disclose that, as a result of the Transmission Defect, Class Vehicles may shift harshly, slip gears, hesitate, or surge, creating an unreasonable risk of serious bodily harm and death.

14.     To the extent warranted by the developing facts, Plaintiffs will further supplement the list of Class Vehicles to include additional Ford vehicles that have the Transmission Defect.

15.     The Transmission Defect makes the Class Vehicles unreasonably dangerous. Because of the Defect, the Class Vehicles are likely to suffer serious damages and potentially catch fire if accidents occur, and there is an unreasonable and extreme risk of serious bodily harm or death to the vehicle's occupants and others in the vicinity.

II.     PARTIES

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

3

16.     Plaintiff Justin O'Connor is an Illinois citizen who lives in Oswego, located in Kendall County, Illinois. Mr. O'Connor leased a 2018 Ford F-150 XLT 3.5 EcoBoost with the 10R80 10-speed transmission. This vehicle was designed, manufactured, sold, distributed, advertised, marketed, and/or warranted by Ford Motor Company.

17.     Plaintiff Stanislaw Zielinski is an Illinois citizen who lives in Crystal Lake, located in McHenry County, Illinois. Mr. Zielinski purchased a new 2018 Ford F-150 with the 10R80 10-speed transmission. This vehicle was designed, manufactured, sold, distributed, advertised, marketed, and/or warranted by Ford Motor Company.

18.     Plaintiff Daniel Fair is a California citizen who lives in Lake Elisnore, located in Riverside County, California. Mr. Fair purchased a 2019 Ford F-150 Limited with the 10R80 10-speed transmission. This vehicle was designed, manufactured, sold, distributed, advertised, marketed, and/or warranted by Ford Motor Company.

19.     Plaintiff Bryan Smith is a California citizen who lives in Morgan Hill, located in Santa Clara County, California. Mr. Smith purchased a 2018 Ford F-150 XLT with the 10R80 10-speed transmission. This vehicle was designed, manufactured, sold, distributed, advertised, marketed, and/or warranted by Ford Motor Company.

20.     Plaintiff Jason Steen is a California citizen who lives in Rancho Cucamonga, located in San Bernardino County, California. Mr. Steen purchased a 2017 Ford F-150 XLT 3.5 EcoBoost with the 10R80 10-speed transmission. This vehicle was designed, manufactured, sold, distributed, advertised, marketed, and/or warranted by Ford Motor Company.

21.     Plaintiff William Fiedler is a Florida citizen who lives in Deerfield Beach, located in Broward County, Florida. Mr. Fiedler purchased a 2018 Ford F-150 with the 10R80 10-speed

transmission. This vehicle was designed, manufactured, sold, distributed, advertised, marketed, and/or warranted by Ford Motor Company.

22.     Plaintiff Michael Barcelona is a Massachusetts citizen who lives in Leominster, located in Worcester County, Massachusetts.  Mr. Barcelona purchased a 2018 Ford F-150 Crew Cab with the 10R80 10-speed transmission.  This vehicle was designed, manufactured, sold, distributed, advertised, marketed, and/or warranted by Ford Motor Company.

23.     Plaintiff Robert Marino is a Massachusetts citizen who lives in Essex County, Massachusetts. Mr. Marino leased a 2019 Ford F-150 Sport. This vehicle was designed, manufactured, sold or leased, distributed, advertised, marketed, and/or warranted by Ford Motor Company.

24.     Plaintiff Brian Dougherty is a New Jersey citizen who lives in Belle Mead, located in Somerset County, New Jersey. Mr. Dougherty purchased a 2018 Ford F-150 with the 10R80 10-speed transmission. This vehicle was designed, manufactured, sold, distributed, advertised, marketed, and/or warranted by Ford Motor Company.

25.     Plaintiff Susan Heller has recently moved to Tennessee where she is now a resident and citizen of Rogersville, Hawkins County, Tennessee. Ms. Heller purchased a 2018 Ford F-150 with the 10R80 10-speed transmission in Goshen, New York. This vehicle was designed, manufactured, sold, distributed, advertised, marketed, and/or warranted by Ford Motor Company.

26.     Plaintiff Victor M. Orndorff is a Pennsylvania citizen who lives in New Freedom, located in York County, Pennsylvania. Mr. Orndorff purchased a 2018 Ford F-150 Super Cab with the 10R80 10-speed transmission. This vehicle was designed, manufactured, sold, distributed, advertised, marketed, and/or warranted by Ford Motor Company.

27.     Plaintiff Michael McDonald is a Texas citizen who lives in Jacksonville, located in Cherokee County, Texas.  Mr. McDonald purchased a 2018 Ford F-150 truck with the 10R80 10-speed transmission. This vehicle was designed, manufactured, sold, distributed, advertised, marketed, and or warranted by Ford Motor Company.

28.     Defendant Ford Motor Company is a publicly traded corporation organized under the laws of the State of Delaware with The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801 as its registered agent. Ford's principle place of business is at One American Road, Dearborn, Michigan 48126.

29.     Ford, through its various entities, designs, manufactures, markets, distributes, and sells its vehicles in this District and many other locations in the United States and worldwide. Ford and/or its agents designed, manufactured, and installed the Ford transmissions in the Class Vehicles. Ford also developed and disseminated the owner's manuals, warranty booklets, advertisements, and other promotional materials pertaining to Class Vehicles.

III.     JURISDICTION AND VENUE

30.     The Court has subject matter jurisdiction over this action under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d). There are at least 100 members in the proposed class, the aggregated claims of the individual Class Members exceed the sum or value of $5,000,000.00 exclusive of interest and costs, and Plaintiffs and Class Members are citizens of states different from Defendant.

31.     The Court has personal jurisdiction over Ford because, through its business of distributing, selling, and leasing the Class Vehicles in this District, Ford has established sufficient contacts in this District such that personal jurisdiction is appropriate.

32.    Venue is proper in this District under 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to Plaintiff O'Connor's and Plaintiff Zielinski's claims occurred in this District.  Specifically, Plaintiff O'Connor's and Plaintiff Zielinski's Vehicles were purchased or leased in this District.

**FACTUAL ALLEGATIONS**

I.    THE NATURE OF THE TRANSMISSION DEFECT

33.    Ford has designed, manufactured, advertised, sold, and leased its popular Ford F-Series pickup trucks, which has been the best-selling pickup in the United States for the last 42 years.[2]

34.    On its website, Ford touts the F-150's superiority among its competitors:



## CLASS-LEADING CAPABILITY

The Ford F-150 makes tough tasks look easy, whether it's working on the job or heading out on a weekend of recreation. F-150 outperforms every other truck in its class when hauling cargo in the bed or towing a trailer.* No wonder the competition is always in a scramble to follow the leader.

35.    In terms of power, Ford states the F-150's 3.5L Ecoboost engine with the 10R80 10-speed transmission provides "on-demand power with virtually no lag"[3]:

---

[2]Source: https://media.ford.com/content/dam/fordmedia/North%20America/US/2019/01/03/sales-dec-18.pdf  (last viewed September 21, 2020).
[3]Source: https://www.ford.com/trucks/f150/2019/features/power/ (last viewed September 21, 2020).

# 3.5L ECOBOOST®

The 3.5L EcoBoost® with 10-speed transmission boasts impressive power ratings of 375 horsepower and best-in-class* 470 lb.-ft. of torque, beating out all gas and diesel competitors. This engine delivers the F-150 best-in-class* tow rating too. Features include the Ford port-fuel and direct-injection (PFDI) system with two injectors per cylinder — one in the air intake port, another inside the cylinder — to increase performance. Plus twin intercooled turbos for on-demand power with virtually no lag.

*When properly configured. Class is Full-Size Pickups under 8,500 lbs. GVWR based on Ford segmentation.

36.     Ford further highlights its 10-speed automatic transmission as shown below:

# 10-SPEED AUTOMATIC TRANSMISSION

F-150 EcoBoost®, V8 and diesel engines deliver their power through an advanced 10-speed automatic transmission. Compared with the 6-speed, the 10-speed delivers improved overall performance, with enhanced acceleration at the low and mid ranges of the power band. Features include optimized wide-span gear spacing coupled with drag-reduction actions plus three overdrive gears. What's more, you can choose from selectable modes: Normal, Tow-Haul, Snow-Wet, EcoSelect, and Sport.



37.     Ford offers a "New Vehicle Limited Warranty" for three years or 36,000 miles, whichever occurs first.[4]

38.     Ford also offers extended warranty coverage for Powertrain components for five years or 60,000 miles, whichever occurs first.  This extended warranty coverage includes the transmission and all internal parts, clutch cover, seals and gaskets, torque converter, transfer case (including all internal parts), transmission case, and transmission mounts.

---

[4] Source: 2018 Model Year Ford Warranty Guide;
http://www.fordservicecontent.com/Ford_Content/Catalog/owner_information/2018-Ford-Car-Lt-Truck-version-5_frdwa_EN-US_01_2018_3.pdf (last viewed September  22, 2020).

39.     Despite the popularity of Ford's F-150, the truck has not been without its problems.  In February 2019, Ford issued three recalls, one of which covered select 2011 and 2013 Ford F-150 vehicles with six-speed automatic transmissions.  In that recall, approximately 1.48 million F-150 trucks had a defect that can cause the truck to unexpectantly downshift into first gear causing accidents and injury to drivers.[5]

40.     More recently, Ford recalled nearly 68,000 vehicles (model year 2020 F-150, Ranger, and Expedition) with 10-speed automatic transmissions. In that recall, a clip connecting the gearshift cable and transmission was not properly seated which meant it was possible for a driver to put the shifter in park but the transmission remained in drive, potentially causing accidents and injury to drivers.[6]

41.     Plaintiffs and Class Members allege a common transmission defect in their 2017-2020 model year Ford F-150's with 10-speed transmissions. As discussed herein, numerous F-150 drivers have experienced a loud "clunking" noise when starting the engine. One driver stated that the transmission "clunk" was so loud that he thought he had been hit by another car. Numerous drivers complain that their transmissions slip gears, jerk, and/or shift roughly. In one NHTSA complaint, a vehicle lost all power while accelerating through an intersection and the transmission failed to shift up or down. In another complaint, an F-150 would repeatedly stay stuck in the same gear, making the truck inoperable for several hours at a time.

42.     Due to the Transmission Defect, drivers have reported whiplash due to harsh shifting. Finally, many drivers have stated in NHTSA complaints that they do not feel safe driving their F-150's in normal traffic conditions.

---

[5] Source:   https://www.cnbc.com/2019/02/13/ford-issues-3-recalls-covering-nearly-1point5-million-vehicles.html (last viewed July 30, 2019).
[6]  Source: https://www.caranddriver.com/news/a32065729/2020-ford-f-150-ranger-expedition-recall/ (last viewed September 24, 2020).

43.     In response to customer complaints, Ford issued at least two Technical Service Bulletins ("TSBs") addressing the Transmission Defect. While the TSBs were meant to address harsh or bumpy transmission shifting, Ford advised that issues were normal and did not offer to repair or replace the Transmissions.

44.     Due to Ford's unwillingness to acknowledge the Transmission Defect and refusal to repair the Class Vehicles, Plaintiffs and Class Members continue to drive defective and unsafe vehicles.

II.     PLAINTIFFS' EXPERIENCES

A.  Plaintiff Justin O'Connor

45.     Mr. O'Connor was shopping for a safe and reliable vehicle to serve as his personal vehicle and to commute to and from work.  As a result of his research, in July 2018, he leased a brand new 2018 Ford F-150 XLT 3.5 EcoBoost with 10-speed transmission pick-up truck from Fox Valley Ford (now called Gerald Ford) in North Aurora, Illinois (an authorized Ford dealership).  Mr. O'Connor's vehicle was equipped with the defective 10-speed transmission.  As per the terms in the lease, Mr. O'Connor made a down payment of $3715.31 and pays $550.00 per month.

46.     At the time of Mr. O'Connor's lease, Ford knew that its F-150 10R80, 10-speed automatic transmissions were defective, but the Ford sales representative did not disclose the Defect to Mr. O'Connor when discussing the features, components and performance of the Vehicle prior to leasing.  In reliance on these material omissions and misrepresentations, Mr. O'Connor leased – then operated the Vehicle on the reasonable but incorrect belief that his Vehicle's transmission would operate properly as warranted. Had Mr. O'Connor been informed

of the Transmission Defect prior to or at the time of lease, he would not have leased the Vehicle or else would have paid significantly less for the Vehicle.

47.     Approximately five months after leasing the Vehicle (in or about December 2018) and with approximately 6000 miles on the odometer, Mr. O'Connor started to notice a loud "clunk" or "bang" noise upon starting the engine. From the time he leased the Vehicle, Mr. O'Connor noticed that during warm up and colder operation of the Vehicle, the Transmission held gears much longer than it should and often had a loss of power while shifting.

48.     On another date in or about January 2019, Mr. O'Connor was driving when his Vehicle lost its acceleration/shifting capabilities and displayed a message stating "drive mode not available" with the orange wrench indicator staying illuminated on the dash. The Vehicle put itself into "limp mode" and he was able pull into a nearby parking lot to get out of the roadway to avoid being rear-ended by other vehicles.  In order to drive home, he had to disconnect then reconnect the battery, which reset the drive mode and allowed him to get home.

49.     Neither Ford nor any of its agents, dealers, or representatives informed Mr. O'Connor of the Transmission Defect prior to his lease of the Vehicle.

50.     On June 24, 2020, Mr. O'Connor found another consumer to assume his lease on the Vehicle. Earlier in the year, he and his wife had their first child, and they decided that the Ford F-150 was not safe and reliable enough to transport their young baby. If Mr. O'Connor had been unable to find another person to assume the lease, he would have had to pay out the remaining amount due, which he planned to do just to be rid of the Vehicle. He no longer drives a Ford.

51.     Had Mr. O'Connor been advised of the Transmission Defect at or before the point of lease, he would not have leased his Vehicle or else would have paid significantly less for the Vehicle. Mr. O'Connor did not receive the benefit of his bargain.

B. Plaintiff Stanislaw Zielinski

52.     Mr. Stanislaw Zielinski was shopping for a safe and reliable vehicle to serve as his personal vehicle and to commute to and from work. He had owned two RVs with Ford engines before and had never had problems with either.

53.     As a result of his research, on January 17, 2019, he purchased a brand new 2018 Ford F-150 from Buss Ford Store in McHenry, Illinois (an authorized Ford dealership). Mr. Zielinski's vehicle was equipped with the defective 10-speed transmission. The purchase price of Mr. Zielinski's Vehicle including Ford's 75,000 miles/72 month extended warranty and protection package was $47,225.00.

54.     At the time of Mr. Zielinski's purchase, Ford knew that its F-150 10R80, 10-speed automatic transmissions were defective but the Ford sales representative did not disclose the Defect to Mr. Zielinski when discussing the features, components and performance of the vehicle prior to purchase. In reliance on these material omissions and misrepresentations, Mr. Zielinski purchased, then operated the Vehicle, on the reasonable but incorrect belief that his Vehicle's transmission would operate properly as warranted. Had Mr. Zielinski been informed of the Transmission Defect prior to or at the time of purchase, he would not have purchased the Vehicle or else would have paid significantly less for the Vehicle.

55.     At the time of purchase, the odometer on Mr. Zielinski's Vehicle showed 48 miles. By the time he had driven the Vehicle for approximately one week, Mr. Zielinski started to notice a loud noise from his transmission, especially when the Vehicle is cold.  He made an appointment with the Ford dealership's service department and took his Vehicle in on February 19, 2019. It had 2466 miles on the odometer at the time.

56.     By June 2019, and with only 11000 miles on his Vehicle, Mr. Zielinski was noticing that additional noises were occurring when accelerating and decelerating including a ticking and a rattling. In addition, the transmission was delaying engaging. The Ford service technicians and service managers were able to replicate the sounds; however, they determined that the transmission was operating normally. Mr. Zielinski disagreed but no repairs were made.

57.     By November 2019, when Mr. Zielinski had 17847 miles on his Vehicle, he still had the same or similar problems with his transmission hard shifting, rough idling, and skipping gears. The Ford service technician again suggested this poor performance and gear skipping was "normal." On his service paper work dated 11/22/19, the description says in relevant part: "EMAILED FORD HOTLINE WITH TRANS UPSHIFT/DOWNSHIFT SKIP CONCERNS AND [sic] INFO – ADVISED THAT 10R80 TRANS IS NORMAL AND INTENDED TO SHIFT IN THIS MANNER – NO PROBLEM FOUND AT THIS TIME."  The service department reprogrammed the "PCM" and noted that TSB 19-2144 addressed certain noises that were considered "normal." No repair was completed, and the problems persisted.

58.     On August 24, 2020, Mr. Zielinski took his Vehicle for repair at Surprise Ford located in Surprise, Arizona. Once again, he expressed concerns about the sounds and operation of the transmission. The service technician found TSB 18-2354 for a related concern, and again reprogramed the PCM per the service procedure. Surprise Ford kept his Vehicle for two days but Mr. Zielinski's transmission problems have not been resolved. The vehicle still clicks and whines upon accelerating, it still slips and bangs intermittently when decelerating, and the Ford service technicians simply keep trying to update the computer, yet nothing resolves the problem.

59.     Neither Ford nor any of its agents, dealers, or representatives informed Mr. Zielinski of the Transmission Defect prior to his purchase of the Vehicle.

60.     On August 12, 2020, counsel for Mr. Zielenski sent a notice letter to Ford regarding his claims being made on behalf of himself and the Class and his state's Subclass. Although Ford responded, it made no offer for classwide resolution of this Defect.

61.     Had Mr. Zielinski been advised of the Transmission Defect at or before the point of purchase, he would not have purchased his Vehicle or would have paid significantly less for the Vehicle. Mr. Zielinski did not receive the benefit of his bargain. As a result, Mr. Zielinski has paid and continues to pay a premium for a defective vehicle which poses a safety hazard to himself, his family, and others.

62.     If Mr. Zielinski's F-150 transmission did not contain the Defect, he would likely lease or purchase another Ford F-150 in the future. Alternatively, if the Court were to issue an injunction ordering Defendant to comply with advertising and warranty laws and fully address the safety issue, Mr. Zielinski would likely lease or purchase an F-150 again in the future.

C. Plaintiff Daniel Fair

63.     Mr. Fair was shopping for a safe and reliable vehicle to serve as his personal vehicle and to commute to and from work.  As a result of his research prior to purchase, in May 2019, he purchased a brand new 2019 Ford F-150 Limited with 10-speed transmission pick-up truck from Hemborg Ford in Norco, California (an authorized Ford dealership).  Mr. Fair's vehicle was equipped with the defective 10-speed transmission.  The purchase price of Mr. Fair's Vehicle was $78,000.

64.     At the time of Mr. Fair's purchase, Ford knew or should have known that its F-150 10R80, 10-speed automatic transmissions were defective, but the Ford sales representative did not disclose the Defect to Mr. Fair when discussing the features, components and performance of the Vehicle prior to purchase.  In reliance on these material omissions and misrepresentations,

Mr. Fair purchased, then operated the Vehicle, on the reasonable but incorrect belief that his Vehicle's transmission would operate properly as warranted. Had Mr. Fair been informed of the Transmission Defect prior to or at the time of purchase, he would not have purchased the Vehicle or else would have paid significantly less for the Vehicle..

65.     At the time of purchase, the odometer on Mr. Fair's Vehicle showed 6 miles. Within the first 1,000 miles of driving his Vehicle, Mr. Fair started to notice a loud "clanking" noise from his transmission, with the transmission slipping and jerking when accelerating and shifting gears. Mr. Fair noticed that while driving his Vehicle, it holds the gears too long, completely shifts out of gear while accelerating, then roughly slams into gear.

66.     After approximately 5,000 miles of driving and experiencing the same transmission issues, Mr. Fair took his Vehicle to the repair shop at Hemborg Ford, an authorized dealership and repair facility, in Norco, CA. Mr. Fair informed employees at Hemborg Ford about the issues he was experiencing with his Vehicle's transmission and requested that they fix the problem per his Vehicle's 3 year/36,000 mile warranty and 5 year/60,000 Powertrain Warranty. Mr. Fair was advised by employees at the repair shop that the transmission in his Vehicle needed to learn his driving habits and that the issue would correct itself over time once this learning occurred.

67.     After approximately 10,000 miles of driving and continuing to experience the same transmission issues, Mr. Fair again took his Vehicle to the repair shop at Hemborg Ford, informed employees at the repair shop about the continuing issues with his Vehicle's transmission and requested that they fix the problem per his Vehicle's warranties. Mr. Fair was advised by employees at the repair shop that they were waiting for a software update from Ford, which would correct the 10R80 transmission problems. A fix was not provided.

68.    Neither Ford nor any of its agents, dealers, or representatives informed Mr. Fair of the Transmission Defect prior to his purchase of the Vehicle.

69.    On November 27, 2019, counsel for Mr. Fair sent a notice letter to Ford regarding his claims being made on behalf of himself and the Class and his state's Subclass. Although Ford responded, it made no offer for classwide resolution of this Defect.

70.    Had Mr. Fair been advised of the Transmission Defect at or before the point of purchase, he would not have purchased his Vehicle or would have paid significantly less for the Vehicle. Mr. Fair did not receive the benefit of his bargain. As a result, Mr. Fair has paid and continues to pay a premium for a defective vehicle which poses a safety hazard to himself, his family, and others.

71.    If Mr. Fair's F-150 transmission did not contain the Defect, he would likely lease or purchase another Ford F-150 in the future. Alternatively, if the Court were to issue an injunction ordering Defendant to comply with advertising and warranty laws and fully address the safety issue, Mr. Fair would likely lease or purchase an F-150 again in the future.

D.    Plaintiff Bryan Smith

72.    Mr. Smith was shopping for a safe and reliable vehicle to serve as his personal vehicle and to commute to and from work. Mr. Smith required a truck to pull his travel trailer. He compared trucks online and found that Ford's F-150, with its 10-speed transmission, should be able to pull his trailer with ease. The Ford website did not mention the Transmission Defect, but instead touted the enhanced performance of the vehicle.

73.    Two months prior to selecting and purchasing his Vehicle, Mr. Smith extensively researched Ford F-150's online and talked to other F-150 owners. He also spoke with a salesman at the Ford Store in Morgan Hill, California (an authorized Ford dealership). That salesman

showed Mr. Smith brochures and online media from Ford "about how the 10-speed transmission would be the best and safest transmission for me to pull my trailer with." Neither the brochures and online media, nor the Ford sales representative disclosed the known Defect to Mr. Smith.

74.     As a result of his research, and in reliance on these material omissions and misrepresentations, in December 2018, he purchased a brand new 2018 Ford F-150 XLT with 10-speed transmission pick-up truck from The Ford Store.  Mr. Smith's vehicle was equipped with the defective 10-speed transmission.   The purchase price of Mr. Smith's Vehicle was approximately $45,000.

75.     At the time of Mr. Smith's purchase, Ford knew or should have known that its F-150 10R80, 10-speed automatic transmissions were defective but did not disclose the Defect to Mr. Smith.  Ford, through its agents and marketing materials, misrepresented the quality and safety of the 10-speed transmission to Mr. Smith, by touting its enhanced performance and reliability. In reliance on these material omissions and misrepresentations, Mr. Smith purchased, then operated the Vehicle, on the reasonable but incorrect belief that his Vehicle's transmission would operate properly as warranted. Had Mr. Smith been informed of the Transmission Defect prior to or at the time of purchase, he would not have purchased the Vehicle or else would have paid significantly less for the Vehicle.

76.     At the time of purchase, the odometer on Mr. Smith's Vehicle showed 5 miles. By the time he had driven the Vehicle approximately 1,000 miles, in February 2019, Mr. Smith started to notice a loud "clanking" noise from his transmission. While driving the Vehicle, Mr. Smith also began to notice that when shifting gears, the Transmission feels like it is "slipping," and when accelerating, the Vehicle will not speed up.

