**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JUSTIN O'CONNOR, et al., on behalf of himself and all other similarly situated, | ) ) ) | Case No. 19-cv-5045 |
| Plaintiffs, | ) ) | Consolidated with Case Nos. 20-cv-1981, 20-cv-2095, |
| v. | ) ) | and 20-cv-2612 |
| FORD MOTOR COMPANY, | ) ) | Judge Robert M. Dow, Jr. |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs bring this class action complaint against Defendant Ford Motor Company ("Defendant" or "Ford") for damages allegedly arising out of Defendant's sale and lease of 2017 to 2020 Model Year Ford F-150 trucks with defective 10R80 10-speed automatic transmissions. Currently before the Court is Defendant's motion [64] to dismiss the Consolidated Amended Class Action Complaint [63]. For the reasons explained below, the motion to dismiss [64] is granted in part and denied in part. In particular, the motion to dismiss:

Count 1, for breach of express warranty, is granted as to Plaintiff Smith (one of several California Plaintiffs), but otherwise denied;

Count 2, for breach of implied warranty, is granted to the extent it is based on the Massachusetts, New York, and Pennsylvania implied warranties of fitness for a particular purpose and the Illinois implied warranty of merchantability, but otherwise denied;

Count 3, for violation of the Magnuson-Moss Warranty Act, is granted as to Plaintiff O'Connor (one of two Illinois Plaintiffs), but otherwise denied;

Count 4, for negligence, is granted as to California, Florida, Illinois, Massachusetts, New Jersey, New York, Pennsylvania, and Texas;

Count 5, for fraud and fraudulent concealment, is granted as to the California, Florida, Illinois, New Jersey, and Pennsylvania fraud and fraudulent concealment claims, the New York fraud claim, the Massachusetts and Texas fraudulent concealment claims, and Massachusetts Defendant Barcelona's fraud claim; but denied as to Massachusetts Defendant Marino's fraud claim and the New York fraudulent concealment claim;

Count 6, for unjust enrichment, is granted as to California, Florida, Illinois, Massachusetts, New Jersey, and New York, but denied as to Pennsylvania and Texas;

Count 7, for violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, is granted;

Count 8, for violation of California's Song-Beverly Consumer Warranty Act based on express warranties, is granted as to Plaintiff Smith (one of several California Plaintiffs), but otherwise denied;

Count 9, for violation of California's Song-Beverly Consumer Warranty Act based on implied warranties, is denied;

Count 10, for breach of California's implied warranty of merchantability, is denied;

Count 11, for violation of California's Consumer Legal Remedies Act, is denied;

Count 12, for violation of California's Unfair Competition Law, is denied;

Count 13, for violation of Florida's Deceptive and Unfair Trade Practices Act, is denied;

Count 14, for breach of Massachusetts' implied warranty of merchantability, is granted because it is duplicative of Count 2;

Count 15, for breach of Massachusetts' implied warranty of fitness for a particular purpose, is granted;

Count 16, for violation of Massachusetts' Consumer Protection Law, is denied;

Count 17, for violation of the New Jersey Consumer Fraud Act, is denied;

Count 18, for violation of the New York General Business Law § 349, is denied;

Count 19, for violation of the New York General Business Law § 350, is denied;

Count 20, for violation of Pennsylvania's Unfair Trade Practice and Consumer Protection Law, is denied;

Count 21, for violation of Texas' implied warranty of merchantability, is denied;

Count 22, for violation of Texas' implied warranty of fitness for a particular purpose, is granted; and

Count 23, for violation of Texas' Deceptive Trade Practices and Consumer Protection Act, is denied.[1]

Counsel are directed to file a joint status report by no later than 10/21/2021 that includes (a) a proposed discovery schedule; and (b) a statement in regard to any settlement discussions and/or any mutual request for a referral to the assigned Magistrate Judge for a settlement conference.

---

[1] The parties (particularly Defendant) are reminded that, in their future briefs, footnotes should not be used to evade the page limits set by the Court. See *Fleming v. Kane County*, 855 F.2d 496, 498 (7th Cir. 1988); *In re Rough Rice Commodity Litigation*, 2012 WL 473091, at *1 n.1 (N.D. Ill. Feb. 9, 2012); *Leonardo v. Health Care Service Corp.*, 2010 WL 317520, at *4 n.1 (N.D. Ill. Jan. 20, 2010). At the parties' request, the Court expanded the page limits to a generous 75 pages for the opening and response briefs and 40 pages for the reply. See [62]. If Defendant had not moved much of its text into footnotes, however, it would have exceeded the page limits by a significant amount. Defendant's opening brief contains 83 footnotes and its reply 113 footnotes, all of which are single-spaced, in small type, and often "contain crucial information and arguments." *Leonardo*, 2010 WL 317520, at *4 n.1. This makes Defendant's arguments more difficult than necessary to follow and creates a risk that Plaintiffs and the Court will miss important points. The Court is also within its discretion to consider points made only in footnotes to be waived. See *Vulcan Golf, LLC v. Google Inc.*, 552 F. Supp. 2d 752, 765 n. 6 (N.D. Ill. 2008). Although the "the Court is not opposed to the use of footnotes in principle," it "encourages the parties to avoid gratuitous misuse of an instrument generally reserved for tangential details." *Leonardo*, 2010 WL 317520, at *4 n.1.

## I.    Background

This action was originally brought by Illinois Plaintiff Justin O'Connor on behalf of himself and a proposed class. In July 2020, the Executive Committee reassigned three related, higher-numbered cases (Case Nos. 20-cv-1981, 20-cv-2095, and 20-cv-2612) to this Court to be consolidated with Case No. 19-cv-5045. See [57]. On August 7, 2020, the Court entered an order dismissing the amended complaint in the lead case, but authorizing Plaintiffs to file a second amended complaint. See [59]. Plaintiffs filed their 127-page Consolidated Amended Class Action Complaint [63] ("Complaint") on September 25, 2020.

The following facts are taken from the Complaint [63]. All well-pled allegations in the Complaint are assumed to be true for purposes of Defendant's motion to dismiss. See *Calderon-Ramirez v. McCament*, 877 F.3d 272, 275 (7th Cir. 2017). Defendant is a publicly traded company, incorporated in Delaware and with a principal place of business in Dearborn, Michigan. The twelve named Plaintiffs are individuals who purchased or leased Model Year 2017-2020 Ford F-150 vehicles ("Class Vehicles" or "Vehicles") that were designed, manufactured, distributed, marketed, sold, and leased by Defendant or Defendant's parent, subsidiary, or affiliates.[2] Each Vehicle was equipped with a 10R80, which is a 10-speed automatic transmission ("Transmission"). The Complaint explains that an automatic transmission is essentially an

---

[2] More particularly, Justin O'Connor ("O'Connor") is an Illinois citizen who leased a 2018 Ford F-150 XLT 3.5 EcoBoost. Stanislaw Zielinski ("Zielinski") is an Illinois citizen who purchased a new 2018 Ford F-150. Daniel Fair ("Fair") is a California citizen who purchased a 2019 Ford F-150 Limited. Bryan Smith ("Smith") is a California citizen who purchased a 2018 Ford F-150 XLT. Jason Steen ("Steen") is a California citizen who purchased a 2017 Ford F-150 XLT 3.5 EcoBoost. William Fiedler ("Fiedler") is a Florida citizen who purchased a 2018 Ford F-150. Michael Barcelona ("Barcelona") is a Massachusetts citizen who purchased a 2018 Ford F-150 Crew Cab. Robert Marino ("Marino") is a Massachusetts citizen who leased a 2019 Ford F-150 Sport. Brian Dougherty ("Dougherty") is a New Jersey citizen who purchased a 2018 Ford F-150. Susan Heller ("Heller") was a New York citizen when she purchased a 2018 Ford F-150; she has since moved to Tennessee. Victor Orndorff ("Orndorff") is a Pennsylvania citizen who purchased a 2018 Ford F-150 Super Cab. Michael McDonald ("McDonald") is a Texas citizen who purchased a 2018 Ford F-150.

automatic gear shifter. Instead of manually shifting the gears with a clutch, the automatic transmission does it on its own. The transmission acts as a powertrain to convert the vehicle engine's force into a controlled source of power. It allows drivers to safely and reliably accelerate and decelerate their vehicles.

Plaintiffs have proposed a class that includes at least 100 members and aggregated claims that exceed $5 million, exclusive of interest and costs. The proposed Class is defined as: "All persons in the United States and its territories who formerly or currently own or lease one or more of 2017 to 2020 Model Year Ford F-150 trucks with a 10R80 10-speed automatic transmission." [63] at 58. The Complaint also proposes Illinois, California, Florida, Massachusetts, New Jersey, New York, Pennsylvania, and Texas Subclasses. *Id.* at 59-60.

The Complaint details all of the Plaintiffs' decisions to buy or lease their Vehicles from Ford and their experiences driving the Vehicles. See [63] at 14-45. The Court will discuss the more granular details of each Plaintiff's decision and experience as necessary in the Analysis section below. At a high level, many or most of the Plaintiffs performed research before deciding to buy or lease their Vehicles, including reviewing Vehicle specifications and advertising touting the Vehicles' performance and reliability, as well as speaking with salespeople at Ford dealerships. None of the Plaintiffs were informed of the problems with the Vehicles' Transmissions. Plaintiffs allege that they would not have purchased/leased the Vehicles or would have paid significantly less if they had known that the Transmission contain a defect ("Defect").

All of the Plaintiffs report experiencing problems with their Transmissions, including: a loud "clunking" or banging noise when the engine starts; a "clanking" noise from the Transmission; jerky and rough acceleration and deceleration; delayed engagement of the Transmission and gears holding too long then roughly slamming into gear; the Vehicle failing to

5

speed up when trying to accelerate; the Transmission slipping and jerking while accelerating and shifting gears; the Transmission slipping while driving in any gears; and, most seriously, the loss of acceleration and shifting capability while driving. The Complaint alleges that because of the Defect, the Class Vehicles are likely to suffer serious damages and potentially catch fire if accidents occur, causing an unreasonable and extreme risk of serious bodily harm or death to the Vehicle's occupants and others in the vicinity. [63] at 7. Nearly all of the Plaintiffs report that they took their Vehicles into Ford dealerships for repairs and/or complained to Ford, but the problems with their Vehicles were not fixed and they were not provided the relief they requested.

The Complaint alleges that Defendant knew or should have known of the Transmission Defect prior to Plaintiffs' purchase or lease of their Vehicles. It details numerous complaints that consumers filed with the National Highway Traffic Safety Administration ("NHTSA") concerning the Transmissions, beginning in late 2017 and continuing through 2020. See [63] at 47-53. Defendant issued its first Technical Service Bulletin ("TSB") concerning the Defect in March 2018 and additional TSBs after that. The TSBs stated that 2017 and 2018 F-150 vehicles "may exhibit harsh/bumpy upshift, downshift and/or engagement concerns." *Id.* at 46. To address this problem, the TSBs suggested reprogramming the powertrain control module ("PCM"). The TSBs explained that the Vehicles were "equipped with an adaptive transmission shift strategy which allows the vehicle's computer to learn the transmission's unique parameters and improve shift quality. When the adaptive strategy is reset, the computer will begin a re-learning process. This re-learning process may result in firmer than normal upshifts and downshifts for several days." *Id*. However, the Complaint alleges, Defendant's "adaptive transmission shift strategy" fails to remedy the Transmission's shifting problems. Defendant nonetheless took no further steps to remedy the

problem, leaving Plaintiffs and other members of the proposed class with knowingly defective Vehicles.

Instead, the Complaint alleges, Defendant misrepresented and actively concealed the Transmission defect "through its website, multimedia advertisements, brochures, and in-person statements by its employees, authorized dealers, agents, sales representatives and/or repair technicians—touting the defective transmission's safety, reliability, enhanced responsiveness and performance." [63] at 54. For instance, in a brochure for the 2019 Ford F-150, Defendant stated:

> 10-Speed Transmission
>
> Standard with five F-150 engines for 2019, the innovative 10-speed automatic transmission with SelectShift®capability helps deliver higher average power for acceleration – improving responsiveness and performance. With optimized gear spacing, including 3 overdrive gears, the 10-speed gearbox helps maximize shift points and gear rations to optimize power, low-rpm torque and fuel efficiency. For proof, see the Engines charts on the previous page.
>
> 10 speeds, plus progressive range select and tow/haul mode, enhance towing confidence. An electronic control system is engineered to help ensure the right gear at the right time, including skip-shift and direct downshift capability. Select the operating range for automatic shifting (in Drive) thanks to progressive range select. Combined with SelectShift operation in manual mode, the 10-speed delivers an exceptional level of driver control.

[63] at 54.

The Complaint alleges that instead of disclosing the Transmission defect, Defendant has, "from 2017 to the present, … attempted to squelch public recognition of the Transmission Defect by propagating the falsehood that the harsh and bumpy shifting in Class Vehicles was 'normal,' through statements made to consumers and the general public by Ford employees, authorized dealers, agents, sales representatives and/or repair technicians, and through TSBs which sought to normalize the poor performance and safety issues." *Id*. at 55. Defendant has not recalled the Vehicles to repair the Transmission Defect or offered to reimburse Vehicle owners/leasees who

incurred costs relating to the Transmissions' problems.  The Defect has allegedly diminished the value of the Vehicles, including their resale value.

Ford offers a "New Vehicle Limited Warranty" for three years or 36,000 miles, whichever occurs first.  [63] at 12 (citing 2018 Model Year Ford Warranty Guide).  Ford also offers extended warranty coverage for Powertrain components for five years or 60,000 miles, whichever occurs first. This extended warranty coverage includes the Transmission and all internal parts, clutch cover, seals and gaskets, torque converter, transfer case (including all internal parts), transmission case, and transmission mounts.  Despite these warranties, however, "Ford refuses to replace or repair the Transmissions and merely states that the abrupt and harsh shifting is normal." *Id*. at 2.

Based on these allegations, the Complaint asserts claims for breach of express warranty under all eight states' laws (Count 1); breach of implied warranty under Illinois, Florida, New Jersey, New York, Massachusetts, and Pennsylvania law (Count 2); violation of the federal Magnuson-Moss Warranty Act (Count 3); negligence (Count 4); fraud/fraudulent concealment (Count 5); unjust enrichment (Count 6); violation of Illinois' Consumer Fraud and Deceptive Business Practices Act (Count 7); violation of California's Song-Beverly Consumer Warranty Act based on express warranties (Count 8) and implied warranties (Count 9); breach of California's implied warranty of merchantability (Count 10), Consumer Legal Remedies Act (Count 11), and Unfair Competition Law (Count 12); violation of the Florida Deceptive and Unfair Trade Practices Act (Count 13); breach of Massachusetts' implied warranty of merchantability (Count 14), implied warranty of fitness for a particular purpose (Count 15), and Consumer Protection Law (Count 16); violation of New Jersey's Consumer Fraud Act (Count 17); violation of New York General Business Law § 349 (Count 18) and § 350 (Count 19); violation of Pennsylvania's Unfair Trade Practice and Consumer Protection Law (Count 20); and violation of Texas' implied warranty of

merchantability (Count 21), implied warranty of fitness for a particular purpose (Count 22), and Deceptive Trade Practices and Consumer Protection Act (Count 23). The particulars of these claims are discussed to the extent necessary in the Analysis section below.

## II.    Legal Standard

A Rule 12(b)(6) motion challenges the legal sufficiency of the complaint. For purposes of a motion to dismiss under Rule 12(b)(6), the Court "'accept[s] as true all of the well-pleaded facts in the complaint and draw all reasonable inferences in favor of the plaintiff.'" *Calderon-Ramirez*, 877 F.3d at 275 (quoting *Kubiak v. City of Chicago*, 810 F.3d 476, 480-81 (7th Cir. 2016)). To survive a motion to dismiss under Rule 12(b)(6), a plaintiff's complaint must allege facts which, when taken as true, "'plausibly suggest that the plaintiff has a right to relief, raising that possibility above a speculative level.'" *Cochran v. Illinois State Toll Highway Auth.*, 828 F.3d 597, 599 (7th Cir. 2016) (quoting *EEOC v. Concentra Health Servs.*, 496 F.3d 773, 776 (7th Cir. 2007)). The Court reads the complaint and assesses its plausibility as a whole. See *Atkins v. City of Chicago*, 631 F.3d 823, 832 (7th Cir. 2011). It is proper for the Court to "consider, in addition to the allegations set forth in the complaint itself, documents that are attached to the complaint, documents that are central to the complaint and are referred to in it, and information that is properly subject to judicial notice." *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013) (citing *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir.2012)); see also Fed. R. Civ. P. 10(c). Further, although it is well established that a "complaint may not be amended by the briefs in opposition to a motion to dismiss," *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 348 (7th Cir. 2012), the Court may "consider additional facts set forth in" a brief opposing dismissal "so long as those facts 'are consistent with the pleadings.'" *Phillips v. Prudential Ins. Co. of Am.*,

714 F.3d 1017, 1019–20 (7th Cir. 2013) (quoting *Geinosky*, 675 F.3d at 745 n.1); *see also In re Dealer Management Systems Antitrust Litigation*, 313 F. Supp. 3d 931, 938–39 (N.D. Ill. 2018).

Claims sounding in fraud are subject to the heightened federal pleading standard of Rule 9(b), which requires a plaintiff to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Id*. "This means that a 'plaintiff must describe the 'who, what, when, where, and how' of the fraud—'the first paragraph of any newspaper story.'" *United States ex rel. Suarez v. AbbVie, Inc.*, 503 F. Supp. 3d 711, 723 (N.D. Ill. 2020) (quoting *United States ex rel. Berkowtiz v. Automation Aids, Inc.*, 896 F.3d 834, 839 (7th Cir. 2018)).

## III. Analysis

### A. Breach of Express Warranty (Counts 1 and 8)

#### 1. Manufacturing defect versus design defect

In Count 1, Plaintiffs allege breach of express warranty in violation of the Illinois, California, Florida, Massachusetts, New Jersey, New York, Pennsylvania, and Texas statutes that codify § 2-313 of the Uniform Commercial Code ("UCC"). See [63] at 62. This count is based on Defendants' alleged breach of its "New Vehicle Limited Warranty," which provides that "authorized Ford Motor Company dealers will, without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in the factory-supplied materials or factory workmanship." *Id*. at 63. In Count 1, Plaintiffs allege that, "[a]s evidenced by the TSB from September 7, 2018, the Transmission Defect is covered by [the] New Vehicle Limited Warranty." *Id*. Similarly, in Count 8, the California Plaintiffs allege that Defendant's breach of the New Vehicle Limited Warranty violates California's Song-Beverly Consumer Warranty Act, Cal. Civ. Code §§ 1791.2 and 1793.2.

Defendant argues that Counts 1 and 8 should be dismissed because the New Vehicle Limited Warranty covers only manufacturing defects, and Plaintiffs have alleged only a design defect. Generally speaking, "[a] manufacturing defect 'occurs when one unit in a product line is defective, whereas a design defect occurs when the specific unit conforms to the intended design but the intended design itself renders the product unreasonably dangerous.'" *Hakim v. Safariland, LLC*, 410 F. Supp. 3d 862, 868–69 (N.D. Ill. 2019) (quoting *Salerno v. Innovative Surveillance Tech., Inc*., 932 N.E.2d 101, 108 (Ill. App. 2010)). While acknowledging that the Complaint, at a minimum, contains "broad, conclusory allegation[s] concerning 'a common design and/or manufacturing defect,'" [64-1] at 36 (citing [63] at 6, ¶ 5), Defendant insists that only a design defect is properly pled, as "confirmed by the sweeping scope of the other class action allegations" of the Complaint that the defect exists in "all" Class Vehicles. *Id*.