77.     Currently, Mr. Smith's Vehicle's Transmission slips while driving in any gear. He will be driving along when it slips for a few seconds, then returns to the same gear it slipped from. As he has described it, "I can be in the 10th gear while driving 65 mph, then transmission slips and I am not in any gear and vehicle starts to slow then it re-engages into the same 10th gear and accelerates again. Again, this happens in all gears." Mr. Smith is afraid to use his Vehicle to tow his travel trailer up steep inclines due to the constant gear slipping problem.

78.     Neither Ford nor any of its agents, dealers, or representatives informed Mr. Smith of the Transmission Defect prior to his purchase of the Vehicle.

79.     On November 27, 2019, counsel for Mr. Smith sent a notice letter to Ford regarding his claims being made on behalf of himself and the Class and his state's Subclass. Although Ford responded, it made no offer for classwide resolution of this Defect.

80.     Had Mr. Smith been advised of the Transmission Defect at or before the point of purchase, he would not have purchased his Vehicle or would have paid significantly less for the Vehicle. Mr. Smith did not receive the benefit of his bargain. As a result, Mr. Smith has paid and continues to pay a premium for a defective vehicle which poses a safety hazard to himself, his family, and others.

81.     If Mr. Smith's F-150 transmission did not contain the Defect, he would likely lease or purchase another Ford F-150 in the future. Alternatively, if the Court were to issue an injunction ordering Defendant to comply with advertising and warranty laws and fully address the safety issue, Mr. Smith would likely lease or purchase an F-150 again in the future.

E.  Plaintiff Jason Steen

82.     Mr. Steen was shopping for a safe and reliable vehicle to serve as his personal vehicle for daily use and to tow a travel trailer. Mr. Steen conducted extensive research online

prior to purchase and viewed Ford's advertising materials regarding the F-150's 10-speed transmission, which touted its enhanced performance and reliability but did not disclose the Defect. Mr. Steen also went to three different authorized Ford dealerships in California (Citrus Ford, Chino Hills Ford, and Upland Ford) and discussed the Vehicle's features, components and enhanced performance with Ford sales representatives; none of the Ford sales representatives disclosed the known defect to Mr. Steen. Based on these material omissions and misrepresentations by Ford and its agents and representatives, Mr. Steen believed that the 10-speed transmission would provide a smooth shifting experience and would shift better than other comparable trucks.

83.     As a result of his research, and in reliance on these material omissions and misrepresentations, in January 2017, Mr. Steen purchased a brand new 2017 Ford F-150 XLT 3.5 EcoBoost with 10-speed transmission pick-up truck from Citrus Ford in Ontario, California (an authorized Ford dealership).  Mr. Steen's Vehicle was equipped with the defective 10-speed transmission.  The purchase price of Mr. Steen's Vehicle was $46,686.

84.     At the time of Mr. Steen's purchase, Ford knew or should have known that its F-150 10R80, 10-speed automatic transmissions were defective, but the Ford sales representative did not disclose the Defect to Mr. Steen when discussing the features, components and performance of the vehicle prior to purchase. In reliance on these material omissions and misrepresentations, Mr. Steen purchased, then operated the Vehicle, on the reasonable but incorrect belief that his Vehicle's transmission would operate properly as warranted. Had Mr. Steen been informed of the Transmission Defect prior to or at the time of purchase, he would not have purchased the vehicle or else would have paid significantly less for the Vehicle.

85.     At the time of purchase, the odometer on Mr. Steen's Vehicle showed 11 miles. In March 2017, Mr. Steen started to notice a loud "rattling" noise from his transmission, with the transmission slipping and jerking when accelerating and shifting gears. Mr. Steen noticed that while driving his Vehicle, it holds the gears too long, completely shifts out of gear while accelerating, then roughly slams into gear making a clunking (metal on metal) sound.

86.     After approximately 500 miles of driving and experiencing the same transmission issues, Mr. Steen took his Vehicle to the repair shop at Citrus Ford, an authorized dealership and repair facility, in Ontario, CA. Mr. Steen informed employees at Citrus Ford about the issues he was experiencing with his Vehicle's transmission and requested that they fix the problem per his Vehicle's 3 year/36,000 mile warranty and 5 year/60,000 Powertrain Warranty. Mr. Steen was advised by employees at the repair shop that they could not replicate the issue with his transmission, but that they updated the Vehicle's transmission software. However, after the update, he continued to have problems due to the Transmission Defect.

87.     Between approximately 500 and 30,000 miles of driving and continuing to experience the same transmission issues, Mr. Steen took his Vehicle to the repair shop at Citrus Ford three more times. During each visit, Mr. Steen informed employees at the repair shop about the continuing issues with his Vehicle's transmission and requested that they fix the problem per his Vehicle's warranties. Mr. Steen was advised by employees at the repair shop that they were able to replicate the issues with his transmission and that they had performed software updates from Ford, which would correct the 10R80 transmission problems. However, the software updates did not correct the problems.

88.     Neither Ford nor any of its agents, dealers, or representatives informed Mr. Steen of the Transmission Defect prior to his purchase of the Vehicle.

89.     On September 14, 2020, counsel for Mr. Steen sent a notice letter to Ford regarding his claims being made on behalf of himself and the Class and his state's Subclass. Ford has not yet responded.

90.     Had Mr. Steen been advised of the Transmission Defect at or before the point of purchase, he would not have purchased his Vehicle or would have paid significantly less for the Vehicle. Mr. Steen did not receive the benefit of his bargain. As a result, Mr. Steen has paid and continues to pay a premium for a defective vehicle which poses a safety hazard to himself, his family, and others.

91.     If Mr. Steen's F-150 transmission did not contain the Defect, he would likely lease or purchase another Ford F-150 in the future. Alternatively, if the Court were to issue an injunction ordering Defendant to comply with advertising and warranty laws and fully address the safety issue, Mr. Steen would likely lease or purchase an F-150 again in the future.

F.   Plaintiff William Fiedler

92.     Mr. Fiedler was shopping for a safe and reliable vehicle to serve as his personal vehicle and to commute to and from work. While researching the vehicle prior to purchase, Mr. Fielder viewed advertisements for the Ford F-150 on Autotrader.com, which touted its enhanced performance and reliability, but did not disclose the Defect. In September 2018, he purchased a 2018 Ford F-150 truck with 10-speed transmission from Greico Chevrolet in Delray Beach, Florida. Mr. Fiedler's vehicle was equipped with the defective 10-speed transmission. The purchase price of Mr. Fiedler's Vehicle was $38,000.

93.     At the time of Mr. Fiedler's purchase, Ford knew that its F-150 10R80, 10-speed automatic transmissions were defective, but the Ford sales representative did not disclose the Defect to Mr. Fielder when discussing the features, components and performance of the vehicle

prior to purchase. In reliance on these material omissions and misrepresentations, Mr. Fiedler purchased, then operated the Vehicle, on the reasonable but incorrect belief that his Vehicle's transmission would operate properly as warranted. Had Mr. Fiedler been informed of the Transmission Defect prior to or at the time of purchase, he would not have purchased the Vehicle or else would have paid significantly less for the Vehicle.

94. At the time of purchase, the odometer on Mr. Fiedler's Vehicle showed approximately 28,000 miles. By the time he had driven the Vehicle 2,000 miles, Mr. Fiedler started to notice the Transmission "slipping" and "jerking" while driving. Mr. Fiedler also noticed the Vehicle would "wind" when starting and would stay in a low gear too long and then "clunk" when downshifting, causing the Vehicle to decelerate in an unsafe manner while driving.

95. During the first few months of 2019, Mr. Fiedler took his Vehicle to the repair shops at both Greico Ford and Schumacher Auto Group, both in Delray, Florida, at least three times to address the Transmission Defect.

96. Mr. Fiedler informed employees at Greico Ford and Schumacher about the issues he was experiencing with his Vehicle's transmission and requested that they fix the problem per his Vehicle's 3 year/36,000 mile warranty and 5 year/60,000 Powertrain Warranty. Mr. Fiedler was advised by employees at Greico Ford that there was no fix for the transmission issues he was experiencing, and that all Ford F-150 pickup trucks with 10-speed transmissions exhibited the same issues his Vehicle exhibited.

97. Neither Ford nor any of its agents, dealers, or representatives informed Mr. Fiedler of the Transmission Defect prior to his purchase of the Vehicle.

98. On November 15, 2019, Mr. Fiedler took his Vehicle to Pompano Ford, an authorized Ford dealer, located in Pompano Beach, Florida. The Ford authorized mechanic

reprogrammed the transmission. After the repair, the Vehicle's transmission problems seemed to improve somewhat. However, it continues to experience gear slippage at low speeds and the "clunk" noise remains, though it is less frequent.

99.     On November 27, 2019, counsel for Mr. Fiedler sent a notice letter to Ford regarding his claims being made on behalf of himself and the Class and his state's Subclass. Although Ford responded, it made no offer for classwide resolution of this Defect.

100.     Had Mr. Fiedler been advised of the Transmission Defect at or before the point of purchase, he would not have purchased his Vehicle or else would have paid significantly less for the Vehicle. Mr. Fiedler did not receive the benefit of his bargain. As a result, Mr. Fiedler has paid and continues to pay a premium for a defective Vehicle, which poses a safety hazard to himself, his family, and others.

101.     If Mr. Fiedler's F-150 transmission did not contain the Defect, he would likely lease or purchase another Ford F-150 in the future. Alternatively, if the Court were to issue an injunction ordering Defendant to comply with advertising and warranty laws and fully address the safety issue, Mr. Fiedler would likely lease or purchase an F-150 again in the future.

G.  Plaintiff Michael Barcelona

102.     Mr. Barcelona was shopping for a safe and reliable vehicle to serve as his personal household vehicle. While researching this vehicle prior to purchase, he read vehicle specification information and advertising on Ford's website about the Ford F-150, which touted its performance and reliability, but made no mention of the F-150's Transmission Defect.

103.     Mr. Barcelona recalls that the specifications and information provided by Ford on its corporate website indicated a top of the line transmission that boasted better fuel performance. The information provided on their website never indicated that as a sacrifice to fuel economy, the

10-speed transmission and driveline would operate worse than previous models of Ford pickup trucks. He expected an increase in operability and not a step in the opposite direction with this newer design. He researched the Ford F-150s online for approximately six months before visiting the Townsend Ford authorized dealership showroom. At the dealership, he spoke with a Ford sales representative who did not tell him that there were any problems with the Vehicle's Transmission, when discussing the Vehicle's features, components and performance.

104. After completing his research, and in reliance on these material omissions and misrepresentations, in June 2018, Mr. Barcelona purchased a brand new 2018 Ford F-150 Crew Cab truck from Townsend Ford in Townsend, Massachusetts (an authorized Ford dealership). Mr. Barcelona's vehicle was equipped with the defective ten-speed transmission. The purchase price of Mr. Barcelona's 2018 Ford F-150 Crew Cab was $45,988.51.

105. At the time of Mr. Barcelona's purchase, Ford knew that its F-150 10R80, ten-speed automatic transmissions were defective, but the Ford sales representative did not disclose the Defect to Mr. Barcelona when discussing the features, components and performance of the vehicle prior to purchase. In reliance on these material omissions and misrepresentations, Mr. Barcelona purchased, then operated the Vehicle, on the reasonable but incorrect belief that his Vehicle's transmission would operate properly as warranted. Had Mr. Barcelona been informed of the Transmission Defect prior to or at the time of purchase, he would not have purchased the Vehicle or else would have paid significantly less for the Vehicle.

106. At the time of purchase, the odometer on Mr. Barcelona's Vehicle showed approximately 25 miles. By the time he had driven the Vehicle 530 miles, Mr. Barcelona started to notice the transmission "slipping" and "jerking" while driving. Mr. Barcelona also noticed a

"clunking" noise during acceleration of the Vehicle, harsh shifts of the transmission, and a "thumping" noise after the Vehicle would come to a stop.

107.    On or about June 28, 2018, Mr. Barcelona took his Vehicle back to Townsend Ford, his original place of purchase, complaining of the a "clunking" noise during acceleration of the Vehicle, harsh shifts of the transmission, and "thumping" noise after the Vehicle would come to a stop.  Mr. Barcelona's repair order for that visit specifically stated, "C-S CLUNK NOISE FROM DRIVELINE WHILE DRIVING AROUND 60, LET OFF, THEN ACCEL.  CAN HAPPEN AT LOWER SPEEDS ALSO," and "C-S TRANSMISSION HAS HARSH UPSHIFTS IN STOP AND GO TRAFFIC AROUND 20-30," and "WHEN TRANS HAS HARSH SHIFT CAN FEEL IN DRIVELINE AND SEEMS TO STUTTER FROM ENGINE," and "WHEN START STOP IF SHUT OFF, AFTER VEHICLE IS AT STOP FOR 2 SECONDS CAN HEAR THUMP FROM REAR.  INTERMITTENT. LEVEL GROUND".  The Ford authorized mechanics at Townsend Ford were unable to diagnose his vehicle, with Mr. Barcelona's repair order stating, "ROADTEST VEHICLE.  DOES NOT EXHIBIT ANY ABNORMAL SYMPTOMS.  CHECK TRANSFER CASE AND DRIVELINE FOR WEAR. OK. FLUID OK.".  The Ford authorized mechanic performed a powertrain control module ("PCM") update pursuant to TSB-2262 which was intended to address the shifting issues. The mechanic also informed Mr. Barcelona that once he put 5,000 miles on the transmission the issues would stop.

108.    However, the transmission issues did not stop after driving the Vehicle 5,000 miles. On January 9, 2019, Mr. Barcelona returned to Townsend Ford complaining of the same transmission issues.  At the time of this visit, the odometer on Mr. Barcelona's Vehicle showed 8,348 miles.  Mr. Barcelona's repair order for that visit stated, "C-S VEHICLE CLUNK WHEN CRUISING, REMOVING FOOT FROM GAS, COASTING AND REAPPLYING.  HWY

SPEEDS, BACK ROADS, TURNS. WORSE HOT. FEELS LIKE DRIVELINE PLAY." Once again, the Ford authorized mechanics were unable to diagnose his vehicle, with Mr. Barcelona's repair order stating, "ROADTEST VEHICLE. DOES NOT EXHIBIT ANY ABNORMAL SYMPTOMS. CHECK TRANSFER CASE AND DRIVELINE FOR WEAR. OK. FLUID OK."

109. On or about July 9, 2019, Mr. Barcelona took his Vehicle to Colonial Ford in Marlboro, Massachusetts, an authorized Ford dealership for oil change, inspection, and to report the same transmission issues that he was experiencing since purchasing the Vehicle in June 2018. At the time of this visit, the odometer on Mr. Barcelona's Vehicle showed 14,512 miles. Mr. Barcelona's repair order for that visit stated, "CUSTOMER STATES ENGINE RATCHETING SOUND AFTER STARTING THE VEHICLE FIRST THING IN THE MORNING OR AFTER IT HAS SAT THROUGHOUT THE DAY. C/S THE ENGINE WILL MAKE RATCHETING NOISE WHEN LETTING OFF THE GAS PEDAL. C/S THIS SYMPTOM ONLY OCCURS WHEN VEHICLE IS IN GEAR AND UNDER LOAD. C/S NOISE GOES AWAY AFTER 5 MINS OF DRIVING" and "CUSTOMER STATES TRANSMISSION NOISE. C/S NOTICEABLE CLUNKING OF THE DRIVETRAIN. ESPECIALLY AT LOW SPEED (25-30MPH) AND IN THE LOWER HALF OF THE GEAR SET. COULD BE DESCRIBED AS JERKY, ROUGH. C/S HE HAS ON OCCASION NOTICEABLE CLUNK IN THE DRIVETRAIN AFTER THE VEHICLE HAS COME TO A COMPLETE STOP WITH AUTO START STOP SYSTEM DEACTIVATED. THIS CLUNK OCCURS 1-2 SECONDS AFTER THE VEHICLE HAS COME TO A COMPLETE STOP." Again, the Ford authorized mechanics were unable to diagnose his vehicle, with Mr. Barcelona's repair order stating, "CUSTOMER REQUESTS STATE INSPECTION. UNABLE TO COMPLETE STICKER AT THIS TIME.

MONITORS NOT SET, CUSTOMER WILL NEED TO COMPLETE DRIVE CYCLE PRIOR TO PERFORMING PASSING STATE INSPECTION."

110.    On or about July 22, 2019, Mr. Barcelona took his Vehicle back to Colonial Ford in Marlboro, Massachusetts, an authorized Ford dealership for oil change, to complete inspection, and to report the same transmission issues that he was experiencing since purchasing the Vehicle in June 2018.   At the time of this visit, the odometer on Mr. Barcelona's Vehicle showed 15,139 miles. Mr. Barcelona's repair order for that visit stated, "SERVICE BAY DIAG – C/S PERFORM TSB'S DEALING WITH TRANS CONCERNS. TSB 18-2354 exhibit an engine rattle noise during a deceleration – reprogram pcm to the most current version per tsb 18-2354" and "SERVICE BAY DIAG-c/s per form tsb 17-2262 – vehicle is running rough and hesitating. Reprogram pcm per recall 17-2262."  Once again, the Ford authorized mechanics were unable to diagnose his vehicle and Mr. Barcelona continues to have problems due to the Transmission Defect.

111.    The repeated trips to have his Vehicle serviced have cost Mr. Barcelona a lot of his time and have been a major inconvenience.

112.    At all times, Mr. Barcelona, like all Class Members, has driven his Vehicle in a foreseeable manner and in the manner in which it was intended to be used.

113.    Had Mr. Barcelona been advised of the Transmission Defect at or before the point of purchase, he would not have purchased his Vehicle or else would have paid significantly less for the Vehicle. Mr. Barcelona did not receive the benefit of his bargain. As a result, Mr. Barcelona has paid a premium for a defective vehicle which poses a safety hazard to himself, his family, and others.

114.     If Mr. Barcelona's F-150 transmission did not contain the Defect, he would likely lease or purchase another Ford F-150 in the future. Alternatively, if the Court were to issue an injunction ordering Defendant to comply with advertising and warranty laws and fully address the safety issue, Mr. Barcelona would likely lease or purchase an F-150 again in the future.

H.   Plaintiff Robert Marino

115.     Mr. Marino was shopping for a safe and reliable vehicle to serve as his personal household vehicle.  A few months prior to purchase, Mr. Marino viewed Ford's advertising about the 10-speed transmission online and in truck magazines. Ford's advertising stated that the F-150 was a reliable truck and touted a new and improved transmission that worked smoothly and efficiently. Mr. Marino also visited Quirk Ford in Quincy, Massachusetts (an authorized Ford dealership). At the dealership, Mr. Marino read Ford advertisements and spoke with salespeople who made similar representations regarding the vehicle and the 10-speed transmission. He was never told at the dealership that the Ford F-150 transmission had known problems.

116.     While researching this vehicle prior to purchase, he read vehicle specification information and advertising on Ford's website about the Ford F-150, which  touted its enhanced performance and reliability but made no mention of the F-150's transmission problems.

117.     In reliance on these material omissions and misrepresentations by Ford, in March 2019, he leased a brand new 2019 Ford F-150 Sport pick-up truck from Quirk Ford in Quincy, Massachusetts (an authorized Ford dealership).  Mr. Marino's vehicle was equipped with the defective ten-speed transmission.  As per the terms in the lease, Mr. Marino made a down payment of $3,000.00 plus another $5,000.00 related to his trade to lease this Vehicle for a total of $8,000.00 out of pocket. He pays $530.00 per month toward the lease of his Vehicle.

118.    At the time of Mr. Marino's lease, Ford knew that its F-150 10R80, ten-speed automatic transmissions were defective, but the Ford sales representative did not disclose the Defect to Mr. Marino when discussing the features, components and performance of the vehicle prior to lease. In reliance on these material omissions and misrepresentations, Mr. Marino leased, then operated the Vehicle, on the reasonable but incorrect belief that his Vehicle's transmission would operate properly as warranted. Had Mr. Marino been informed of the Transmission Defect prior to or at the time of lease, he would not have leased the vehicle or else would have paid significantly less for the Vehicle.

119.    Approximately two months after leasing the Vehicle, Mr. Marino started to notice a loud "clunk" or "bang" noise upon starting the engine.  While driving his Vehicle, Mr. Marino also noticed the Vehicle slipping and jerking when changing gears.

120.    Neither Ford nor any of its agents, dealers, or representatives informed Mr. Marino of the Transmission Defect prior to his lease of the Vehicle.

121.    In late December 2019, Mr. Marino had to take his Vehicle back to the Ford dealership because he was unable to drive it due to the transmission problems. For the time the Vehicle was being serviced, he was forced to incur rental car expenses. The dealership updated the Vehicle's transmission software; however, after the update, he continues to have problems due to the Transmission Defect.

122.    On November 27, 2019, counsel for Mr. Marino sent a notice letter to Ford regarding his claims being made on behalf of himself and the Class and his state's Subclass. Although Ford responded, it made no offer for classwide resolution of this Defect.

123.    Had Mr. Marino been advised of the Transmission Defect at or before the point of lease, he would not have leased his Vehicle or else would have paid significantly less for the

Vehicle. Mr. Marino did not receive the benefit of his bargain. As a result, Mr. Marino has paid a premium for a defective vehicle which poses a safety hazard to himself, his family, and others.

124.     If Mr. Marino's F-150 transmission did not contain the Defect, he would likely lease or purchase another Ford F-150 in the future. Alternatively, if the Court were to issue an injunction ordering Defendant to comply with advertising and warranty laws and fully address the safety issue, Mr. Marino would likely lease or purchase an F-150 again in the future.

I.     Plaintiff Brian Dougherty

125.     Plaintiff Brian Dougherty is a "die hard" fan of Ford vehicles, so in 2018, when he was searching for a new vehicle, his first choice was to look at new Fords. In mid-September 2018 Mr. Dougherty purchased a new 2018 Ford F-150 truck with 10-speed transmission from Ditschman Ford located in Flemington, New Jersey. Mr. Dougherty's vehicle was equipped with the defective 10-speed transmission. The purchase price of Mr. Dougherty's Vehicle was $46,543.00.

126.     At the time of Mr. Dougherty's purchase, Ford knew that its F-150 10R80, 10-speed automatic transmissions were defective, but the Ford sales representative did not disclose the Defect to Mr. Dougherty when discussing the features, components and performance of the vehicle prior to purchase. In reliance on these material omissions and misrepresentations, Mr. Dougherty purchased, then operated the Vehicle, on the reasonable but incorrect belief that his Vehicle's transmission would operate properly as warranted. Had Mr. Dougherty been informed of the Transmission Defect prior to or at the time of purchase, he would not have purchased the Vehicle or else would have paid significantly less for the Vehicle.

127.     At the time of his purchase, the odometer on Mr. Dougherty Vehicle showed approximately 40 miles. By the time he had driven the Vehicle 1,000 miles, Mr. Dougherty started

to notice that when the transmission is shifting from third to fourth gear when the engine is cold, the engine revs high, then the Vehicle slows down, and finally jumps into fourth gear. Mr. Dougherty also noticed the Vehicle would "rattle" and was jerking and rough, causing the Vehicle to decelerate and accelerate in an unsafe manner while driving.

128.     On October 26, 2018, with only 2263 miles on the odometer, Mr. Dougherty took his Vehicle to the service department at Ditschman Ford, complaining of rattling.  Although some repairs were made, many of his problems continued. The dealership kept his Vehicle for nine days for the repairs.

129.     On June 25, 2019, Mr. Dougherty took his Vehicle back to the service department at Ditschman Ford to address the Transmission Defect. At the time, his Vehicle had 16,443 miles on the odometer. The Ford authorized service department conducted various tests and attempted to repair the Vehicle, including programming the transmission. The dealership also checked Ford's hotline for relevant responses to try to figure out the problem with his Transmission.