The Court is not convinced that this issue can be decided based on the pleadings alone. The Complaint's allegations do not compel the Court to conclude that only a design defect, and not a manufacturing defect, must be the root cause of the Transmission Defect. At this early stage of the case, "it is logically possible that either could be the case; perhaps the transmissions work badly even though built as designed; or maybe they *all* were badly built, even though well-patterned." *Francis v. General Motors, LLC*, 504 F. Supp. 3d 659, 673 (E.D. Mich. 2020). That is, even assuming that a manufacturing defect "is more likely to occur sporadically, it is entirely possible that some grave error in material or workmanship during assembly caused all Class Vehicles to deviate from Defendant's intended design." *Granillo v. FCA US LLC*, 2016 WL 9405772, at *14 (D.N.J. Aug. 29, 2016). This is in contrast to the cases relied on by Defendant, which allege specific design defects. See *Troup v. Toyota Motor Corp*., 545 Fed. Appx. 668, 669 (9th Cir. 2013) ("the gravamen of the complaint is that the Prius' defect resulted from the use of

resin to construct the gas tanks, which is a design decision"); *Cummings v. FCA US LLC*, 401 F. Supp. 3d 288, 314-315 (N.D.N.Y. 2019) (complaint plausibly alleged design defect rather than manufacturing defect in transmission where it "cit[ed] to design failure mode analysis testing and fundamental design guidelines"); *Barakezyan v. BMW of North America, LLC*, 2016 WL 11505592, at *6 (C.D. Cal. May 19, 2016) ("To the extent Plaintiff alleges that BMW's decision to use either 'ceramic friction layers' or 'a mixture of carbon and ceramic' caused the Brakes to produce excessive noise or that the noise resulted from 'tension relief cracks which arise during the manufacturing process,' such theories describe defects in design which are excluded by BMW's actual warranty covering defects in materials and workmanship.").

While the Complaint does not attempt to diagnose a precise cause of the Defect, this is understandable and does not warrant dismissal. This is the type of information that one would expect to be in Defendant's possession and that would require discovery and perhaps expert analysis to determine. See *Haag v. Hyundai Motor Am.*, 969 F. Supp. 2d 313, 316 (W.D.N.Y. 2013) ("[w]hether ... alleged defects [in brakes] arose from a faulty design, faulty materials or faulty workmanship cannot be ascertained absent discovery, since any information concerning the true origin of the alleged defect is within the sole possession of the defendant."); *Marshall v. Hyundai Motor Am.*, 51 F. Supp. 3d 451, 467 (S.D.N.Y. Sept. 30, 2014) (same); *Francis*, 504 F. Supp. 3d at 673 (denying motion to dismiss express warranty claims brought under Florida, Indiana and New York law based on allegedly defective transmissions "because the amended complaint does not commit to either theory on the origin of the defect" and "the culprit here must await development of the record").

The Complaint plausibly alleges, in the alternative, that the Vehicles contain either manufacturing or design defects. See [63] at 5, ¶ 3 ("Defendant knew or should have known that

12

the Vehicles contain one or more design and/or manufacturing defects, including but not limited to defects contained in the Vehicles' 10R80, a 10-speed automatic transmission that can shift harshly and erratically, causing the vehicle to jerk, lunge, and hesitate between gears."); *id*. at 6, ¶ 5 ("A common design and/or manufacturing defect in Ford's 10R80 transmissions is a potentially life-threatening safety issue, and Ford has refused to recall or replace the defective Transmissions."); see also *id.* at 60, ¶ 217(a); 69, ¶ 265; 90, ¶ 389; 92, ¶ 403; 119, ¶ 546; 121, ¶ 557; 121, ¶ 557; 123, ¶ 570. Similar allegations have been found sufficient to plead the existence of a design defect. See *Persad v. Ford Motor Co*., 2018 WL 3428690, at *4 (E.D. Mich. July 16, 2018) (plaintiffs' allegation of "defects in materials, workmanship, or manufacture" as well as design defects "are sufficient to sustain that the Exhaust Fume Defect is covered by the applicable warranties," which exempted design defects); see also *In re Volkswagen Timing Chain Prod. Liab. Litig*., 2017 WL 1902160, at *12 (D.N.J. May 8, 2017) ("Courts within this district have refused to apply a distinction between a defect in design and a defect in materials or workmanship at the pleading stage of litigation."); *In re Caterpillar, Inc., C13 & C15 Engine Prod. Liab. Litig*., 2015 WL 4591236, at *19 (D.N.J. July 29, 2015) (concluding that it would be "premature … to dismiss Plaintiffs' express warranty claim on the grounds that it is based on defective design as opposed to defects in material or workmanship" where the complaint "contain[ed] sufficient allegations regarding defects in material and workmanship to support a breach of the express warranties at issue"); *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prod. Liab. Litig*., 754 F. Supp. 2d 1145, 1181 (C.D. Cal. 2010) (dismissal of express warranty claim not warranted where complaint alleged that defendant "fail[ed] to design, assemble and manufacture the ETCS-i wiring harnesses in such a way as to prevent mechanical and environmental stresses from causing various shorts and faults").

### 2.    Smith's claims

Defendant moves to dismiss California Plaintiff Smith's breach of express warranty claims, which are contained in Count 1, for violation of California Commercial Code § 2313, as well as Count 8, for violation of California's Song-Beverly Consumer Warranty Act.  In response, Smith concedes Count 8, but does not address Count 1.  The Court will dismiss that claim as well, as to Smith only.  The Warranty provides that "if your Ford vehicle is properly operated and maintained, *and was taken to a Ford dealership for a warranty repair during the warranty period*, then authorized Ford Motor Company dealers will, without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use . . . due to a manufacturing defect in factory-supplied materials or factory workmanship."  [64-1] at 35 (emphasis modified).  The Complaint does not allege that Smith ever took his Vehicle to a Ford dealership for repair—and Plaintiffs appear to concede, at least for purposes of Count 8, that he did not.  Since Smith "has not alleged that he complied with this contractual warranty requirement," his claim under Cal. Comm. Code § 2313 will be dismissed.  *Barakezyan v. BMW of North America, LLC*, 2016 WL 2840803, at *6 (C.D. Cal. Apr. 7, 2016).

### B.    Breach of Implied Warranty (Counts 2, 9, 10, 14, 15, 21, 22)

The Complaint asserts claims for violations of state laws codifying U.C.C. § 2-314, the implied warranty of merchantability, and U.C.C. § 2-315, the implied warranty of fitness for a particular purpose.  Defendant moves to dismiss the breach of implied warranty claims on several bases.  In their response brief, Plaintiffs concede the claims that are based on an alleged breach of the implied warranty of fitness for a particular purpose, which include Count 2 to the extent it is based on Massachusetts General Laws Ch. 106, § 2-315, New York U.C.C. Law § 2-315, and Pennsylvania Statutes and Consolidated Statutes § 2315; Count 15, which is also based on

14

Massachusetts General Laws Ch. 106, § 2-315; and Count 22, which is based on Texas Business & Commercial Code § 2-315. The motion to dismiss the conceded claims is granted.

Plaintiffs do not concede Count 14, which is based on Massachusetts General Laws Ch. 106, § 2-314, but the Court agrees with Defendant that this count is also properly dismissed because it is duplicative of the breach of implied warranty claim brought in Count 2, which is brought under both §§ 2-314 and 2-315. See [64-1] at 41, n.13. Plaintiffs do not respond to this point.

The breach of implied warranty claims that remain to be evaluated are those based on the implied warranty of merchantability, which include: Count 2, which is based on Illinois, Florida, New Jersey, New York, Massachusetts, and Pennsylvania statutory law; Count 9, which alleges violations of California's Song Beverly Consumer Warranty Act, Cal. Civ. Code §§ 1791 & 1792; Count 10, which alleges violations of California Commercial Code § 2314; and Count 21, which alleges violations of Texas Business & Commercial Code § 2.314. In those counts, the Complaint alleges that Defendant had a duty to ensure that its Transmissions are "fit for the ordinary purposes for which transmissions are used and that they pass without objection in the trade under the contract description." [63] at 66. The Transmissions were allegedly defective at the time they left Defendant's possession and were not in merchantable condition or quality when sold to Plaintiffs. *Id*. The Complaint alleges that Defendant had actual knowledge of the Defect, yet failed and refused to offer an effective remedy, which breached the implied warranty of merchantability. *Id*. at 67; see also *id*. at 81 (Count 10); 85 (Count 11); *id*. at 118 (Count 21). For the reasons explained below, the Court grants the motion to dismiss Count 2 to the extent it is based on alleged violation of 810 ILCS 5/2-314, but otherwise denies the motion to dismiss the claims for breach of implied warranty of merchantability.

15

### 1.    Vehicles' fitness for ordinary purposes

Defendant argues that Plaintiffs fail to state a claim for breach of implied warranty of merchantability under any of the state laws at issue because its Vehicles are fit for the ordinary purposes for which such goods are used—*i.e.*, driving.  See [64-1] at 39 & n.8.  Defendant recognizes case law requiring a vehicle to transport the driver "upon the streets and highways . . . in a reasonably safe manner."  *Id.* at 39 (quoting *Feliciano v. General Motors LLC*, 2016 WL 9344120, at *8 (S.D.N.Y. Mar. 31, 2016)).  Defendant contends that the Complaint's allegations demonstrate that it satisfied this standard, because "Plaintiffs' continued use of their vehicles and their other allegations undermine the plausibility of any claim that the transmission defect is a safety issue rendering the vehicle unfit for its ordinary purpose."  *Id.* a 40 (citing *Priebe v. Autobarn, Ltd*., 240 F.3d 584 (7th Cir. 2001)).

Defendant's argument, however, fails to draw all inferences in Plaintiff's favor and also overstates the import and applicability of the Seventh Circuit's decision in *Priebe*.  As Defendant recognizes, a vehicle, to be fit for its ordinary purpose, must at a minimum provide safe transportation for its occupants.  See, e.g., *Feliciano*, 2016 WL 9344120, at *8; *Karczewski v. Ford Motor Co*., 382 F. Supp. 1346, 1351 (N.D. Ind. 1974), *aff'd*, 515 F.2d 511 (7th Cir. 1975) ("There is no question that the particular purpose of a passenger automobile is to drive on the public streets and highways safely without uncontrolled and unsafe behavior."); *Lessin v. Ford Motor Co*., 2020 WL 6544705, at *7 (S.D. Cal. Nov. 5, 2020) ("The ordinary purpose of a car is not simply to provide transportation but rather, safe and reliable transportation."); *Razen v. FCA US LLC*, 2019 WL 7482214, at *4 (M.D. Fla. Oct. 23, 2019) ("the ordinary purpose of a motor vehicle is safe and reliable transportation."); *Enobakhare v. Carpoint, LLC*, 2011 WL 703920, at *9 (E.D.N.Y. Jan. 10, 2011) (ordinary purpose of vehicle is "to enable the purchaser to transport herself upon

16

the streets and highways ... in a reasonably safe manner" (quoting *Diaz v. Paragon Motors of Woodside, Inc.*, 424 F. Supp. 2d 519, 541 (E.D.N.Y. 2006))).

The Complaint's allegations, read in the light most favorable to Plaintiffs, support a conclusion that the Vehicles are unsafe. For example, the Complaint alleges that:

- Plaintiff O'Connor's "[v]ehicle lost its acceleration/shifting capabilities and displayed a message stating 'drive mode not available' with the orange wrench indicator staying illuminated on the dash. The Vehicle put itself into 'limp mode' and he was able pull into a nearby parking lot to get out of the roadway to avoid being rear-ended by other vehicles. In order to drive home, he had to disconnect then reconnect the battery, which reset the drive mode and allowed him to get home." [63] at 15.

- Plaintiff "Fair noticed that while driving his Vehicle, it holds the gears too long, completely shifts out of gear while accelerating, then roughly slams into gear." [63] at 19. Plaintiff Steen experienced the same. *Id.* at 24.

- Plaintiff Smith's "Vehicle's Transmission slips while driving in any gear. He will be driving along when it slips for a few seconds, then returns to the same gear it slipped from. As he has described it, 'I can be in the 10th gear while driving 65 mph, then transmission slips and I am not in any gear and vehicle starts to slow then it re-engages into the same 10th gear and accelerates again. Again, this happens in all gears.'" [63] at 22.

- "By the time he had driven the Vehicle 2,000 miles, [Plaintiff] Fiedler started to notice the Transmission 'slipping' and 'jerking' while driving. Mr. Fiedler also noticed the Vehicle would 'wind' when starting and would stay in a low gear too long and then 'clunk' when downshifting, causing the Vehicle to decelerate in an unsafe manner while driving." [63] at 26.

- "Approximately two months after leasing [his] Vehicle, [Plaintiff] Marino started to notice a loud 'clunk' or 'bang' noise upon starting the engine. While driving his Vehicle, Mr. Marino also noticed the Vehicle slipping and jerking when changing gears." [63] at 33.

- Plaintiff Heller's Transmission was sometimes "'slipping' and 'jerking' while driving, mostly not engaging after stopping. It would clunk and fail to engage immediately in an unsafe manner while driving around other vehicles." [63] at 37.

- "While driving [his] Vehicle, [Plaintiff] Orndorff also noticed the Vehicle would shift gears in a 'rough' manner with unusually long shift times causing the vehicle to decelerate in an unsafe manner while driving." [63] at 39.

- "Despite the repair attempts by Ford and its dealers, [Plaintiff] McDonald continues to experience the Transmission Defect, including but not limited to, transmission slips, bucking, kicking, jerking, harsh engagement, premature internal wear, sudden acceleration,

17

delay in downshifts, and delayed acceleration. Most recently, the Vehicle lurches backwards each time he is able to get the vehicle into reverse. He must keep his foot on the brake so as to prevent the Vehicle from hitting objects while putting it into reverse." [63] at 44.

It is not difficult to see why these alleged problems make or could make the Vehicles unsafe and therefore not fit for their intended purposes. Imagine discovering that your vehicle will not accelerate as you are attempting to merge onto an interstate highway during rush hour. Or driving in busy traffic when your vehicle deaccelerates unexpectedly, lurches forward unexpectedly, or goes into "limp mode" and becomes inoperable. Any one of these problems could cause an accident, property damage, and physical injuries. See, e.g., *Clark v. American Honda Motor Co., Inc.*, 2021 WL 1186338, at *7 (C.D. Cal. Mar. 25, 2021) (breach of implied warranty of merchantability claim based on alleged defects to vehicles where "Plaintiffs allege that the defect causes the Vehicles to unexpectedly and dramatically decelerate, particularly at highway speeds; puts their Vehicles in limp mode; and causes them to fail to accelerate predictably"; concluding that "[t]he Court cannot say as a matter of law that Vehicles manifesting such performance issues are sufficiently safe to be merchantable").

The fact that all of the Plaintiffs do not claim to have stopped driving their Vehicles does not, at least at the pleading stage, undermine a conclusion that the Vehicles are not fit for their ordinary purposes. The case on which Defendant relies, *Priebe*, was decided at summary judgment and involved very different facts. In that case, the defendant was a car dealership that sold the plaintiff a used Acura vehicle without disclosing that it had been damaged in a previous crash. *Priebe*, 240 F.3d at 588. The plaintiff made only "vague" claims that once he discovered this, he "lost faith" in the Acura and believed it was "dangerous to drive," which were belied by the fact that, at the time of trial, he "had driven the Acura more than 30,000 miles." *Id*. Here, by contrast, Plaintiffs point to specific examples of how the Transmission Defect caused their Vehicles to

18

operate in an unsafe manner.  While it appears that many of the Plaintiffs have continued to drive their Vehicles, *Priebe* did not establish a blanket rule that continuing to drive a vehicle after learning it is unsafe necessarily undermines a claim for breach of the implied warranty of merchantability.  According to the Complaint, Plaintiffs took their Vehicles to Ford dealerships to have them repaired, the repairs did not fix the Defect, and Ford refused to do anything further, instead maintaining that the Transmissions were operating as they should.  Plaintiffs' decisions to continue driving their Vehicles may simply indicate that, given Defendant's lack of responsiveness, they had no other choice.  After all, people still need to get to work, pick up their kids from school, and perform other essential activities, and may not have cash on hand to purchase a replacement vehicle or the option of taking public transportation.  The Court will not punish Plaintiffs for having no choice but to continue driving Vehicles that they fear are unsafe and declines to dismiss the breach of implied warranty claims on this basis.

### 2.    Privity

Defendant argues that the California, Florida, Illinois, and New York Plaintiffs' breach of implied warranty claims must be dismissed due to lack of privity between Plaintiffs and Defendant. The Complaint alleges three bases for privity.  First, Plaintiffs assert that they "had and continue to have sufficient direct dealings with Ford and/or its authorized dealers, franchisees, representatives, and agents to establish any required privity of contract," because "Ford's authorized dealers, franchisees, representatives, and agents were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles."  [63] at 65.  Rather, "[t]he warranty agreements were designed for and intended to benefit only the ultimate purchasers and lessees of the Class Vehicles, *i.e.*, Plaintiffs and Class Members."  *Id.*  Second, Plaintiffs allege that "[b]y extending express written warranties

to end-user purchasers and lessees, [Defendant] brought itself into privity with Plaintiffs and all Class Members." *Id*. at 66. Third, Plaintiffs allege that privity is not required because Plaintiffs are "intended third-party beneficiaries of contracts between Ford and its dealers, franchisees, representatives, and agents," who are in privity with one another. *Id*.

While Defendant's opening brief groups the four relevant states, their requirements for privity vary in significant ways. Therefore, the Court will discuss each state separately. When applying state law, the Court is "bound by the decisions of the state's highest court." *In re Emerald Casino, Inc.*, 867 F.3d 743, 765 (7th Cir. 2017). If the state's highest court has not ruled on a matter, the Court's "job is to decide the case like the state's high court would if presented the issue." *Id*. "Although not binding, intermediate-state-court decisions serve as guidance in a federal court's quest to decide a case like a state's high court would." *Id*. "When an intermediate state court announces a rule of law, 'that is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.'" *Id*. (quoting *West v. American Tel. & Tel. Co.*, 311 U.S. 223, 237 (1940)).

### a. California

"California Commercial Code § 2314 requires vertical privity for an implied warranty of merchantability claim," but "[t]he privity requirement is not required for an implied warranty of merchantability claim brought under California's Song–Beverly Act." *Allen v. Similasan Corp.*, 96 F. Supp. 3d 1063, 1075 (S.D. Cal. 2015); see also *Keegan v. American Honda Motor Co., Inc.*, 838 F. Supp. 2d 929, 946–47 (C.D. Cal. 2012) (explaining that the Song-Beverly Act "did away with the vertical privity requirements that apply to implied warranty causes of action" (collecting cases)). Defendant's motion to dismiss due to lack of privity is therefore denied as to Count 9.

20

That leaves Count 10, for violation of California Commercial Code § 2314. In *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017 (9th Cir. 2008), the court explained that, for purposes of § 2314's privity requirement, "[a] buyer and seller stand in privity if they are in adjoining links of the distribution chain." *Id*. at 1023. "Thus, an end consumer … who buys from a retailer is not in privity with a manufacturer." *Id*. However, "[s]ome particularized exceptions to the rule exist." *Id*. One exception that *Clemens* did not consider, see *Toyota*, 754 F. Supp. 2d at 1185, but that "'the clear weight of authority'" from the California federal district courts supports, is that "where a plaintiff sufficiently pleads that he or she is a third-party beneficiary to a contract that gives rise to the implied warranty of merchantability, he or she may assert a claim for the warranty's breach." *Mosqueda v. American Honda Motor Co.*, 443 F. Supp. 3d 1115, 1128–29 (C.D. Cal. 2020) (quoting *Toyota*, 754 F. Supp. 2d at 1184); see also *In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 980, 983-84 (N.D. Cal. 2014); *Keegan*, 838 F. Supp. 2d at 947 ("[I]ndividuals who purchase a vehicle from an authorized dealership can maintain an implied warranty cause of action against the manufacturer as third party beneficiaries."); *Cartwright v. Viking Industries, Inc.,* 249 F.R.D. 351, 356 (E.D. Cal. 2008) (concluding that plaintiffs were, as third-party beneficiaries, entitled to maintain a breach of implied warranty claim against the manufacturer where plaintiffs, not the distributors, were the intended consumers); *In re Sony VAIO Computer Notebook Trackpad Litigation*, 2010 WL 4262191, at *3 (S.D. Cal. Oct. 28, 2010) (holding that plaintiffs' allegation that the retailer from which they purchased defective products was manufacturer's authorized retailer and service facility precluded dismissal of a breach of implied warranty claim for lack of privity).

The courts recognizing a third-party beneficiary exception to the privity requirement "typically cited *Gilbert Financial Corp. v. Steelform Contracting Co.*, 82 Cal. App. 3d 65 (1978),

21

in support." *MyFord Touch*, 46 F. Supp. 3d at 983. As *MyFord Touch* explains: "In *Gilbert*, the plaintiff-homeowner asserted an implied warranty claim against a subcontractor. The trial court dismissed the claim on the basis of lack of privity. On appeal, the appellate court stated: '[U]nder the facts of this case we do not need to decide the issue of privity per se' because, '[u]nder Civil Code section 1559 and the cases interpreting it, we conclude [the plaintiff-homeowner] is a third party beneficiary of the contract between [the contractor] and [the defendant-subcontractor] and therefore can sue for breach of the implied warranty of fitness.'" *Id.* (quoting *Gilbert*, 82 Cal. App. 3d at 69); see also *Arnold v. Dow Chemical Co.,* 91 Cal. App. 4th 698, 720 (2001) (finding, based on the fact that distributors and retailers were not intended to be the ultimate consumers, that plaintiff could maintain breach of implied warranty claim notwithstanding the lack of privity with manufacturer of pesticide). While a few federal district courts have come out the other way,[3] this Court will follow *Gilbert*—the only state court decision discussed by the parties—and the bulk of federal district courts in concluding that the third-party beneficiary exception to the privity requirement is viable under California law.