130.     Just three days after getting his Vehicle back, on June 28, 2019, Mr. Dougherty took the Vehicle back to the Ford dealership for the same or similar problems. His Vehicle was not returned to him until July 11, 2019.

131.     At least three times, Mr. Dougherty was told that his Vehicle had been repaired and the problem was corrected, but to this day, he continues to have problems with the Transmission. The problem has never been corrected.

132.     Neither Ford nor any of its agents, dealers, or representatives informed Mr. Dougherty of the Transmission Defect prior to his purchase of the Vehicle.

133.     On August 18, 2020, counsel for Mr. Dougherty sent a notice letter to Ford regarding his claims being made on behalf of himself and the Class and his state's Subclass. Ford

responded to his notice letter but made no offer for classwide relief as Mr. Daugherty requested in his letter.

134.    Had Mr. Dougherty been advised of the Transmission Defect at or before the point of purchase, he would not have purchased his Vehicle or else would have paid significantly less for the Vehicle. Mr. Dougherty did not receive the benefit of his bargain. As a result, Mr. Dougherty has paid and continues to pay a premium for a defective Vehicle, which poses a safety hazard to himself, his family, and others.

135.    If Mr. Dougherty's F-150 transmission did not contain the Defect, he would likely lease or purchase another Ford F-150 in the future. Alternatively, if the Court were to issue an injunction ordering Defendant to comply with advertising and warranty laws and fully address the safety issue, Mr. Dougherty would likely lease or purchase an F-150 again in the future.

J.    Plaintiff Susan Heller

136.    In February 2018, Plaintiff Susan Heller purchased her 2018 Ford F-150 with a 10R80 Transmission. She purchased the Vehicle from the Healey Ford Lincoln dealership located in Goshen, New York, which was near her former home in Florida, New York. At the time, the Vehicle was brand new with only 8 miles showing on the odometer.

137.    Prior to buying the F-150, she drove a Ford Edge. She had never heard of any problems with the 10-speed transmission in the Ford F-150. She was shopping for a safe and reliable vehicle and needed a truck instead of a small SUV to serve as her personal vehicle and to commute to and from work.  The purchase price of Ms. Heller's Vehicle was $48,703.74.  In addition to the Vehicle's regular 3 year/36,000 mile warranty with the 5 year/60,000 mile powertrain warranty, Ms. Heller also purchased a 5-year, 100,000 mile extended warranty from Portfolio MBI.

138. At the time of Ms. Heller's purchase, Ford knew that its F-150 10R80, 10-speed automatic transmissions were defective, but the Ford sales representative did not disclose the Defect to Ms. Heller when discussing the features, components and performance of the vehicle prior to purchase. In reliance on these material omissions and misrepresentations, Ms. Heller purchased, then operated the vehicle, on the reasonable but incorrect belief that her Vehicle's transmission would operate properly as warranted. Had Ms. Heller been informed of the Transmission Defect prior to or at the time of purchase, she would not have purchased the Vehicle or else would have paid significantly less for the Vehicle.

139. In June 2018, when Ms. Heller had driven her Vehicle about 5,000 miles, she began noticing that the transmission had problems. It was sometimes "slipping" and "jerking" while driving, mostly not engaging after stopping. It would clunk and fail to engage immediately in an unsafe manner while driving around other vehicles. She took it for inspection at the Healey Ford dealership at 5568 miles, but the service department said they found no problem.

140. On July 11, 2018, she returned to the Ford dealership for the same clunking and slipping problems, but again, the Healey Ford dealership's service department said they found nothing wrong.

141. In August 2018, frustrated with her on-going problems with her new Vehicle and the Ford dealership's inability to identify either the problem or a solution, Ms. Heller made a complaint to Ford's corporate customer service department. She was assigned Case Number 15605073. In addition, on August 18, 2020, counsel for Ms. Heller sent a notice letter to Ford regarding her claims being made on behalf of herself and the Class and her state's Subclass. Ford has not yet responded.

142. Ms. Heller took her Vehicle to the Leo Kaytes Ford dealership located in Warwick, New York for the same sort of issues when her transmission problems were continuing in early October 2018 and received the same response: the service department found nothing wrong with her Vehicle. Time after time, Ms. Heller has spent her valuable time seeking relief from Ford and its authorized dealerships to no avail.

143. Every time Ms. Heller has sought help with her Vehicle's transmission problems, Ford has failed to repair or replace anything. She has spent an excessive amount of her time trying to have her Vehicle repaired yet that has still not happened.

144. As of September 2020, Ms. Heller has just over 40,000 miles on her Vehicle, it still clunks when it is started, and it still has the same delay and jerking of the transmission when accelerating. Although this does not occur every single day, it does randomly happen approximately once a month or more and is a safety hazard when it occurs.

145. Neither Ford nor any of its agents, dealers, or representatives informed Ms. Heller of the Transmission Defect prior to her purchase of the Vehicle.

146. Had Ms. Heller been advised of the Transmission Defect at or before the point of purchase, she would not have purchased his Vehicle or else would have paid significantly less for the Vehicle. Ms. Heller did not receive the benefit of her bargain. As a result, Ms. Heller paid and continues to pay a premium for a defective Vehicle, which poses a safety hazard to herself, her family, and the public.

147. If Ms. Heller's F-150 transmission did not contain the Defect, she would likely lease or purchase another Ford F-150 in the future. Alternatively, if the Court were to issue an injunction ordering Defendant to comply with advertising and warranty laws and fully address the safety issue, Ms. Heller would likely lease or purchase an F-150 again in the future.

K.  Plaintiff Victor M. Orndorff

148.    Mr. Orndorff was shopping for a safe and reliable vehicle to serve as his personal vehicle and to commute to and from work.  As a result of his research prior to purchase, in September 2018, he purchased a brand new 2018 Ford F-150 Super Cab with 10-speed transmission pick-up truck from Chapman Ford in Columbia, Pennsylvania (an authorized Ford dealership).  Mr. Orndorff's vehicle was equipped with the defective 10-speed transmission.  The purchase price of Mr. Orndorff's Vehicle was $36,487.

149.    At the time of Mr. Orndorff's purchase, Ford knew that its F-150 10R80, 10-speed automatic transmissions were defective, but the Ford sales representative did not disclose the Defect to Mr. Orndorff when discussing the features, components and performance of the vehicle prior to purchase. In reliance on these material omissions and misrepresentations, Mr. Orndorff purchased, then operated the Vehicle, on the reasonable but incorrect belief that his Vehicle's transmission would operate properly as warranted. Had Mr. Orndorff been informed of the Transmission Defect prior to or at the time of purchase, he would not have purchased the Vehicle or else would have paid significantly less for the Vehicle.

150.    At the time of purchase, the odometer on Mr. Orndorff's Vehicle showed 10 miles. By the time he had driven the Vehicle 6,000 miles, Mr. Orndorff started to notice a loud "clanking" noise from his transmission. While driving the Vehicle, Mr. Orndorff also noticed the Vehicle would shift gears in a "rough" manner with unusually long shift times causing the vehicle to decelerate in an unsafe manner while driving.

151.    In roughly the Fall of 2018, Mr. Orndorff took his Vehicle to the repair shop at Chapman Ford, an authorized dealership and repair facility, in Columbia, PA. Mr. Orndorff informed employees at Chapman Ford about the issues he was experiencing with his Vehicle's

transmission and requested that they fix the problem per his Vehicle's 3 year/36,000 mile warranty and 5 year/60,000 Powertrain Warranty. Mr. Orndorff was advised by employees at the repair shop that there was no fix for the transmission issues he was experiencing and that all Ford F-150 pickup trucks with 10 speed transmissions exhibited the same loud "clank" or "bang" noise and slipping and jerking while starting the engine, accelerating or shifting gears.

152.    In the Spring of 2019, after continuing to experience the same issues with his Vehicle's transmission, Mr. Orndorff contacted the Ford corporate office and informed Ford of the issues he was experiencing with his Vehicle's transmission and requested that Ford fix the problem per his Vehicle's warranty. Mr. Orndorff was told to take his Vehicle to Gene Latta Ford in Hanover, Pennsylvania. Ford's corporate office advised Mr. Orndorff that Gene Latta Ford was a "Premier Dealership." Again Mr. Orndorff was told by employees at the repair shop that there was no fix for the transmission issues he was experiencing and that all Ford F-150 pickup trucks with 10 speed transmissions exhibited the same loud "clank" or "bang" noise and slipping and jerking while starting the engine, accelerating or shifting gears.

153.    On or about September 5, 2019, after continuing to experience the same issues with his Vehicle's transmission, Mr. Orndorff took his Vehicle to the repair shop at Crouse Ford, an authorized dealer and repair shop, in Taneytown, MD.  Mr. Orndorff informed the repair shop of the issues he was experiencing with his Vehicle's transmission and requested that they fix the problem per his Vehicle's warranty. Again Mr. Orndorff was advised by employees at the repair shop that there was no fix for the transmission issues he was experiencing and that all Ford F-150 pickup trucks with 10 speed transmissions exhibited the same loud "clank" or "bang" noise and slipping and jerking while starting the engine, accelerating or shifting gears.

154.     On November 27, 2019, counsel for Mr. Orndorff sent a notice letter to Ford regarding his claims being made on behalf of himself and the Class and his state's Subclass. Although Ford responded, it made no offer for classwide resolution of this Defect.

155.     Neither Ford nor any of its agents, dealers, or representatives informed Mr. Orndorff of the Transmission Defect prior to his purchase of the Vehicle.

156.     Had Mr. Orndorff been advised of the Transmission Defect at or before the point of purchase, he would not have purchased his Vehicle or else would have paid significantly less for the Vehicle. Mr. Orndorff did not receive the benefit of his bargain. As a result, Mr. Orndorff has paid and continues to pay a premium for a defective vehicle which poses a safety hazard to himself, his family, and others.

157.     If Mr. Orndorff's F-150 transmission did not contain the Defect, he would likely lease or purchase another Ford F-150 in the future. Alternatively, if the Court were to issue an injunction ordering Defendant to comply with advertising and warranty laws and fully address the safety issue, Mr. O'Connor would likely lease or purchase an F-150 again in the future.

L.   Plaintiff Michael McDonald

158.     Mr. McDonald was shopping for a safe and reliable vehicle to serve as his personal vehicle and to commute to and from work. He began his research prior to purchase by reviewing Ford's corporate website a couple of months before going to Pegues-Hurst Ford in August 2018. He saw Ford's advertising about the F150 10-speed Transmission online while researching new vehicles to purchase for himself and his wife. The advertisements stated the transmission was reliable, smooth, and efficient. The advertisements did not say that his new F150 10-speed transmission Vehicle would jerk each time it goes from third to fourth gear; that it would not go into reverse for hours at a time; or that it would lurch forward in a whipping motion at times.

159.    Prior to his purchase, Mr. McDonald also viewed Ford's advertisements on Pegues-Hurst Ford's website (an authorized Ford dealer) which again claimed that the transmission was reliable, smooth, and efficient. Mr. McDonald viewed the same advertising at the Pegues-Hurst Ford showroom on the day he purchased his vehicle.

160.    As a result of his research prior to purchase, and in reliance on these material omissions and misrepresentations, in August 2018, he purchased a 2018 Ford F-150 truck with 10-speed transmission from Pegues-Hurst Ford in Longview, Texas. Mr. McDonald's vehicle was equipped with the defective 10-speed transmission. The purchase price of Mr. McDonald's Vehicle was $36,302.24.

161.    At the time of Mr. McDonald's purchase, Ford knew that its F-150 10R80, 10-speed automatic transmissions were defective, but the Ford sales representative did not disclose the Defect to Mr. McDonald when discussing the features, components and performance of the vehicle prior to purchase. In reliance on these material omissions and misrepresentations, Mr. McDonald purchased, then operated the Vehicle, on the reasonable but incorrect belief that his Vehicle's transmission would operate properly as warranted. Had Mr. McDonald been informed of the Transmission Defect prior to or at the time of purchase, he would not have purchased the Vehicle or else would have paid significantly less for the Vehicle.

162.    At the time of purchase, the odometer on Mr. McDonald's Vehicle showed approximately 4 miles. By the time he had driven the Vehicle 32,000 miles, Mr. McDonald started to notice the Transmission "slipping" and "jerking" while driving.  Mr. McDonald also noticed the Vehicle would "wind" when starting and would stay in a low gear too long and then "clunk" when downshifting, causing the Vehicle to decelerate in an unsafe manner while driving. Further,

Mr. McDonald noticed the Vehicle lunging forward, stalling between gears, not going into reverse on occasion, and making loud metal on metal noises.

163.    On or about September 16, 2019, Mr. McDonald took his vehicle back to Pegues Hurst Ford, his original place of purchase, complaining of a harsh shift between gears to the authorized Ford dealer and mechanics.  Mr. McDonald's repair order for that visit specifically stated, "C/S THAT HAS A HARD SHIFT FROM 1ST TO 2ND GEAR AT TIMES."  The Ford authorized mechanics at Pegus Hurst Ford  were unable to diagnose his vehicle, with Mr. McDonald's repair order stating, "TEST DRIVE CHECK OUT NO STORED CODES, RUN OASIS AND CHECKED TSB'S AND SSM'S NOTHING PERTAINING TO THIS CONCERN, TEST DROVE AND WAS UNABLE TO DUPLICATE CUSTOMERS CONCERN AT THIS TIME.  NO UPDATES AVAILABLE. RETEST DROVE AND COMPARED TO LIKE VEHICLE. TRANS. IS OPERATING AS DESIGNED.  NO PROBLEM FOUND AT THIS TIME." The Ford authorized dealer told Mr. McDonald that the 10-speed transmissions are "squirrely."

164.    Less than one month later, November 13, 2019, Mr. McDonald took his vehicle back to Pegues Hurst Ford complaining of the transmission defect again, and this time, Mr. McDonald's repair order for that visit specifically stated, "CHECK FOR 20-30 MPH 3RD TO 4TH DIDN'T SHIFT, WAS BETWEEN GEARS STUCK IN ROAD, THEN WOULD NOT GO INTO REVERSE, WHEN DID SLAMMED IN TO GEAR, SOUNDED LIKE SOMETHING TRANS, REPORT." The Ford authorized mechanics at Pegus Hurst Ford were unable to diagnose his vehicle, with Mr. McDonald's repair order stating, "NPF RUN SELF TEST, TEST DROVE TWICE AND WAS UNABLE TO DUPLICATE CONCERN."  Once again, the Ford authorized dealer told Mr. McDonald that the 10-speed transmissions are "squirrely."  Additionally, the Ford

authorized Dealer Manager stated that they could not repair anything that Ford would not authorize them to repair.

165.    On January 24, 2020, Mr. McDonald filed a complaint with the NHTSA on Safercar.gov referenced as Complaint Number 11301581 stating as follows:

> "THAT HAS A HARSH SHIFT FORM 1ST TO 2ND GEAR Reported to Dealer-Pegues Ford in Longview, Texas on 10/10/2019 with 33,521 miles on the vehicle. Dealer stated that the truck has a 10 speed transmission and they are "Squirrely" and that is just how they are. 11/13/2019 from 20-30 MPH 3RD TO 4TH DIDN'T SHIFT, WAS BETWEEN GEARS STUCK IN ROAD. THEN WOULD NOT GO INTO REVERSE. WHEN DID SLAMMED INTO GEAR, SOUNDED LIKE SOMETHING HAMMERING IN TRANSMISSION. Vehicle has 33,339 miles on it. Service department said that is just how the 10 speed transmission is. "Squirrely". The vehicle was in the service department for over 36 days during the two trips to the service department. On 1/17/2020 drove to dealer and talked with sales rep and manager at Pegues Hurst Ford to attempt trade and discuss continuing problem with the transmission – Manager stated "We can only fix what Ford tells us to. I would call Ford and discuss with them repairing your vehicle or getting a new one. When crossing US HWY 79 from 1408 in Jacksonville, Texas, which is done daily, the vehicle will stall and or stop and then lurch forward from 3rd to 4th gear and when putting into reverse there is a loud metal on metal sound and one occasion when the vehicle would not shift into reverse until later that day".

166.    Despite the repair attempts by Ford and its dealers, Mr. McDonald continues to experience the Transmission Defect, including but not limited to, transmission slips, bucking, kicking, jerking, harsh engagement, premature internal wear, sudden acceleration, delay in downshifts, and delayed acceleration. Most recently, the Vehicle lurches backwards each time he is able to get the vehicle into reverse. He must keep his foot on the brake so as to prevent the Vehicle from hitting objects while putting it into reverse.

167.    At all times, Mr. McDonald, like most other Class members, has driven his vehicle in a foreseeable manner and in the manner in which it was intended to be used.

168.     Neither Ford nor any of its agents, dealers, or representatives informed Mr. McDonald of the Transmission Defect prior to his purchase of the Vehicle.

169.     On August 18, 2020, counsel for Mr. McDonald sent a notice letter to Ford regarding his claims being made on behalf of himself and the Class and his state's Subclass. Ford responded but offered no classwide relief as Mr. McDonald requested.

170.     Had Mr. McDonald been advised of the Transmission Defect at or before the point of purchase, he would not have purchased his Vehicle or else would have paid significantly less for the Vehicle. Mr. McDonald did not receive the benefit of his bargain. As a result, Mr. McDonald has paid and continues to pay a premium for a defective Vehicle, which poses a safety hazard to himself, his family, and others.

171.     If Mr. McDonald's F-150 transmission did not contain the Defect, he would likely lease or purchase another Ford F-150 in the future. Alternatively, if the Court were to issue an injunction ordering Defendant to comply with advertising and warranty laws and fully address the safety issue, Mr. McDonald would likely lease or purchase an F-150 again in the future.

III.     DEFENDANT KNEW OR SHOULD HAVE KNOWN OF THE TRANSMISSION DEFECT PRIOR TO PLAINTIFFS' PURCHASES

A.     Ford Knew of and Refused to Remedy the Transmission Defect.

172.     Since the 10R80 transmission was introduced and equipped in the Class Vehicles, drivers have repeatedly complained about difficulty shifting and vehicle lunging and/or jerking to Ford.  During the class period there was an unusually large number of complaints of harsh and belabored transmission shifting such that Ford was put on notice of a specific problem.

173.     Namely, as the consumer complaints below indicate, Ford was aware, or should have been aware, that the Transmission Defect was present in the Class Vehicles dating back to

before March 2018, the date Ford issued its first TSB. Prior to that date, it is logical to assume that Ford had to open an internal investigation that led to its TSB.

174.    Thus, by early 2018, Ford knew or should have known through sufficient product testing, consumer complaints, or other methods, that the Class Vehicles contained the Transmission Defect.

175.    Upon information and belief, the Class Vehicles contain one or more defects in materials, components, construction or design, including but not limited to, the Transmission Defect, as described herein.

176.    Upon information and belief, faced with the fact that Class Vehicles were not properly shifting due to the Transmission Defect, Ford has issued multiple Technical Service Bulletins ("TSBs") addressing the shifting problems.

177.    The TSBs stated 2017 and 2018 F-150 vehicles "may exhibit harsh/bumpy upshift, downshift and/or engagement concerns."[7] The TSBs suggested reprogramming the powertrain control module ("PCM"). The TSBs further stated that the Class Vehicles were "equipped with an adaptive transmission shift strategy which allows the vehicle's computer to learn the transmission's unique parameters and improve shift quality. When the adaptive strategy is reset, the computer will begin a re-learning process. This re-learning process may result in firmer than normal upshifts and downshifts for several days."[8]

178.    Upon information and belief, and the actual experience of Plaintiffs, Ford's "adaptive transmission shift strategy" fails to remedy the Transmission's shifting problems reported in Class Vehicles.

---

[7] Source: https://static.nhtsa.gov/odi/tsbs/2018/MC-10149749-9999.pdf (last viewed July 30, 2019).
[8] Source: https://static.nhtsa.gov/odi/tsbs/2018/MC-10149749-9999.pdf (last viewed July 30, 2019).

179.    Despite this knowledge, Ford took no further steps to remedy this issue, leaving Plaintiffs and the other Class Members with knowingly defective Class Vehicles.

B.    <u>Customers Repeatedly Complained About Harsh and Erratic Shifting and Vehicle Lunging, Hesitation, and Jerking.</u>

180.    Hundreds, if not thousands, of purchasers and lessees of the Class Vehicles have experienced the Transmission Defect. Complaints filed by consumers with the NHTSA and posted on the Internet demonstrate that the Transmission Defect is widespread. Not only have consumers complained about harsh and bumpy shifting, but this defect has often led to potentially life-threatening situations. In addition, these complaints illuminate Ford's awareness of the Transmission Defect and its potential danger (note that spelling and grammar mistakes remain as found in the original).

**2017 Ford F-150**

<u>NHTSA Complaint dated May 20, 2019</u>:  original problem was transmission slamming into gear and slipping when accelerating. the truck was kept at agency for 2 1/2 weeks. service manager told me that ford instructed him to quit working on it. problem of slipping still exist and recently the vehicle jumped out of gear when i was merging onto the interstate, i do not feel safe driving this vehicle. (ID No. 11208720)

<u>NHTSA Complaint dated April 12, 2019</u>: transmission will stick and not change gears. like a dead spot and truck would not go faster. this has happened several times. (ID No. 11195806)

<u>NHTSA Complaint dated April 8, 2019</u>:  traveling down my driveway, coming to a stop and the transmission gets stuck in 3rd gear. it won't down shift into 1st gear so it won't move forward. i put the shifter into reverse and i am able to back up. put shifter into drive and still stuck in 3rd gear. back up to my house and park the truck not able to go anywhere. go into the house wait a couple of hours and then try it again and everything is okay. this has happened to me 3 other times. (ID No. 11195452)

<u>NHTSA Complaint dated March 14, 2019</u>:  vehicle lost all power while accelerating thru an intersection. the orange wrench illuminated on the dash with "check manual". i noticed the transmission not shifting down and up smoothly. it tried to start the truck off in 5th gear from a stop. after being shut down for an hour, the issue went away. dealer scanned it this morning and said no code was stored. (ID No. 11079161)

NHTSA Complaint dated January 3, 2018: wind noise is heard coming from both front doors. Dealer claims this is a known issue with the new aluminum body but they don't have a fix. The 10 speed transmission shutters at random. (ID No. 11058299)

NHTSA Complaint dated November 18, 2017: 4500 miles on vehicle, never towed anything, only normal city/highway driving, no long trips ever taken. was turning left at intersection and transmission seemed to slip, truck still made it through, I then noticed that a yellow "wrench" light came on, I assumed this was for my upcoming 5k mile oil change. I didn't think much of the "slip" and assumed it was an anomaly. I then got onto the highway and noticed the truck was behaving strangely, power was inconsistent, I attempted to put it into cruise control and it refused to activate. I got off of highway and turned left at an intersection, starting from a complete stop the truck lurched forward and then slipped out of gear and stalled out in the intersection. if a car was coming I would have easily been struck. I let it sit for a few seconds and then the transmission finally got into, and stayed in, first gear. at first it went into gear and then slipped out of gear. this "wrench" light was apparently a limp home mode, another complaint, besides the stalling, would be the fact that this little yellow wrench light does nothing to warn me that the truck is actually in an impaired state, a "limp" mode. I work in the aerospace industry and this would never be tolerated, a function that hampers the normal performance of your vehicle should be easy to recognize as a warning, a little yellow wrench looks like a service light. (ID No. 11047221)

**2018 Ford F-150**

NHTSA Complaint dated May 13, 2019: intermittent transmission hesitation under acceleration, while pulling into traffic from a side street. without warning the truck completely cuts out. the engine is still running but there is no forward acceleration from the truck. this lasts about 10 seconds. two incidents so far. also very heavy, abrupt shifting, jerking shifting. also intermittent when shifting the truck into reverse while stationary there is a loud heavy clunk from the transmission. (ID No. 11207153)

NHTSA Complaint dated April 17, 2019: with 2018 f-150 10 speed transmission is shifting hard an down shifts hard getting whiplash. downstairs too hard been at the dealership today is the second time they constantly act like there's nothing wrong with the vehicle av to reset it once before still having major problems with that new transmission. so basically in inner-city driving is somebody was to jump in front of the vehicle with downshift quickly giving driver or any passengers whiplash stop the vehicle not a very safe or practical build can cause accidents and give major problems if anybody has bad backs or necks was not disclosed at time of sale of a hard shifting transmissions. (ID No. 11196876)

NHTSA Complaint dated April 11, 2019: my truck has 15,000 miles on it. the acceleration will run away frequently (press the pedal and there is a severe lag and lack of power). there will be random engine noise when decelerating around 45 miles per hour. also, acceleration will be rough when going from 20-30 miles per hour just before the it shifts into a higher gear. i took this to the ford dealer and they said there are no error codes on the trucks computer system. also, the steering will be stiff or unaligned at random times. please assist in getting these issues corrected. (ID No. 11195550)

NHTSA Complaint dated March 26, 2019:  tl* the contact owns a 2018 ford f-150. while driving various speeds, the vehicle hesitated to accelerate while depressing the accelerator pedal. also, a clunking noise was present when the transmission switched gears and the vehicle felt different. the vehicle was not diagnosed or repaired. nye ford (1555 upper lennix ave, onye, ny) and the manufacturer were notified of the failure. the vin was not available. the failure mileage was 14,000. (ID No. 11191541)

NHTSA Complaint dated March 4, 2019:  since purchasing the truck, the 10 speed automatic transmission doesn't seem to shift smoothly in many gears. it seems to lurch when shifting at often times and will skip gears when sifting quite frequently. for a new vehicle it doesn't shift smoothly at all. it's been serviced at an authorized ford dealer where they told me the transmission was reprogrammed due to a technical service bulletin but even since then it still doesn't shift smoothly. it happens pretty much everyday or every time i drive it since it was purchased. (ID No. 11184182)

NHTSA Complaint dated February 20, 2019:  this vehicle generally exhibits harsh upshifts (3rd-to-4th) and downshifts (4th-to-3rd) as indicated on the driver's ip. (ID No. 11181413)

i have experienced multiple occasions when the vehicle will "miss" the shift from 3rd to 4th, normally when cold and under light to moderate throttle conditions. the gear indicator briefly shows 1st gear, however, i was able to apply full throttle (100% accel pedal), but had no power to the wheels (drive is not engaged), engine speed rose to approximately 3000 rpm. this condition lasted for about 2-3 secs before it shifted to 4th, the revs settled to normal/expected range and drive to the wheels was re-engaged. **this is an extremely dangerous condition that leaves me without power to safely accelerate, or merge with traffic.** (ID No. 11181413) (emphasis added).