Here, Plaintiffs allege that they purchased the Vehicles from a network of authorized Ford dealers, see *Mosqueda*, 443 F. Supp. 3d at 1129, and that "they were the intended consumers," not

---

[3] See *Hastings v. Ford Motor Co*., 495 F. Supp. 3d 919, 925 (S.D. Cal. 2020) (stating that exceptions to the privity requirement for claims for breach of implied warranty of merchantability include the plaintiff's reliance on written labels or advertisements of a manufacturer or special cases involving foodstuffs, pesticides, and pharmaceuticals, and where the end user is an employee of the purchaser, but not discussing third-party beneficiary exception); *Goldstein v. General Motors LLC*, 445 F. Supp. 3d 1000, 1019 (S.D. Cal. 2020) (concluding that buyers of allegedly defective motor vehicles failed to allege that they were in vertical contractual privity with the seller, as required to state a claim against the seller for breach of the implied warranty of merchantability, but not expressly discussing whether there is exception for intended third-party beneficiaries); *Gonzalez v. Mazda Motor Corp*., 2017 WL 345878, at *3 (N.D. Cal. Jan. 5, 2017) ("Having reviewed the relevant available authority, the Court is persuaded by the reasoning of those cases that have declined to extend the list of exceptions to [privity requirement to] encompass asserted third-party beneficiaries."). Unlike these California federal district courts, see *id.*, this Court would not be bound by the Ninth Circuit's ruling in *Clemens*, even if it had expressly considered and rejected a third-party beneficiary exception to the privity requirement.

the dealers, *Toyota*, 754 F. Supp. 2d at 1185. Plaintiffs also allege that the dealers "have no rights under the warranty agreements provided with the Class Vehicles." [63] at 65. Rather, "[t]he warranty agreements were designed for and intended to benefit only the ultimate purchasers and lessees of the Class Vehicles." *Id*. The Court concludes that these allegations are sufficient to plausibly allege the applicability of the third-party beneficiary exception to § 2314's privity requirement.

### b.      Florida

Under Florida law, "[a] cause of action for breach of implied warranty of merchantability or fitness for a particular purpose cannot exist in the absence of privity." *Ohio State Troopers Ass'n, Inc. v. Point Blank Enterprises, Inc.*, 2018 WL 3109632, at *6 (S.D. Fla. Apr. 5, 2018) (citing *Kramer v. Piper Aircraft Corp.,* 520 So. 2d 37 (Fla. 1988)). Direct privity is not always required, however. See *id*. at *6-7; see also *Sanchez-Knutson v. Ford Motor Co*., 52 F. Supp. 3d 1223, 1234 (S.D. Fla. 2014) ("Literal privity can be finessed by a proxy: direct beneficiary or third-party beneficiary status."). As in California, the federal district courts in Florida are split on whether there is a third-party beneficiary exception to Florida's privity requirement for breach of implied warranty claims. The decisions rejecting the exception rely on *In re Takata Airbag Products Liability Litigation*, 193 F. Supp. 3d 1324 (S.D. Fla. 2016), a case in which the plaintiffs did not respond to the defendant's privity argument. See *Weiss v. General Motors LLC*, 418 F. Supp. 3d 1173, 1182–83 (S.D. Fla. 2019). The Court declines to follow this line of cases, since *Takata* "did not consider or analyze a fully briefed and contested third-party beneficiary argument." *Id*. at 1183.

Instead, the Court will follow the more fully reasoned competing line of cases, under which a plaintiff can establish privity with a vehicle manufacturer "if he alleges that he purchased a

vehicle from an authorized dealer who was an agent of [the manufacturer], he was the intended consumer of the vehicle, the dealership was not the intended consumer, and the warranty was intended to benefit the consumer, not the dealership." *Weiss*, 418 F. Supp. 3d at 1183; see also *Sanchez-Knutson*, 52 F. Supp. 3d at 1234; *Ohio State Troopers Ass'n*, 2018 WL 3109632, at *6-7; *Feldman v. BRP US, Inc.*, 2018 WL 8300534, at *8 (S.D. Fla. Oct. 22, 2019); *Varner v. Domestic Corp.*, 2017 WL 3730618, at *12 (S.D. Fla. Feb. 7, 2017). The Court finds this line of cases more persuasive as "[o]therwise, a manufacturer would always be able to shield itself from implied warranty claims even though it knows that its intended consumer is not the dealership." *Weiss*, 418 F. Supp. 3d at 1183; see also *Manheim v. Ford Motor Co*., 201 So. 2d 440 (Fla. 1967) (neither absence of privity between automobile manufacturer and purchaser, nor the execution of written warranty agreement between manufacturer and its dealer disclaiming any implied warranty of merchantability, precluded recovery by purchaser from manufacturer on basis of implied warranty due to automobile's alleged defects and lack of fitness and suitability).

For the reasons explained in the preceding section concerning California, the Court concludes that the Complaint's allegations are sufficient to plausibly support application of the third-party beneficiary exception to Florida's privity requirement. See *Sanchez-Knutson*, 52 F. Supp. 3d at 1234 (automobile purchasers stated breach of implied warranty claim against manufacturer by alleging that they were intended consumers of the automobiles and third-party beneficiaries of contract between dealer and manufacturer).

### c.     Illinois

In Illinois, "privity of contract is a prerequisite to recover economic damages for breach of implied warranty." *Voelker v. Porsche Cars North America, Inc.*, 353 F.3d 516, 525 (7th Cir. 2003). Illinois law is clear that, for purely economic loss, the UCC-based warranty of

merchantability "gives a buyer of goods a potential cause of action only against his immediate seller." *Rothe v. Maloney Cadillac, Inc.*, 518 N.E.2d 1028, 1029 (Ill. 1988). The Illinois Plaintiffs bought their Vehicles from Ford dealers, rather than Ford itself, and therefore lack the privity required to bring a breach of implied warranty claim unless an exception applies.

In Illinois state court, the privity requirement "has been 'relaxed' when (1) a manufacturer has extended a written warranty with a product; and (2) a consumer brought an action against the manufacturer under the Magnuson–Moss Act." *Shoop v. DaimlerChrysler Corp.*, 864 N.E.2d 785, 792 (Ill. App. 2007); see also *Szajna v. General Motors Corp.*, 503 N.E.2d 760, 767-70 (Ill. 1986) (reaffirming traditional Illinois rule requiring privity in implied warranty suits seeking recovery for economic loss but interpreting the MMWA to allow plaintiff to assert an implied warranty claim against a manufacturer if there was also a written warranty). But, contrary to Plaintiff's argument that this allows in to bring a state-law based breach of implied warranty claim against Defendant, see [66] at 36, the privity requirement is relaxed only for purposes of an MMWA claim,[4] not for "a separate claim based solely on the UCC implied warranties," which is "properly dismissed because [Plaintiffs] lack[] privity with the manufacturer." *Connick v. Suzuki Motor Co., Ltd.*, 656 N.E.2d 170, 180 (Ill. App. 1995) (citing *Rothe*, 518 N.E.2d at 1028), *reversed in part on other grounds*, 675 N.E.2d 584 (Ill. 1996).

Plaintiffs also argue that they can take advantage of Illinois' "limited third-party beneficiary exception to privity 'where the manufacturer knew the identity, purpose and

---

[4] And it is not relaxed even for that purpose in federal courts in the Seventh Circuit. As the Seventh Circuit held in *Voelker*, 353 F.3d at 525, "a valid claim for breach of the implied warranty of merchantability under the Magnuson–Moss Act must allege privity in accordance with the applicable state law." Although *Voelker* does not directly address *Szajna*'s interpretation of the MMWA to allow a breach of implied warranty claim where state law would not, "[t]he courts in this district that have dealt with this issue have overwhelmingly rejected *Szajna*'s approach." *Smith v. Monaco Coach Corp.*, 334 F. Supp. 2d 1065, 1069 (N.D. Ill. 2004) (collecting cases and holding that MMWA did not extend implied warranties to customers not protected by traditional state law due to absence of privity).

requirements of the dealer's customer and manufactured or delivered the goods specifically to meet those requirements.'" [66] at 35 (quoting *Frank's Maintenance & Eng'g, Inc. v. C.A. Roberts Co.*, 408 N.E.2d 403, 412 (Ill. App. 1980)). However, no Illinois Plaintiff has alleged any facts to satisfy this exception. Although Plaintiffs claim that "Ford was aware of consumers' requirement that vehicles safely and reliably accelerate and decelerate, and that Ford delivered the Class Vehicle to meet these requirements," *id.* at 36, these allegations relate to consumers generally, not any particular Illinois customer. See *Allstate Ins. Co. v. Toyota Motor Mfg. N. Am., Inc.*, 2009 WL 3147315, at *2 (N.D. Ill. Sept. 28, 2009) (third-party exception inapplicable where "there is no suggestion that [the specific consumer] had Toyota manufacture the minivan specifically to meet his requirements"); *Duncan Place Owners Ass'n v. Danze, Inc.*, 2016 WL 3551665, at *13 n.5 (N.D. Ill. June 30, 2016) (third-party beneficiary exception inapplicable where "[plaintiff] does not allege that he had Danze manufacture the faucet to meet his specific needs"), *reversed in part on other grounds*, 927 F.3d 970 (7th Cir. 2019).

### d.    New York

"[T]he general rule in New York is that, absent privity, a plaintiff cannot recover damages for economic loss based upon breach of implied warranty." *Dixon v. Ford Motor Co.*, 2015 WL 6437612, at *4 (E.D.N.Y. Sept. 30, 2015). However, as in California and Florida, "[s]ome courts have held that a plaintiff can escape the privity requirement under a third-party beneficiary theory." *Id.* at *5 (citing *Praxair, Inc. v. General Insulation Co.*, 611 F. Supp. 2d 318, 330 (W.D.N.Y. 2009) (purchaser stated a claim for breach of implied warranty under New York law against manufacturer when purchaser was not in privity with manufacturer but was a third-party beneficiary of a distribution contract between manufacturer and supplier); *Delgado v. Kornegay*, 395 N.Y.S.2d 126, 127 (N.Y. Dist. Ct. Suffolk Cnty. 1977) (home purchaser was entitled to recover

consequential damages resulting from breach of implied warranty as a third-party beneficiary where defendant termite inspector, who contracted with the home seller, knew the property was in the process of being sold, that his report was for the benefit of the purchaser and, that his report would be relied on by the purchaser)). "Under New York law, a plaintiff claiming rights as a third-party beneficiary must demonstrate: '(1) the existence of a valid and binding contract between other parties, (2) that the contract was intended for his benefit and (3) that the benefit to him is sufficiently immediate, rather than incidental, to indicate the assumption by the contracting parties of a duty to compensate him if the benefit is lost.'" *Fillmore East BS Finance Subsidiary LLC v. Capmark Bank*, 2013 WL 1294519, at *11 (S.D.N.Y. Mar. 30, 2013) (quoting *State of Ca. Pub. Emps. Ret. Sys. v. Shearman & Sterling*, 741 N.E.2d 101 (N.Y. 2000)).

Courts applying the third-party beneficiary exception in cases that are factually similar to this one have come to mixed conclusions on the level of specificity required to plausibly allege a breach of implied warranty claim based on the theory that the purchasers of vehicles are intended third-party beneficiaries of contracts between a vehicle manufacturer and its dealers. The resolution of each case ultimately came down to how much specificity the court required concerning the terms of the contract between the manufacturer and its dealers. In the cases granting motions to dismiss, the plaintiffs were faulted for not identifying specific contracts and contract terms between the manufacturer and its dealers. See *Cummings v. FCA US LLC*, 401 F. Supp. 3d 288, 313 (N.D.N.Y. 2019) ("to the extent that Plaintiff relies an exception to the privity requirement based on being a third-party beneficiary of the contract between Defendant and its authorized dealer, Plaintiff has failed to allege facts plausibly suggesting the applicability of such exception here because she has not included any factual allegations regarding the contract between Defendant and the authorized dealer, much less any factual allegations plausibly suggesting that

the contract was intended to provide a sufficiently immediate benefit to her"); *Catalano v. BMW of North America, LLC*, 167 F. Supp. 3d 540, 557 (S.D.N.Y. 2016) (dismissing complaint where plaintiff "baldly alleges that he and the other class members were 'intended third-party beneficiaries of the contracts for sale of the Class Vehicles from Defendants to the dealerships who ultimately sold the Class Vehicles to Plaintiff and Class members' and that defendants knew that consumers were the 'end-users of the Class Vehicles'" and "does not cite any provisions from the alleged contracts between BMW and dealerships indicating that the class members are intended third-party beneficiaries of those agreements"); *Dixon*, 2015 WL 6437612, at *6 (dismissing complaint that "alleges, in conclusory fashion, that plaintiff was the intended beneficiary of 'Ford's written warranties and its contractual relationships with Ford dealerships' and that 'Ford's express warranties were designed for and intended to benefit the consumers only,'" where "[t]he complaint does not cite any contractual provisions in the alleged contracts between Ford and its dealerships that indicate plaintiff is a third-party beneficiary of those contracts").

The court in *Johnson v. Nissan North America, Inc*., 272 F. Supp. 3d 1168 (N.D. Cal. 2017), which applied New York law, did not require plaintiffs to cite "specific provisions from the alleged contracts between Nissan and its dealers," reasoning that "it would be inappropriate to impose such a duty at the pleadings stage, prior to the benefit of discovery." *Id*. at 1182. The court concluded that the New York plaintiff's "implied warranty claim … survives because she plausibly alleges that she is an intended third-party beneficiary of the contracts between Nissan and its dealers." *Id*. at 1181. In particular, she pled: "Nissan's authorized dealers, franchisees, representatives, and agents were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles. The warranty agreements were designed for and intended to benefit only the ultimate purchasers and lessees of

the Class Vehicles, *i.e.*, Plaintiffs and the New York Class Members. … Plaintiff and the New York Class Members are intended third-party beneficiaries of contracts between Nissan and its dealers, franchisees, representatives, and agents." *Id*. at 1180-81. The court concluded that "[t]hese allegations, which concern the existence of a contract as well as a sufficiently immediate benefit intended for [plaintiff], are sufficient to establish that [plaintiff] is an intended third-party beneficiary under *Praxair*." *Id*. at 1181 (citing *Praxair*, 611 F. Supp. 3d at 330-31); see also *Marshall v. Hyundai Motor America*, 51 F.Supp.3d 451, 469 (S.D.N.Y. 2014) (explaining that "[w]hile Plaintiffs' contention that the 'sales contracts' [between the manufacturer and dealers] included the warranty provisions by which Defendant provided coverage for Plaintiffs' vehicles may provide a basis to infer that the contracting parties intended to benefit Plaintiffs," their complaint must nonetheless be dismissed because "no such allegation appears in" the governing complaint).

Although it is a close call, the Court finds the reasoning of *Johnson* most persuasive and will err on the side of allowing the New York plaintiffs' claim for breach of implied warranty to proceed based on the third-party beneficiary theory. This is a matter of applying the federal pleading standards, rather than predicting how the New York courts would rule substantively on Plaintiff's claim. Under those standards, "the required level of specificity is not easily quantified," requiring simply "enough details about the subject-matter of the case to present a story that holds together." *Bilek v. Fed'l Insur. Co.*, 8 F.4th 581, 586 (7th Cir. 2021) (internal quotation marks and citation omitted). "Fundamentally, 'the plausibility determination is a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Id.* at 586-87 (quoting *W. Bend Mut. Ins. Co. v. Schumacher*, 844 F.3d 670, 676 (7th Cir. 2016)). Using that lens, the Court sees little reason why Plaintiffs must, necessarily, plead specific terms of the

29

contracts between Ford and its authorized dealers. Plaintiffs would not be expected to have access to such contracts (which Defendants do not deny exist) without the benefit of discovery. And "[t]he plausibility standard … does not call for the pleading of evidence." *Atlantic Casualty Ins. Co. v. Sealtite Roofing & Constr. Co.*, 73 F. Supp. 3d 953, 959 n.4 (N.D. Ill. 2014).

Similar to the New York plaintiff in *Johnson*, Plaintiffs here allege that they are "intended third-party beneficiaries of contracts between Ford and its dealers, franchisees, representatives, and agents." [63] at 66. As part of those contracts, "applicable law imposed upon Ford a duty that the Transmissions installed in the Class Vehicles be fit for the ordinary purposes for which transmissions are used and that they pass without objection in the trade under the contract description." *Id*. Warranty agreements were also "provided with the Class Vehicles." *Id.* at 65. "Ford's authorized dealers, franchisees, representatives, and agents were not intended to be the ultimate consumers of the Class Vehicles" and therefore "have no rights under th[ose] warranty agreements." *Id*. Instead, "[t]he warranty agreements were designed for and intended to benefit only the ultimate purchasers and lessees of the Class Vehicles, *i.e*., Plaintiffs and Class Members." *Id*. These allegations plausibly suggest that Plaintiffs will be able to satisfy New York's standard for intended third-party beneficiaries. It is plausible that there are "valid and binding contract[s]" between Ford and its authorized dealers, which contain both an implied warranty of merchantability and the express warranty "intended for [Plaintiff's] benefit"—a "sufficiently immediate, rather than incidental" benefit requiring Ford to repair certain problems with its Vehicles. *Fillmore*, 2013 WL 1294519, at *11. Defendant's motion to dismiss the breach of implied warranty claim under New York UCC § 2-314 is therefore denied.

### C. Magnuson-Moss Warranty Act (Count 3)

Defendant moves to dismiss the claim for violation of the Magnuson-Moss Warranty Act ("MMWA") on three bases, the first two of which can be disposed of in short order. Defendant first argues that the MMWA claim fails for lack of actionable state law breach of warranty claims. The MMWA "creates a federal cause of action for breach of written and implied warranties under state law." *Schiesser v. Ford Motor Co*., 2017 WL 1283499, at *4 (N.D. Ill. Apr. 6, 2017) (citing 15 U.S.C. § 2310(d)(1)). "A claim under the Magnuson-Moss Warranty Act depends on the existence of a viable underlying state law warranty claim." *Id*. Since Plaintiffs have pled at least one viable state law breach of warranty claim for each of the eight states in which the named Plaintiffs reside, the MMWA claim remains viable, as well.

Second, Defendant argues—and Plaintiffs concede—that Plaintiff O'Connor's MMWA claim must be dismissed because he failed to provide Ford with a reasonable opportunity to cure the alleged breach before filing suit. See [64-1] at 28 n.26. The Court grants the motion to dismiss the MMWA claim on this limited basis.

Third, Defendant asserts that the entire MMWA claim must be dismissed for absence of pre-suit notice to Defendant, because "Plaintiffs do not allege that they complied with the alternative dispute resolution procedure set forth in the Warranty." [64-1] at 49. In particular, the Warranty expressly "requires vehicle owners, before filing a claim under the MMWA, to follow the BBB Auto Line mediation and arbitration process." *Id*.

The MMWA "encourage[s] warrantors to establish procedures whereby consumer disputes are fairly and expeditiously settled through informal dispute settlement mechanisms." 15 U.S.C. § 2310(a)(1). If the warrantor establishes such a procedure, the procedure meets certain requirements established by the Federal Trade Commission, and the warrantor "incorporates in a

written warranty a requirement that the consumer resort to such procedure before pursuing any legal remedy under this section respecting such warranty," then "a class of consumers may not proceed in a class action … except to the extent the court determines necessary to establish the representative capacity of the named plaintiffs, unless the named plaintiffs (upon notifying the defendant that they are named plaintiffs in a class action with respect to a warranty obligation) initially resort to such procedure."  15 U.S.C. § 2310(a)(3).