NHTSA Complaint dated February 20, 2019: tl* the contact owns a 2018 ford f-150. while driving various speeds, the transmission downshifted on its own. the vehicle was taken to joel confer ford (2935 penns valley pike, centre hall, bellfornte, pa) on several occasions for the same failure and the transmission control module was reprogrammed; however, the failures continued. the **manufacturer was notified of the failures, but no assistance was offered.** the vin was not available. the failure mileage was 10,000. *tt*jb (ID No. 11181310) (emphasis added).

NHTSA Complaint dated February 13, 2019:  transmission downshifts hard, delays of power to rear wheels, clunking noise, shuddering. been to dealership,3 times for transmission. dealership said i need to drive the truck until transmission gets worse before they can fix it. **dealership said im wasting their time with warranty work. ford will not take action to help. transmission problems make the truck unsafe to drive** along with its severe steering problems. please someone please help me before myself or my kids or someone else gets injured due to this unsafe truck and negligent dealership and ford (ID No. 11179963) (emphasis added).

NHTSA Complaint dated February 9, 2019: 10-speed transmission hesitates/randomly shifts constantly during driving. when stopping at traffic lights, after being completely stopped, the vehicle lurches and an audible clunk can be heard from the transmission. it has always been sluggish when accelerating, today that has gotten far worse and the transmission light is on. i had a 45 minute drive home and the truck struggled to get up to 40 mph. this erratic transmission

behavior makes it dangerous to drive in any kind of traffic or on the highway because you can't predict how the vehicle will behave when pushing the gas pedal. (ID No. 11175904)

NHTSA Complaint dated January 18, 2019: the transmission can not decide which gear to be in creating pauses of power distribution to the rear wheels. the transmission shifts hard and pulls the vehicle back and forth creating loud clunking noises and rattling the passengers. the poor operation of the transmission creates unsafe driving conditions. (ID No. 11170881)

NHTSA Complaint dated January 18, 2019: vehicle will sometimes hesitate during acceleration and transmission will slip - engine rpms will rise to about 2000 and then transmission will engage with a heavy clunk in the drive train. this issues has happened when engine is cold and at normal operating temp. the vehicle currently has 9000 miles on the odometer and has happened five(5) times already. took to local dealer and they are unable to doplicate (ID No. 11166063)

NHTSA Complaint dated December 13, 2018: my truck occasionally does not accelerate from a stop at the correct speed. the rpms go way up but the truck barely moves. i described it to the dealer as being in 1/2 of 1st gear, but even then it does not feel totally connected between engine and transmission. it was much worse during hot weather. (ID No. 11161192)

NHTSA Complaint dated November 8, 2018: while driving 60mph up a slight incline on the interstate, the truck stopped decelerating. the engine rpms jumped up. fortunately i was in the right hand lane and pulled to the shoulder and out of traffic. i was able to rev the rpms and no acceleration, while the gear indicator continued to read "d." it appeared the transmission slipped out of all gears. i coasted to a stop and apologized to my friend for the language as i was on a handsfree call. i placed the gear selector in park, noticed that there were no warning indicators on the dash, and shut off the truck. i pulled out the manual and tried to think of what to do next. finding no solutions, a friend suggested before i call a tow truck, to start it up and try to put it in drive. i did, and it went into gear normally. it has not happened again, however it has had a few unusually aggressive gear changes. i do not trust this truck with the coyote v-8 engine and 10-speed transmission combination. (ID No. 11161177)

NHTSA Complaint dated December 7, 2018: tl* the contact owns a 2018 ford f-150. the contact stated that the transmission shifted unevenly in the first three gears. when the vehicle was started initially, the rpms increased and decreased. the contact called koons sterling ford (46869 harry byrd hwy, sterling, va 20164, (703) 430-7700) and was informed that there was no recall for the failure. a diagnostic appointment was scheduled for a recall that was unrelated to the failure. the manufacturer was not contacted. the failure mileage was 13,000. (ID No. 11156801)

NHTSA Complaint dated December 7, 2018: 10 speed automatic transmission. transmission makes noise, shifts hard when cold, bucks and surges at lower speeds, downshifts are harsh. dealer states this is all normal behavior for this transmission. worst automatic i have ever owned. (ID No. 11156896)

NHTSA Complaint dated November 17, 2018: 10 speed transmission has been an ongoing issue, was hopeful it would resolve itself once the 5k mile break-in period was surpassed. transmission is awkward, clumsy and spends too much time hunting between gear shifts. my 2013 f150 with

105k miles on it drives noticeably smoother. ford dealer ok with no real explanation for customers. (ID No. 11152174)

NHTSA Complaint dated October 8, 2018:  transmission has intermittent slipping and very rough up and down shifting. it also has intermittent rough hot start (truck kicks forward as if it wants to take off during start up). the truck also has problems shifting while on "sport" mode in which it will not shift up to the next gear even as it reaches the red line in the tachometer. these problems have progressively increased since i bought the truck back in november 2017 **i have brought up these concerns to two separate ford dealers and both stated i had to get used to the shifting in this new 10 speed transmission. both dealers also stated that they've had lots of costumer complaints regarding my concern but have not received any direction from ford.** my concern is that the transmission might lock up, seize or have a catastrophic failure in which fluid would spill on the roadway and cause me to loose control of the truck. i have looked into several forums and found lots of people with similar complains regarding this 10 speed transmission. please help...thank you. (ID No. 11139060) (emphasis added).

NHTSA Complaint dated September 6, 2018:  same issues I'm reading here. vehicle frequently makes a loud bang when started. shifts gears extremely rough to the point where you're jerked around. no power when trying to accelerate from a stop which is extremely dangerous when cars are behind you or trying to accelerate merging onto the freeway. my truck has been to dealer twice now. the first time it was because my fuel injector went out at 4,500 miles! it doesn't run much better now. when i took it in they just blew me off and said it was "normal behavior for the vehicle. reading all these issues here, ford really needs to take action! extremely dangerous!! (ID No. 11124723)

NHTSA Complaint dated August 23, 2018: 10-speed transmission: the transmission shifts very badly. jerky shifting and often times the truck is sluggish when starting from a stop, often times to the point of acting like the engine is about to die. the only way to partially correct this issues is to drive aggressively and take off from a start with more throttle than one would normally want to. occasionally you can hear/feel a knock from under the truck - underneath the driver's seat when you start the truck and place the transmission in drive. other times when you start the truck and quickly place the transmission in drive the engine will cut off all while your right foot is still on the brake pedal. on one occasion while i was driving through an intersection on a highway at a slow speed (3 - 5 mph?) behind a car which made a right hand turn, i started accelerating and a very loud bang noise occurred that sounded like two cars hitting one another and a hard shake was felt. i checked my mirrors because i thought someone had rear-ended me. just this terrible 10-speed transmission. **all of what i have described is after taking the truck to 2 different ford dealerships. all they have done so far is to re-install software.** i plan to take it back to a dealership for the third time hoping that maybe someone might test drive it and actually drop the transmission oil pan and actually look at the transmission. maybe if i am lucky the transmission will self-destruct. (ID No. 11121927) (emphasis added).

NHTSA Complaint dated August 4, 2018: truck downshifts very erratically and harsh from 6th to 5th gear while braking, causing the brake pedal to be pushed down at various pressures due to the truck lunging forward because of the erratic and harsh downshift from 6th to 5th gear. truck does not feel safe, the downshift is so erratic and harsh that it feels as if you are being rear ended.

i have allowed time for the transmission to "learn" as stated in the manual but it has not changed. (ID No. 11119910)

NHTSA Complaint dated April 20, 2018:  10 speed transmission hazards: when braking the transmission lunges into to lower gears and surges forward erratically requiring varying brake pressure to stop. acceleration is also erratic, sometimes delayed, sometimes immediate. the ford dealership does not have a solution and ford will not responds to calls. the erratic behavior of the transmission makes the vehicle dangerous. (ID No. 11089179)

NHTSA Complaint dated April 9, 2018:  tl* the contact owns a 2018 ford f-150. while driving approximately 10 mph with the vehicle in first gear, the vehicle shifted into neutral. a few seconds later, the vehicle shifted into second gear. the contact stated that the failure recurred fifteen times. the vehicle was taken to the dealer (moberly motors ford in moberly, missouri, 660-263-6000) determined that the vehicle performed normally. **the vehicle was not repaired. the manufacturer was notified of the failure. the approximate failure mileage was 521.** (ID No. 11084065)(emphasis added).

NHTSA Complaint dated February 14, 2018:  my truck since day one 12-08-2017 has had drivetrain issues erratic shifting , clunking in rear and front drive trains. This morning went pull out it felt like it pop out of gear then in thumped back into gear this happened twice.

Before today the dealer has reprogrammed the firmware with thee 2 tsb
Tsb 17-2262.
Tsb 17-2272.

Iit helped some but not getting better it is very erratic and i am concerned that it is going to become a safety issue (ID No. 11072824)


**2019 Ford F-150**

NHTSA Complaint dated August 9, 2020: From 4th to 10th gear the transmission is hunting / surging. This is worse in a downshift from 10th to 9th and from 9th to 8th. It is extremely aggravating to purchase a new vehicle and have so many problems. The dealership says it is the transmission acting different to my driving style because it is adapted to how my wife drives. That's a terrible excuse for all ford employees to use because ford hasn't given them a clear answer. This design flaw should be rectified. This is the dream truck my wife and i have always wanted. We decided to spend a little more than we should have to get what we wanted and we have been entirely let down. Please fix this, ford. Do the right thing. (ID No. 11344203)

NHTSA Complaint dated July 16, 2020:  I bought new in june 2019 the following month the transmission upshifts downshifts extremely harsh from gears 3,4,5,6 transmission also over revs like clutch is held in when upshifting. Vehicle will drop down 5 gears from highway speeds. When coming to stops it sometimes lurches forward fast almost rear ending cars multiple times. It has been reprogrammed, serviced multiple times, transmission valve body was replaced and still to this day problem getting worse. My ford shop put a flight recorder in and verified all the

issues. Waiting for ford engineers to fix this issue. 2 other issues that started almost day one was rear differential leaked, four wheel drive solenoids replaced along with 4x4 wheel hubs. My ford mechanics are great but it's ford moco that is the issue. My ford repair shop is waiting for them to provide a solution. I don't hall or tow anything in this truck. It's used like a car. (ID No. 11339695)

NHTSA Complaint dated May 28, 2020: I recently just purchased my 2019 ford f150 with the 10 speed transmission. Ever since i bought this truck the transmission has been making this clunking sound and jerks very hard. These trucks are very expensive to have them clunk and shift hard and jerk. Ford needs to find a solution to fix these issues with this transmission. It also lurches when its downshifting which could potentially cause an accident. *tr (ID No. 11326425)

NHTSA Complaint dated February 20, 2020: 10R80 10-speed automatic transmission / driveshaft makes loud bang or clunk noise when first starting the engine.the clunking noise continues when you accelerate (light or heavy) and take your foot off throttle the clucks/ bangs are so strong you feel like someone reared you. The automatic transmission jerks and slipped when shifting gears up or down. When city driving transmission / driveshaft clucks/ bangs more because of stop and go. On the highway transmission downshifts and up shifts for no reason and 4 to 6 second delay in throttle response. Have had it to dealership 5 times. First time dealer reset tcm program to "relearn" shifts. Didn't fix problem. Second time checked grease in yolk. Grease full. **Still not fixed. 3rd, 4th, and 5th time dealership called ford "hotline" for repair or fix. No call back or fix from ford to date.** (ID No. 11310260)(emphasis added).

NHTSA Complaint dated January 19, 2020: transmission make a loud bang when starting vehicle. Upon acceleration at highway speeds when transmission shifts from 10th to 6th gear it it so violent it feels like i have been rear ended by another car. Sometimes transmission will have a 3-4 second delay to go into reverse and then makes a loud bang when reverse engages. Spermatic hard shifting. All these problems started at about 20,000 miles. (ID No. 11300268)

NHTSA Complaint dated December 26, 2019: The 10 speed transmission is inconsistent in shifting especially when cold ... Also grabs and clunks if slightly rolling backwards when moved to drive (inconsistent). Creates unpredictable driving situations. (ID No. 11291388)

**2020 Ford F-150**

NHTSA Complaint dated May 25, 2020: After 6 weeks of ownership and 1000 miles of usage, i had a few examples of potential transmission issues. First i had a couple of examples of clunks when beginning to drive immediately after start up. A couple days ago i had the worst experience yet. After pulling into a parking spot to wait for a curbside pickup, i turned off the engine for about 5 minutes. Upon restart, i shifted into drive and gave a little gas as i pulled away from spot going forward. There was a loud clunk and the truck jerked before driving normally. Even my wife noticed and made a comment on the severity of this instance. A little while later, still driving after the start up from parking spot, i experienced a hesitation when pulling away from stop light and slowed down to make a quick left turn. After turning, there was a noticeable hesitation before resuming normal driving conditions. Today once again i noticed a slight hesitation pulling from a stop light though not as sever as last time. (ID No. 11325906)

181.     Ford failed to disclose the Transmission Defect or to conduct sufficient testing or research that would have revealed the Defect. As a result, Ford has caused Ford F-150 drivers to spend money and time at its dealerships or other third-party repair facilities and/or take other remedial measures related to the Transmission Defect in the Class Vehicles.

182.     As evidenced by the customer complaints, Ford was put on sufficient notice regarding harsh and abnormal shifting and loss of vehicle power.

C.     Ford Misrepresented and Actively Concealed the Defect.

183.     Beginning in 2017 and continuing to the present, Ford has misrepresented the safety, performance and reliability of the 2017-2020 model year Ford F-150's that have a 10R80 10-speed transmission, through its website, multimedia advertisements, brochures, and in-person statements by its employees, authorized dealers, agents, sales representatives and/or repair technicians—touting the defective transmission's safety, reliability, enhanced responsiveness and performance with statements such as:[9]

**10- SPEED T R A NSMISSION**

Standard with five F-150 engines for 2019, the innovative 10-speed automatic transmission with SelectShift® capability helps deliver higher average power for acceleration — improving responsiveness and performance. With optimized gear spacing, including 3 overdrive gears, the 10-speed gearbox helps maximize shift points and gear ratios to optimize power, low-rpm torque and fuel efficiency. For proof, see the Engines charts on the previous page.
10 speeds, plus progressive range select and tow/haul mode, enhance towing confidence. An electronic control system is engineered to help ensure the right gear at the right time, including skip-shift and direct downshift capability. Select the operating range for automatic shifting (in Drive) thanks to progressive range select. Combined with SelectShift operation in manual mode, the 10-speed delivers an exceptional level of driver control.

---

[9] Source: 2019 Ford F-150 brochure, available at:
https://www.ford.com/services/assets/Brochure?make=Ford&model=F-150&year=2019 (last visited Sept. 21, 2020).

184.    Ford has never disclosed the Transmission Defect to consumers. Instead, from 2017 to the present, Ford has attempted to squelch public recognition of the Transmission Defect by propagating the falsehood that the harsh and bumpy shifting in Class Vehicles was "normal," through statements made to consumers and the general public by Ford employees, authorized dealers, agents, sales representatives and/or repair technicians, and through TSBs which sought to normalize the poor performance and safety issues, as described herein.

185.    Ford has allowed Plaintiffs and Class Members to continue to drive the Class Vehicles, despite knowing that they are prone to harsh or abrupt shifting, hesitation, and surging.

186.    Despite its knowledge since well before March 2018, Ford has not recalled the Class Vehicles to repair the Transmission Defect and has not offered to reimburse Class Vehicle owners and lessees who incurred costs relating to the transmission problems.

187.    Plaintiffs and Class Members are reasonable consumers who reasonably expect their Class Vehicles will not harshly and abruptly shift and will not experience sudden and unexpected power surges and losses.

188.    Plaintiffs and Class Members reasonably expected that Ford would not sell or lease Class Vehicles with known defects, including the Transmission Defect, and that it would disclose any such defects to its customers before they purchased or leased Class Vehicles. Plaintiffs and Class Members did not expect Ford to conceal the Transmission Defect, or to continually deny its existence.

189.    Consequently, Plaintiffs and Class Members have not received the benefit for which they bargained when they purchased or leased the Class Vehicles.

190.    As a result of the Transmission Defect, the value of the Class Vehicles has diminished, including without limitation the resale value of the Class Vehicles.

191.     Plaintiffs' claims presented herein rise to the level of plausibility set forth in *Bell Atlantic Corp. v. Twombly* by asserting the who, what, when, where and how of the misconduct which caused Plaintiffs' damages: the "who" (Defendant, through its employees, authorized dealers, agents, sales representatives and/or repair technicians); the "what" (misrepresentations regarding the safety, performance, and reliability of the 2017-2020 model year Ford F-150's 10R80 10-speed transmission and concealment of material information regarding the Transmission Defect and the performance and quality of Class Vehicles); the "when" (between 2017 to the present); the "where" (Ford's website, Ford print and multimedia advertisements, its brochures, TSBs, and in-person by Ford employees, authorized dealers, agents, sales representatives and/or repair technicians); and the "how" (by misrepresenting that the Ford F-150's 10R80 10-speed transmission was safe, reliable and "delivers improved overall performance, with enhanced acceleration" and by actively concealing the Transmission Defect by failing to disclose it and propagating the falsehood that the harsh and bumpy shifting in Class Vehicles was "normal."). *See U.S. ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 853 (7th Cir. 2009). *See generally Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007).

## TOLLING ARGUMENTS

### I.     TOLLING OF THE STATUTE OF LIMITATIONS

#### A.     Discovery Rule Tolling

192.     Plaintiffs and Class Members could not have discovered through the exercise of reasonable diligence that their Class Vehicles were defective within the time period of any applicable statutes of limitation.

193.     Among other things, neither Plaintiffs nor the other Class Members knew or could have known that the Class Vehicles are equipped with 10R80 transmissions with the Transmission

Defect, which causes those transmissions to harshly shift causing gear slippage, vehicle surging, and hesitation.

194.    Further, Plaintiffs and Class Members had no knowledge of the Defect and it occurred in a part of the vehicle that was not visible to consumers. Ford attempted to squelch public recognition of the Transmission Defect by propagating the falsehood that the harsh shifting that drivers of the Cass Vehicles were experiencing was "normal" and that the Transmissions would, in time, correct themselves. Accordingly, any applicable statute of limitation is tolled.

B.      <u>Fraudulent Concealment Tolling</u>

195.    Throughout the time period relevant to this action, Ford concealed from and failed to disclose to Plaintiffs and the other Class Members vital information about the Transmission Defect described herein.

196.    Ford kept Plaintiffs and the other Class Members ignorant of vital information essential to the pursuit of their claims. As a result, neither Plaintiffs nor the other Class Members could have discovered the Defect, even upon reasonable exercise of diligence.

197.    Throughout the Class Period, Ford has been aware that the transmissions it designed, manufactured, and installed in the Class Vehicles contained the Transmission Defect, resulting in harsh shifting, gear slippage, and vehicle surging and hesitation, placing Plaintiffs and other drivers in unsafe situations.

198.    Despite its knowledge of the Defect, Ford failed to disclose and concealed, and continues to conceal, this critical information from Plaintiffs and the other Class Members, even though, at any point in time, it could have disclosed the Transmission Defect through individual correspondence, media release, a recall, or by other means.

199.     Plaintiffs and the other Class Members justifiably relied on Ford to disclose the Transmission Defect in the Class Vehicles that they purchased or leased, because the Defect was hidden and not discoverable through reasonable efforts by Plaintiffs and the other Class Members.

200.     Thus, the running of all applicable statutes of limitation have been suspended with respect to any claims that Plaintiffs and the other Class Members have sustained as a result of the Defect, by virtue of the fraudulent concealment doctrine.

C.     Estoppel

201.     Ford was under a continuous duty to disclose to Plaintiffs and the other Class Members the true character, quality, and nature of the unsafe and defective Transmissions.

202.     Ford knowingly concealed the true nature, quality, and character of the defective Transmissions from consumers.

203.     Based on the foregoing, Ford is estopped from relying on any statutes of limitations in defense of this action.

II.     CLASS ACTION ALLEGATIONS

204.     Plaintiffs bring this lawsuit individually and as a class action on behalf of all others similarly situated pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and/or (b)(3). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Rule 23.

205.     The Class is defined as:

> All persons in the United States and its territories who formerly or currently own or lease one or more of 2017 to 2020[10] Model Year Ford F-150 trucks with a 10R80 10-speed automatic transmission.

---

[10] Plaintiffs reserve the right to amend or modify their Class and Subclass definitions to include or exclude model years of Vehicles with a 10R80 10-speed automatic transmissions after they have had an opportunity to conduct discovery related to changes made to the 10R80 transmission in each model year, if any.

206.     The Illinois Subclass is defined as:

All persons in Illinois who formerly or currently own or lease one or more of 2017 to 2020 Model Year Ford F-150 trucks with a 10R80 10-speed automatic transmission.

207.     The California Subclass is defined as:

All persons in California who formerly or currently own or lease one or more of 2017 to 2020 Model Year Ford F-150 trucks with a 10R80 10-speed automatic transmission.

208.     The Florida Subclass is defined as:

All persons in Florida who formerly or currently own or lease one or more of 2017 to 2020 Model Year Ford F-150 trucks with a 10R80 10-speed automatic transmission.