The Complaint does not allege that Plaintiffs participated in Defendant's alternative dispute resolution procedure.  Nonetheless, the Court agrees with Plaintiffs that dismissal on this basis would be premature, as "failure to participate in Ford's informal dispute settlement procedure is an affirmative defense—subject to waiver, tolling, and estoppel, that Ford may raise, not that Plaintiff[s] must negate in [their] Complaint." *Sanchez-Knutson*, 52 F. Supp. 3d at 1235; see also *Lessin*, 2020 WL 6544705, at *6.  Futility is another defense to IDR exhaustion that at least several courts have recognized.  See *Sanchez-Knutson*, 52 F. Supp. 3d at 1235; *Persad*, 2018 WL 3428690, at *6; *Toyota*, 754 F. Supp. 2d at 1189; *Tsonev v. Kia Motors America, Inc*., 2016 WL 10000244, at *4 (C.D. Cal. Nov. 9, 2016).  The Court cannot resolve on the pleadings "whether Ford's program fits within the statutory criteria, whether [each] Plaintiff is able to demonstrate evidence of futility, and other issues not appropriate when ruling on a motion to dismiss." *Sanchez-Knutson*, 52 F. Supp. 3d at 1235.

Defendant relies on *L. Zingerman, D.D.S., P.C. v. Nissan North America, Inc*., 2015 WL 1840952, at *2–3 (N.D. Ill. Apr. 20, 2015), to argue that dismissal is appropriate.  But that case did not address whether compliance with IDR is an affirmative defense and the plaintiff does not appear to have raised a futility argument, as Plaintiffs do here.  Similar to the plaintiffs in *Persad*, Plaintiffs allege that Defendant "has attempted to squelch public recognition of the Transmission

Defect by propagating the falsehood that the harsh and bumpy shifting in Class Vehicles was 'normal,' through statements made to consumers and the general public by Ford employees, authorized dealers, agents, sales representatives and/or repair technicians, and through TSBs which sought to normalize the poor performance and safety issues." [63] at 55. Plaintiffs also allege that, "[d]espite its knowledge since well before March 2018, Ford has not recalled the Class Vehicles to repair the Transmission Defect and has not offered to reimburse Class Vehicle owners and lessees who incurred costs relating to the transmission problems." *Id*. Most of the individual Plaintiffs also allege how they sought repairs from Ford dealers, but the repairs were unsuccessful and they continued to suffer the same problems with their Transmissions. See *Persad*, 2018 WL 3428690, at *6 (plaintiffs' "allegations that any informal dispute resolution process would be futile [we]re enough to sustain the MMWA claims," where the complaint alleged that "Defendant steadfastly denies the existence of the Exhaust Fume Defect" and "Defendant's attempts to address exhaust fume issues have been ineffective"); *Tsonev*, 2016 WL 10000244, at *4 ("Plaintiff's complaint alleges repeated attempts to convince Kia to resolve the dispute by providing non-soy wiring, allowing him to exit the lease, providing him a non-Kia loaner car, and covering the repairs under the warranty. … Such allegations certainly allow for the inference that any informal dispute resolution attempt would be futile, excusing Plaintiff's non-compliance with 15 U.S.C. § 2310(a)(3)."). Finally, the Complaint alleges that Defendant's response to Plaintiffs' pre-suit notice letters suggested "only a possibility of individual resolution rather than classwide relief," [63] at 64, which also could potentially support application of the futility exception.

D.   **Negligence (Count 4), Fraud and Fraudulent Concealment Claims Under California, Florida, and Pennsylvania Common Law (Counts 5), and the Pennsylvania Unfair Trade Practice and Consumer Protection Law (Count 20)**

Defendants move to dismiss all of these claims on the basis of the economic loss rule.  In general terms, "[t]he economic loss doctrine denies a tort remedy for product defects when the loss 'is rooted in disappointed contractual or commercial expectations.'" *American United Logistics, Inc. v. Catellus Development Corp.*, 319 F.3d 921, 926 (7th Cir. 2003) (citing *Mutual Serv. Cas. Ins. Co. v. Elizabeth State Bank*, 265 F.3d 601, 615 (7th Cir. 2001)).  Under this formulation of the doctrine, "[c]ontract law provides the proper remedy for disappointed commercial expectations, such as when a product is unfit for its intended use." *Id.* (citing *Moorman Mfg. Co. v. Nat'l Tank Co.*, 435 N.E.2d 443, 450 (Ill. 1982)).  "To recover in tort under the economic loss doctrine, a party must show harm above and beyond a party's contractual or commercial expectations." *Id.* However, "[n]ot all states have adopted the economic loss rule, and those that have vary widely in their understanding of the doctrine's scope." *Portier v. NEO Technology Solutions*, 2019 WL 7946103, at *16 (D. Mass. Dec. 31, 2019) (internal quotation marks and citation omitted).  "While some states apply the economic loss doctrine only in products liability cases or when it is apparent that a plaintiff in privity with the defendant is seeking to circumvent provisions of the contract, other states apply the doctrine widely, barring all claims in tort that fail to allege either personal injury or property damage." *Id.*  Due to these variations, the Court finds it necessary to analyze Defendants' economic loss doctrine arguments claim by claim and state by state.

Before turning to this analysis, the Court notes that Plaintiffs concede the negligence claim (Count 4) to the extent it is brought under Illinois, Florida, Texas, or New Jersey law.  Plaintiffs also concede the fraud/fraudulent concealment claim (Count 5) to the extent it is based on California or Pennsylvania law, as well as the claim for violation of the Pennsylvania Unfair Trade

Practice and Consumer Protection Law (Count 20).  The Court grants the motion to dismiss the conceded claims.

### 1. Negligence (Count 4)

 The negligence claims that Plaintiffs have not conceded are based on California, Massachusetts, New York, and Pennsylvania law.  For the reasons that follow, Defendants' motion to dismiss is granted as to all four of these states.

### a. California

In California, "[e]conomic loss consists of damages for inadequate value, costs of repair and replacement of the defective product or consequent loss of profits—without any claim of personal injury or damages to other property."  *Robinson Helicopter Co. v. Dana Corp.*, 34 Cal. 4th 979, 988 (2004). "The economic loss rule requires a purchaser to recover in contract for purely economic loss due to disappointed expectations, unless he can demonstrate harm above and beyond a broken contractual promise."  *Id*.

Plaintiffs maintain that their negligence claim remains viable due to an exception to California's economic loss rule for a plaintiff who suffers "damage to property 'other than the product itself.'"  [66] at 40 (quoting *Jimenez v. Superior Court*, 58 P.3d 450, 456 (Cal. 2002)). That rule comes from the California Supreme Court's decision in *Jimenez*, which held that the economic loss rule did not bar the owners of mass-produced homes from bringing a products liability action against window manufacturers whose allegedly defective windows caused damage to other parts of plaintiffs' homes.  As Plaintiffs frame the issue, the relevant "product" in this case is the Transmission, which causes damages to the Vehicle, *i.e.*, the "other" property.  Plaintiffs cite a single case applying *Jimenez* in the context of an allegedly defective vehicle part, *Sater Chrysler Group LLC*, 2015 WL 736273, at *13 (C.D. Cal. Feb. 20, 2015), which involved defective steering

assemblies installed in defendant's trucks. *Sater* held that "[t]he tenor of *Jimenez* makes clear that the defect in this case is the steering assembly, not the truck, and so the economic loss rule does not bar tort claims to the extent the [complaint] asserts them for personal injury or property damage apart from the allegedly defective component parts." *Id.*

Defendant, while never addressing *Jimenez*, argues that the negligence claim must be dismissed because, "'in the context of defective vehicles, courts consistently have found that the economic loss rule applies where the sole damage alleged is to the vehicle itself.'" [69] at 28 (quoting *Sonneveldt v. Mazda Motor of America, Inc.*, 2021 WL 62502, at *9 (C.D. Cal. Jan. 4, 2021) (rejecting plaintiffs' argument that "the economic loss rule does not apply because 'the defective part, the water pump, has caused damage to other parts of the Class Vehicles (*e.g.*, the engine),' which constitutes damage to 'other property' sufficient to avoid the application of the economic loss rule")). *Sonneveldt* relies on three cases—*McCarthy*, *Sharma*, and *Callaghan*— none of which discuss *Jimenez* or its application to products liability actions involving defective vehicle parts. See *McCarthy v. Toyota Motor Corp.*, 2018 WL 6318841, at *11 (C.D. Cal. Sept. 14, 2018) (rejecting argument that a vehicle's "defective inverters caused a loss of value in the entire vehicle, which constitutes damage to 'other property' sufficient to avoid the economic loss rule"); *Sharma v. BMW of N. Am., LLC*, 2014 WL 2795512, at *1, 6 (N.D. Cal. June 19, 2014) (economic loss rule barred negligence claim in which plaintiffs alleged that due to the defective design of "drainage tubes used to drain water away from the vehicles' sun roofs," they "suffered actual damages in that the electronic component parts located in the Class Vehicles' trunks are experiencing continuous and progressive failure problems"); *Callaghan v. BMW of N. Am., LLC*, 2014 WL 1340085, at *1, 6 (N.D. Cal. Apr. 2, 2014) (plaintiffs did not allege "any other personal or property injury" caused by alleged safety defect in their vehicles, which was that "the automatic

36

transmission fluid would need to be replaced at some point during the lifetime of the vehicles"); see also *Traba v. Ford Motor Co*., 2018 WL 6038302, at *3–4 (C.D. Cal. June 27, 2018) (granting judgment on the pleadings to defendant on fraud claim based on economic loss rule, without any discussion of *Jimenez*, where plaintiffs did "not claim that the vehicle's alleged defects caused any personal injury or damage to property other than the vehicle).

Upon reviewing the cases cited by the parties and conducting its own research, the Court concludes that (1) it is unclear whether the California Supreme Court would apply the economic loss rule to foreclose a negligence claim based on the theory that a defective vehicle part caused damage to other parts of the vehicle, but (2) dismissal of the California Plaintiffs' negligence claim is warranted, regardless, because the Complaint's allegations do not plausibly suggest that the Transmission Defect caused physical damage to other parts of the California Plaintiffs' Vehicles.

In interpreting state law, the Court is required to follow the state's highest court or, where that court has not spoken directly, to "decide the case like the state's high court would if presented the issue." *Emerald Casino*, 867 F.3d at 765. *Jimenez* appears to be the most relevant California Supreme Court decision on the issue currently before the Court: whether the economic loss rule forecloses a plaintiff from bring a negligence claim based on the theory that a defective part of the plaintiff's vehicle caused damage to other parts of the vehicle. In *Jimenez*, the court explained that, "[t]o apply the economic loss rule, we must first determine what the product at issue is. Only then do we find out whether the injury is to the product itself (for which recovery is barred by the economic loss rule) or to property other than the defective product (for which plaintiffs may recover in tort)." 58 P.3d at 456. The court noted that "California decisional law has long recognized that the economic loss rule does not necessarily bar recovery in tort for damage that a defective product (e.g., a window) causes to other portions of a larger product (*e.g.*, a house) into

37

which the former has been incorporated." *Id*. at 457 (citing *Aas v. Superior Court*, 12 P.3d 1125 (Cal. 2000), *superceded in part by statute*, as stated in *Southern California Gas Leak Cases*, 441 P.3d 881, 895 (Cal. 2019)). In the *Aas* case cited by *Jimenez*, the court discussed how, "[o]ver time, the concept of recoverable physical injury or property damage expanded to include damage to part of a product caused by another, defective part." *Aas*, 12 P.3d at 1130. The *Aas* court gave as an example a situation "in which an unknown defect in an engine compartment started a fire that destroyed the entire automobile." *Id*. (citing *Gherna v. Ford Motor Co.*, 246 Cal. App. 2d 639, 644, 649-51 (1966)). It further noted that "the decision in *Seely* [*v. White Motor Co.*, 403 P.2d 145 (Cal. 1965)], "suggested these results by intimating that further damage to a truck caused by a manufacturing defect might be recoverable in strict liability or negligence, even though the cost of repairing the original defect was not." *Aas*, 12 P.3d at 1134. Applying this line of authority, which also included "cases in which poorly prepared lots subsided, damaging the houses built thereon," *Jimenez* concluded that "the manufacturer of a defective window installed in a mass-produced home may be held strictly liable in tort for damage that the window's defect causes to other parts of the home in which it is installed." 58 P.3d at 457.

Although Defendant claims—without specifically mentioning *Jimenez*—that "in the context of defective vehicles, courts consistently have found that the economic loss rule applies where the sole damage alleged is to the vehicle itself," [69] at 28, the case law is more mixed. Only one of the cases cited by Defendant—*Sonneveldt*—mentions *Jimenez*, and disposes of it without any analysis solely on the basis that *Sharma*, *Callaghan*, and *McCarthy*, which also do not mention *Jimenez*, come out in the vehicle manufacturer's favor. Defendant's attempt to distinguish *Sater*, which comes out in the plaintiffs' favor based on *Jimenez*, is unpersuasive. Defendant claims that the *Sater* court "found that the defective product—the steering assembly—was actually

38

separate from the truck," whereas "Plaintiffs here have not asserted—and cannot assert—that the transmission is separate from their vehicles." [69] at 28, n.42. But nothing in *Sater* suggests that the steerage assembly was, in fact, separate from the truck in which it was installed any more than Defendant's Transmissions are separate from its Vehicles. Rather, *Sater*'s point was that, under *Jimenez*, "when a 'defective product (*e.g.*, a window) causes [damage] to other portions of a larger product (*e.g.*, a house) into which the former has been incorporated,'" then they relevant "product" for purposes of the economic loss rule is the defective product itself rather than the larger product into which it is incorporated. *Sater*, 2015 WL 736273, at *13 (quoting *Jimenez*, 58 P.3d at 457).

Similar to *Sater*, in *Stockinger v. Toyota Motor Sales USA Inc*, 2017 WL 10574372 (C.D. Cal. July 7, 2017), the court determined that the economic loss rule barred the plaintiffs "from recovering for damages to the[ir vehicles'] HVAC system itself under their negligent misrepresentation claims," but that the plaintiffs could "still recover to the extent [they could] show the odors and mold from the HVAC system damaged the rest of their vehicles." *Id*. at *21 (relying on *Jimenez*, 58 P.3d at 457). The court explained that, "according to the reasoning of *Jimenez*, … Defendant's HVAC system is but one part that 'has been incorporated' into a larger product." *Id*. There is also a line of cases rejecting fraudulent joinder arguments and granting motions to remand in which California district courts have held, based on *Jimenez*, that the economic loss rule does not necessarily preclude the recovery of damages in tort where a defect in one part of a vehicle caused damage to the vehicle in which the part had been incorporated. See *Sabicer v. Ford Motor Co*., 362 F. Supp. 3d 837, 840–42 (C.D. Cal. 2019); *Nam Nguyen v. Ford Motor Co*., 2020 WL 416841, at *8 (N.D. Cal. Jan. 27, 2020); *Simmons v. Ford Motor Co*., 2020 WL 1151197, at *2–3 (N.D. Cal. Mar. 10, 2020); *Millican v. Ford Motor Co*., 2019 WL 7020214, at *1–2 (N.D. Cal. Dec. 20, 2019); *Hernandez v. Ford Motor Co*., 2019 WL 3854305, at *2 (C.D.

Cal. Aug. 15, 2019); *Madison v. Ford Motor Co*., 2019 WL 3562386, at *2–3 (E.D. Cal. Aug. 6, 2019); *Krasner v. Ford Motor Co*., 2019 WL 1428116, at *4 (E.D. Cal. Mar. 29, 2019).

Given the parties' lack of discussion of some of the relevant case law or analysis concerning why either the Vehicle or the Transmission should be considered the relevant "product" for purposes of applying the economic loss rule, the Court declines to decide one way or the other whether California's economic loss would bar a negligence claim to recover for damages that a defective vehicle part causes to other parts of the vehicle. Ultimately, it is unnecessary to decide the issue because the Complaint does not contain allegations plausibly suggesting that a California Plaintiff's defective Transmission caused physical damage to any other part of the Plaintiff's vehicle—such as the damages caused by the "serious wrecks," vehicle rollovers and crashes alleged in *Sater*, 2015 WL 736273, at *1, or the "odors and mold" the allegedly defective HVAC systems caused to the rest of the vehicle in *Stockinger*, 2017 WL 10574372, at *21. Instead, the Complaint focuses on problems with the California Plaintiffs' Transmissions themselves. See [63] at 19, ¶ 65 (allegations that Plaintiff Fair "started to notice a loud "clanking" noise from his transmission, with the transmission slipping and jerking when accelerating and shifting gears" and that "while driving his Vehicle, it holds the gears too long, completely shifts out of gear while accelerating, then roughly slams into gear"); *id*. at 21-22, ¶¶ 76-77 (similar allegations concerning Plaintiff Smith's transmission); *id*. at 24, ¶ 85 (similar allegations concerning Plaintiff Steen's transmission). The negligence claim brought under California law is therefore dismissed based on the economic loss doctrine.

### b.    Pennsylvania

As in California, "Pennsylvania's economic loss doctrine has evolved in recent years." *Roamingwood Sewer & Water Ass'n v. National Diversified Sales, Inc*., 509 F. Supp. 3d 198, 205

(M.D. Pa. 2020). And as with California, the parties disagree as to how this evolution affects Plaintiffs' negligence claims. Pennsylvania's economic loss doctrine "'developed in the product liability context to prevent tort recovery where the only injury was to the product itself.'" *Amig v. County of Juniata*, 432 F. Supp. 3d 481, 488 (M.D. Pa. 2020) (quoting *Sarsfield v. CitiMortgage, Inc.*, 707 F. Supp. 2d 546, 556 (M.D. Pa. 2010)). "Eventually, the doctrine came to stand for the proposition that, 'no cause of action can be maintained in tort for negligence or strict liability where the only injury was "economic loss"—that is, loss that is neither physical injury nor damage to tangible property.'" *Id.* (quoting *2–J Corp. v. Tice*, 126 F.3d 539, 541 (3d Cir. 1997)). However, in *Dittman v. UPMC*, 196 A.3d 1036 (Pa. 2018), "the Pennsylvania Supreme Court limited the doctrine's application and moved away from an analysis of whether plaintiff alleges solely economic harms." *Amig*, 432 F. Supp. 3d at 488. In *Dittman*, the plaintiffs were employees who brought suit against their employer alleging that the employer "breached its common law duty to act with reasonable care in collecting and storing their personal and financial information on its computer systems." 196 A.3d at 1056. The court held that because "this legal duty exists independently from any contractual obligations between the parties, the economic loss doctrine does not bar Employees' claim." *Id.*; see also *Amig*, 432 F. Supp. 3d at 1038 (interpreting *Dittman* to hold that "recovery for purely pecuniary damages is permissible under a negligence theory provided that the plaintiff can establish the defendant's breach of a legal duty arising under common law that is independent of any duty assumed pursuant to contract").

According to Plaintiffs, the Complaint plausibly alleges that "Ford had a duty to design and manufacture a product that would be safe for its intended and foreseeable uses and users," which it breached by being "negligent in the design, development, manufacture, and testing of the transmissions installed in the Class Vehicles." [66] at 40-41. The Complaint also alleges that

41

Defendant has "a duty to provide thorough notice of known safety defects" and "a duty not to engage in fraudulent or deceptive conduct," which are "independent of any contractual duties Ford may owe." *Id*. at 41. Plaintiffs argues that "[t]hese allegations plausibly state claims for negligence under Pennsylvania law arising independently of any contract with Ford." *Id.* (citing *Yachera v. Westminster Pharm., LLC*, 477 F. Supp. 3d 1251, 1272-73 (M.D. Fla. 2020)).