209.     The Massachusetts Subclass is defined as:

All persons in Massachusetts who formerly or currently own or leased one or more of 2017 to 2020 Model Year Ford F-150 trucks with a 10R80 10-speed automatic transmission.

210.     The New Jersey Subclass is defined as:

All persons in New Jersey who formerly or currently own or lease one or more of 2017 to 2020 Model Year Ford F-150 trucks with a 10R80 10-speed automatic transmission.

211.     The New York Subclass is defined as:

All persons in New York who formerly or currently own or lease one or more of 2017 to 2020 Model Year Ford F-150 trucks with a 10R80 10-speed automatic transmission.

212.     The Pennsylvania Subclass is defined as:

All persons in Pennsylvania who formerly or currently own or lease one or more of 2017 to 2020 Model Year Ford F-150 trucks with a 10R80 10-speed automatic transmission.

213.     The Texas Subclass is defined as:

All persons in Texas who formerly or currently own or lease one or more of 2017 to 2020 Model Year Ford F-150 trucks with a 10R80 10-speed automatic transmission.

214.    Excluded from the Class and Subclasses are Defendant and its subsidiaries and affiliates, Defendant's executives, board members, legal counsel, the judges and all other court personnel to whom this case is assigned, their immediate families, and those who purchased Class Vehicles for the purpose of resale.

215.    Plaintiffs reserve the right to amend or modify the Class and Subclass definitions after they have had an opportunity to conduct discovery.

216.    <u>Numerosity</u>:  Fed. R. Civ. P. 23(a)(1). The Class is so numerous that the joinder of all members is unfeasible and not practicable. While the precise number of Class Members has not been determined at this time, Plaintiffs are informed and believe that thousands of consumers have purchased or leased the Class Vehicles in Illinois.

217.    <u>Commonality</u>: Fed. R. Civ. P. 23(a)(2) and (b)(3). There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a.    whether the Class Vehicles and their transmissions are defectively designed or manufactured such that they are not suitable for their intended use;

b.    whether the fact that the Class Vehicles suffer from the Transmission Defect would be considered material to a reasonable consumer;

c.    whether, as a result of Ford's concealment or failure to disclose material facts, Plaintiffs and Class Members acted to their detriment by purchasing Class Vehicles manufactured by Ford;

d.    whether Ford was aware of the Transmission Defect;

      e.     whether the Transmission Defect constitutes an unreasonable safety risk;

      f.     whether Ford breached express and/or implied warranties with respect to the Class Vehicles;

      g.     whether Ford violated consumer protection laws for failing to notify the Transmission Defect to Plaintiffs and Class Members;

      h.     whether Ford has a duty to disclose the defective nature of the Class Vehicles and the Transmission Defect to Plaintiffs and Class Members;

      i.     whether Plaintiffs and Class Members are entitled to equitable relief, including but not limited to a preliminary and/or permanent injunction; and

      j.     Whether Ford violated the Magnuson-Moss Warranty Act when it sold to consumer Class Vehicles that suffered from the Transmission Defect.

218.    <u>Adequate Representation</u>: Plaintiffs will fairly and adequately protect the interests of Class Members. Plaintiffs have retained attorneys experienced in the prosecution of class actions, including consumer and product defect class actions, and Plaintiffs intend to prosecute this action vigorously.

219.    <u>Predominance and Superiority</u>: Plaintiffs and Class Members have all suffered and will continue to suffer harm and damages as a result of Ford's unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Absent a class action, Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law. Because of the relatively small size of Class Members' individual claims, it is likely that few Class Members could afford to seek legal redress for Ford's misconduct. Absent a class action, Class Members will continue to incur damages, and Ford's misconduct will continue without remedy. Class

treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants and will promote consistency and efficiency of adjudication.

CAUSES OF ACTION

FIRST CAUSE OF ACTION

BREACH OF EXPRESS WARRANTY
U.C.C. § 2-313
(Illinois: 810 Ill. Comp. Stat. 5/2-313)
(California: Cal. Com. Code § 2313)
(Florida: F.S.A. § 672.313)
(Massachusetts: Mass. Gen. Laws ch. 106 § 2-313)
(New Jersey: N.J.S. 12A:2-313 and 2A-210)
(New York: N.Y. UCC § 2-313)
(Pennsylvania: 13 Pa. C.S.A. § 2313)
(Texas: TEX. BUS. & COM. CODE ANN § 2.313)

(Plaintiffs[11] individually, and on behalf of the Class and Subclasses)

220.    Plaintiffs incorporate by reference and re-allege the preceding paragraphs as if fully set forth herein.

221.    Plaintiffs bring this cause of action individually and on behalf of the Class and Subclasses.

222.    Plaintiffs and Class members are "buyers" within the meaning of each applicable warranty statute.

223.    The Class Vehicles are "consumer goods" within the meaning of each applicable warranty statute.

224.    Ford is a "manufacturer" within the meaning of the warranty statutes.

225.    Plaintiffs and Class Members bought or leased Ford F-150 pick-up trucks equipped with Ford's defective 10R80 10-speed transmission.

---

[11] This claim is brought on behalf of all Plaintiffs except Plaintiff O'Connor. *See* Dkt. 59.

226.    Ford made express warranties to Plaintiffs and Class members within the meaning of the warranty statutes.

227.    In the course of selling and leasing the Class Vehicles, Ford expressly warranted in writing that the vehicles were covered by certain warranties in Ford's "New Vehicle Limited Warranty" as described herein.  This express warranty states that "authorized Ford Motor Company dealers will, without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in the factory-supplied materials or factory workmanship."[12]

228.    As evidenced by the TSB from September 7, 2018, the Transmission Defect is covered by New Vehicle Limited Warranty.

229.    The New Vehicle Limited Warranty as described was made part of the basis of the bargain when Plaintiffs and Class Members bought or leased the Class Vehicles.

230.    Ford breached its express warranties to repair defects in materials and workmanship of any part supplied by Ford. Ford has not repaired, and has been unwilling to reasonably repair, the Transmission Defect.

231.    Furthermore, the express warranties to repair defective parts fail in their essential purpose because the contractual remedy is insufficient to make Plaintiffs and Class Members whole and because Ford has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

232.    Accordingly, recovery by Plaintiffs and the Class is not limited to the express warranties of repair to parts defective in materials or workmanship, and Plaintiffs seek all remedies as allowed by law.

---

[12] Source: http://www.fordservicecontent.com/Ford_Content/Catalog/owner_information/2018-Ford-Car-Lt-Truck-version-5_frdwa_EN-US_01_2018_3.pdf (last viewed September 16, 2020).

233.     Ford was provided notice of these issues by numerous customer complaints regarding the Transmission Defect before or within a reasonable amount of time after the allegations of the Defect became public.

234.     In addition, most of the Plaintiffs named in this complaint have provided Ford with notice of claims they make on behalf of themselves and similarly situated consumers. Although Ford responded to most of the notice letters, in each case it suggests only a possibility of individual resolution rather than classwide relief. Ford's responses make clear that the Plaintiffs' efforts for early resolution were futile.

235.     Plaintiffs were not required to notify Ford of its breach and/or were not required to do so because affording Ford a reasonable opportunity to cure any breach of written warranty would have been futile. Ford was also on notice of the defect from the complaints and service requests it received from Class Members, from repairs and/or replacements of the transmission or a component thereof, through TSBs acknowledging the defect, and through other internal sources.

236.     Plaintiffs and other Class members are entitled to statutory damages and other legal and equitable relief including, at their election, the purchase price of or a buyback of their Ford vehicles, or the overpayment or diminution in value of their Class Vehicles.

237.     Plaintiffs and Class members are also entitled to costs and reasonable attorneys' fees.

SECOND CAUSE OF ACTION

BREACH OF IMPLIED WARRANTY
U.C.C. § 2-314
(Illinois: 810 Ill. Comp. Stat. 5/2-314)
(Florida: F.S.A. § 672.314)
(New Jersey: N.J.S. 12A:2-314 and 2A-212)
(New York: UCC Sec. 2-314 and 2-315)
(Massachusetts: Mass. Gen. Laws ch. 106, 2-314 and 2-315)
(Pennsylvania: 13 Pa. C.S.A. §§ 2314, *et seq.*)

(Plaintiffs[13] individually, and on behalf of the Class and Subclasses[14])

238.    Plaintiffs incorporate by reference and reallege the preceding paragraphs as if fully set forth herein.

239.    Plaintiffs bring this cause of action individually and on behalf of the Class and applicable Subclasses.

240.    Ford is and was at all relevant times a merchant with respect to the Class Vehicles.

241.    Ford was and is in actual or constructive privity with all Plaintiffs and all Class Members.

a.    Plaintiffs had and continue to have sufficient direct dealings with Ford and/or its authorized dealers, franchisees, representatives, and agents to establish any required privity of contract. Ford's authorized dealers, franchisees, representatives, and agents were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles. The warranty agreements were designed for and intended to benefit only the ultimate purchasers and lessees of the Class Vehicles, *i.e.*, Plaintiffs and Class Members.

---

[13] This claim is brought on behalf of all Plaintiffs except Plaintiff O'Connor.
[14] Additional implied warranty claims are brought on behalf of the California and Texas Subclasses below.

b.      Privity is not required to assert this claim because Plaintiffs and the Class Members are intended third-party beneficiaries of contracts between Ford and its dealers, franchisees, representatives, and agents.

c.      By extending express written warranties to end-user purchasers and lessees, brought itself into privity with Plaintiffs and all Class Members.

242.    At all times relevant hereto, applicable law imposed upon Ford a duty that the Transmissions installed in the Class Vehicles be fit for the ordinary purposes for which transmissions are used and that they pass without objection in the trade under the contract description.

243.    Ford has not validly disclaimed, excluded, or modified the implied warranties or duties described above, and any attempted disclaimer or exclusion of the implied warranties was and is ineffectual.

244.    The Transmissions installed in the Class Vehicles were defective at the time they left the possession of Ford, as set forth above. Ford knew of this defect at the time the purchase and lease transactions occurred. Thus, the Transmissions installed in the Class Vehicles, when sold and at all times thereafter, were not in merchantable condition or quality because they are not fit for their ordinary intended purpose and they do not pass without objection in the trade under the contract description.

245.    Plaintiffs and Class Members used the Transmissions installed in the Class Vehicles in a manner consistent with their intended use and performed each and every duty required under the terms of the warranties, except as may have been excused or prevented by the conduct of Ford or by operation of law in light of Ford's unconscionable conduct.

246.     Ford had actual knowledge of, and received timely notice regarding, the Defect at issue in this litigation and, notwithstanding such notice, failed and refused to offer an effective remedy.

247.     In addition, Ford received, on information and belief, numerous consumer complaints and other notices from customers advising of the Defect associated with the Transmissions installed in the Class Vehicles.

248.     By virtue of the conduct described herein and throughout this Complaint, Ford breached the implied warranty of merchantability.

249.     As a direct and proximate result of Ford's breach of warranties, Plaintiffs and Class members suffered economic damage, including loss attributable to the diminished value of their Class Vehicles, loss of use of their Class Vehicles and other tangible property, as well as the monies spent and to be spent to repair and/or replace their Transmissions.

THIRD CAUSE OF ACTION

VIOLATION OF MAGNUSON-MOSS WARRANTY ACT
(15 U.S.C. § 2301, *et seq*.)
(Plaintiffs, individually, and on behalf of the Class)

250.     Plaintiffs incorporate by reference and reallege the preceding paragraphs as if fully set forth herein.

251.     Plaintiffs bring this cause of action individually and on behalf of the Class.

252.     Plaintiffs and Class Members are "consumers" within the meaning of 15 U.S.C. § 2301(6).

253.     Defendant is a "supplier" and "warrantor" within the meaning of 15 U.S.C. § 2301(6).

254.    The Class Vehicles are "consumer products" within the meaning of 15 U.S.C. § 2301(6).

255.    This Court has original jurisdiction over this matter under CAFA, and therefore can assert supplemental jurisdiction over this claim.

256.    Ford's express warranties are each a "written warranty" within the meaning of 15 U.S.C. § 2301(6).

257.    As discussed herein, Ford extended a three-year/36,000 mile New Vehicle Limited Warranty with the purchase or lease of the Class Vehicles, thereby warranting to repair or replace any part defective in material or workmanship at no cost to the owner or lessee. Ford further extended a five-year/60,000 mile Powertrain Warranty with the purchase or lease of the Class Vehicles.

258.    Ford breached each of these express warranties by:

    a.    Selling and leasing Class Vehicles with transmissions that were defective in material and workmanship, requiring repair or replacement within the warranty period; and

    b.    Refusing and/or failing to honor the express warranties by repairing or replacing, free of charge, any defective component parts.

259.    Ford's breach of express warranty has deprived Plaintiffs and Class Members of the benefit of their bargain.

260.    The matter in controversy exceeds the sum or value of $5,000,000.00 exclusive of interest and costs, and there are over 100 Class Members.

261.    Ford has been afforded a reasonable opportunity to cure its breach of written warranties, including when Ford consumers brought their vehicles in for diagnosis and repair of the Transmission Defect.

262.    As a direct and proximate cause of Ford's breach of written warranties, Plaintiffs and Class Members sustained damages and other losses in an amount to be determined at trial. Ford's conduct damaged Plaintiffs and Class Members, who are entitled to recover actual damages, consequential damages, specific performance, diminution of value, costs, including statutory attorneys' fees and/or other relief as appropriate.

<u>FOURTH CAUSE OF ACTION</u>

NEGLIGENCE
(Plaintiffs[15] individually, and on behalf of the Class)

263.    Plaintiffs incorporate by reference and re-allege the preceding paragraphs as if fully set forth herein.

264.    Plaintiffs bring this cause of action individually and on behalf of the Class.

265.    Ford had a duty to design and manufacture a product that would be safe for its intended and foreseeable uses and users, including the use to which its products were put by Plaintiffs and the Class Members. Ford breached its duties to Plaintiffs and the Class Members because they were negligent in the design, development, manufacture, and testing of the Transmissions installed in the Class Vehicles, and Ford is responsible for this negligence.

266.    Ford was negligent in the design, development, manufacture, and testing of the Transmissions installed in the Class Vehicles because they knew, or in the exercise of reasonable care should have known, that the vehicles equipped with defective transmissions pose an unreasonable risk of serious bodily injury to Plaintiffs and Class Members, passengers, other

---

[15] This claim is brought on behalf of all Plaintiffs except Plaintiff O'Connor.

motorists, pedestrians, and the public at large, because they are susceptible to shifting harshly and erratically, causing the vehicle to jerk, lunge, and hesitate between gears, which can, among other things, distract drivers and cause them to lose control over their vehicles.

267.    Ford owed Plaintiffs and the Class a duty to provide thorough notice of known safety defects, such as the Transmissions' shifting difficulties.

268.    Once it discovered the Transmission Defect, Ford also owed Plaintiffs and the Class Members a duty to ensure that an appropriate repair procedure was developed and made available to consumers.

269.    Ford owed also Plaintiffs and the proposed Class a duty not to engage in fraudulent or deceptive conduct, including the knowing concealment of material information such as the transmission's shifting problems. This duty is independent of any contractual duties Ford may owe or have owed.

270.    Under the TREAD Act, Ford owed an independent duty to send notice to Plaintiffs and Class Vehicle owners, purchasers, and dealers whenever it "learns the vehicle or equipment contains a defect and decides in good faith that the Defect is related to motor vehicle safety." 49 U.S.C. § 30118(c). Despite Ford's awareness of the Transmission's safety defect, it failed to timely notify owners, purchasers, and dealers. This duty is independent of any contractual duties Ford may owe or have owed to them.

271.    A finding that Ford owed a duty to Plaintiffs and the Class would not significantly burden Ford. Ford has the means to efficiently notify drivers of Class Vehicles about dangerous defects. The cost borne by Ford for these efforts is insignificant in light of the dangers posed to Plaintiffs and the Class by Ford's failure to disclose the Transmission Defect and provide an appropriate notice and repair.

272.     Ford's failure to disclose the Defect in Class Vehicles to consumers and the NHTSA is a departure from the reasonable standard of care. Accordingly, Ford breached its duties to Plaintiffs and the Class.

273.     Ford's conduct was contrary to public policy favoring the disclosure of defects that may affect customer safety; these policies are embodied in the TREAD Act, and the notification requirements in 49 C.F.R. § 573.1, *et seq*.

274.     As a direct, reasonably foreseeable, and proximate result of Ford's failure to exercise reasonable care to inform Plaintiffs and the Class about the Defect or to provide appropriate repair procedures for it, Plaintiffs and the Class Members have suffered damages in that they spent more money than they otherwise would have on Class Vehicles which are of diminished value.

275.     Plaintiffs and the Class Members could not have prevented the damages caused by Ford's negligence through the exercise of reasonable diligence. Neither Plaintiffs nor the Class Members contributed in any way to Ford's failure to provide appropriate notice and repair procedures.

276.     Plaintiffs and the Class seek to recover the damages caused by Ford. Because Ford acted fraudulently and with wanton and reckless misconduct, Plaintiffs also seek an award of punitive damages.

## FIFTH CAUSE OF ACTION

### FRAUD/FRAUDULENT CONCEALMENT
(Plaintiffs individually, and on behalf of the Class)

277.     Plaintiffs repeat and re-allege the allegations above as if fully set forth herein.

278.     This claim is brought by Plaintiffs individually and on behalf of Class Members.

279.    Ford concealed and suppressed material facts concerning the performance and quality of the Class Vehicles—namely, the Transmission Defect—and the quality of the Ford brand. Specifically, Ford knew (or should have known of) the Transmission Defect but failed to disclose it prior to or at the time it sold or leased Class Vehicles to consumers. Ford did so to boost sales and leases of Class Vehicles.

280.    Plaintiffs and Class Members had no way of knowing that Ford's representations were false and gravely misleading, or that Ford had omitted imperative details. Plaintiffs and Class Members did not, and could not, unravel Ford's deception on their own.

281.    Ford had a duty to disclose the true performance of Class Vehicles and the Transmission Defect because knowledge thereof and the details related thereto were known and/or accessible only to Ford; Ford had superior knowledge and access to the facts; and knew the facts were not known to, or reasonably discoverable, by Plaintiffs and the Class. Ford also had a duty to disclose because they made many general affirmative representations about the qualities of the Class Vehicles.

282.    On information and belief, Ford still has not made full and adequate disclosures, and continues to defraud consumers by concealing material information regarding the Defect and the performance and quality of Class Vehicles.

283.    Plaintiffs and the Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased or leased the Class Vehicles. The actions of Plaintiffs and Class Members were justified. Ford was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or Class Members.

284.    Plaintiffs and the Class relied upon Ford's representations and omissions regarding the quality of Class Vehicles and the Defect in deciding to purchase or lease Class Vehicles.

285.    Because of the concealment and/or suppression of the facts, Plaintiffs and the Class sustained damage because they did not receive the value of the price paid for their Class Vehicles. Plaintiffs and Class Members would have paid less for Class Vehicles had they known about the Transmission Defect, or they would not have purchased or leased Class Vehicles at all.

286.    Accordingly, Ford is liable to Plaintiffs and Class Members for damages in an amount to be proven at trial.

287.    Ford's actions and omissions were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class' rights and well-being, to enrich Ford. Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

288.    Furthermore, as the intended and expected result of its fraud and conscious wrongdoing, Ford has profited and benefited from Plaintiffs' and Class Members' purchase of Class Vehicles containing the Transmission Defect. Ford has voluntarily accepted and retained these profits and benefits with full knowledge and awareness that, as a result of Ford's misconduct alleged herein, Plaintiffs and Class Members were not receiving trucks of the quality, nature, fitness, or value that had been represented by Ford, and that a reasonable consumer would expect.

289.    Ford has been unjustly enriched by its fraudulent, deceptive, and otherwise unlawful conduct in connection with the sale and lease of Class Vehicles and by withholding benefits from Plaintiffs and Class Members at the expense of these parties. Equity and good

conscience militate against permitting Ford to retain these profits and benefits, and Ford should

be required to make restitution of its ill-gotten gains resulting from the conduct alleged herein.

### SIXTH CAUSE OF ACTION

UNJUST ENRICHMENT
(Plaintiffs individually, and on behalf of the Class)

290.    Plaintiffs incorporate by reference and re-allege the preceding paragraphs as if

fully set forth herein.

291.    Plaintiffs bring this cause of action individually and on behalf of the Class.

292.    Ford has long known that its 10R80, 10-speed automatic transmissions have a

propensity to shift harshly and erratically, causing the vehicle to jerk, lunge, and hesitate between

gears, posing a serious safety risk, which it concealed and failed to disclose to Plaintiffs and the

proposed Class Members. By late-2017, complaints were being lodged on NHTSA's safer car

website, and Ford issued its first TSB addressing this issue as early as March 2018.

293.    As a result of its fraudulent acts and omissions related to the defective

Transmissions, Ford obtained monies which rightfully belong to Plaintiffs and the Class Members

to the detriment of Plaintiffs and the proposed Class Members.

294.    Ford appreciated, accepted, and retained the non-gratuitous benefits conferred by

Plaintiffs and the proposed Class Members who, without knowledge of the Defect, paid a higher

price for their vehicles which actually had lower values.  Ford also received monies for vehicles

and transmissions that Plaintiffs and the proposed Class Members would not have otherwise

purchased or leased.

295.    It would be inequitable and unjust for Ford to retain these wrongfully obtained

profits.

296.    Ford's retention of these wrongfully obtained profits would violate the fundamental principles of justice, equity, and good conscience.

297.    Plaintiffs and the Class are entitled to restitution of the profits unjustly obtained plus interest.

<u>SEVENTH CAUSE OF ACTION</u>

ILLINOIS CONSUMER FRAUD
AND DECEPTIVE BUSINESS PRACTICES ACT ("CFA")
(815 Ill. Comp. Stat. 505/1, *et seq*. and 720 Ill. Comp. Stat. 295/1A)
(Plaintiffs O'Connor and Zielinski individually, and on behalf of the Illinois Subclass)

298.    Plaintiffs incorporate by reference and reallege the preceding paragraphs as if fully set forth herein.

299.    Plaintiffs O'Connor and Zielinski ("Plaintiffs" for this cause of action) bring this cause of action individually and on behalf of the Illinois Subclass.

300.    Ford is a "person" as that term is defined in 815 Ill. Comp. Stat. 295/1(c).

301.    Plaintiffs and the proposed Illinois Subclass are "consumers" as that term is defined in 815 Ill. Comp. Stat. 505/1(e).

302.    The CFA prohibits "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact…in the conduct of trade or commerce…whether any person has in fact been misled, deceived or damaged thereby." 815 Ill. Comp. Stat. 505/2.

303.    Ford engaged in deceptive trade practices in violation of the CFA by failing to disclose and actively concealing the dangers and risks posed by the Class Vehicles and/or the defective transmissions installed in them.  Ford's deceptive business practices include:  (i)

representing that its vehicles and transmissions had characteristics, uses, or benefits which they do not have; (ii) advertising its goods with intent not to sell them as advertised; (iii) representing that its vehicles and transmissions are of a particular standard, quality, or grade when they are not; (iv) representing that a transaction conferred or involved rights, remedies, or obligations which they do not; and (v) representing that its goods have been supplied in accordance with a previous representation when they have not.

304.    Ford has known of the defective transmissions since at least March 2018, when it issued the first TSB regarding the Defect, thereby acknowledging numerous consumer complaints made to the NHTSA.  However, Ford continued to allow unsuspecting new and used car purchasers to buy or lease the Class Vehicles and allowed them to continue driving dangerous vehicles.

305.    Ford owed Plaintiffs and Illinois Subclass Members a duty to disclose the true safety and reliability of the Class Vehicles and/or the defective Transmissions installed in them because Ford: (a) possessed exclusive knowledge of the dangers and risks posed by the foregoing; (b) intentionally concealed the foregoing from Plaintiff; and/or (c) made incomplete representations about the safety and reliability of the foregoing generally, while withholding material facts from Plaintiff and Illinois Subclass Members that contradicted these representations.