The Court agrees with Defendant that the exception recognized in *Dittman* is not available here because "Ford's duties arise from the contractual relationship (the Warranty) related to Plaintiff Orndorff's purchase of his vehicle—not from any *independent* non-contractual duty." [69] at 30 (emphasis added). *Winkworth v. Spectrum Brands, Inc*., 2020 WL 3574687 (W.D. Pa. June 30, 2020), a products liability action involving "Hot Rollers" hair curlers, is instructive. There, the plaintiffs argued that, independently of any contractual duties between the parties, Defendant "had a duty (1) to ensure that its Hot Rollers did not pose a significantly increased or unreasonable risk of injury to consumers, and (2) to use reasonable care to warn consumers about the risks and dangers regarding the use of the Hot Rollers." *Id*. at *7. The court rejected this argument, explaining that these duties were encompassed in the express and implied warranties that governed the parties' relationship. Those warranties "relate[d] to the quality and characteristics of the Hot Rollers, including that they are free of defects due to faulty material or workmanship and can be used for their ordinary purpose." *Id*. "Because no independent legal duty apart from those warranties exists," the court concluded, "Plaintiffs' negligence and negligent failure to warn claims are barred by the economic loss rule and must be dismissed." *Id*. In this case, as in *Winkworth*, the duties alleged by Plaintiffs are encompassed in the express and implied warranties that govern the parties' relationship. In addition, the harms alleged in the negligence count and the breach of warranty counts are also the same. See [63] at 71, ¶ 274 (alleging in

negligence claim that "Plaintiffs and the Class Members have suffered damages in that they spent more money than they otherwise would have on Class Vehicles which are of diminished value"); *id*. at 65, ¶ 236 (alleging in the breach of express warranty claim that "Plaintiffs and other Class members are entitled to statutory damages and other legal and equitable relief including, at their election, the purchase price of or a buyback of their Ford vehicles, or the overpayment or diminution in value of their Class Vehicles"); *id.* at 67, ¶ 249 (alleging in the breach of implied warranty claim that, "[a]s a direct and proximate result of Ford's breach of warranties, Plaintiffs and Class members suffered economic damage, including loss attributable to the diminished value of their Class Vehicles, loss of use of their Class Vehicles and other tangible property, as well as the monies spent and to be spent to repair and/or replace their Transmissions"). Where, as here, "a plaintiff has contractual remedies for her solely economic harms, she must seek those remedies in contract, not tort." *Amig*, 432 F. Supp. 3d at 488 (interpreting *Dittman*).

### c.     Massachusetts

The Supreme Judicial Court of Massachusetts "has long stood with the majority of jurisdictions in embracing the economic loss rule." *Wyman v. Ayer Properties, LLC*, 11 N.E.3d 1074, 1080 (Mass. 2014). "Essentially," under that rule, "where the negligent design or construction of a product leads to damage only to the product itself, the recovery for economic loss is in contract, and the economic loss rule bars recovery in tort." *Id.* Plaintiffs maintain that the "Massachusetts' economic loss rule mirrors the rule in Pennsylvania," that the Massachusetts Supreme Judicial Court would follow the Pennsylvania Supreme Court's ruling in *Dittman*, and, therefore, Plaintiffs may maintain a negligence claim because Defendant owes them duties that do not arise from a contract between the parties. See [66] at 41 (citing *Portier v. NEO Technology*

43

*Solutions*, 2019 WL 7946103, at *18 (D. Mass. Dec. 31, 2019) (determining that the highest Massachusetts court would likely follow *Dittman* in employer data breach cases)).

Assuming Plaintiffs' interpretation of Massachusetts law is correct, the Massachusetts Plaintiffs' negligence claim is barred by the economic loss rule for the same reasons as the Pennsylvania Plaintiffs' claim. This is consistent with the rationale for Massachusetts' economic loss rule, which is that, "when a commercial product fails without harming persons or other property, 'the resulting loss due to repair costs, decreased value, and lost profits is essentially the failure of the purchaser to receive the benefit of its bargain—traditionally the core concern of contract law.'" *Rule v. Fort Dodge Animal Health, Inc*., 604 F. Supp. 2d 288, 293 (D. Mass. 2009) (quoting *E. River Steamship Corp. v. Transamerica Delaval Inc.,* 476 U.S. 858, 870 (1986)) (holding that under Massachusetts' law, dog owner's products liability claim against manufacturer and seller of heartworm medication, alleging defendants failed to warn consumers adequately of the potential adverse health effects to dogs treated with the medication, was barred by the economic loss rule, given that dog owner did not claim that her dog ever became infected with heartworm or suffered any adverse consequences from having been treated with the medication, nor did she claim that the allegedly defective product harmed her personally).

### d. New York

Plaintiffs' arguments concerning New York's economic loss doctrine are essentially the same as its arguments for Pennsylvania and Massachusetts and will be resolved in the same way. Plaintiffs maintain that they plausibly allege that Defendant owed them a duty "beyond the contract itself" and therefore are not subject to the economic loss doctrine. See [66] at 41. However, Plaintiffs do not cite any New York common law establishing the relevant duties, and New York's highest court has rejected their argument in a factually similar case, *Clark-Fitzpatrick v Long*

44

*Island R. Co*., 516 N.E.2d 190 (N.Y. 1987). In *Clark-Fitzpatrick*, the plaintiff brought suit against a railroad for gross negligence, alleging that the "defendant failed to exercise 'due care' in designing [a tract improvement] project, locating utility lines, acquiring necessary property rights, and informing plaintiff of problems with the project before construction began." *Id*. at 194. The court determined that the exception to the economic loss rule for situations in which the applicable "legal duty … spring[s] from circumstances extraneous to, and not constituting elements of, the contract" did not apply because each of the plaintiff's allegations of duty "is merely a restatement, albeit in slightly different language, of the 'implied' contractual obligations asserted in the cause of action for breach of contract." *Id*.; see also *ESI, Inc. v. Coastal Power Production Co*., 995 F. Supp. 419, 432 (S.D.N.Y. 1998) ("a plaintiff may not recast a contract-based claim as a tort claim 'where plaintiff is essentially seeking enforcement of the [contractual] bargain'" (quoting *In re Chateaugay Corp*., 10 F.3d 944, 958 (2nd Cir. 1993))).

In this case, even if Plaintiffs "plausibly allege[] that Ford had a duty to design and manufacture a product that would be safe for its intended and foreseeable uses and users,'" a "duty to provide thorough notice of known safety defects," and a "duty not to engage in fraudulent or deceptive conduct," [66] at 40-41, these duties are merely a restatement, albeit in slightly different language, of Defendant's alleged contractual obligations asserted in the breach of warranty causes of action, including to ensure that "the Transmissions [are] fit for the ordinary purposes for which transmissions are used and that they pass without objection in the trade under the contract description." [63] at 66; see also *Bocre Leasing Corp. v General Motors Corp. (Allison Gas Turbine Div), No. 178*, 84 N.Y.2d 685, 685, 694 (N.Y. 1995) (answering in the negative certified question "[w]hether, under New York law, one who buys a helicopter in a commercial transaction may recover in tort, under either strict products liability or negligence theory, from the engine

manufacturer for damages caused by a defect in the engine, where only the helicopter itself was damaged"); *Feliciano*, 2016 WL 9344120, at *13–14 (applying economic loss rule to bar negligence claim arising out of alleged defect to vehicles that caused antifreeze to leak from radiator).

      **2.**      **California Fraud, Florida Fraud and Fraudulent Concealment (Count 5), and Pennsylvania Unfair Trade Practice and Consumer Protection Law (Count 20)**

For the reasons explained below, the Court grants Defendant's motion to dismiss the California fraud claim and the Florida Fraud and Fraudulent Concealment claims but denies the motion to dismiss the Pennsylvania Unfair Trade Practice and Consumer Protection Law ("UTPCPL") claim.

      **a.**      **California**

While conceding their fraudulent concealment claim, the California Plaintiffs argue that their fraud claim is not barred by the economic loss rule because there is an exception to that rule for situations "where 'one party has lied to the other.'" [66] at 42 (quoting *Hannibal Pictures, Inc. v. Sonja Prods. LLC*, 432 F. App'x 700, 701 (9th Cir. 2011)). This quoted line from *Hannibal* is based on the California Supreme Court's decision in *Robinson Helicopter Co., Inc. v. Dana Corp.*, 102 P.3d 268 (Cal. 2004), which the parties appear to agree is the controlling decision in evaluating Plaintiffs' fraud claim. In *Robinson Helicopter*, the defendant Dana, a manufacturer, fraudulently misrepresented to the plaintiff Robinson, a helicopter manufacturer, that the helicopter clutches it supplied had a certain level of hardness, per the plaintiff's specifications. Dana provided certificates to this effect with each delivery of clutches, which were required by the Federal Aviation Administration ("FAA"). *Id.* at 270. After twelve years, Dana changed the hardness of its clutches but continued to supply certificates attesting to the prior level of hardness. *Id.* at 271.

The new clutches had an unacceptably high failure rate. *Id.* Robinson incurred significant expenses uncovering the problem and correcting it by recalling and replacing the clutches. *Id.* at 271-72. After a jury found in Robinson's favor on all of its claims, Dana appealed to the Supreme Court of California, seeking "review of the Court of Appeal's application of the economic loss rule to its fraud and intentional misrepresentation claims." *Id.* at 272.

The Supreme Court explained that the "economic loss rule requires a purchaser to recover in contract for purely economic loss due to disappointed expectations, unless he can demonstrate harm above and beyond a broken contractual promise." *Robinson Helicopter*, 102 P.3d at 273. The rule is meant to "'prevent[] the law of contract and the law of tort from dissolving one into the other.'" *Id.* at 273 (quoting *Rich Products Corp. v. Kemutec, Inc.*, 66 F. Supp. 2d 937, 969 (E.D. Wis. 1999)). Focusing "solely on the fraud and misrepresentation claim based on Dana's provision of the false certificates of conformance," the court held that the claims were not barred by the economic loss doctrine. The court reasoned that, "[b]ut for Dana's affirmative misrepresentations by supplying the false certificates of conformance, Robinson would not have accepted delivery and used the nonconforming clutches over the course of several years, nor would it have incurred the cost of investigating the cause of the faulty clutches." *Id.* at 274. "Accordingly, Dana's tortious conduct was separate from the breach itself, which involved Dana's provision of the nonconforming clutches." *Id.* In addition, "Dana's provision of faulty clutches exposed Robinson to liability for personal damages if a helicopter crashed and to disciplinary action by the FAA." *Id.* For these two reasons, the court concluded, the defendant's "fraud is a tort independent of the breach" and not barred by the economic loss doctrine. *Id.* The court emphasized that its holding was "narrow in scope and limited to a defendant's affirmative

misrepresentations on which a plaintiff relies and which expose a plaintiff to liability for personal damages independent of the plaintiff's economic loss." *Id*. at 276.

The Court agrees with Defendant that *Robinson Helicopter* does not except Plaintiffs' fraud claim from the economic loss rule, because the Complaint does not allege that Plaintiffs were exposed "to liability for personal damages independent of the[ir] economic loss," 102 P.3d at 276. Rather, the fraud claim is based on "purely economic loss due to disappointed expectations." *Id*. at 273. In particular, the Complaint's fraud claim alleges that, "[b]ecause of the concealment and/or suppression of the facts, Plaintiffs and the Class sustained damage because they did not receive the value of the price paid for their Class Vehicles." [63] at 73, ¶ 285. This is the same loss alleged in the Complaint's breach of warranty claims. See *id*. at 65, ¶¶ 236, 249. As the Central District of California recently held in a case very similar to this one: "Plaintiff[s] ha[ve] not alleged fraudulent conduct similar to the issuance of false certificates in *Robinson Helicopter*, or conduct that is otherwise sufficiently independent of Ford's contractual/warranty obligations to repair or replace the vehicle, as would be required to exempt his fraudulent omission claim from the economic loss rule. To the contrary, Ford's allegedly tortious omission was its failure to disclose a defect in the vehicle—conduct that overlaps with Ford's alleged breach of its warranty obligations." *In re Ford Motor Co. DPS6 Powershift Transmission Products Liability Litigation*, 483 F. Supp. 3d 838, 849 (C.D. Cal. 2020) (consumer's fraudulent omission claims against Ford based on allegedly defective transmission barred by the economic loss rule); see also *Nafisi v. Mercedes-Benz USA, LLC*, 2021 WL 2525454, at *1 (C.D. Cal. Mar. 31, 2021) (dismissing fraudulent concealment claim arising from defendant's sale of vehicle with alleged battery malfunction, where "Plaintiff's well-pleaded allegations do not include allegations that Plaintiff suffered any personal injury or other damages separate and apart from the economic damages

associated with his warranty claims"); *Hien Bui v. Mercedes-Benz USA, LLC*, 2021 WL 242936, at *4 (S.D. Cal. Jan. 25, 2021) (concluding based on *Robinson* that the economic loss rule barred fraudulent concealment claim arising out of defendant's sale of allegedly defective vehicle to plaintiff, where "the complaint does not allege any personal injury to Plaintiff or damage to physical property (independent of the Vehicle itself)" and "the only allegations of harm caused by the alleged omission was that Plaintiff purchased the Vehicle that he would not have otherwise purchased"); *Yi v. BMW North America, LLC*, 2018 WL 11148443, at *2 (C.D. Cal. Mar. 5, 2018) (dismissing fraud claim arising out of lease of vehicle with alleged oil consumption and engine defects based on the economic loss doctrine where "[t]he only damages Plaintiff claims are those that arise from the defective vehicle itself"). Therefore, the Court grants Defendant's motion to dismiss the California Plaintiffs' fraud claim.

### b. Florida

The Florida Plaintiffs argue that the economic loss rule does not bar their fraud and fraudulent concealment claims because, in *Tiara Condo. Ass'n, Inc. v. Marsh & McLennan Cos.*, 110 So. 3d 399 (Fla. 2013), the Florida Supreme Court both restored application of the rule to its original realm of products liability and "limited the application of the rule to preclude negligence or strict liability products liability theories" only—not fraud or fraudulent concealment theories. [66] at 43. Defendant disputes this interpretation of *Tiara*, and each side points to a handful of cases supporting their reading of the case.

In *Tiara*, the Florida Supreme Court "discussed the history of the economic loss rule, from its products liability roots" in *Seely v. White Motor Co.*, 403 P.2d 145 (Cal. 1965), and *East River Steamship Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858 (1986), "to its later expansion to contractual privity cases." *Aprigliano v. American Honda Motor Co.*, 979 F. Supp. 2d 1331, 1336

49

(S.D. Fla. 2013) (citing *Tiara*, 110 So. 3d at 403-407). The Court then explained its attempt in *Indemnity Insurance Co. of North America v. American Aviation, Inc.*, 891 So. 2d 532 (Fl. 2004), to retract its "unprincipled extension of the rule" and limit it to its "original rationale and intent" that "a manufacturer or distributor in a commercial relationship has no duty beyond that arising from its contract to prevent a product from malfunctioning or damaging itself." *Tiara*, 110 So. 3d at 406 (citing *American Aviation*, 891 So. 2d at 542). At the same time, *Tiara* explained, *American Aviation* "reaffirmed that in cases involving either privity of contract or products liability, the other exceptions to the economic loss rule that we have developed, such as for professional malpractice, fraudulent inducement, and negligent misrepresentation, or free-standing statutory causes of action" remained viable and were "untouched" by *American Avation*. *Tiara*, 110 So.3d at 406 (citing *American Aviation*, 891 So.2d at 543). The "fraudulent inducement" exception mentioned in *Tiara*, see *id*. at 406, n.7, came from *HTP, Ltd. v. Lineas Aereas Costarricenses, S.A.*, 685 So. 2d 1238 (Fla. 1996), which involved an alleged breach of a settlement agreement—not products liability. *Id*. at 1239. *Tiara* concluded by holding that "the application of the economic loss rule is limited to products liability cases." 110 So. 3d at 407.

*Tiara*'s dicta concerning the fraudulent inducement exception has created some confusion for courts applying its holding to fraudulent inducement and fraudulent concealment claims in products liability cases. Although the parties do not discuss how Florida state courts have read *Tiara*, most of the Florida federal district courts to consider the issue have dismissed fraud claims arising in the products liability context based on the economic loss rule. For instance, in *Takata*, 193 F. Supp. 3d at 1338-39, the court considered "whether Florida's Supreme Court, by its dicta, intended to abridge the economic loss rule in the products liability setting to allow fraudulent inducement and negligent misrepresentation claims (and by implication fraudulent concealment

claims), even where the action for fraud depends upon precisely the same allegations as a warranty claim—*i.e.*, a claim the product failed to work as promised." The *Takata* court agreed with other courts in the Eleventh Circuit that "have concluded that Florida's Supreme Court did not intend to allow such products liability claims to survive." *Id*. at 1339 (citing *Aprigliano*, 979 F. Supp. 2d at 1337–39; *Burns v. Winnebago Indus., Inc.*, 2013 WL 4437246, at *4 (M.D. Fla. Aug. 16, 2013) (holding that fraudulent inducement and negligent misrepresentation exceptions to the economic loss rule generally arise in the context of contractual privity cases, not in products liability actions, and finding that economic loss rule barred claims of fraudulent concealment and negligent misrepresentation in the products liability context); *In re Atlas Roofing Corp. Chalet Shingle Prods. Liab. Litig*, 2015 WL 3796456, at *3 (N.D. Ga. June 18, 2015) (applying Florida law and holding economic loss rule barred action for fraudulent concealment in products liability case because the alleged misrepresentation concerned the heart of the parties' agreement and "simply applying the label of fraud to a cause of action will not suffice to subvert the sound policy rationales underlying the economic loss rule")). The *Takata* court explained that "[h]ere, the fraudulent concealment claims allege precisely what a breach of warranty claim would allege—namely that the Mazda vehicles did not work as promised," and concluded that the economic loss rule therefore barred the plaintiffs' fraudulent concealment claim. *Id*. Likewise, in this case, Plaintiff's fraud and fraudulent concealment claims have the same factual basis as its warranty claims: that the Vehicles contained the Transmission defect and that "Plaintiffs and the Class sustained damage because they did not receive the value of the price paid for their Class Vehicles." [63] at 73, ¶ 285.

Plaintiff relies on two out-of-state cases and one Florida district court case in support of its contrary reading of *Tiara*. The Court does not find those decisions persuasive. *MyFord Touch* relies on *Tiara*'s reference to *HTP*, which was a contractual privity case, not a products liability

case, in concluding that Florida law authorizes fraudulent inducement cases even in the context of products liability. *MyFord Touch*, 46 F. Supp. 3d at 965. *Volkswagen*, 2017 WL 1902160, at *18, relied on *MyFord Touch*, without any further analysis and in a single sentence summarizing six states' laws on the application of the economic loss doctrine to fraudulent inducement claims. *Jerue v. Drummond Co.*, 2017 WL 10876737 (M.D. Fla. Aug. 17, 2017), criticizes *Tiara* for limiting the economic loss doctrine to the products liability context only. See *id.* at *3 (asserting that "[w]hile the Florida Supreme Court correctly identifies the viability of the 'economic loss rule' in products liability cases, it is the view of this Court that *Tiara* ignores the fundamental first principle of negligence-based liability, *i.e.* that negligence only protects against bodily harm or property damage, not purely economic losses"). *Jerue* does not address whether *Tiara* should be read to authorize fraud and fraudulent concealment claims *in* the products liability context. Its statement that "Florida's formulation of the economic loss rule "allow[s] plaintiffs to recover purely economic damages" for intentional torts of fraud and fraudulent concealment is made generally, not based on *Tiara*, and in the context of deciding an issue of Article III standing. *Id.* at *4.

The Court will follow the bulk of precedent addressing the issue and hold that the Florida Plaintiffs' fraud and fraudulent inducement claims are barred by the economic loss doctrine. "To hold otherwise would allow the economic loss rule to be manipulated such that any time a purchaser received a defective product that did not cause any injuries or damage to other property, such a purchaser could assert claims for negligent and fraudulent concealment regarding the defect to avoid the economic loss rule." *Burns*, 2013 WL 4437246, at *4; see also *Cardenas v. Toyota Motor Corp.*, 418 F. Supp. 3d 1090, 1104-1105 (S.D. Fla. 2019) (economic loss rule barred plaintiffs' claims that car manufacturers defrauded them by concealing defect in vehicles' heating,

ventilation, and air conditioning systems, where plaintiffs sought damages for vehicles allegedly not working as promised); *Koski v. Carrier Corp.*, 347 F. Supp. 3d 1185, 1189 (S.D. Fla. 2017) (dismissing fraudulent concealment claim under economic loss rule in case alleging defendants manufactured defective heaters and HVAC equipment and falsely certified the products complied with applicable safety standards); *Leon v. Continental AG*, 301 F. Supp. 3d 1203, 1225 (S.D. Fla. 2017) ("the Florida Supreme Court did not intend any 'fraudulent inducement' exception to the economic loss rule in the products liability context"); *Vazquez v. Gen. Motors, LLC*, 2018 WL 447644, at *5 (S.D. Fla. Jan. 16, 2018) ("Fraudulent concealment claims in the products liability sphere that seek to recover only economic damages are clearly barred by Florida's economic loss rule.").