306.    Ford's failure to disclose and active concealment of the dangers and risks posed by the defective transmissions in Class Vehicles were material to Plaintiffs and Illinois Subclass Members. A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

307.    Plaintiffs and Illinois Subclass Members suffered ascertainable loss caused by Ford's misrepresentations and failure to disclose material information. Had they been aware of the defective transmissions installed in the Class Vehicles, Plaintiffs and Illinois Subclass Members either would have paid less for their vehicles or would not have purchased or leased them at all. Plaintiffs and Illinois Subclass Members did not receive the benefit of their bargain as a result of Ford's misconduct.

308.    Ford knew or should have known that its conduct violated the CFA.

309.    Ford's violations present a continuing risk to Plaintiffs, the Illinois Subclass, as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

310.    As a direct and proximate result of Ford's violations of the CFA, Plaintiff and Illinois Subclass Members have suffered injury-in-fact and/or actual damages.

311.    Pursuant to 815 Ill. Comp. Stat. 505/10a(a), Plaintiff and the Illinois Subclass seek monetary relief against Ford in the amount of actual damages, as well as punitive damages because Ford acted with fraud and/or malice and/or was grossly negligent.

312.    Plaintiff and the Illinois Subclass also seek an order enjoining Ford's unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, and any other just and proper relief available under 815 Ill. Comp. Stat. 505/1 *et seq.*

## EIGHTH CAUSE OF ACTION

VIOLATION OF THE SONG-BEVERLY CONSUMER WARRANTY ACT
FOR BREACH OF EXPRESS WARRANTIES ("SBCWA")
(Cal. Civ. Code §§ 1791.2 & 1793.2)
(Plaintiffs Smith, Fair, and Steen individually, and on behalf of the California Subclass)

313.    Plaintiffs incorporate by reference and re-allege the preceding paragraphs as if fully set forth herein.

314.    Plaintiffs Smith, Fair, and Steen bring this cause of action individually and on behalf of the Class.

315.    Plaintiffs and Class members are "buyers" within the meaning of the SBCWA. Cal. Civ. Code § 1791(b).

316.    The Class Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

317.     Ford is a "manufacturer" within the meaning of Cal. Civ. Code § 1791(j).

318.    Plaintiffs and Class Members bought or leased Ford F-150 pick-up trucks equipped with Ford's defective 10R80 10-speed transmission.

319.    Ford made express warranties to Plaintiffs and Class members within the meaning of Cal. Civ. Code §§ 1791.2 and 1793.2 as set forth herein.

320.    Specifically, in the course of selling and leasing the Class Vehicles, Ford expressly warranted in writing that the vehicles were covered by certain warranties in Ford's "New Vehicle Limited Warranty" as described herein.  This express warranty states that "authorized Ford Motor Company dealers will, without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in the factory-supplied materials or factory workmanship."[16]

321.    As set forth herein in detail, the Class Vehicles are inherently defective because they are equipped with Ford's defective 10R80 10-speed transmission which results in harsh shifting, gear slippage, and vehicle surging and hesitation.

---

[16] Source: http://www.fordservicecontent.com/Ford_Content/Catalog/owner_information/2018-Ford-Car-Lt-Truck-version-5_frdwa_EN-US_01_2018_3.pdf (last viewed July 30, 2019).

322.     The Transmission Defect jeopardizes the safety of drivers and passengers of Class Vehicles, and other drivers on the road, and substantially impairs the use, value, and safety of the Class Vehicles to reasonable consumers like Plaintiffs and Class members.

323.     Plaintiffs took their Class Vehicles to Ford or its authorized repair facility to repair the Defect and notified Ford in writing of the need for repair, as set forth herein, but Ford failed and continues to fail to make repairs to Plaintiffs' Class Vehicles under its Warranty.

324.     As evidenced by the TSB from September 7, 2018, the Transmission Defect is covered by Ford's New Vehicle Limited Warranty.

325.     The New Vehicle Limited Warranty as described was made part of the basis of the bargain when Plaintiffs and Class Members bought or leased the Class Vehicles.

326.     Ford breached its express warranties to repair defects in materials and workmanship of any part supplied by Ford. Ford has not repaired, and has been unwilling to reasonably repair, the Transmission Defect.

327.     Furthermore, the express warranties to repair defective parts fail in their essential purpose because the contractual remedy is insufficient to make Plaintiffs and Class Members whole and because Ford has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

328.     Ford made additional warranties to Plaintiffs and Class Members such as the 10R80 transmissions delivered "enhanced acceleration," "immediate responsiveness," and "on demand power."

329.     Accordingly, recovery by Plaintiffs and the Class is not limited to the express warranties of repair to parts defective in materials or workmanship, and Plaintiffs seek all remedies as allowed by law.

330.    As a direct and proximate result of Ford's breach of its express warranties, Plaintiffs and Class members received goods containing a dangerous condition that substantially impairs the value of the goods sold to Plaintiffs and Class members, and have been damaged in an amount to be determined at trial.

331.    Pursuant to Cal. Civ. Code. §§ 1793.2 & 1794, Plaintiffs and other Class Members are entitled to damages and other legal and equitable relief including, at their election, the purchase price of or a buyback of their Ford vehicles, or the overpayment or diminution in value of their Class Vehicles.

332.    Pursuant to Cal. Civ. Code § 1794, Plaintiffs and Class Members are also entitled to costs and reasonable attorneys' fees.

<u>NINTH CAUSE OF ACTION</u>

VIOLATION OF THE SONG-BEVERLY CONSUMER WARRANTY ACT
FOR BREACH OF IMPLIED WARRANTIES ("SBCWA")
(Cal. Civ. Code §§ 1791.1 & 1792)
(Plaintiffs Smith, Fair, and Steen individually, and on behalf of the California Subclass)

333.    Plaintiffs incorporate by reference and re-allege the preceding paragraphs as if fully set forth herein.

334.    Plaintiffs Smith, Fair, and Steen bring this cause of action individually and on behalf of the California Subclass.

335.    Plaintiffs and California Subclass members are "buyers" within the meaning of the SBCWA. See Cal. Civ. Code § 1791(b).

336.    The Class Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

337.    Ford was at all relevant times the "manufacturer, distributor, warrantor, and/or seller" of the Class Vehicles within the meaning of Cal. Civ. Code § 1791.

338.    Ford impliedly warranted to Plaintiffs and the other California Subclass members that its Class Vehicles and their component and parts were merchantable and fit for the ordinary purpose for which they were sold, within the meaning of Cal. Civ. Code §§ 1791.1(a) & 1792.

339.    In reality, the Class Vehicles do not possess those qualities that a buyer would reasonably expect, where the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, inter alia, the Class Vehicles and their transmissions suffered from an inherent defect at the time of sale and thereafter are not fit for their particular purpose of providing safe and reliable transportation.

340.    Cal. Civ. Code § 1791.1(a) states: "Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following: (1) Pass without objection in the trade under the contract description. (2) Are fit for the ordinary purposes for which such goods are used. (3) Are adequately contained, packaged, and labeled. (4) Conform to the promises or affirmations of fact made on the container or label.

341.    The Class Vehicles are not suitable for the market, and would not pass without objection in the automotive industry and market because they are equipped with Ford's defective 10R80 10-speed transmission which results in harsh shifting, gear slippage, and vehicle surging and hesitation.

342.    Ford's defective 10R80 10-speed transmission makes the Class Vehicles unsuitable for safe driving. The Class Vehicles are not in merchantable condition, and are therefore, not fit for their ordinary purposes.

343.    Furthermore, Class Vehicles are not adequately labeled because the labeling fails to disclose the Transmission Defect.

344.    Ford breached the implied warranty of merchantability by manufacturing and selling Class Vehicles equipped with Ford's defective 10R80 10-speed transmission. Furthermore, the Transmission Defect has caused Plaintiffs and other California Subclass members to not receive the benefit of their bargain and have caused Class Vehicles to depreciate in value.

345.    The Transmissions installed in the Class Vehicles were defective at the time they left the possession of Ford, as set forth above.  The Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and not fit for their ordinary purpose of providing safe and reliable transportation. The Class Vehicles contain an inherent defect in the 10R80 Transmission and present an undisclosed safety risk to drivers, occupants, and others.

346.    Thus, Ford breached its implied duty of merchantability.

347.    Defendant cannot disclaim its implied warranties as it knowingly sold or leased a defective product.

348.    Ford knew, or should have known, that the Class Vehicles posed a safety risk and were defective and knew, or should have known, of these breaches of implied warranties prior to sale or lease of the Class Vehicles to Plaintiffs and California Subclass Members.

349.    Plaintiffs and the other California Subclass Members have had sufficient direct dealings with Ford and/or its authorized dealers, franchisees, representatives, and agents to establish privity of contract between Ford and Plaintiffs and each of the other California Subclass Members. Ford's authorized dealers, franchisees, representatives, and agents were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty

agreements provided with the Class Vehicles. The warranty agreements were designed for and intended to benefit only the ultimate purchasers and lessees of the Class Vehicles, i.e., Plaintiffs and California Subclass Members.

350.     Nonetheless, privity is not required here because Plaintiffs and each of the other California Subclass Members are intended third-party beneficiaries of contracts between Ford and its dealers, and specifically, of Ford's implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumers only.

351.     In addition, by extending express written warranties to end-user purchasers and lessees, Ford brought itself into privity with Plaintiffs and all California Subclass Members.

352.     Ford has not validly disclaimed, excluded, or modified the implied warranties or duties described above, and any attempted disclaimer or exclusion of the implied warranties was and is ineffectual.

353.     Plaintiffs and California Subclass Members used the Class Vehicles, its Transmissions, in a manner consistent with their intended use and performed each and every duty required under the terms of the warranties, except as may have been excused or prevented by the conduct of Ford or by operation of law in light of Ford's unconscionable conduct.

354.     Ford had actual knowledge of and received timely notice of the Defect at issue in this litigation and, notwithstanding such notice, failed and refused to offer an effective remedy.

355.     In addition, Ford received, on information and belief, numerous consumer complaints and other notices from customers advising of the Defect associated with the Transmissions installed in the Class Vehicles.

356.    As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiffs and the other California Subclass Members received goods whose defective condition substantially renders them unsafe for their intended purpose and impairs their value to Plaintiffs and the other California Subclass Members; Plaintiffs and California Subclass members have suffered actual damages and Ford was unjustly enriched by keeping the profits for its unsafe products while never having to incur the cost of repair, replacement or a recall.

357.    Pursuant to Cal. Civ. Code §§ 1791.1(d) and 1794, Plaintiffs and California Subclass members are entitled to damages and other legal and equitable relief, including, at their election, the purchase price of or a buyback of their Class Vehicles, or the overpayment or diminution in value of their Class Vehicles.

358.    Pursuant to Cal. Civ. Code § 1794, Plaintiffs and California Subclass members are also entitled to costs and reasonable attorneys' fees.

<u>TENTH CAUSE OF ACTION</u>

BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(Cal. Com. Code § 2314)
(Plaintiffs Smith, Fair, and Steen individually, and on behalf of the California Subclass)

359.    Plaintiffs incorporate by reference and re-allege the preceding paragraphs as if fully set forth herein.

360.    Plaintiffs Smith, Fair, and Steen bring this cause of action individually and on behalf of the California Subclass.

361.    Ford is and was at all relevant times a merchant with respect to motor vehicles. Cal. Com. Code § 2104.

362.    A warranty that the Class Vehicles were in merchantable condition is implied by law, pursuant to Cal. Com. Code § 2314.

363.    The Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which trucks are used. Specifically, the Class Vehicles suffer from an inherent Transmission Defect, as alleged herein.

364.    Ford had actual knowledge of and received timely notice of the Defect at issue in this litigation and, notwithstanding such notice, failed and refused to offer an effective remedy. In addition, Ford received, on information and belief, numerous consumer complaints and other notices from customers advising of the Defect associated with the Transmissions installed in the Class Vehicles.

365.    Plaintiffs and the other California Subclass Members have had sufficient direct dealings with either Ford or its agents (dealerships) to establish privity of contract between Ford and Plaintiffs and the other California Subclass members, as alleged herein.

366.    By extending express written warranties to end-user purchasers and lessees, Ford brought itself into privity with Plaintiffs and California Subclass Members.

367.    Notwithstanding this, privity is not required in this case because Plaintiffs and the other California Subclass Members are intended third-party beneficiaries of contracts between Ford and its dealers; specifically, they are the intended beneficiaries of Ford's implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the ultimate consumers only.

368.    Finally, privity is also not required because Plaintiffs' and the other California Subclass members' Class Vehicles are dangerous instrumentalities due to the Transmission Defect.

369.     Furthermore, the application of (or refusal to permit coverage under) the Warranty is unconscionable and inadequate to protect Plaintiffs and members of the California Subclass given that Ford knew of the Defect but failed and fails to disclose it. A gross disparity in bargaining power existed between Ford and California Subclass Members, and Ford knew or should have known that the Class Vehicles were unsafe and defective at the time of sale due to its defective 10R80 transmission, as alleged herein.

370.     As a direct and proximate result of Ford's breach of the warranty of merchantability, Plaintiffs and California Subclass members bought the Class Vehicles without knowledge of the Defect or their serious safety risks and purchased unsafe products which could not be used for their intended use. Plaintiffs and the California Subclass members suffered, and will continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Transmission Defect, Plaintiffs and the California Subclass members were harmed and suffered actual damages in that the Class Vehicles' transmissions are substantially certain to fail before their expected useful life has run.

371.     Plaintiffs and the other California Subclass Members have been damaged in an amount to be proven at trial.

## ELEVENTH CAUSE OF ACTION

VIOLATION OF THE CONSUMER LEGAL REMEDIES ACT ("CLRA")
(*Cal. Civ. Code* § 1750, *et seq.*)
(Plaintiffs Smith, Fair, and Steen individually, and on behalf of the California Subclass)

372.     Plaintiffs incorporate by reference and re-allege the preceding paragraphs as if fully set forth herein.

373.     Plaintiffs Smith, Fair, and Steen bring this cause of action individually and on behalf of the California Subclass.

374.    Ford's actions, representations and conduct violated the CLRA because they extend to transactions that intended to result and which have resulted, in the sale or lease of goods to Plaintiffs and California Subclass Members. Cal. Civ. Code § 1770.

375.    Defendant is a "person" as defined by Cal. Civ. Code § 1761(c).

376.    Plaintiffs and California Subclass Members are "consumers" as defined by Cal. Civ. Code § 1761(d), because they purchased their Class Vehicles for personal, family or household use.

377.    The Class Vehicles are "goods" within the meaning of Cal. Civ. Code § 1761(a).

378.    Ford made numerous representations concerning the Class Vehicles' specifications that were misleading, including marketing and advertising the workmanship of Class Vehicles and the nature and extent of Ford's Warranty.

379.    Ford also omitted material facts about the Class Vehicles, namely the Transmission Defect.

380.    In purchasing or leasing Class Vehicles, Plaintiffs and California Subclass Members were deceived by Ford's failure to disclose that the Class Vehicles contain the Transmission Defect, resulting in expensive damage for which Ford will not provide coverage under its express or implied warranties.

381.    By failing to disclose and concealing the defective nature of the transmissions from Plaintiffs and prospective Class members Ford violated the CLRA in at least the following respects:

      a.    in violation of § 1770(a)(5), Ford represented that the Class Vehicles have approval, characteristics, and uses or benefits which they do not have;

b.  in violation of § 1770(a)(7), Ford represented that the Class Vehicles are of a particular standard, quality or grade, when they are of another;

c.  in violation of Section 1770(a)(9), Ford has advertised the Class Vehicles as safe with the intent not to sell them as advertised; and

d.  in violation of § 1770(a)(16), Ford represented that the goods have been supplied in accordance with previous representations, when they were not.

382.  Ford violated the CLRA by representing the Class Vehicles were safe and free of defects when they were not and Ford knew, or should have known, that its representations and advertisements were false and misleading.

383.  Ford had a duty to disclose the Transmission Defect because Ford had exclusive knowledge of the Defect prior to making sales and leases of Class Vehicles and because Ford made partial representations about the quality of Class Vehicles but failed to fully disclose that the Transmission Defect plagues Class Vehicles.

384.  Specifically, Ford was under a duty to Plaintiffs and California Subclass Members to disclose the defective nature of the Class Vehicles because:

a.  Ford was in a superior position to know the true state of facts about the Transmission Defect –a defect that can pose a safety risk—and associated repair costs in the Class Vehicles;

b.  Plaintiffs and the California Subclass Members could not reasonably have been expected to learn or discover that the Class Vehicles have a defect that affects operability of Class Vehicles and creates safety concerns until manifestation of the Transmission Defect;

    c.   Ford knew that Plaintiffs and the California Subclass Members could not reasonably have been expected to learn or discover the Transmission Defect until manifestation of the Defect; and

    d.   Ford made incomplete representations about the safety and reliability of Class Vehicles generally, while withholding material facts from Plaintiffs and California Subclass Members that contradicted these representations.

385.    In failing to disclose the defective nature of the transmissions, Ford knowingly and intentionally concealed material facts and breached its duty not to do so.

386.    The facts concealed or not disclosed by Ford to Plaintiffs and California Subclass Members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease Class Vehicles or pay a lesser price. Had Plaintiffs and California Subclass Members known about the defective nature of the Class Vehicles, they would not have purchased or leased the Class Vehicles, or they would have paid less. A vehicle made by a reputable manufacturer of safe vehicles is worth more than a comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

387.    Ford has known of the defective transmissions since well before March 2018, when it issued the first TSB regarding the Transmission Defect, thereby acknowledging numerous consumer complaints made to the NHTSA prior to 2018. However, Ford continued to allow unsuspecting new and used truck purchasers to buy or lease the Class Vehicles and allowed them to continue driving dangerous vehicles.

388.    Defendant's unfair and deceptive acts or practices occurred repeatedly in

Defendant's trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

389.    Defendant intended that Plaintiffs and California Subclass Members would, in the course of their decision to expend monies in purchasing, leasing and/or repairing Class Vehicles, reasonably rely upon the misrepresentations, misleading characterizations, warranties and material omissions concerning the quality of the Class Vehicles and its transmissions with respect to materials, workmanship, design and/or manufacture.

390.    Plaintiffs and California Subclass Members are reasonable consumers who do not expect the transmissions installed in their vehicles to exhibit transmission slips, jerking, delayed acceleration and/or difficulty in stopping the vehicle. This is the reasonable and objective consumer expectation relating to vehicle transmissions.

391.    Plaintiffs and California Subclass Members reasonably relied on Ford's misrepresentations and omissions in purchasing or leasing Class Vehicles.

392.    Plaintiffs and California Subclass Members have been damaged as a proximate result of Defendant's violations of the CLRA and have suffered actual damages, and will continue to suffer actual damages, as a direct and proximate result of purchasing or leasing defective Class Vehicles, in that the Class Vehicles experienced, and will continue to experience transmission slips, jerking, delayed acceleration and/or difficulty stopping the vehicle.

393.     Prior to filing this Complaint, Plaintiffs served notice letters on Ford, notifying Ford of Plaintiffs' damages and the Transmission Defect in their Class Vehicles, in compliance with Cal. Civ. Code §1782(a). Plaintiffs have made pre-suit attempts to remedy the Transmission Defect in their Class Vehicles, to no avail.

394.    Under Cal. Civ. Code § 1780(a), Plaintiffs and California Subclass Members seek

actual damages, an order enjoining Ford from further engaging in the unfair and deceptive acts and practices alleged herein, restitution, attorney's fees and costs.

395.    Under Cal. Civ. Code § 1780(b), Plaintiffs and California Subclass Members seek an additional award against Ford of up to $5,000 for each California Subclass Member who qualifies as a "senior citizen" or "disabled person" under the CLRA. Ford knew or should have known that its conduct was directed to one or more California Subclass Members who are senior citizens or disabled persons. Ford's conduct caused one or more of these senior citizens or disabled persons to suffer a substantial loss of property set aside for retirement or for personal or family care and maintenance, or assets essential to the health or welfare of the senior citizen or disabled person. One or more California Subclass Members who are senior citizens or disabled persons are substantially more vulnerable to Ford's conduct because of age, poor health or infirmity, impaired understanding, restricted mobility, or disability, and each of them suffered substantial physical, emotional, or economic damage resulting from Ford's conduct.

396.    Pursuant to Cal. Civ. Code § 3345, Plaintiffs and California Subclass Members seek an award of trebled damages on behalf of all senior citizens and disabled persons comprising the California Subclass as a result of Ford's conduct alleged herein.

397.    Pursuant to CLRA Section 1780(a)(4), Plaintiffs and California Subclass Members also seek punitive damages against Ford because it carried out reprehensible conduct with willful and conscious disregard of the rights and safety of others, subjecting Plaintiffs and California Subclass Members to potential cruel and unjust hardship as a result. See Cal. Civ. Code § 1780(a)(4). Ford intentionally and willfully deceived Plaintiffs on life-or-death matters, and concealed material facts that only Ford knew. Ford's unlawful conduct likewise constitutes malice, oppression, and fraud warranting exemplary damages under Cal. Civ. Code § 3294.

398.    California Subclass and Plaintiffs further seek any other just and proper relief available under the CLRA.

<u>TWELFTH CAUSE OF ACTION</u>

VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW ("UCL")
(Cal. Bus. Prof. Code §§ 17200, *et seq*.)
(Plaintiffs Smith, Fair, and Steen individually, and on behalf of the California Subclass)

399.    Plaintiffs repeat and re-allege the allegations above as if fully set forth herein.

400.    Plaintiffs Smith, Fair, and Steen bring this claim on behalf of themselves and California Subclass Members.

401.    The UCL broadly prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

402.    Plaintiffs and the California Subclass members are reasonable consumers who don't expect their transmissions to exhibit transmission slips, kicking forward, jerking and or delayed acceleration.

403.    Defendant knew the Class Vehicles and their transmissions suffered from inherent defects, were defectively designed and/or manufactured, would fail prematurely, and were not suitable for their intended use.

404.    A business act or practice is "unfair" under the UCL if the reasons, justifications and motives of the alleged wrongdoer are outweighed by the gravity of the harm to the alleged victims.

405.    Ford has engaged in "unfair" business practices and/or acts by falsely representing the qualities of its express and implied warranties for Class Vehicles; by misrepresenting the workmanship of its Class Vehicles; by failing to disclose the Defect to consumers; and by refusing

to provide warranty coverage for the Transmission Defect.

406.     The acts and practices alleged herein are unfair because they caused Plaintiffs and California Subclass Members, and reasonable consumers like them, to believe that Ford was offering something of value that did not, in fact, exist. Ford intended for Plaintiffs and California Subclass Members to rely on its representations. As a result, purchasers and lessees, including Plaintiffs, reasonably perceived that they were receiving Class Vehicles with certain benefits. This perception induced reasonable purchasers to purchase or lease Class Vehicles which they would not otherwise have done had they known the truth.

407.     The gravity of the harm to Plaintiffs and California Subclass Members resulting from these unfair acts and practices outweighs any conceivable reasons, justifications and/or motives of Ford for engaging in such deceptive acts and practices. By committing the acts and practices alleged above, Ford engaged in unfair business practices within the meaning of the UCL.

408.     A business act or practice is also "fraudulent" under the UCL if it is likely to deceive members of the consuming public. Ford engaged in a uniform course of conduct which was intended to, and did in fact, deceive Plaintiffs and California Subclass Members and induced them into buying Class Vehicles. Ford's course of conduct and marketing practices were fraudulent within the meaning of the UCL because they deceived Plaintiffs and were likely to deceive members of the California Subclass, into believing that they were entitled to a benefit that did not, in fact, exist. Ford's misrepresentations are likely to deceive and have deceived the public.