### c. Pennsylvania

As noted above, the Pennsylvania Plaintiffs concede their fraud and fraudulent concealment claims, but argue that the economic loss rule does not bar their claim for violation of the UTPCPL. Defendant is correct that, in *Werwinksi v. Ford Motor Co.*, 286 F.3d 661 (3d Cir. 2002), the Third Circuit predicted that the Supreme Court of Pennsylvania would interpret Pennsylvania's economic loss doctrine to bar fraudulent concealment and UTPCPL claims asserted by purchasers against manufacturers that provided allegedly defective products. *Id.* at 681. However, since briefing was completed on Defendant's motion to dismiss, the Third Circuit abrogated *Werwinski* and held based on intervening Pennsylvania Supreme Court and Superior Court precedent that "the economic loss doctrine no longer may serve as a bar to UTPCPL claims." *Earl v. NVR, Inc.*, 990 F.3d 310, 314 (3d Cir. 2021). In particular, the court cited to *Excavation Techs., Inc. v. Columbia Gas Co. of Pa.*, 985 A.2d 840 (Pa. 2009), which held that "though the economic loss doctrine is 'well-established' in Pennsylvania, the common law rule gives way if

there is a 'statutory basis to impose liability for economic losses,' such as when a statute 'provide[s] a private cause of action for economic losses.'" *Earl*, 990 F.3d at 313 (quoting *Excavation Techs.*, 985 A.2d at 842-43). The Court also cited and gave "due deference" to two Pennsylvania Superior Court decisions extending *Excavation Tech.*'s reasoning to UTPCPL claims. See *id.* at 313 (citing *Dixon v. Nw. Mut.*, 146 A.3d 780, 790 (Pa. Super. Ct. 2016); *Knight v. Springfield Hyundai*, 81 A.3d 940, 951-52 (Pa. Super. Ct. 2013)). The Court will follow this more recent precedent and deny Defendant's motion to dismiss the UTPCPL claim based on the economic loss doctrine.

### E.     Fraud and Fraudulent Concealment (Count 5)

In Section V of their brief, Defendants attempt to group together all the common law fraud and fraudulent concealment claims with the "fraud-based claims under state consumer protection statutes," Counts 5, 7, 11-13, 16-20, and 23. However, Section V's handling of the state consumer protection statutes is extremely cursory and confined almost exclusively to footnotes. See [64-1] at 58 & n.39; 62 n.44; 67 n.52; 68 n.54; 69 n.57. Section V never clearly lays out the elements of proof required under each consumer fraud statute, nor does it address whether proof of fraud is actually required as to all of those laws—which is important given that some state consumer protection statutes may allow claims to proceed on the grounds of "unfair" or similar business practices that may not rise to the level of being fraudulent. Defendant's brief also contains a separate section, Section VII, titled "Plaintiffs Fail To Plead Actionable State Consumer Protection Law Claims," which makes various arguments addressed to specific consumer protection statutes. To avoid any more confusion than necessary, the Court addresses only the fraud and fraudulent concealment claims in this portion of its analysis. And since the Court has already determined that the economic loss doctrine bars the fraud and fraudulent concealment claims in several of the states

54

at issue, the Court confines its discussion here to Illinois, Massachusetts, New Jersey, New York, and Texas. The state consumer protection claims are addressed below in a separate section of the Analysis. As that discussion indicates, the Court declines to dismiss any of those claims on grounds that Defendant never properly raises in its briefs, as perfunctory and undeveloped arguments and arguments made only in footnotes are waived. See *Schaefer v. Universal Scaffolding & Equipment, LLC*, 839 F.3d 599, 607 (7th Cir. 2016); *Vulcan Golf*, 552 F. Supp. 2d at 765 n. 6.

### 1. Fraud

As noted above, Rule 9(b) requires Plaintiffs to "state with particularity the circumstances constituting fraud," although "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). "This means that a plaintiff must describe the 'who, what, when, where, and how' of the fraud—'the first paragraph of any newspaper story.'" *Suarez*, 503 F. Supp. 3d at 723 (quoting *Berkowtiz*, 896 F.3d at 839). In each of the five states at issue, the elements of fraud are essentially the same. The plaintiff must show: (1) a false statement of material fact; (2) knowledge or belief by the defendant that the statement was false; (3) an intention to induce the plaintiff to act; (4) reasonable reliance upon the truth of the statement by the plaintiff; and (5) damages. *Smart Oil, LLC v. DW Mazel, LLC*, 970 F.3d 856, 866 (7th Cir. 2020) (Illinois); see also *In re Sheedy*, 801 F.3d 12, 23 (1st Cir. 2015) (Massachusetts); *Durr Mechanical Construction, Inc. v. PSEG Fossil, LLC*, 516 F. Supp. 3d 407, 421 (D.N.J. 2021) (New Jersey); *Twohig v. Shop-Rite Supermarkets, Inc.*, 519 F. Supp. 3d 154, 165 (S.D.N.Y. 2021) (New York); *CBE Group, Inc. v. Lexington Law Firm*, 993 F.3d 346, 350 (5th Cir. 2021) (Texas).

Before turning to the individual Plaintiffs' allegations concerning fraud, the Court considers Plaintiffs' argument that they "reasonably believed and relied on Ford's representations

made in the 2017, 2018, and 2019 F-150 extended warranty coverage that their F150's transmissions would operate properly as warranted." [66] at 48. However, the Complaint does not allege that the extended warranty, or the limited warranty, promised that the transmission (or any other parts) would "operate properly"; rather, the warranties required Ford to fix certain components for a certain number of months and miles. See [63] at 12. Plaintiffs raise a question about whether Defendant complied with the warranties, but do not identify any false statements of fact contained in the warranties. In addition, Plaintiffs are already pursuing breach of express warranty claims to remedy Defendant's alleged failure to live up to its end of the bargain.

The Court now turns to the fraud claims of Dougherty (the only New Jersey Plaintiff), Heller (the only New York Plaintiff), and O'Connor and Zielinski (the two Illinois Plaintiffs).[5] The Court agrees with Defendant that these four Plaintiffs' fraud claims are deficient because they fail to allege that Defendant made any false statements on which Plaintiffs relied. The Complaint does not allege that these Plaintiffs did any particular research or reviewed Ford's websites or advertising prior to deciding to purchase their Vehicles. Nor does the Complaint identify any conversations that these Plaintiffs had with any Ford representatives. Instead, the sole basis for their fraud claims appears to be an allegation that a Ford sales representative did not disclose the Defect prior to their purchases. See [63] at 34, ¶ 126 (Dougherty); *id*. at 37, ¶ 138 (Heller); *id*. at 14, ¶ 46 (O'Connor); *id*. at 16, ¶ 54 (Zielinski). By contrast, in the *Rustoleum* case cited extensively by Plaintiffs, each Plaintiff alleged to have seen and been deceived by specific Rust-

---

[5] In their response brief, Plaintiffs do not discuss individual Plaintiffs and the specific misrepresentations on which they allegedly rely, focusing instead on statements Defendant made on its website. See [66] at 45-47. This is the improper focus. Rule 9(b) requires the complaint to allege "the particulars of how each plaintiff was defrauded and how each defendant committed fraud." *Gandhi v. Sitara Capital Management, LLC*, 689 F. Supp. 2d 1004, 1012 (N.D. Ill. 2010).

Oleum packaging and advertising. *In re Rust-Oleum Restore Marketing, Sales Practices & Products Liability Litigation*, 155 F. Supp. 3d 772, 813 (N.D. Ill. 2016).

That leaves Barcelona and Marino (the two Massachusetts Plaintiffs) and McDonald (the only Texas Plaintiff). Defendant argues that their allegations are insufficient, as well, because the allegedly false statements on which they relied were nonactionable puffery. "'Puffing denotes the exaggerations reasonably expected of a seller as to the degree of quality of his or her product, the truth or falsity of which cannot be precisely determined.'" *Muir v. Playtex Products, LLC*, 983 F. Supp. 2d 980, 989 (N.D. Ill. 2013) (quoting *Barbara's Sales, Inc. v. Intel Corp.,* 879 N.E.2d 910, 926 (Ill. 2007)); see also *Rust-Oleum*, 155 F. Supp. 3d at 817. "Puffing typically consists of subjective descriptions relating to quality, such as 'high quality,' 'perfect,' and 'best.'" *Muir*, 983 F. Supp. 2d at 989. Statements of puffery are "so vague as to leave the standards for interpretation open to a number of plausible criteria for judgment," and "not capable of precise measuring," such that a reasonable consumer would not rely on them. *Id*.[6]

Applying this standard to Barcelona, the Court concludes that his fraud claim should also be dismissed. Barcelona alleges that "[w]hile researching this vehicle prior to purchase, he read vehicle specification information and advertising on Ford's website about the Ford F-150, which touted its performance and reliability." [63] at 27, ¶ 102. He "recalls that the specifications and

---

[6] The parties disagree about whether it is proper to determine on a motion to dismiss that an allegedly false statement is mere puffery. The case law is mixed on this issue. See, e.g., *Bietsch v. Sergeant's Pet Care Products, Inc*., 2016 WL 1011512, at *3 (N.D. Ill. Mar. 15, 2016) ("[w]hether a statement is puffery or actionable is generally a factual question" that cannot be determined on the pleadings); *Yetter v. Ford Motor Co.*, 428 F. Supp. 3d 210, 234 (N.D. Cal. 2019) ("Whether a statement is puffery or a representation of fact is a question of law that can be properly decided on a motion to dismiss."). Even if "puffery" is properly considered a defense, a fraud plaintiff must allege sufficient facts to plausibly suggest that the defendant made a false statement on which the plaintiff relied. If the statement at issue is obviously so vague as to lack any discernable meaning, then the plaintiff cannot plausibly show either that the statement is false or that she reasonably relied on it. In such cases, the Court agrees with Defendant that dismissal on the pleadings may be appropriate. Where the statement at issue could be interpreted either way, however, the Court agrees with Plaintiff that dismissal on the pleadings would be premature.

information provided by Ford on its corporate website indicated a top of the line transmission that boasted better fuel performance." *Id.*, ¶ 103. The Complaint does not suggest that the Transmission does not have "better fuel performance," thus the only statements that are allegedly false concern the Vehicle's "performance and reliability" and that its Transmission is "top of the line." These are classic statements of puffery, which are insufficient to be actionable. See *Costa v. FCA US LLC*, 2021 WL 2338963, at *11 (D. Mass. June 8, 2021) ("general statements about big-picture concepts such as trust, security, reputation, and safety are non-actionable puffery"). There is no indication from the Complaint what is even meant by the Vehicles' "performance and reliability" being "touted." This statement is "'so vague as to leave the standards for interpretation open to a number of plausible criteria for judgment." *Muir*, 983 F. Supp. 2d at 989. The statement that the Transmission is "top of the line" is merely a statement "in general terms that one product is superior" and therefore "is not actionable," either, as it provides "no plausible criteria" for measurement, *id.*; see also *Cummings v. HPG Int'l, Inc.*, 244 F.3d 16, 21-22 (1st Cir. 2001) (under Massachusetts law, manufacturer's statements regarding supposed superiority of its unreinforced PVC membrane roofs was mere puffery, which could not be actionable in deceit or negligent misrepresentation); *Yetter*, 428 F. Supp. 3d at 234 ("generalized claims about a vehicle's "high performance" or "durability" are non-actionable puffery); *Costa*, 2021 WL 2338963 at *11 (under Massachusetts law, car owner's vague allegations that manufacturer represented that the car's headrests were safe and that owner relied on manufacturer's assurances that the car was safe were insufficient to state claim against manufacturer for misrepresentation-based fraud in connection with the allegedly defective headrests that had safety mechanism to mitigate risk of whiplash).

Next are Marino and McDonald. As to Marino, the Complaint alleges that a few months before he leased his Vehicle in March 2019, he viewed Defendant's advertising, which "stated that

58

the F-150 was a reliable truck and touted a new and improved transmission that worked smoothly and efficiently." [63] at 32, ¶ 115. He also read vehicle specification information and advertising on Ford's website about the Ford F-150, which "touted its enhanced performance and reliability." *Id.*, ¶ 116. Similarly, while McDonald was doing research before buying his Vehicle in August 2018, he viewed online advertisements which stated that "the transmission was reliable, smooth, and efficient." *Id.* at 41, ¶ 158. Prior to his purchase, he "also viewed Ford's advertisements on Pegues-Hurst Ford's website (an authorized Ford dealer) which again claimed that the transmission was reliable, smooth, and efficient." *Id.* He "viewed the same advertising at the Pegues-Hurst Ford showroom on the day he purchased his vehicle." *Id.* The Complaint's strongest support for the fraud claim is the alleged false representation that the Transmission is "smooth." The Court cannot determine based solely on the pleadings that this is puffery. Arguably, "smooth" is a measurable attribute in the context of transmissions. The Complaint contains numerous allegations that the Transmission does not switch smoothly between gears. All of the Plaintiffs reported experiencing problems with the Transmission, including jerky and rough acceleration and deceleration and delayed engagement of the Transmission and gears holding too long then roughly slamming into gear. And Defendant's own TSBs stated that 2017 and 2018 F-150 vehicles "may exhibit harsh/bumpy upshift, downshift and/or engagement concerns," which is at least arguably in direct contradiction to the representation that the transmissions are "smooth." [63] at 46.

Finally, the Court considers whether Marino and McDonald have adequately alleged that Defendant knew the truth—that its Transmissions were not "smooth"—at the time they purchased or leased their vehicles, which occurred in August 2018 and March 2019. The Complaint cites in support of the knowledge element (1) the TSBs that Defendant issued in March 2018 and September 2018; (2) complaints that consumers submitted to NHTSA, including 36 complaints

59

summarized in the Complaint; and (3) that Defendant "knew or should have known through sufficient product testing" of problems with the Vehicles' Trasmissions. [63] at 46, ¶ 174. The Court finds these allegations sufficient to plausibly suggest that Defendant had knowledge of the Defect—and in particular the problem with jerky and rough acceleration and deceleration—when Marino and McDonald leased or purchased their Vehicles. Knowledge "may be alleged generally" under Rule 9(b); particularity is not required as to this element, as Defendant's briefing suggests. See [64-1] at 63, 65. The TSBs are the strongest evidence of Defendant's knowledge. Although the Complaint does not quote directly from the March 2018 TSB, as it does with the later TSB, it does allege that both were "meant to address harsh or bumpy transmission shifting," and "Ford advised that issues were normal and did not offer to repair or replace the Transmissions." [63] at 14. These are the same conditions Plaintiffs allege to have experienced with their Vehicles. The Complaint also plausibly alleges that, prior to March 2018, "it is logical to assume that Ford had to open an internal investigation that led to its TSB." *Id*. The NHTSA complaints, though apparently not as numerous as the complaints received in the case law cited by Defendant, see [64-1] at 65-66, are consistent with the TSBs and further suggest Defendant's knowledge of the Defect. Exactly what Defendant knew and when is information uniquely within Defendant's knowledge. Taking the allegations concerning knowledge as a whole and drawing all reasonable inferences in Plaintiffs' favor, the Court concludes that they are sufficient to satisfy Rule 9(b). See, e.g., *Persad*, 2018 WL 3428690, at *3 (complaint alleged that Ford issued multiple TSBs about the same defect); *Volkswagen*, 2017 WL 1902160, at *4-5 (complaint alleged that Volkswagen issued several TSBs about the defect); *Victorino v. FCA US LLC*, 2016 WL 6441518, at *8-9 (S.D. Cal. Nov. 1, 2016) (complaint alleged that Fiat-Chrysler had issued TSBs about the defect in the same transmission in the plaintiffs' vehicles).

2. **Fraudulent Concealment**

As with the fraud claims, the Court focuses on the five states for which the Court has not already determined that dismissal of the fraudulent concealment claims is appropriate—Illinois, Massachusetts, New Jersey, New York, and Texas. Under each of these states' laws, a claim for fraudulent concealment (which some of the states appear to use interchangeably with "fraud by omission") requires proof that the defendant "intentionally induce[d] a false belief through the concealment of a material fact while under a duty to speak." *Nartey v. Franciscan Health Hospital*, 2 F.4th 1020, 1026 (7th Cir. 2021) (Illinois); see also *Squeri v. Mount Ida College*, 954 F.3d 56, 70 (1st Cir. 2020) (Massachusetts); *Wiatt v. Winston & Strawn LLP*, 838 F. Supp. 2d 296, 315–16 (D.N.J. 2012) (New Jersey); *Federal Deposit Insurance Corp. v. Murex LLC*, 500 F. Supp. 3d 76, 116 (S.D.N.Y. 2020) (New York); *CBE Group*, 993 F.3d at 353 (Texas).

a. **duty**

Plaintiff argues that, in Massachusetts, New Jersey, and New York, Defendant has a duty to speak due to its exclusive and superior knowledge concerning the Transmission Defect. The Court will address New Jersey first. The only case on which Plaintiff relies, *Majdipour v. Jaguar Land Rover North America, LLC*, 2013 WL 5574626, at *16 (D.N.J. Oct. 9, 2013), interpreted California law, not New Jersey law. "[A] party's 'superior knowledge' is insufficient to impose a duty to disclose in New Jersey." *Schechter v. Hyundai Motor America*, 2019 WL 3416902, at *9 (D.N.J. July 29, 2019).

The parties agree that under Massachusetts law, a duty to disclose arises where "there are matters known to the speaker that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading." *Squeri v. Mount Ida College*, 954 F.3d 56, 71 (1st

Cir. 2020). But while Plaintiffs identify the proper legal standard, they do not identify any "partial or ambiguous statement of the facts" made by Defendant. *Id*.

Under New York law, "[a] duty to disclose may arise 'where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge.'" *Tears v. Boston Scientific Corp.*, 344 F. Supp. 3d 500, 515 (S.D.N.Y. 2018). Defendant argues that this exception does not apply because the Complaint alleges that other Ford customers filed public complaints with NHTSA concerning the Defect, and Plaintiffs had access to those complaints. However, the Court cannot determine on the pleadings whether the NHTSA complaints were "readily available" to Plaintiffs or would have provided Plaintiffs with sufficient notice of the Defect. Defendant's argument regarding the ready availability of the complaints to Plaintiffs also seems in tension with its argument that the Complaint does not plausibly allege that *Defendant* had any knowledge of the NHTSA complaints. See [64-1] at 64-65. It is not apparent that the average consumer would know about NHTSA complaints, know how to access them, or know how to interpret them or their importance to the decision to purchase a Vehicle. Cf. *Brass v. American Film Technologies, Inc.*, 987 F.2d 142, 151 (2d Cir. 1993) ("in an increasing number of situations, a buyer is not required to conduct investigations to unearth facts and defects that are present, but not manifest"). Therefore, the Court declines to dismiss the New York fraudulent concealment claim on the basis of duty.

Finally, Plaintiffs argue that Illinois and Texas law both impose on Defendant a duty to disclose safety defects. See [66] at 53. However, neither of the cases cited by Plaintiffs say this. *McCabe v. Daimler*, 948 F. Supp. 2d 1347, 1368-70 (N.D. Ga. 2013), was interpreting Georgia law, not Texas law as Plaintiffs claim. And *In re: Takata Airbag Products Liability Litigation*,

2016 WL 6072406, at *5 (S.D. Fla. Oct. 14, 2016), contains no discussion or suggestion of a "duty to disclose safety defects" under Illinois law.

### b.      knowledge

Defendant argues that the Complaint fails to allege specific facts showing that it had knowledge of the alleged Defect at the time that Plaintiffs purchased or leased their vehicles and, therefore, cannot be held liable for allegedly failing to disclose the Defect. Since New York is the only state in which a claim for fraudulent concealment may yet be viable, the Court just considers the sole New York Plaintiff, Heller. She bought her Vehicle in February 2018, the month before Defendant's first TSB came out. As explained above in relation to the fraud claim, the Complaint plausibly alleges that, at some point prior to March 2018, "it is logical to assume that Ford had to open an internal investigation that led to its TSB." [63] at 14. It is not implausible to infer that this investigation began at least a month before Defendant ultimately decided to issue a TSP addressing problem with jerky and rough acceleration and deceleration. The exact details of what Defendant knew and when would likely be in Defendant's exclusive knowledge and can be explored in discovery. The Complaint is sufficient to survive the motion to dismiss.

### F.      Unjust Enrichment (Count 6)

#### 1.      Adequate remedy at law (California, Florida, Massachusetts, New Jersey, and New York)

Defendant moves to dismiss Plaintiffs' claims for unjust enrichment under California, Florida, Massachusetts, New Jersey, and New York law on the basis that a claim for unjust enrichment is not cognizable where the plaintiff has an adequate remedy at law—here, a claim under the relevant state's consumer protection statute, which is based on the same facts as the unjust enrichment claim. The Court agrees as to California, Florida, Massachusetts, and New York and will dismiss the unjust enrichment claim (Count 6) to the extent it is based on those four states'

common law. However, Defendant has not convinced the Court that dismissal on the pleadings would be appropriate as to New Jersey, and therefore denies the motion to dismiss as to that portion of the claim.