409.     A business act or practice is also "unlawful" under the UCL if it violates any other law or regulation. Ford's conduct is unlawful as it has violated the MMWA, the CLRA, the Song-Beverly Consumer Warranty Act, the express warranty provisions of California Commercial

Code section 2313, and other laws as set forth herein.

410. Ford has engaged in unfair competition and unfair, unlawful and fraudulent business practices by the conduct, statements, and omissions described above, and by knowingly and intentionally concealing from Plaintiffs and California Subclass Members that the Class Vehicles suffer from the Transmission Defect (and the costs, risks, and diminished value of the Vehicles as a result of this problem).

411. Ford should have disclosed the Transmission Defect and related information because Ford was in a superior position to know the true facts related to the Defect. Plaintiffs and California Subclass Members could not reasonably be expected to learn or discover the true facts related to the Defect. Plaintiffs and California Subclass Members relied upon Ford's express representations and promises, as well as omissions, regarding the workmanship of and the warranties for the Class Vehicles, believed them to be true, and would not have agreed to purchase or lease Class Vehicles had they known the truth about the Defect.

412. Therefore, the omissions and acts of concealment, fraud, and deceit by Ford pertained to information that was material to Plaintiffs and the California Subclass Members, as it would have been to all reasonable consumers.

413. Ford had a duty to disclose the Transmission Defect because Ford had exclusive knowledge of the Defect prior to making sales and leases of Class Vehicles and because Ford made partial representations about the quality of Class Vehicles but failed to fully disclose that the Transmission Defect plagues Class Vehicles.

414. In failing to disclose that Class Vehicles contain the Defect, the true nature of the quality and workmanship of Class Vehicles, and suppressing other material facts from Plaintiffs and California Subclass Members, Ford breached its duties to disclose these facts, violated the

UCL, and caused injuries to Plaintiffs and California Subclass Members.

415.    Plaintiffs and California Subclass Members acted reasonably when they relied on Ford's misrepresentations and omissions in purchasing or leasing Class Vehicles—reasonably believing these were true and lawful.

416.    The injuries suffered by Plaintiffs and the California Subclass Members greatly outweigh any potential countervailing benefit to consumers or to competition, nor are they injuries that Plaintiffs and the California Subclass Members should have reasonably avoided.

417.    Through its fraudulent, unfair, and unlawful acts and practices, Ford has improperly obtained money from Plaintiffs and the California Subclass.

418.    As a result of their justifiable reliance on Ford's omissions and/or misrepresentations, Plaintiffs and the California Subclass members suffered, and will continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Transmission Defect, Plaintiffs and the California Subclass members were harmed and suffered actual damages in that the Class Vehicles' transmissions are substantially certain to fail before their expected useful life has run.

419.    Plaintiffs seek to enjoin further unlawful, unfair and/or fraudulent acts or practices by Ford relating to the Transmission Defect in Class Vehicles and from violating the UCL in the future by selling Class Vehicles with the Transmission Defect.

420.    Plaintiffs and California Subclass Members also seek to obtain restitutionary disgorgement of all monies and revenues generated as a result of such practices, require notice of this dangerous condition be given to the California Subclass, and all other relief allowed under Cal. Bus. & Prof. Code § 17200.

<u>THIRTEENTH CAUSE OF ACTION</u>

FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT ("FDUTPA")
(F.S.A. §§ 501.201, *et seq.*)
(Plaintiff Fiedler individually, and on behalf of the Florida Subclass)

421.    Plaintiffs incorporate by reference and reallege the preceding paragraphs as if fully set forth herein.

422.    Plaintiff Fiedler brings this cause of action individually and on behalf of the Florida Subclass.

423.    Plaintiff and other Florida Subclass Members are "persons" within the context of the FDUTPA. Fla. Stat. § 501.203(7).

424.    Defendant Ford is a "person" within the context of the FDUTPA. Fla. Stat. § 501.203(7).

425.    At all times relevant hereto, Ford was engaged in trade or commerce, as defined under the FDUTPA. Fla. Stat. § 501.203(8).

426.    Plaintiff and the proposed Florida Subclass are "consumers" who purchased and/or leased the Class Vehicles for personal, family or household use within the meaning of the FDUTPA. Fla. Stat. § 501.203(7).

427.    The FDUTPA prohibits engaging in any "unfair or deceptive acts or practices in the conduct of any trade or commerce…." Fla. Stat. § 501.204.

428.    Defendant's conduct, as described herein, took place within the state of Florida and constitutes unfair or deceptive acts or practices in the course of trade and commerce, in violation of the FDUTPA.

429.    Ford engaged in deceptive trade practices in violation of the FDUTPA by failing

430.    to disclose and actively concealing the dangers and risks posed by the Class

Vehicles and/or the defective Transmissions installed in each of them.

431.   Defendant violated the FDUTPA by representing that its Class Vehicles and Transmissions have characteristics or benefits that they do not have, and that the Class Vehicles "are of a particular standard, quality or grade" when they are of another.

432.   Defendant advertised the Class Vehicles with intent not to sell them as advertised, in violation of the FDUTPA.

433.   Defendant engaged in fraudulent and/or deceptive conduct, which creates a likelihood of confusion or of misunderstanding in violation of the FDUTPA.

434.   Ford has known of the Transmission Defect since before March 2018, when it issued the first TSB regarding the Defect, thereby acknowledging numerous consumer complaints made before that time to the NHTSA.  However, Ford continued to allow unsuspecting new and used car purchasers to buy or lease the Class Vehicles and allowed them to continue driving dangerous Vehicles.

435.   Ford owed Plaintiff and Florida Subclass Members a duty to disclose the true safety and reliability of the Class Vehicles and/or the defective Transmissions installed in them because Ford: (a) possessed exclusive knowledge of the dangers and risks posed by the foregoing; (b) intentionally concealed the foregoing from Plaintiff; and/or (c) made incomplete representations about the safety and reliability of the foregoing generally, while withholding material facts from Plaintiff and Florida Subclass Members that contradicted these representations.

436.   Defendant intended that Plaintiff and other Florida Subclass Members would, in the course of their decision to expend monies in purchasing, leasing and/or repairing Class Vehicles, reasonably rely upon the misrepresentations, misleading characterizations, warranties

and material omissions concerning the quality of the Class Vehicles and its Transmissions with respect to materials, workmanship, design and/or manufacture.

437. Ford's failure to disclose and active concealment of the dangers and risks posed by the defective Transmissions in Class Vehicles were material to Plaintiff and Florida Subclass Members, and any reasonable consumer would have considered those facts important in deciding whether to purchase or lease a Class Vehicle. A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

438. Ford's misrepresentations, concealment, omissions and other deceptive conduct were likely to deceive and cause misunderstanding and/or, in fact, caused Plaintiff and other Florida Subclass Members to be deceived about the safety and reliability of the Class Vehicles and its Transmissions, and that such Class Vehicles would be backed by both express and implied warranties that would, in fact, be honored by Defendant.

439. Although Ford and its agents were aware that the Class Vehicles were equipped with a defective 10R80 Transmission at the time that Plaintiff and Florida Subclass Members purchased or leased their Class Vehicles, Ford refused to provide a fix for its defective Transmission, free-of-charge in accord with the terms of its written warranty and to prevent the damages described herein.

440. Plaintiff and Florida Subclass Members reasonably relied on Ford's misrepresentations and omissions and expected that the Class Vehicles would not be equipped with a defective Transmission, such that it would render the Class Vehicles unsafe and not fit for their ordinary use. Further, Plaintiff and Florida Subclass Members reasonably expected Ford would honor its warranty obligations, as represented to them at the time they purchased or leased

their Class Vehicles.

441.    The conduct of Defendant offends public policy, as established by statutes and common law; is immoral, unethical, oppressive and/or unscrupulous and caused avoidable and substantial injury to Class Vehicle owners and lessees (who were unable to have reasonably avoided the injury due to no fault of their own) without any countervailing benefits to consumers.

442.    Plaintiff and Florida Subclass Members have been damaged as a proximate result of Defendant's violations of the FDUTPA and have suffered damages as a direct and proximate result of purchasing defective Class Vehicles.

443.    As a direct and proximate result of Defendant's violations of the FDUTPA, as set forth above, Plaintiff and Florida Subclass Members have suffered ascertainable loss of monies and property, caused by Ford's misrepresentations and failure to disclose material information and refusal to provide effective and free repairs pursuant to its warranty. Had they been aware of the defective Transmissions installed in the Class Vehicles, Plaintiff and Florida Subclass Members either would have paid less for their Vehicles or would not have purchased or leased them at all. Plaintiff and Florida Subclass Members did not receive the benefit of their bargain as a result of Ford's misconduct.

444.    Plaintiff Fiedler and the Florida Subclass are therefore entitled to relief, including restitution, actual damages, costs and attorneys' fees under section 501.2075 of the FDUTPA. Pursuant to relevant case law, Plaintiff and Florida Subclass Members may also be entitled to treble damages and punitive damages resulting from violations of the FDUTPA. Plaintiff and Florida Subclass Members are also entitled to injunctive relief, seeking an order enjoining Ford's unfair and/or deceptive acts or practices.

FOURTEENTH CAUSE OF ACTION

BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(Mass. Gen. Laws ch. 106, 2-314)
(Plaintiffs Barcelona and Marino individually, and on behalf of the Massachusetts Subclass)

445.    Plaintiffs incorporate by reference and re-allege the preceding paragraphs as if fully set forth herein.

446.    Plaintiffs Barcelona and Marino bring this cause of action individually and on behalf of the Massachusetts Subclass.

447.    Ford is and was at all relevant times a merchant with respect to the Class Vehicles.

448.    Ford was an is in actual or constructive privity with Plaintiffs and all Massachusetts Subclass Members.

449.    Pursuant to Mass. Gen. Laws ch. 106, § 2-314, the Class Vehicles owned or leased by Plaintiffs and Massachusetts Subclass Members were defectively designed and manufactured and posed a serious and immediate safety risk to consumers and the public.  The Class Vehicles were subject to an implied warranty of merchantability, did not comply with the warranty in that they were defective at the time of sale, and as a proximate result of the defect the Plaintiffs and Massachusetts Subclass Members sustained damages.

450.    The Class Vehicles left Ford's facilities and control with a Defect caused by defective design incorporated into the manufacture of the Class Vehicles.  The Defect puts the consumers at a safety risk upon driving the Class Vehicles.  At all times relevant hereto, there was a duty imposed by law which requires that a manufacturer or seller's product be reasonably fit for the ordinary purposes for which such products are used, and that the product be acceptable in trade for the product description.  This implied warranty of merchantability is part of the basis

of the bargain between Ford, on the one hand, and Plaintiffs and Massachusetts Subclass Members, on the other.

451.     Notwithstanding its duty, at the time of delivery Ford breached the implied warranty of merchantability in that the Class Vehicles transmissions were defective and posed a serious safety risk at the time of sale, would not pass without objection, are not fit for the ordinary purposes for which such goods are used, and failed to conform to the standard performance of like products used in the trade.

452.     Ford knew, or should have known, that the Class Vehicles posed a safety risk and were defective and knew, or should have known, of these breaches of implied warranties prior to sale or lease of the Class Vehicles to Plaintiffs and Massachusetts Subclass Members.

453.     As a direct and proximate result of Ford's breaches of its implied warranties, Plaintiffs and Massachusetts Subclass Members bought the Class Vehicles without knowledge of the Defect or their serious safety risks and purchased unsafe products which could not be used for their intended use.

454.     As a direct and proximate result of Ford's breach of its implied warranties, Plaintiffs and Massachusetts Subclass Members have suffered damages and Ford was unjustly enriched by keeping the profits for its unsafe products while never having to incur the cost of repair, replacement or a recall.

<u>FIFTEENTH CAUSE OF ACTION</u>

BREACH OF IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE
(Mass. Gen. Laws ch. 106, 2-315)
(Plaintiffs Barcelona and Marino individually, and on behalf of the Massachusetts Subclass)

455.     Plaintiffs Barcelona and Marino incorporate by reference and re-allege the preceding paragraphs as if fully set forth herein.

456. Pursuant to the Mass. Gen. Laws ch. 106, § 2-315, at the time Plaintiffs and Massachusetts Subclass members purchased or leased the Class Vehicles, they intended to use the goods for the particular purpose of safely driving the Class Vehicles on and off roadways for personal, family, or work purposes. At the time of purchase of the Class Vehicles, Ford had reason to know of these particular purposes and this implied warranty of fitness for a particular purpose was part of the basis of the bargain between Ford, on the one hand, and Plaintiffs and Massachusetts Subclass Members, on the other hand. Indeed, Ford sold or leased the Class Vehicles for such purposes.

457. Plaintiffs and Massachusetts Subclass members relied on Ford's skill and judgment to design and manufacture Class Vehicles suitable for this particular purpose. At the time of purchase, Ford had reason to know that Plaintiffs and Massachusetts Subclass members relied on its skill and judgment. The Class Vehicles, however, when sold or leased to Plaintiffs and Massachusetts Subclass members, and at all times thereafter, were not fit for their particular purpose of safely being driven. Specifically, the Class Vehicles owned by Plaintiffs and Massachusetts Subclass members were defectively designed and manufactured and left Ford's facilities and control with a Defect incorporated into the manufacture of the Class Vehicles and posed a serious risk to safety immediately upon purchase.

458. As a direct and proximate result of Ford's breach of the warranty of merchantability, Plaintiffs and Massachusetts Subclass members bought the Class Vehicles without knowledge of the Defect or their serious safety risks and purchased unsafe products which could not be used for their intended use. Plaintiffs and the Massachusetts Subclass members suffered, and will continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Transmission Defect, Plaintiffs and the

Massachusetts Subclass members were harmed and suffered actual damages in that the Class Vehicles' transmissions are substantially certain to fail before their expected useful life has run.

459. Plaintiffs and the other Massachusetts Subclass Members have been damaged in an amount to be proven at trial.

SIXTEENTH CAUSE OF ACTION

MASSACHUSETTS CONSUMER PROTECTION LAW
(Mass. Gen. Laws ch. 93A *et seq.*)
(Plaintiffs Barcelona and Marino individually, and on behalf of the Massachusetts Subclass)

460. Plaintiffs incorporate by reference and re-allege the preceding paragraphs as if fully set forth herein.

461. Plaintiffs Barcelona and Marino bring this cause of action individually and on behalf of the Massachusetts Subclass.

462. Plaintiffs assert a claim under the Massachusetts Consumer Protection Law ("MCPL") ("Chapter 93A"), which makes it unlawful to engage in any "[u]nfair methods of competition or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws ch. 92A, § 2(a).

463. Ford developed, manufactured, marketed and sold the defective Class Vehicles containing the Defective Transmissions as alleged herein. Ford developed, manufactured, marketed and sold the Class Vehicles despite knowledge of the Defect and that the Class Vehicles posed a serious safety risk to consumers like Plaintiffs and Massachusetts Subclass members.

464. Ford's actions and omissions in selling and leasing its Class Vehicles as safe for the road despite knowing that the Class Vehicles posed a serious safety risk to consumers, failing to disclose the Defect and safety risks known to Ford but hidden from the consumer, and Ford's knowing concealment of the defective Class Vehicles' unreasonable safety risks, are

misrepresentations, omissions and concealments of material fact that constitute unfair and/or deceptive trade practices in violation of the MCPL. Ford's unfair and deceptive practices alleged herein constitute unfair and deceptive acts or practices in or affecting commerce pursuant to 940 C.M.R. § 6.04(1)-(2). Ford's practices are illegal, unfair or deceptive acts or practices in the conduct of trade or commerce and are inherently deceptive. Ford's practices alleged herein offend public policy and are immoral, unethical, oppressive, and unscrupulous.

465.    Ford violated the MCPL not only when it sold the Class Vehicles as safe for use by consumers, but also when it failed to disclose to Plaintiffs and Massachusetts Subclass members that the Class Vehicles had a Defect that posed a serious safety risk to consumers and the public, despite Ford's knowledge that the Class Vehicles posed such a risk to Plaintiffs and Massachusetts Subclass members.

466.    Ford engaged in deceptive trade practices, in violation of the MCPL, including selling a product for personal or household use that was unsafe to use, holding out to the public that its product could be driven safely on the road, and failing to warn consumers that the Class Vehicles contained a Defect that posed a serious safety risk to consumers and the public.

467.    Ford's deceptive trade practices were designed to induce Plaintiffs and Massachusetts Subclass members to purchase the Class Vehicles containing the Defect and to avoid the cost of replacing, repairing or recalling the Class Vehicles already in use across the United States. Ford's violations of the MCPL were designed to conceal, and Ford failed to disclose, material facts about the Defect and unreasonable safety risks in the Class Vehicles in order to induce Plaintiffs and Massachusetts Subclass members to purchase the Class Vehicles and in order to avoid the business cost of replacing, repairing and/or recalling the Class Vehicles.

468.    By engaging in the unfair and deceptive conduct described herein, Ford actively

concealed and failed to disclose material facts about the defective Class Vehicles.

469.    The omissions set forth above regarding the Class Vehicles are omissions of material facts that a reasonable person would have considered important in deciding whether or not to purchase a Class Vehicle.  Indeed, no reasonable consumer would have knowingly bought or leased a Class Vehicle for use on the road, or otherwise, if that consumer had known that the product had a serious Defect that posed a safety risk and that the Defect caused the Class Vehicles to lose power in the normal course of use.

470.    Ford's acts were intended to be deceptive and/or fraudulent, namely to market, distribute and sell the Class Vehicles and to avoid the expense of replacing, repairing and/or recalling Class Vehicles across the United States.

471.    Plaintiffs and Massachusetts Subclass members suffered injury in-fact as a direct result of Ford's violations of the MCPL in that they have paid a premium for Class Vehicles that are equipped with Ford's defective 10R80 10-speed automatic transmission and that pose an immediate safety risk to consumers and the public. Plaintiffs and Massachusetts Subclass members did not receive the benefit of the bargain they made when purchasing or leasing their Class Vehicles.

472.    Plaintiffs and Massachusetts Subclass members have also been denied the use of their Class Vehicles, expended money on replacement and repairs, and suffered unreasonable diminution in value of their Class Vehicles as a result of Ford's conduct alleged herein.

473.    Had Ford disclosed the true quality, nature and defects of the Class Vehicles, Plaintiffs and Massachusetts Subclass members would not have purchased the Class Vehicles or would have paid less.

474. To this day, Ford continues to violate the MCPL by concealing the defective nature of the Class Vehicles in failing to notify customers, in failing to issue a recall, and in collecting the profits from costly repairs and replacements.

475. Prior to filing this Complaint, on November 27, 2019, Plaintiff Marino served a demand letter on Ford, notifying Ford of Plaintiff's damages and the Transmission Defect in his Class Vehicle and demanding relief, in compliance with Mass. Gen. Laws ch. 93A, § 9(3). Ford responded but did not offer classwide relief as requested.

476. Plaintiffs and Massachusetts Subclass Members have been damaged by these violations of the MCPL. The damages should be trebled, and Plaintiffs and Massachusetts Subclass members should be allowed to recover attorneys' fees pursuant to Mass. Gen. Laws ch. 93A § 9.

<u>SEVENTEENTH CAUSE OF ACTION</u>

BREACH OF NEW JERSEY CONSUMER FRAUD ACT
N.J. Stat. § 56:8-2
(On Behalf of Plaintiff Dougherty individually, and on behalf of the New Jersey Class)

477. Plaintiffs incorporate by reference and reallege the preceding paragraphs as if fully set forth herein.

478. Plaintiff Dougherty brings this cause of action individually and on behalf of the New Jersey Subclass.

479. Plaintiff Dougherty, who has suffered injury in fact and lost money or property as a result of Defendants' violations of New Jersey's Consumer Fraud Act ("NJCFA"), alleges this cause of action as a class action on behalf of himself and other similarly situated members of the New Jersey Subclass.

480. The NJCFA protects consumers from "any unconscionable commercial practice,

deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission, in connection with the sale or advertisement of any merchandise . . . ." N.J. Stat. Ann. § 56:8-2.

481.    As detailed above, Ford engaged in unlawful conduct by deliberately and knowingly misrepresenting and omitting the true character, quality, and nature of the 10R80 Transmissions in the Class Vehicles.

482.    Ford intended that Plaintiff Dougherty and New Jersey Class Members rely on its misrepresentation and/or acts of concealment and omission, so that they would purchase the Class Vehicles.

483.    Accordingly, Ford has engaged in, unfair, and deceptive trade practices. Further, Defendant's acts and practices described herein offend established public policy because the harm caused to Plaintiff and New Jersey Class Members, and their personal property, outweighs any benefit associated with such practices, and because Ford fraudulently, negligently and deceptively concealed the true nature of the Defect.

484.    Ford's actions as set forth above occurred in the conduct of trade or commerce.

485.    By engaging in the above-described practice and the actions and omissions alleged in this complaint, Ford has committed one or more unlawful acts in violation of the NJCFA.

486.    Ford's conduct caused Plaintiff Dougherty and New Jersey Class Members to suffer an ascertainable loss. In addition to direct monetary losses, Plaintiff and New Jersey Class Members have suffered an ascertainable loss in that they received less than what was promised to them by Defendant at the time they purchased their vehicles. Plaintiff and New Jersey Class Members have also had to expend time and resources for the repair of or attempted repair of their transmissions. Therefore, Plaintiff and New Jersey Class Members are entitled to recover such

damages, together with appropriate penalties, including treble damages, attorneys' fees and costs of suit.

487.    A causal relationship exists between Defendant's unlawful conduct and the ascertainable losses suffered by Plaintiff and the New Jersey Class Members. Had the Defect in the Class Vehicles been disclosed, Plaintiff and the New Jersey Class Members would not have purchased Class Vehicles or would have paid significantly less for them.

488.    Plaintiff Dougherty and New Jersey Class Members are entitled to equitable relief, including an order directing Ford to disclose the existence of the Defect inherent in its transmissions and to provide restitution and disgorgement of all profits paid to Ford as a result of its unfair, deceptive, and fraudulent practices, reasonable attorneys' fees and costs, and a permanent injunction enjoining such practices.

489.    Pursuant to N.J. STAT. ANN. § 56:8-20, Plaintiff Dougherty is serving the New Jersey Attorney General with a copy of this Complaint by certified mail.

<u>EIGHTEENTH CAUSE OF ACTION</u>

VIOLATION OF NEW YORK GENERAL BUSINESS LAW § 349
(N.Y. GEN. BUS. LAW § 349)
(On Behalf of Plaintiff Heller individually, and on behalf of the New York Subclass)

490.    Plaintiffs incorporate by reference and reallege the preceding paragraphs as if fully set forth herein.

491.    Plaintiff Heller brings this cause of action individually and on behalf of the New York Subclass.

492.    New York's General Business Law § 349 makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce."

493.    By failing to disclose and actively concealing the dangers and risks posed by the Class Vehicles and/or the defective transmissions installed in them, Defendants engaged in deceptive acts or practices prohibited by the New York General Business Law § 349, including: (i) representing that its vehicles and their transmissions had characteristics, uses, or benefits which they do not have; (ii) advertising its goods with intent not to sell them as advertised; (iii) representing that its vehicles and transmissions are of a particular standard, quality, or grade when they are not; (iv) representing that a transaction conferred or involved rights, remedies, or obligations which they do not; and (v) representing that its goods have been supplied in accordance with a previous representation when they have not.

494.    Defendants' actions as set forth above occurred in the conduct of trade or commerce.

495.    In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the defective transmissions installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

496.    Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the defective transmissions installed in them.

497.    Ford has known of the defective transmissions since before March 2018, when it issued its first TSB on this issue.  A formal internal investigation into the problem would have logically preceded that TSB.