Plaintiffs do not dispute that their unjust enrichment claim is based on the same factual premise as their consumer protection claims. In the consumer protection claims, Plaintiffs allege that Ford sold the Class Vehicles knowing that they posed a safety risk to consumers and without disclosing the Defect. See [63], Counts 11 (California), 13 (Florida), 16 (Massachusetts), 17 (New Jersey), 18 and 19 (New York). Similarly, their unjust enrichment claim (Count 6) is based on the theory that Ford has long known of the Defect, yet accepted money from the Plaintiffs who, without knowledge of the Defect, "paid a higher price for their vehicles which actually had lower values" or purchased Vehicles they otherwise would not have purchased. [63] at 74, ¶ 294. Plaintiffs' only response to Defendants' argument is that, as a general rule, the counts of a complaint may be pled in the alternative. Plaintiffs do not address the more specific caselaw cited by Defendant for California, Florida, Massachusetts, and New York, which recognizes that despite the general rule, an unjust enrichment claim is properly dismissed on the pleadings where the plaintiff has pled another adequate remedy at law—even if the plaintiff is not, at the end of the day, entitled to that remedy. See *In re Ford Tailgate Litigation*, 2014 WL 1007066, at *5 (N.D. Cal. 2014) (under California law, where the unjust enrichment claim "relies upon the same factual predicates as a plaintiff's legal causes of action, it is not a true alternative theory of relief but rather is duplicative of those legal causes of action" and subject to dismissal; "[i]f plaintiffs claim they were damaged as a result of consumer deception, the proper remedy is under their respective state consumer protection statutes"); *American Honda Motor Co., Inc. v. Motorcycle Info. Network, Inc.*, 390 F. Supp. 2d 1170, 1178 (M.D. Fla. 2005) (dismissing unjust enrichment claim brought

under Florida law where "the amended counterclaim does not suggest that an adequate legal remedy is unavailable to the Defendants," but instead was "predicated on the same set of allegations supporting [defendants] claims under FUTSA and FDUTPA"); *Pershouse v. L.L. Bean, Inc.*, 368 F. Supp. 3d 185, 190 (D. Mass. 2019) (under Massachusetts law, unjust enrichment claim would be dismissed where plaintiff had an adequate remedy at law through claims for breach of contract and violation of the state consumer protection statute, even though those causes of action were "ultimately unviable," as well).

The law in New Jersey, however, does not appear to be as clear-cut, at least not according to the case relied on by Defendant or the Court's own brief research. In *Ponzio v. Mercedes-Benz USA, LLC*, 447 F. Supp. 3d 194, 259 (D.N.J. 2020), the Court stated that "plaintiff cannot sustain an unjust enrichment claim where there is an adequate remedy at law" and cited in support case law from other states. See *id.* at 259 n.30. The court also recognized, however, that "[o]n occasion, courts in this district are reluctant to dismiss pursuant to 12(b)(6), a plaintiff's unjust enrichment claim solely because they there is another remedy at law available." *Id.* at 259-60 (citing *Coyle v. Hornell Brewing Co.*, 2010 WL 2539386, at *5 (D.N.J. June 15, 2010); *In re K–Dur Antitrust Litigation*, 338 F. Supp. 2d 517, 544 (D.N.J. 2004)). The *Ponzio* court did not dismiss the unjust enrichment claim based on the availability of other adequate remedies at law, instead dismissing the claim on an alternate basis. Given the lack of supporting precedent cited by Defendant, the Court declines to dismiss the New Jersey unjust enrichment claim on the basis of there being an adequate remedy at law available to Plaintiffs.

### 2. Absence of direct relationship (New Jersey)

Defendant also moves to dismiss the New Jersey unjust enrichment claim on the basis that it fails to allege a direct relationship between Defendant and Dougherty, the sole New Jersey

Plaintiff. According to the Complaint, Dougherty purchased his Vehicle from a Ford dealership, Ditschman Ford. See [63] at 34, ¶ 125. Defendant asserts that "New Jersey federal courts … uniformly have precluded unjust enrichment claims in the context of claims by consumers against automobile manufacturers where the consumers purchased their vehicle from a dealership rather than the manufacturer." [69] at 41 & n.80. Plaintiff acknowledges that "New Jersey law requires a direct relationship between the parties" to maintain an unjust enrichment claim, but argues that "it would be inequitable to suggest that Ford can insulate itself from liability on unjust enrichment simply by asserting that the sales between its authorized Ford dealers cuts off any relationship Ford has with consumers, such as Plaintiff Dougherty." [66] at 57-58.

The Court is not wholly convinced that an unjust enrichment claim is never available between a consumer and a car manufacturer. However, Plaintiffs have not convinced the Court that Dougherty's relationship with Ford is sufficiently direct under the facts alleged in the Complaint. The Court finds instructive *Dawson v. General Motors LLC*, 2019 WL 3283046 (D.N.J. July 22, 2019), which like this case involved consumers who purchased vehicles from an authorized dealer of the manufacturer but brought their unjust enrichment claim against the manufacturer. The court explained that "[t]o prove unjust enrichment, a plaintiff must show both that defendant received a benefit and that retention of that benefit without payment would be unjust." *Id*. at *7. While the "[p]laintiffs paid substantial sums of money for their vehicles, … they paid these sums—and thus conferred a benefit—to the dealerships." *Id*. The complaint did not "specify if or how this benefit accrued to Defendant." *Id*. Although "[i]t is not difficult to imagine that Defendant has benefitted through the sales of its cars," the court concluded, "Plaintiffs must connect those dots in the pleadings." *Id*. (citing *Stewart v. Beam Global Spirits & Wine, Inc.*, 877 F. Supp. 2d 192, 199–200 (D.N.J. 2012) ("[W]here a plaintiff [consumer] alleges that a

66

defendant manufacturer has made false claims or misrepresentations directed for the purpose of generating retail sales, and where those retails sales could have the effect of increasing the amount of wholesale sales to the manufacturer, it is plausible that a plaintiff can show evidence of a sufficiently direct relationship between the parties"). Likewise, in this case neither the Complaint nor the response to the motion to dismiss "connect the dots" to explain how the sums paid by Plaintiffs conferred a benefit on Defendant, rather than on its dealers. Therefore, the Court will dismiss the unjust enrichment claim to the extent it is based on New Jersey law. See *id.*; see also *Schechter*, 2019 WL 3416902, at *11 (dismissing unjust enrichment claim where "a direct relationship between Defendants and Plaintiff is lacking, as he leased his vehicle from Circle Auto Group, an authorized Hyundai dealer located in New Jersey, not [Defendants]"); *Merkin v. Honda North America, Inc.*, 2017 WL 5309623, at *6 (D.N.J. Nov. 13, 2017) ("According to the [complaint], Plaintiff purchased his vehicle from an authorized Honda retailer, not Honda. As such, no direct relationship has been demonstrated and, therefore, Plaintiff has not stated a claim for unjust enrichment.").

### 3. Failure of Underlying Statutory Claims (Illinois and Pennsylvania)

The parties agree that, under Illinois and Pennsylvania law, if an unjust enrichment claims rests on the same alleged conduct that is identified in the underlying tort claim, the unjust enrichment claim will rise or fall with the underlying tort. See [64-1] at 77; [66] at 57; see also *O'Connor v. Ford Motor Co.*, 477 F. Supp. 3d 705, 720–21 (N.D. Ill. 2020). Since the Court is dismissing Plaintiffs' ICFA claim, the Illinois unjust enrichment claim will be dismissed, as well. See *id*. And since the Court is denying the motion to dismiss the UTPCPL claim, the motion to dismiss is denied as to the Pennsylvania unjust enrichment claim.

### 4. Sufficiency of the Pleadings

The Court considers this argument in relation to Pennsylvania and Texas only, as they are the only two states for which the unjust enrichment claim has not already been dismissed. Defendant argues that all of the unjust enrichment claims must be dismissed because they are not pled with the particularity required by Rule 9(b). Defendant bases this argument on Illinois law and one Michigan district court opinion. See [64-1] at 73-75. While Defendant is correct that the unjust enrichment claim alleges that Defendant was unjustly enriched "[a]s a result of its fraudulent acts and omissions related to the defective Transmissions," [63] at 74, it also alleges more generally that Defendant "appreciated, accepted, and retained the non-gratuitous benefits conferred by Plaintiffs and the proposed Class Members who, without knowledge of the Defect, paid a higher price for their vehicles which actually had lower values." *Id*. Defendant makes no attempt to show under the relevant states' laws that a claim for unjust enrichment requires proof of fraudulent acts or omissions. Defendant makes no mention of Pennsylvania or Texas law at all. Without any more to go on, it would be premature to dismiss the Pennsylvania and Texas unjust enrichment claims.

### G. State Consumer Protection Law Claims

For the most part, Plaintiff's claims for violation of state consumer protection laws are subject to Rule 9(b)'s heightened pleading requirement because they are based on the same allegedly fraudulent conduct on which the fraud and fraudulent concealment claims are premised—that Defendant knew about the Defect yet concealed it and made misrepresentations about the Transmission. To the extent that Rule 9(b) is not applicable, the Court makes note of that fact in the following section of the Opinion.

### 1. Illinois (Count 7)

The two Illinois Plaintiffs, O'Connor and Zielinski, fail to state a claim for violation of the ICFA, for the same reasons stated above in relation to the fraud claim and in the Court's prior opinion. See *O'Connor*, 477 F. Supp. 3d at 717-20. Given the length of this opinion and the thoroughness of the Court's prior analysis, it will not rehash the arguments here other than to point out that the amended pleading does not fix the problem with the Illinois Plaintiffs' lack of allegations supporting proximate cause, as the Complaint does not identify any statements or communications on which they relied. Plaintiffs claim that proof of individualized reliance is not required, because the "'misrepresentations and false statements were part of an extensive and long-term advertising campaign." [66] at 61. But Plaintiffs cite only case law interpreting California's Unfair Competition Law and False Advertising Law, not the ICFA. See *id*. (citing *In re Toyota Motor Corp.*, 790 F. Supp. 2d 1152, 1168-69 (C.D. Cal. 2011)). And even if that law applied, it would not save the ICFA claim, because Plaintiffs do not "allege 'exposure to a long-term advertising campaign,'" as required when applying the more lenient standard for demonstrating actual reliance. *In re Sony Gaming Networks and Customer Data Sec. Breach Litigation*, 903 F. Supp. 2d 942, 969 (S.D. Cal. 2012).

### 2. California

#### a. Unfair Competition Law (Count 12)

California's Unfair Competition Law ("UCL") broadly prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200. "A business act or practice may violate the UCL if it is either 'unlawful,' 'unfair,' or 'fraudulent.'" *Ketayi v. Health Enrollment Group*, 516 F. Supp. 3d 1092, 1127 (S.D. Cal. 2021) (citing *Rubio v. Capital One*

*Bank*, 613 F.3d 1195, 1203 (9th Cir. 2010)); see also Cal. Bus. & Prof. Code § 17200. While these three adjectives capture "separate and distinct theor[ies] of liability," *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1127 (9th Cir. 2009), Count 12 of the Complaint includes all three theories and a single factual basis: that Defendant "knowingly and intentionally conceal[ed] from Plaintiffs and California Subclass Members that the Class Vehicles suffer from the Transmission Defect." [63] at 94. The Court finds it unnecessary to address each of the three theories of liability, because the UCL claim is viable based on at least the "unlawful" theory (and this opinion is long enough already). "The unlawful prong incorporates other laws and treats violations of those laws as unlawful business practices independently actionable under the UCL." *Ketayi*, 516 F. Supp. 3d at 1228 (citing *Chabner v. United of Omaha Life Ins. Co.*, 225 F.3d 1042, 1048 (9th Cir. 2000)). Defendants argue that Plaintiffs' claim should be dismissed as to the "unlawful" theory because Plaintiffs' MMWA, CLRA, SBCWA, and express warranty claims all fail as a matter of law. [64-1] at 85. Because the Court is denying Defendant's motion to dismiss as to at least some of those claims, it will allow the UCL claim to proceed, as well.

The Court also is not persuaded that the UCL claim must be dismissed due to the potential availability of other remedies at law. The California federal district courts are "split on the issue of whether it is appropriate to dismiss UCL claims at the pleading stage when they are based on identical facts as other claims providing the legal remedy of damages." *Eason v. Roman Catholic Bishop of San Diego*, 414 F. Supp. 3d 1276, 1282 (S.D. Cal. 2019). The Court opts against dismissal at this time, as Defendant has not demonstrated that any "controlling authority prevents a plaintiff from pleading alternative legal remedies" in the context of a UCL claim. *Wildin v. FCA US LLC*, 2018 WL 3032986, at *7 (S.D. Cal. June 19, 2018); see also *Adkins v. Comcast Corp.*, 2017 WL 3491973, at *7 (N.D. Cal. Aug. 1, 2017). "[A]lternatively pled remedial requests" can

always be sorted out later in the case.  *Id.*  At that point, discovery will have revealed whether the California Plaintiffs' "legal remedies are inadequate for any number of reasons, despite the fact that their allegations appear adequate" at this early stage of the case.  *Wildin*, 2018 WL 3032986, at *7.  Finally, "dismissal of the UCL claim at this stage would not save Defendant or the Court substantial resources: if the UCL claim is truly identical to the [California Plaintiffs'] other claims as Defendant asserts, retention of the UCL claim at this stage would cause only incidental discovery burdens on Defendant beyond what would be necessary to litigate those claims that provide legal remedies."  *Id.*; see *also Deras v. Volkswagen Grp. of Am., Inc.*, 2018 WL 2267448, at *6 (N.D. Cal. May 17, 2018) (plaintiff could pursue alternative equitable remedies under the UCL at the pleading stage).

### b.  Consumer Legal Remedies Act (Count 11)

California's Consumer Legal Remedies Act ("CLRA") prohibits "unfair methods of competition" and "unfair or deceptive acts or practices." Cal Civ. Code § 1770(a).  "To state a claim under the CLRA, a plaintiff generally must allege a misrepresentation, reliance, and damages."  *Doe v. Epic Games, Inc.*, 435 F. Supp. 3d 1024, 1046 (N.D. Cal. 2020).  A plaintiff can state a claim under the CLRA by alleging either an affirmative misrepresentation or a failure to disclose."  *Id.*; see also *Cooper v. Simpson Strong-Tie Company, Inc.*, 460 F. Supp. 3d 894, 909–10 (N.D. Cal. 2020)  In failure to disclose cases, the plaintiff must allege a duty to disclose, which "'arises in four circumstances: (1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from plaintiff; or (4) when the defendant makes partial representations but also suppresses some material facts.'"  *Barrett v. Apple*

*Inc.*, 2021 WL 827235, at *11 (N.D. Cal. Mar. 4, 2021) (quoting *In re Apple In-App Purchase Litig.*, 855 F. Supp. 2d 1030, 1039 (N.D. Cal. 2012)).

In their CLRA claim, the California Plaintiffs allege that Defendant both made representations that were misleading and omitted material facts about the Class Vehicles, namely the Transmission Defect, through which they were deceived. See [63] at 87, ¶¶ 378-80. Defendant's actions allegedly violated multiple sections of the CLRA, including: (a) § 1770(a)(5), by representing that the Class Vehicles have approval, characteristics, and uses or benefits which they do not have; (b) § 1770(a)(7), by representing that the Class Vehicles are of a particular standard, quality or grade, when they are of another; (c) § 1770(a)(9), by advertising the Class Vehicles as safe with the intent not to sell them as advertised; and (d) § 1770(a)(16), by representing that the goods have been supplied in accordance with previous representations, when they were not. [63] at 87-88, ¶ 381. The Complaint further alleges that Defendant was "was under a duty to Plaintiffs and California Subclass Members to disclose the defective nature of the Class Vehicles because: (a) Ford was in a superior position to know the true state of facts about the Transmission Defect –a defect that can pose a safety risk—and associated repair costs in the Class Vehicles; (b) Plaintiffs and the California Subclass Members could not reasonably have been expected to learn or discover that the Class Vehicles have a defect that affects operability of Class Vehicles and creates safety concerns until manifestation of the Transmission Defect; (c) Ford knew that Plaintiffs and the California Subclass Members could not reasonably have been expected to learn or discover the Transmission Defect until manifestation of the Defect; and (d) Ford made incomplete representations about the safety and reliability of Class Vehicles generally, while withholding material facts from Plaintiffs and California Subclass Members that contradicted these representations." *Id.* at 88-89, ¶ 384.

72

Defendant argues that the CLRA claim must be dismissed because the Complaint does not allege any specific representations that Defendant made to Fair and the statements Defendant allegedly made to Smith and Stern were non-actionable puffery. See [64-1] at 83-84. Assuming Defendant is correct (which the Court need not decide), Defendant fails to show that the CLRA claim should be dismissed because its opening brief does not address Defendant's "omission" theory of liability. While Defendant briefly addresses the theory in its reply, arguments made for the first time in a reply brief are waived. See *Thulin v. Shopko Stores Operating Co., LLC*, 771 F.3d 994, 997 (7th Cir. 2014); *Keith v. Ferring Pharm., Inc.*, 2016 WL 5391224, at *13 (N.D. Ill. Sept. 27, 2016). In any event, the Court agrees with Plaintiff that this case is similar enough to *Falk v. General Motors Corp.*, 496 F. Supp. 2d 1088 (N.D. Cal. 2007), to allow the CLRA claim to go forward. There, vehicle buyers stated a CLRA claim against GM for selling trucks and SUVs with allegedly defective speedometers. The court determined that the plaintiffs satisfactorily alleged that GM had a duty to disclose the defect based on its "exclusive knowledge of material facts not known to the plaintiff," because the complaint alleged that "[o]nly GM had access to the aggregate data from its dealers[,] only GM had access to pre-release testing data[, and] only GM had access to the numerous complaints from its customers." *Id*. at 1096. The court agreed with plaintiff that since "GM 'was in a superior position to know' that its speedometers might fail, plaintiffs successfully state a CLRA claim for omission of a material fact which lay within GM's exclusive knowledge." *Id*. at 1096-97. *Id*. The court also noted that while it was "is true that prospective purchasers, with access to the Internet, could have read the many complaints about the failed speedometers," GM was "alleged to have *known* a lot more about the defective speedometers, including information unavailable to the public." *Id*. at 1097. Similarly, in this case, Defendant was alleged to have known much more about the allegedly defective Transmission

than the Plaintiffs knew when they purchased their Vehicles, as discussed above in relation to the fraud and fraudulent concealment claims. Defendant knew enough to issue two TSBs, which presumably would have required Defendant to investigate the problem before proposing potential solutions.

*Falk* also held that the plaintiffs sufficiently alleged that the defendant actively concealed a material fact from them, where GM received customer complaints for several years but "never made any attempt to notify other customers or effect a recall," and GM replaced speedometers that were still under warranty with "equally defective speedometers and speedometer mechanisms such that the defect was not corrected even though GM informed consumers that it was," an allegation that the court found "suggest[ed] that GM tried to gloss over the problems with its speedometers." *Id*. at 1097. Similarly, in this case, Plaintiffs allege that Ford knew about the Defect, has not repaired the Defect or recalled the Vehicles, and has told complaining customers the condition is normal in order to "gloss over" the Defect and its inability or unwillingness to fix it. See [63] at 45-47, ¶¶ 173–179. While the allegations in *Falk* arguably may have been stronger than the allegations here, Defendant has failed to show that the Complaint is so deficient that dismissal is warranted.

### 3.     Florida (Count 13)

To state a claim under Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA"), "a plaintiff must allege: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *Cardenas*, 418 F. Supp. 3d at 1105. Defendant argues that Florida Plaintiff Fiedler's allegations concerning damages are insufficient to state a claim for violation of the statute.

The Complaint alleges that had Fiedler "been advised of the Transmission Defect at or before the point of purchase, he would not have purchased his Vehicle or else would have paid

significantly less for the Vehicle." [63] at 28, ¶ 100. Fiedler allegedly "did not receive the benefit of his bargain" and as a result "has paid and continues to pay a premium for a defective Vehicle, which poses a safety hazard to himself, his family, and others." *Id*. The Complaint also alleges: "Ford's failure to disclose and active concealment of the dangers and risks posed by the defective Transmissions in Class Vehicles were material to Plaintiff and Florida Subclass Members, and any reasonable consumer would have considered those facts important in deciding whether to purchase or lease a Class Vehicle. A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them." *Id.* at 98, ¶ 437.