498.     Complaints to the NHTSA, which Ford monitors with respect to its vehicles, show that drivers back were reporting the problem with the 10R80 Transmissions as early as mid-to-late 2017. Further Ford uses a variety of other means to track data about how its vehicles are performing after they are sold, including through tracking complaints, warranty claims, replacement parts data, and other aggregated data sources.

499.     Defendant's unfair or deceptive acts or practices, including these concealments, and omissions of material facts, had a tendency or capacity to mislead, tended to create a false impression in consumers, were likely to and did in fact deceive reasonable consumers, including Plaintiff, about the true safety and reliability of Class Vehicles and/or the defective transmissions installed in them, and the true value of the Class Vehicles.

500.     Defendant intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the defective transmissions installed in them with an intent to mislead Plaintiff Heller and the New York Subclass.

501.     To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the defective transmissions installed in the Class Vehicles, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving dangerous vehicles.

502.     Defendant owed Plaintiff and the Subclass a duty to disclose the true safety and reliability of the Class Vehicles and/or the defective transmissions installed in them because Defendants: (a) possessed exclusive knowledge of the dangers and risks posed by the foregoing; (b) intentionally concealed the foregoing from Plaintiff; and/or (c) made incomplete representations about the safety and reliability of the foregoing generally, while withholding material facts from Plaintiff and Subclass members that contradicted these representations.

503. Defendant's failure to disclose and active concealment of the dangers and risks posed by the defective transmissions in Class Vehicles were material to Plaintiff and the New York Subclass. A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

504. Plaintiff Heller and the New York Subclass suffered ascertainable loss caused by Defendant's misrepresentations and its failure to disclose material information. Had they been aware of the defective transmissions installed in the Class Vehicles, Plaintiff Heller and the New York Subclass either would have paid less for their vehicles or would not have purchased or leased them at all. Plaintiff and the New York Subclass did not receive the benefit of their bargain as a result of Defendant's misconduct.

505. Defendant's violations present a continuing risk to Plaintiff, the New York Subclass, as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

506. Plaintiff Heller and the other Subclass members were injured as a result of Defendant's conduct in that Plaintiff and the other New York Subclass members overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of Ford's misrepresentations and omissions.

<u>NINETEENTH CAUSE OF ACTION</u>
VIOLATION OF NEW YORK GENERAL BUSINESS LAW § 350
(N.Y. GEN. BUS. LAW § 350)
(Plaintiff Heller individually, and on behalf of the proposed New York Sub-Class)

507. Plaintiffs reference and reallege the paragraphs above as if fully set forth herein.

508.    Plaintiff Heller brings this cause of action individually and on behalf of the New York Subclass.

509.    New York's General Business Law § 350 makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce[.]" False advertising includes "advertising, including labeling, of a commodity … if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in the light of …representations [made] with respect to the commodity…." N.Y. Gen. Bus. Law § 350-a.

510.    Ford caused to be made or disseminated through New York, through advertising, marketing, and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Ford, to be untrue and misleading to consumers, including Plaintiff Heller and the other New York Subclass members.

511.    Ford has violated N.Y. Gen. Bus. Law § 350 because the misrepresentations and omissions regarding the Class Vehicles and/or the defective transmissions installed in them, as described above, which was material and likely to deceive a reasonable consumer.

512.    Plaintiff Heller and the other New York Subclass members have suffered injury, including the loss of money or property, as a result of Ford's false advertising. In purchasing or leasing their Class Vehicles, Plaintiff and the other New York Subclass members relied on the misrepresentations and/or omissions of Ford with respect to the safety, quality, functionality, and reliability of the Class Vehicles and/or the defective transmissions installed in them. Ford's representations turned out to be untrue because the defects described within renders the Class Vehicles and/or the panoramic transmissions installed in them to spontaneously shatter, as

described hereinabove. Had Plaintiff Heller and the other New York Subclass members known this, they would not have purchased or leased their Class Vehicles and/or paid as much for them.

513.    Accordingly, Plaintiff Heller and the other New York Subclass members overpaid for their Class Vehicles and did not receive the benefit of the bargain for their Class Vehicles, which have also suffered diminution in value.

514.    Plaintiff Heller, individually and on behalf of the other New York Subclass members, requests that this Court enter such orders or judgments as may be necessary to enjoin Ford from continuing their unfair, unlawful and/or deceptive practices. Plaintiff Heller and the other New York Subclass members are also entitled to recover their actual damages or $500, whichever is greater. Because Ford acted willfully or knowingly, Plaintiff Heller and the other Class members are entitled to recover three times actual damages, up to $10,000.

<u>TWENTIETH CAUSE OF ACTION</u>

PENNSYLVANIA UNFAIR TRADE PRACTICE
AND CONSUMER PROTECTION LAW ("UTPCPL")
(73 Pa. C.S.A. § 201-1, et seq.)
(Plaintiff Orndorff individually, and on behalf of the Pennsylvania Subclass)

515.    Plaintiffs incorporate by reference and reallege the preceding paragraphs as if fully set forth herein.

516.    Plaintiff Orndorff brings this cause of action individually and on behalf of the Pennsylvania Subclass.

517.    Plaintiff and other Pennsylvania Subclass Members are persons within the context of the UTPCPL, 73 P.S. § 201-2(2).

518.    Defendant Ford is a person within the context of the UTPCPL, 73 P.S. § 201-2(2).

519.    At all times relevant hereto, Ford was engaged in trade or commerce as defined

under the UTPCPL, 73 P.S. § 201-2(3).

520.    Plaintiff and the proposed Pennsylvania Subclass are "consumers" who purchased and/or leased the Class Vehicles for personal, family or household use within the meaning of the UTPCPL, 73 P.S. §§ 201-2(2) and 201.9-2.

521.    The UTPCPL prohibits engaging in any "unfair or deceptive acts or practices in the conduct of any trade or commerce…."  including representing that goods or services have characteristics, benefits or qualities that they do not have; representing that goods or services are of a particular standard, quality or grade if they are of another; advertising goods or services with intent not to sell them as advertised and certified; and engaging in other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding. 73 P.S. §§ 201-2, 201-3.

522.    Defendant's conduct, as described herein, took place within the Commonwealth of Pennsylvania and constitute unfair or deceptive acts or practices in the course of trade and commerce, in violation of §§ 201-2(4)(v), (vii), (ix), (xiv) and (xxi) of the UTPCPL.

523.    Ford engaged in deceptive trade practices in violation of the UTPCPL by failing to disclose and actively concealing the dangers and risks posed by the Class Vehicles and/or the defective transmissions installed in them.

524.    Defendant violated UTPCPL §§ 201-2(4)(v) and (vii) by representing that its Class Vehicles and transmissions have characteristics or benefits that they do not have and that the Class Vehicles "are of a particular standard, quality or grade" when they are of another.

525.    Defendant advertised the Class Vehicles with intent not to sell them as advertised, in violation of UTPCPL § 201-2(4)(ix).

526.    Defendant engaged in fraudulent and/or deceptive conduct which creates a likelihood of confusion or of misunderstanding in violation of UTPCPL § 201-2(4)(xxi).

527. Ford intentionally and knowingly misrepresented material facts regarding the Class Vehicles with an intent to mislead Plaintiff and the Pennsylvania Subclass members.

528. Ford has known of the defective transmissions since well before March 2018, when it issued the first TSB regarding the Defect, thereby acknowledging that numerous consumer complaints had already been made to the NHTSA, problems were reported by dealerships, and similar that would have led to an internal investigation. However, Ford continued to allow unsuspecting new and used car purchasers to buy or lease the Class Vehicles and allowed them to continue driving dangerous vehicles.

529. Ford owed Plaintiff and Pennsylvania Subclass members a duty to disclose the true safety and reliability of the Class Vehicles and/or the defective transmissions installed in them because Ford: (a) possessed exclusive knowledge of the dangers and risks posed by the foregoing; (b) intentionally concealed the foregoing from Plaintiff; and/or (c) made incomplete representations about the safety and reliability of the foregoing generally, while withholding material facts from Plaintiff and Pennsylvania Subclass members that contradicted these representations.

530. Defendant intended that Plaintiff and other Pennsylvania Subclass Members would, in the course of their decision to expend monies in purchasing, leasing and/or repairing Class Vehicles, reasonably rely upon the misrepresentations, misleading characterizations, warranties and material omissions concerning the quality of the Class Vehicles and its transmissions with respect to materials, workmanship, design and/or manufacture.

531. Ford's failure to disclose and active concealment of the dangers and risks posed by the defective transmissions in Class Vehicles were material to Plaintiff and Pennsylvania Subclass Members and any reasonable consumer would have considered those facts important in

deciding whether to purchase or lease a Class Vehicle. A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

532.    Ford's misrepresentations, concealment, omissions and other deceptive conduct were likely to deceive and cause misunderstanding and/or in fact caused Plaintiff and other Pennsylvania Subclass Members to be deceived about the safety and reliability of the Class Vehicles and its transmissions, and that such Class Vehicles would be backed by both express and implied warranties that would in fact be honored by Defendant.

533.    In failing to disclose the defective nature of the transmissions, Ford knowingly and intentionally concealed material facts and breached its duty not to do so

534.    Further, Section 201-(4)(xiv) of the UTPCPL provides that it shall be unlawful in the sale of goods to fail to comply with the terms of any written warranty given to the buyer at, or after a contract for the purchase of goods or services is made.

535.    Although Ford and its agents were aware that the Class Vehicles were equipped with a defective 10R80 transmission at the time that Plaintiff and Pennsylvania Subclass Members purchased or leased their Class Vehicles, Ford refused to provide a fix for its defective transmission, free of charge, as to comply with the terms of its written warranty and prevent the damages described herein.

536.    Plaintiff and Pennsylvania Subclass members reasonably relied on Ford's misrepresentations and omissions and expected that the Class Vehicles would not be equipped with a defective transmission, such that it would render the Class Vehicles unsafe and not fit for their ordinary use. Further, Plaintiff and Pennsylvania Subclass members reasonably expected

Ford would honor its warranty obligations as represented to them at the time they purchased or leased their Class Vehicle.

537.    The conduct of Ford offends public policy as established by statutes and common law; is immoral, unethical, oppressive and/or unscrupulous and caused avoidable and substantial injury to Class Vehicle owners and lessees (who were unable to have reasonably avoided the injury due to no fault of their own) without any countervailing benefits to consumers.

538.    Plaintiff and Pennsylvania Subclass members have been damaged as a proximate result of Defendant's violations of the UTPCPL and have suffered damages as a direct and proximate result of purchasing defective Class Vehicles.

539.    As a direct and proximate result of Defendant's violations of the UTPCPL, as set forth above, Plaintiff and the Pennsylvania Subclass members have suffered ascertainable loss of monies and property, caused by Ford's misrepresentations and failure to disclose material information and refusal to provide effective cost-free repairs pursuant to its warranty. Had they been aware of the defective transmissions installed in the Class Vehicles, Plaintiff and Pennsylvania Subclass members either would have paid less for their vehicles or would not have purchased or leased them at all. Plaintiff and Pennsylvania Subclass members did not receive the benefit of their bargain as a result of Ford's misconduct.

540.    Plaintiff and Pennsylvania Subclass members are therefore entitled to relief, including restitution, actual damages, treble damages, punitive damages, costs and attorney's fees, under sections 201-9.2(a) and 201-4.1 of the UTPCPL. Plaintiff and Pennsylvania Subclass members are also entitled to injunctive relief, seeking an order enjoining Ford's unfair and/or deceptive acts or practices under section 201-9.2(b) of the UTPCPL.

## TWENTY-FIRST CAUSE OF ACTION

BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(TEX. BUS. & COM. CODE § 2.314)
(Plaintiff McDonald individually, and on behalf of the Texas Subclass)

541.    Plaintiffs incorporate by reference and reallege the preceding paragraphs as if fully set forth herein.

542.    Plaintiff McDonald brings this cause of action individually and on behalf of the Texas Subclass.

543.    Ford was at all relevant times the manufacturer, distributor, warrantor, and/or seller of the Class Vehicles. Ford knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased.

544.    Ford provided Plaintiff McDonald and Texas Subclass Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.  However, the Class Vehicles are not fit for the ordinary purpose of providing reasonably reliable and safe transportation because, inter alia, the Class Vehicles and their transmissions suffered from an inherent defect at the time of sale and thereafter are not fit for their particular purpose of providing safe and reliable transportation.

545.    Ford impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use. This implied warranty included among other things:  (i) a warranty that the Class Vehicles and their transmissions were manufactured, supplied, distributed, and/or sold by Ford were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their transmissions would be fit for their intended use while the Class Vehicles were being operated.

546.     Contrary to the applicable implied warranties, the Class Vehicles and their transmissions at the time of sale and thereafter were not fit for their purpose and intended purpose of providing Plaintiff McDonald and Texas Subclass Members with reliable, durable and safe transportation.  Instead, the Class Vehicles are defective, including but not limited to the defective design and manufacture of their transmissions.

547.     As a result of Ford's breach of the applicable implied warranties, owners and/or lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles.  Additionally, as a result of the Transmission Defect, Plaintiff McDonald and Texas Subclass Members were harmed and suffered actual damages in that the Class Vehicles' transmissions are substantially certain to fail before their expected useful life has run.

548.     Ford's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and for such use in violation of TEX. BUS. & COM. CODE § 2.314.

549.     As a result of Ford's breach of the applicable implied warranties, owners and/or lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles.  Additionally, as a result of the Transmission Defect, Plaintiff McDonald and Texas Subclass Members were harmed and suffered actual damages in that the Class Vehicles' transmissions are substantially certain to fail before their expected useful life has run.

550.     As a direct and proximate result of Ford's breach of the warranty of merchantability, Plaintiff and Texas Subclass members bought the Class Vehicles without knowledge of the Defect or their serious safety risks and purchased unsafe products which could not be used for their intended use. Plaintiff and the Texas Subclass members suffered, and will continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles.

Additionally, as a result of the Transmission Defect, Plaintiff and the Texas Subclass members were harmed and suffered actual damages in that the Class Vehicles' transmissions are substantially certain to fail before their expected useful life has run.

551.    Plaintiff and the Texas Subclass Members have been damaged in an amount to be proven at trial.

<u>TWENTY-SECOND CAUSE OF ACTION</u>

BREACH OF IMPLIED WARRANTY OF FITNESS FOR A
PARTICULAR PURPOSE
(TEX. BUS. & COM. CODE § 2.315)
(Plaintiff McDonald individually, and on behalf of the Texas Subclass)

552.    Plaintiffs incorporate by reference and reallege the preceding paragraphs as if fully set forth herein.

553.    Plaintiff McDonald brings this cause of action individually and on behalf of the Texas Subclass Members.

554.    Ford was at all relevant times the manufacturer, distributor, warrantor, and/or seller of the Class Vehicles. Ford knew or had reason to know of the specific use and the particular purpose for which the Class Vehicles were purchased or leased

555.    Ford provided Plaintiff McDonald and Texas Subclass Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.  However, the Class Vehicles are not fit for the ordinary purpose of providing reasonably reliable and safe transportation because, *inter alia,* the Class Vehicles and their transmissions suffered from an inherent defect at the time of sale and thereafter are not fit for their particular purpose of providing safe and reliable transportation.

556.    Ford impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use. This implied warranty included among other things:  (i) a warranty that the Class

Vehicles and their transmissions were manufactured, supplied, distributed, and/or sold by Ford were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their transmissions would be fit for their intended use while the Class Vehicles were being operated.

557.    Contrary to the applicable implied warranties, the Class Vehicles and their transmissions at the time of sale and thereafter were not fit for their purpose and intended purpose of providing Plaintiff McDonald and Texas Subclass Members with reliable, durable and safe transportation.  Instead, the Class Vehicles are defective, including but not limited to the defective design and manufacture of their transmissions.

558.    As a result of Ford's breach of the applicable implied warranties, owners and/or lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles.  Additionally, as a result of the Transmission Defect, Plaintiff McDonald and Texas Subclass Members were harmed and suffered actual damages in that the Class Vehicles' transmissions are substantially certain to fail before their expected useful life has run.

559.    Ford's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of TEX. BUS. & COM. CODE § 2.315.

560.    As a result of Ford's breach of the applicable implied warranties, owners and/or lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles.  Additionally, as a result of the Transmission Defect, Plaintiff McDonald and Texas Subclass Members were harmed and suffered actual damages in that the Class Vehicles' transmissions are substantially certain to fail before their expected useful life has run.

561.    As a direct and proximate result of Ford's breach of the warranty of fitness for a particular purpose, Plaintiff and Texas Subclass members bought the Class Vehicles without knowledge of the Defect or their serious safety risks and purchased unsafe products which could not be used for their intended use. Plaintiff and the Texas Subclass members suffered, and will continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Transmission Defect, Plaintiff and the Texas Subclass members were harmed and suffered actual damages in that the Class Vehicles' transmissions are substantially certain to fail before their expected useful life has run.

562.    Plaintiff and the Texas Subclass Members have been damaged in an amount to be proven at trial.

<u>TWENTY-THIRD CAUSE OF ACTION</u>

VIOLATION OF THE TEXAS DECEPTIVE TRADE PRACTICES AND CONSUMER
PROTECTION ACT
(TEX. BUS. & COM. CODE § 17.41, et seq.)
(Plaintiff McDonald individually, and on behalf of the Texas Subclass)

563.    Plaintiffs incorporate by reference and reallege the preceding paragraphs as if fully set forth herein.

564.    Plaintiff McDonald brings this cause of action individually and on behalf of the Texas Subclass.

565.    Ford is a "person" as defined by TEX. BUS. & COM. CODE § 17.45(3).

566.    Class Vehicles are "goods" as defined by TEX. BUS. & COM. CODE § 17.45(1)

567.    Plaintiff McDonald and Texas Subclass Members are "consumers" within the meaning of TEX. BUS. & COM. CODE § 17.41(4) because they are individuals who acquired by purchase or lease their Class Vehicles.

568.     By failing to disclose and concealing the defective nature of the transmissions from Plaintiff McDonald and Texas Subclass Members, Ford violated TEX. BUS. & COM. CODE § 1746(a), as it represented that the Class Vehicles and their transmissions had characteristics and benefits that they do not have, and represented the Class Vehicles and their transmissions were of a particular standard, quality or grade when they were of another. TEX. BUS. & COM. CODE § 1746(b)(5) & (7).

569.     Ford's unfair and deceptive acts or practices occurred repeatedly in Ford's trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

570.     Ford knew that the Class Vehicles and their transmissions suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

571.     As a result of their reliance on Ford's omissions and/or misrepresentations, owners and or lessees of the Class Vehicles suffered an ascertainable loss of money, property and/or value of their Class Vehicles.  Additionally, as a result of the Transmission Defect, Plaintiffs and the Texas Subclass Members were harmed and suffered actual damages in that the Class Vehicles' transmissions are substantially certain to fail before their expected useful life has run.

572.     Ford was under a duty to Plaintiff and the Texas Subclass Members to disclose the defective nature of the transmissions and/or associated repair cost because:

      (a) Ford was in a superior position to know the true state of facts about the safety defect in Class Vehicles' transmissions;

      (b) Plaintiff and Texas Subclass could not have reasonably been expected to learn or discover that their transmissions had a dangerous safety defect until it

manifested; and

(c) Ford knew that Plaintiff and Texas Subclass could not reasonably have been expected to learn of or discover the safety defect.

573.    In failing to disclose the defective nature of the transmissions, Ford knowingly and intentionally concealed material facts and breached its duty not to do so.

574.    The facts Ford concealed from or did not disclose to Plaintiff and the Texas Subclass members are material in that a reasonable consumer would have considered them important in deciding whether to purchase or lease the Class Vehicles or pay less.  Had Plaintiff and the Texas Subclass members known that the Class Vehicles' transmissions were defective, they would not have purchased or leased the Class Vehicles or would have paid less for them.

575.    Plaintiff and Texas Subclass members are reasonable consumers who do not expect the transmissions installed in their vehicles to exhibit slips, kicking forward, jerking, premature internal wear, delayed acceleration and/or difficulty stopping the vehicle.  This is the reasonable and objective consumer objective relating to vehicle transmissions.

576.    As a result of Ford's conduct, Plaintiff and Texas Subclass members were harmed and suffered actual damages in that the Class Vehicles experienced and will continue to experience transmission slips, kicking forward, jerking, increased stopping times, premature internal wear, and delayed acceleration.

577.    As a direct and proximate result of Ford's unfair and deceptive acts or practices Plaintiff and Texas Subclass members suffered and will continue to suffer actual damages.

578.    Plaintiff and Texas Subclass members are entitled to equitable relief.

<u>REQUESTS FOR RELIEF</u>

WHEREFORE, Plaintiffs, individually and on behalf of the other members of the Class

and Subclasses proposed in this Complaint, respectfully request that the Court enter judgment in their favor and against Ford, as follows:

A.    Declaring that this action is a proper class action, certifying the Class as requested herein, designating Plaintiffs as Class and Subclass Representatives and appointing the undersigned counsel as Class Counsel;

B.    Ordering Ford to pay actual damages (and no less than the statutory minimum damages) and equitable monetary relief to Plaintiffs and the other members of the Class and Subclasses;

C.    Ordering Ford to pay punitive damages, as allowable by law, to Plaintiffs and the other members of the Class and Subclasses;

D.    Ordering Ford to pay statutory damages, as allowable by the statutes asserted herein, to Plaintiffs and the other members of the Class and Subclasses;

E.    Awarding injunctive relief as permitted by law or equity, including enjoining Ford from continuing the unlawful practices as set forth herein, and ordering Defendant to engage in a corrective recall campaign;

F.    Ordering Ford to pay attorneys' fees and litigation costs incurred by Plaintiffs for the benefit of the Class and Subclasses;

G.    Ordering Ford to pay both pre- and post-judgement interest on any amounts awarded; and

H.    Ordering such other and further relief as may be just and proper.

DEMAND FOR JURY TRIAL

Plaintiffs, on behalf of themselves and all others similarly situated, hereby demand a trial by jury as to all matters so triable.

Dated:  September 25, 2020                    Respectfully submitted,

**GREG COLEMAN LAW PC**

/s/ *Lisa A. White*
Lisa A. White*
Gregory F. Coleman
Lisa A. White*
Ryan P. McMillan*
800 S. Gay Street, Suite 1100
Knoxville, TN 37929
Telephone: 865-247-0080
Facsimile:  865-522-0049
greg@gregcolemanlaw.com
lisa@gregcolemanlaw.com
ryan@gregcolemanlaw.com

John R. Fabry*
**THE CARLSON LAW FIRM, P.C**.
1717 N. Interstate Highway 35**,** Suite 305
Round Rock, Texas 78664
Telephone: 512-671-7277
Facsimile:  512-238-0275
JFabry@carlsonattorneys.com

Sidney F. Robert*
**BRENT COON AND ASSOCIATES**
300 Fannin, Suite 200
Houston, Texas 77002
Telephone:713-225-1682
Facsimile: 713-225-1785
Email: sidney.robert@bcoonlaw.com

Edward A. Wallace
**WEXLER WALLACE LLP**
55 W. Monroe Street, Suite 3300
Chicago, IL 60603
Telephone: 312-346-2222
Facsimile:  312-346-0022
eaw@wexlerwallace.com

*Attorneys for Plaintiffs*

*Admitted or pending *pro hac vice*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the above and foregoing document was filed and served electronically through the Court's CM/ECF system on September 25, 2020, upon the following counsel of record:

Hector Torres
Cindy Caranella Kelly
Constantine Z. Pamphilis
**KASOWITZ BENSON TORRES LLP**
1633 Broadway
New York, NY 10019
Telephone: 212-506-1700
 Facsimile: 212-506-1800

 Mark H. Boyle
 Bradley E. Puklin
**DONOHUE BROWN MATHEWSON & SMYTH LLC**
140 South Dearborn Street, Suite 800
Chicago, IL 60603
Telephone: 312-422-0900
Facsimile:  312-422-0909

/s/ *Lisa A. White*
Lisa A. White*