These allegations are sufficient to plead actual damages. By comparison, in *Carriuolo v. General Motors LLC*, 72 F. Supp. 3d 1323 (S.D. Fla. 2014), the Court denied a motion to dismiss where "Plaintiffs allege[d] that they 'were damaged because the automobiles they purchased or leased did not contain the safety ratings that were represented, making the automobiles less valuable than the automobiles would have been had [Defendant's] representations been true.'" *Id*. at 1325-26 (noting that "Florida's appellate courts have found such allegations sufficient to sustain a FDUTPA claim" (citing *Collins v. DaimlerChrysler Corp*., 894 So.2d 988, 990 (Fla. Dist. Ct. App. 2004) (reversing dismissal where a plaintiff alleged that a car manufacturer violated the FDUTPA by advertising that a car had effective seatbelts when in fact it did not))). Like *Collins*, this case "turns on a relatively simple question, at least as to damages—Is a car with [a] defective [transmission] worth less than a car with [an] operational [transmission]"? *Collins*, 894 So. 2d at 991. "Common sense indicates that it is," and at this point that is sufficient to allow Fiedler to proceed with his claim. *Id*.

### 4.     Massachusetts (Count 16)

Plaintiffs assert a claim under the Massachusetts Consumer Protection Law ("Chapter 93A"), which makes it unlawful to engage in any "[u]nfair methods of competition or deceptive acts or practices in the conduct of any trade or commerce."  M.G.L.A. 93A, § 2(a).  A person who has been "injured by another person's use or employment of any method, act or practice declared to be unlawful by section two" may bring a claim for damages or injunctive relief.  M.G.L.A. 93A, § 9(1).

Defendant argues that the Massachusetts Supreme Judicial Court's holding in *Iannacchino v. Ford Motor Co*., 888 N.E.2d 879 (Mass. 2008), "is dispositive" because the Massachusetts Plaintiffs "have not alleged that the claimed defect violated a legally required safety standard." [64-1] at 8.  *Iannacchino* addressed whether the plaintiffs "adequately alleged an 'injury' or 'loss' for purposes of stating a claim under § 9."  *Id*. at 885.  The plaintiffs argued that they had been injured because "they paid for and currently own vehicles that purported to comply with Federal safety standards, but instead received noncompliant and defective vehicles."  *Id*.  Ford argued that the plaintiffs failed to allege "any 'actual' injury resulting from Ford's allegedly unfair or deceptive conduct"—they "have not experienced door latch failure, paid to have the allegedly defective door handle systems repaired, sold their vehicles at a loss, or curtailed their use of their vehicles."  *Id*. The court opined that because "[m]otor vehicles are inherently dangerous in operation, and safety standards play a highly significant role in relation to them," "a claim, supported by sufficient factual allegations, that the plaintiffs own vehicles manufactured and sold by Ford as meeting required government safety standards; that the vehicle's door handles, as Ford knew, failed to comply with NHTSA safety standards; and that the noncompliance was not properly remedied, would support a cause of action under [Chapter 93A]."  *Iannacchino*, 888 N.E.2d at 886.

76

Nonetheless, dismissal of the plaintiffs' claim was proper because their "complaint d[id] not adequately allege that their vehicles fail to comply with FMVSS 206." *Id*. at 887.

*Iannacchino* did not hold that noncompliance with a government safety standard is required in every case that is premised on an alleged safety-related product defect. Rather, the court opined that where, as in that case, "there is no allegation that the plaintiffs—or indeed anyone else—have suffered personal injury or property damage, the complaint must identify a legally required standard that the vehicles were at least implicitly represented as meeting, but allegedly did not." 888 N.E.2d at 888. "When the standard that a product allegedly fails to meet is not one legally required by and enforced by the government, a claim of economic injury based on overpayment lacks the premise that the purchase price entitled the plaintiffs to a product that met that standard." *Id*.

In determining whether *Iannacchino* bars the Massachusetts Plaintiffs' Chapter 93A claim, the Court finds it unnecessary to decide whether (as Plaintiffs maintain) Defendant's alleged failure to send out notices required by the NHTSA's TREAD Act constitutes a "legally required standard" that Defendant's Vehicles were required to meet. Nor must the Court decide whether a plaintiff might bring a Chapter 93A claim for economic injury based on overpayment if, unlike the plaintiffs in *Iannacchino*, the plaintiff offered sufficient factual allegations showing that the complained-of product was, in fact, defective in some manner that was not intertwined with a government safety standard but that made the product unsafe or reduced its value in a measurable way. See *Baranco v. Ford Motor Co.*, 294 F. Supp. 3d 950, 962–63 (N.D. Cal. 2018) (distinguishing *Iannacchino* on the basis, among others, "Plaintiffs' allegations of a defect in the instant case are not 'conclusory' or 'bare assertion[s],'" where "Ford itself has acknowledged that the product is defective in its 2014 TSB"). Instead, the Court concludes that Plaintiffs' allegations

are sufficient at this stage because they identify property damage apart from the reduced value of the Vehicles. In particular, the Massachusetts Plaintiffs allege that they "have also been denied the use of their Class Vehicles" and "expended money on replacement and repairs." [63] at 105, ¶ 472. See *Duncan v. Nissan North America, Inc.*, 305 F. Supp. 3d 311, 324–25 (D. Mass. 2018) (concluding that "the injury alleged by the Plaintiffs"—"property damage[] in the form of having paid for repairs to correct the defect"—"is not sufficiently similar to the injury alleged in *Iannacchino* to render the allegations insufficient to state a claim for relief under Chapter 93A"); *Costa*, 2021 WL 2338963, at *10 (holding that "[b]ecause [plaintiff's] headrest has actually malfunctioned, … as distinguished from *Iannacchino*, he is not required to identify a legally required standard that [defendant] allegedly failed to meet" and noting that, "whereas the plaintiffs in *Iannacchino* sought damages solely for the amount they overpaid for their purportedly defective cars," plaintiff "also seeks to recover for property damage to the Car"). While Defendant attempts to distinguish *Duncan* on the basis that the plaintiff pled a particular amount spent on repairs, Defendant cites no case law suggesting that level of specificity is required to allege injury under Chapter 93A.

Defendant's second argument in support of dismissing the Chapter 93A claim is that the claim is barred by the Massachusetts Plaintiffs' lack of pre-suit notice. The statute requires that, "[a]t least thirty days prior to … filing" an action for violation of Chapter 93A, "a written demand for relief, identifying the claimant and reasonably describing the unfair or deceptive act or practice relied upon and the injury suffered, shall be mailed or delivered to any prospective respondent." M.G.L.A. 93A §9(3). "The notice requirement is 'a prerequisite to suit' that 'must be alleged in the plaintiff's complaint.'" *Rust-Oleum*, 389 F.3d at 19.

Defendant points out that Barcelona does not allege to have given any pre-suit notice, and argues that Marino's pre-suit notice is "subject to dismissal to the extent it is predicated on alleged fraudulent omissions by Ford," because the letter "relied exclusively on allegations that Ford made 'false and misleading' representations concerning the Class Vehicles." [64-1] at 90. However, as Plaintiff notes, "Massachusetts courts [] have determined that in a putative class action, the demand letter need only be sent by a class representative on behalf of herself and the entire class, as long as the letter sufficiently describes the claimant's injuries." *Bosque v. Wells Fargo*, 762 F. Supp. 2d 342, 354 (D. Mass. 2011). Marino's letter is sent on behalf of himself "as well as all other persons similarly situated." [64-3] at 138. Therefore, the fact that Barcelona did not send his own letter is not fatal to his Chapter 93A claim. Further, the Court is not convinced by Defendant's cursory discussion of the case law that Marino's letter is insufficient to put Defendant on notice of both a "false and misleading representation" theory and a "fraudulent omission" theory of liability under Chapter 93A. While his detailed letter focuses more on the former theory, it also indicates that Marino was not informed of the Defect at the time of purchase, which would be the factual predicate for a fraudulent omission theory of liability. In particular, Marino informs Defendant that "[i]f he had known that the Vehicle's transmission would not perform properly, and that the promises made in literature, online, and on the Vehicle's window sticker were unfair, deceptive, and misleading, then he would not have leased the Vehicle." [64-3] at 139. That Marino did not use the words "fraudulent omission" is not fatal to his claim, as "[s]pecificity [in the notice letter] is required to describe the practices complained of, not the legal basis for the claim." *Casavant v. Norwegian Cruise Line Ltd.*, 952 N.E.2d 908, 913 (Mass. 2011) (explaining that "[t]he demand letter required under G.L. c. 93A does not require claimants to set forth every specific statutory or

regulatory violation alleged, so long as it fairly notifies the prospective respondent of the actions or practices of the respondent and the injury suffered by those actions").

Finally, Defendant argues in a footnote that "[t]he Massachusetts Plaintiffs' 93A claim also fails because, as discussed [in] Section V, they have failed to state a claim for common law fraud." [64-1] at 90, n.78. However, Defendant never develops this argument or explains why the Chapter 93A claim is necessarily contingent on Plaintiffs successfully pleading a claim for common law fraud. Therefore, the argument is waived. *Vulcan Golf*, 552 F. Supp. 2d at 765 n.6.

## 5.     New Jersey (Count 17)

The New Jersey Consumer Fraud Act ("NJCFA") "affords a private right of action to consumers who have suffered unconscionable or fraudulent practices in the marketplace" and "is to be liberally construed in favor of the consumer." *Mickens v. Ford Motor Co.*, 900 F. Supp. 2d 427, 435 (D.N.J. 2012). To state a *prima facie* case for violation of the NJCFA, "a plaintiff must demonstrate three elements: (1) unlawful conduct by the defendant; (2) an ascertainable loss by the plaintiff; and (3) a causal connection between the defendant's unlawful conduct and the plaintiff's ascertainable loss." *Id.* at 436. Defendant argues that the NJCFA claim must be dismissed because the New Jersey Plaintiff, Dougherty, "has provided no information concerning the quantification of his alleged losses and instead relies only on conclusory allegations of diminution of value." [64-1] at 92.

The Complaint alleges that had Dougherty "been advised of the Transmission Defect at or before the point of purchase, he would not have purchased his Vehicle or else would have paid significantly less for the Vehicle." [63] at 36, ¶ 134. He further alleges that he "did not receive the benefit of his bargain" and "has paid and continues to pay a premium for a defective Vehicle, which poses a safety hazard to himself, his family, and others." *Id.* The Court finds this sufficient

to plead ascertainable loss. The case law is somewhat mixed on the level of specificity required by the NJCFA. Compare *Mickens*, 900 F. Supp. at 446 ("At the motion to dismiss stage, alleging diminution in value due to the defect is sufficient."), *with In re AZEK Building Products, Inc., Marketing and Sales Practices Litigation*, 82 F. Supp. 3d 608, 624 (D.N.J. 2015) ("Plaintiffs must plead specific price information or provide alternate means of quantifying their loss to allege ascertainable loss under New Jersey law"). Since this Court is supposed to be following the highest state court or predicting how it would rule, see *Emerald Casino*, 867 F.3d at 765, the Court finds New Jersey state court cases—and federal district court cases relying on them—more instructive than federal district court cases that do not discuss any state court precedent. *Maniscalco v. Brother Int'l (USA)*, 627 F. Supp. 2d 494, 503 (D.N.J. 2009), explains that "[a]lthough the loss must be ascertainable, no special specificity with regard to pleading ascertainable loss is required" by the NJCFA. In support, *Maniscalco* cites a New Jersey intermediate court decision allowing a NJCFA claim to proceed where the "plaintiff alleged in her complaint that she suffered an ascertainable loss," but "did not allege the nature of that loss." *Id*. at 503, n.8 (citing *Perkins v. DaimlerChrysler Corp.*, 890 A.2d 997, 1003 (N.J. Super. 2006)). *Perkins* explained that no more was required at the pleading stage, because Plaintiff's "obligation to provide admissible evidence of a diminution in value had not arisen." 890 A.2d at 1004 (citing *Thiedemann v. Mercedes–Benz USA, LLC,* 872 A.2d 783 (N.J. 2005)). Instead, the "issue of 'damage' … is one the resolution of which … should await the development of a record[.]" *Lamont v. OPTA Corp.*, 2006 WL 1669019, at *8 (N.J. Super. A.D. June 16, 2006) (quoting *Printing Mart-Morristown v. Sharp Electronics Corp.*, 563 A.2d 31, 47 (N.J. 1989); internal quotation marks omitted) (plaintiff's allegations of ascertainable loss were sufficient where she "asserted damages in the form of money spent on the non-usable DVD discs and purchase of a product that does not do what it is purported to do"). The

81

Court agrees with this reasoning and does not believe that it would be reasonable to require Plaintiff to quantify the amount of his loss in dollars at this early stage of the case. Plaintiff does specify how much he paid for his vehicle, $46,543.00. [63] at 34, ¶ 125. But the amount his vehicle is worth with the Defect is an issue that is likely to require input from an expert, and the Court would not expect a plaintiff to retain an expert simply to draft a complaint. At this point, it is certainly plausible that a Vehicle that contains a defective Transmission—which Defendant refuses to fix—is worth less than a comparable vehicle with a properly functioning transmission.

### 6.  New York (Counts 18 and 19) and Pennsylvania (Count 21)

Counts 18 and 19 of the Complaint are for alleged violations of New York General Business Law § 349 (deceptive acts and practices) and § 350 (false advertising), respectively. Defendant's handling of these claims is confined to a few footnotes in the section of its brief addressing fraud and fraudulent concealment. Apparently, Defendant believes that the Complaint's allegations concerning fraudulent misrepresentations and omissions are insufficient to satisfy the pleading requirements for §§ 349 and 350—requirements that Defendant never clearly spells out. Defendant also acknowledges that §§ 349 and 350 are not subject to Rule 9(b)'s heightened pleading standard but does not explain why the Complaint's allegations are insufficient under Rule 8(a)'s more lenient standard. With so little analysis to go on, the Court sees no basis for dismissing Counts 18 and 19—especially as the Court already determined that the sole New York Plaintiff, Heller, has alleged sufficient facts to proceed on her claim for fraudulent concealment.

Count 21 of the Complaint is for violation of Pennsylvania's UTPCP. The Court already rejected Defendant's motion to dismiss this claim based on the economic loss doctrine; however, Defendant also urges the dismissal of this claim on the basis that it contains insufficient allegations

that Defendant made false or misleading representations. However, as with the New York consumer protection statutes, Defendant never addresses the specific requirements of a UTPCP claim or how they apply to the Pennsylvania Plaintiff's factual allegations. As the Court's extensive discussion above indicates, state law has many nuances, which cannot be adequately addressed through a few parentheticals in a footnote. Therefore, the Court will deny Defendant's motion to dismiss as to Counts 18, 19, and 21.

### 7.    Texas (Count 23)

Defendant's motion to dismiss the TDTPA claim is denied for the same reasons the Court denies the motion to dismiss the Texas fraud claim. The Court also agrees with Plaintiffs that it is not clear that Ford is "insulated from TDTPA liability by upstream manufacturer status" under *Chavez v. Ford Motor Co.*, 2018 WL 6190601 (W.D. Tex. Sept. 26, 2018), as Defendant contends, because Texas Plaintiff McDonald alleges that "Ford 'directly transacted with [him] by directly communicating its misrepresentations to him via the Ford website prior to purchase." [66] at 76; see also *Chavez*, 2018 WL 6190601, at *3 ("The Texas Supreme Court has made clear that DTPA claims based on allegedly false, misleading, deceptive, or unconscionable acts cannot be brought against remote, or 'upstream,' manufacturers and suppliers that never directly transacted with the plaintiff-consumer.").

### H.    Statute of Limitations

Defendant argues that California Plaintiff Steen's negligence, fraud, unjust enrichment, and CLRA claims are barred by the applicable California statutes of limitations and that Texas Plaintiff McDonald's negligence, unjust enrichment, and TDTPA claims are barred by the applicable Texas statutes of limitations. In response, Plaintiff argues that "[w]here, as in this case, 'the dates pertinent to the running of the statute cannot be determined from the allegations of the

complaint, [] the matter cannot be decided on a motion to dismiss, and defendants must raise the defense through a motion for summary judgment or at trial.'"  [66] at 79 (quoting *Deirmenjian v. Deutsch Bank, A.G.*, 526 F.2d 1068, 1074 (C.D. Cal. 2007)).  The Court agrees and declines to dismiss any claims based on a statute of limitations defense.

"Dismissing a complaint as untimely at the pleading stage is an unusual step, since the complaint need not anticipate and overcome affirmative defenses, such as the statute of limitations."  *Sidney Hillman Health Ctr. of Rochester v. Abbott Labs., Inc.*, 782 F.3d 922, 928 (7th Cir. 2015).  "[A] motion to dismiss based on failure to comply with the statute of limitations should be granted only where the allegations of the complaint itself set forth everything necessary to satisfy the affirmative defense."  *Vergara v. City of Chicago*, 939 F.3d 882, 886 (7th Cir. 2019); see also *Chi. Bldg. Design, P.C. v. Mongolian House, Inc.*, 770 F.3d 610, 613–14 (7th Cir. 2014). Defendant has not shown that to be the case here.  Seeking to fit into one page statute of limitations arguments for seven claims under two different states' laws, Defendant's factual and legal analyses are both underdeveloped.  "Without the benefit of a complete factual record" and better developed legal argumentation, "the Court declines to dismiss [any portion of the] complaint on statute of limitations grounds."  *Sharma v. Board of Trustees of University of Illinois*, 404 F. Supp. 3d 1183, 1197 (N.D. Ill. 2019).

## I.    Nationwide Class Allegations

The Complaint defines the proposed class to include "[a]ll persons in the United States and its territories who formerly or currently own or lease one or more of 2017 to 2020 Model Year Ford F-150 trucks with a 10R80 10-speed automatic transmission."  [63] at 58.  It also includes subclasses for Illinois, California, Florida, Massachusetts, New Jersey, New York, Pennsylvania, and Texas residents.  *Id*. at 59-60.  Defendant moves to strike the "nationwide class allegations"

under Rule 12(f) on the basis that they are "facially and inherently deficient" given all of the "material distinctions among the different laws to be applied to the members of the proposed class." *Id*. at 97.

The Court agrees with Plaintiffs that this issue is better left to the class certification stage of the case, after "class discovery, the plaintiff's motion for certification, and the benefit of full briefing on the issue of class certification." *Wagner v. General Nutrition Corp.*, 2017 WL 3070772, at *9 (N.D. Ill. July 19, 2017); see also *Mednick v. Precor, Inc.*, 2014 WL 6474915, at *7 (N.D. Ill. Nov. 13, 2014) ("Whether a plaintiff has fulfilled Rule 23 class action requirements … is not an appropriate inquiry at the motion to dismiss stage." (internal quotation marks and citation omitted)). Defendant asserts, but makes no attempt to demonstrate, that the fifty states' laws governing express warranty, implied warranty, negligence, fraud/fraudulent concealment, and unjust enrichment are so varied that Plaintiff could not satisfy Rule 23(a)'s commonality requirement. See Fed. R. Civ. P. 23(a). "[E]ven assuming there are material differences in applicable state law," it might "be prudent to create subclasses based on similarities in various states' laws." *Wagner*, 2017 WL 3070772, at *9. But these are complex issues that cannot be decided on the current record. See *Muehlbauer v. General Motors Corp.*, 431 F. Supp. 2d 847, 872 (N.D. Ill. 2006) ("whether these differences destroy commonality is an issue for another day").

Defendant's extremely lengthy motion to dismiss briefs (which would be much lengthier had Defendant not moved much of its analysis into footnotes) suggest that the laws applicable to the eight subclasses are so varied that class treatment may not be appropriate for even that smaller number of states. Cf. *In re Aqua Dots Products Liability Litigation*, 270 F.R.D. 377, 386 (N.D. Ill. 2010) ("the law of unjust enrichment varies too much from state to state to be amenable to national or even to multistate class treatment" (collecting cases)). But while this may beg the

question why Defendant pushed so strongly for consolidation in the first place, it does not warrant striking the nationwide class allegations without the benefit of class discovery or full briefing on class certification. Defendant's motion to strike is therefore denied.

## IV.  Conclusion

For these reasons, Defendant's motion to dismiss Plaintiff's amended complaint [23] is granted in part and denied in part, as detailed in first paragraph of the opinion. Counsel are directed to file a joint status report by no later than 10/21/2021 that includes (a) a proposed discovery schedule; and (b) a statement in regard to any settlement discussions and/or any mutual request for a referral to the assigned Magistrate Judge for a settlement conference.

Dated: October 19, 2021

Robert M. Dow, Jr.
United States District Judge