**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JUSTIN O'CONNOR, et al., on behalf of himself and all others similarly situated, | ) ) ) | Case No. 19-cv-5045 |
| Plaintiffs, | ) ) | Consolidated with Case Nos. 20-cv-1981, 20-cv-2095, |
| v. | ) ) | 20-cv-2612 and 21-cv-6540 |
| FORD MOTOR COMPANY, | ) ) | Judge Robert M. Dow, Jr. |
| Defendant. | ) ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs bring this class action complaint against Defendant Ford Motor Company ("Defendant" or "Ford") for damages arising out of Defendant's sale and lease of 2017 to 2020 Model Year Ford F-150 trucks with allegedly defective 10R80 10-speed automatic transmissions. Currently before the Court are Defendant's motions to compel arbitration with Plaintiffs Michael Barcelona, Brian Dougherty, Daniel Fair, Robert Marino, Michael McDonald, Victor Orndorff, and Bryan Smith [95] and with Plaintiffs Gary and Sandra Dastolfo [127]. For the reasons explained below, the first motion [95] is granted as to Dougherty, McDonald, and Orndorff and denied as to Barcelona, Fair, Marino and Smith,[1] and the second motion [127] is granted. The claims of Dougherty, McDonald, Orndorff and the Dastolfos are stayed pending arbitration. See *Tice v. American Airlines, Inc.*, 288 F.3d 313, 318 (7th Cir. 2002) ("district courts should retain

---

[1] Plaintiffs Smith and Fair purchased F-150 trucks from Ford dealerships in California; their Financing Agreements are governed by California law. Defendant initially moved to compel Smith and Fair to arbitrate based on the doctrine of equitable estoppel, but subsequently withdrew that portion of its motion in light of the Ninth Circuit's holding in *Ngo v. BMW of North America, LLC*, 23 F.4th 942, 948-50 (9th Cir. 2022). See [120] at 8 n.3 (Defendant's reply brief). Therefore, Defendant's motion to compel arbitration [95] is denied as to Smith and Fair.

jurisdiction over a suit that must be interrupted for reference of an issue to another forum rather than dismiss it if, should it be dismissed, there might later be grounds for reinstating it").

## I.    Background

All of the Plaintiffs as to whom Defendant moves to compel arbitration purchased or leased 2017 to 2020 Model Year Ford F-150 trucks that were designed, manufactured, distributed, marketed, sold, and leased by Defendant.  See [63] at 5 (complaint).  These vehicles were equipped with the 10R80, a 10-speed automatic transmission.  The complaint alleges that the transmissions contain a design and/or manufacturing defect that makes them "shift harshly and erratically, causing the vehicle to jerk, lunge, and hesitate between gears," which is a "potentially life-threatening safety issue."  *Id*. at 5-6.  According to the complaint, Defendant has refused to recall or replace its defective transmissions.  *Id*. at 6.  The complaint asserts claims for breach of express and implied warranty, negligence, fraud and fraudulent concealment, unjust enrichment, and violation of various state consumer protection statutes.

When they purchased or leased their vehicles, the Plaintiffs who oppose arbitration all entered into financing agreements with their respective Ford dealerships.  Defendant attaches the financing agreements as exhibits to its motions to compel.  See [96-1] through [96-4]; [130-1].  The parties agree that the Barcelona and Marino financing agreements are governed by Massachusetts law; the Dougherty and Dastolfo financing agreements are governed by New Jersey law; the McDonald financing agreement is governed by Texas law; and the Orndorff financing agreement is governed by Pennsylvania law.

The financing agreements signed by Barcelona, Dougherty, the Dastolfos, McDonald and Orndorff each provides for the immediate assignment of the contract from the dealership to Ford's affiliate, Ford Credit, assigning Ford Credit each dealership's "rights, privileges, and remedies" under the agreements.  See, e.g., [96-1] at 9 (Barcelona agreement).  They further provide that

2

"Buyer acknowledges and accepts assignment of this contract to [Ford Credit]." *Id.* at 6. Each financing agreement also contains an arbitration agreement, which provides:

> "Either you or Creditor ("us" or "we") (each, a "Party") may choose at any time, including after a lawsuit is filed, to have any Claim related to this contract decided by arbitration. Neither party waives the right to arbitrate by first filing suit in a court of law. Claims include but are not limited to the following: 1) Claims in contract, tort, regulatory or otherwise; 2) Claims regarding the interpretation, scope, or validity of this provision, or arbitrability of any issue except for class certification; 3) Claims between you and us, your/our employees, agents, successors, assigns, subsidiaries, or affiliates; 4) Claims arising out of or relating to your application for credit, this contract, or any resulting transaction or relationship, including that with the dealer, or any such relationship with third parties who do not sign this contract."

*Id.* at 8. In addition, each agreement provides that "[y]our or we may choose the American Arbitration Association … or any other organization subject to our approval, to conduct the arbitration." See, e.g., [96-1] at 8. "The applicable rules … may be obtained from the selected organization," but "[i]f there is a conflict between the Rules and the [arbitration agreement], th[e] [arbitration agreement] shall govern." *Id.*

Plaintiff Marino's financing agreement is slightly different than the other Plaintiffs'. See [96-5]. It specifically identifies Ford Credit as the "Finance Company" in its terms. *Id.* at 2. It includes a binding arbitration agreement that allows either party, the "Finance Company," or the "Holder," to choose to arbitrate any claims between them. Specifically, it provides that "[e]ither you or Lessor/Finance Company/Holder . . . may choose at any time, including after a lawsuit is filed, to have any Claim related to this contract decided by arbitration." [96-5] at 8. Otherwise, Marino's financing agreements contains the same arbitration provisions as the Barcelona, Dougherty, McDonald, Orndorff, and Dastolfo agreements. See *id.*

Pursuant to these contractual provisions, Defendant has requested that Plaintiffs arbitrate the claims they raise in this litigation. Plaintiffs, through counsel, have refused. Defendant now moves to compel arbitration.

## II.     Legal Standard

The Federal Arbitration Act ("FAA") "governs the enforcement, validity, and interpretation of arbitration clauses in commercial contracts in both state and federal courts." *Jain v. de Mere*, 51 F.3d 686, 688 (7th Cir. 1995); see also *Rudolph v. United Airlines Holdings, Inc.*, 519 F. Supp. 3d 438, 445 (N.D. Ill. 2021). Section 2 of the FAA provides that "an agreement in writing to submit to arbitration an existing controversy … shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. This provision "embodies both a 'liberal federal policy favoring arbitration and the fundamental principle that arbitration is a matter of contract.'" *Gore v. Alltel Communications, LLC*, 666 F.3d 1027, 1032 (7th Cir. 2012) (quoting *AT&T Mobility LLC v. Concepcion,* 563 U.S. 333, 339 (2011)); see also *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983).

Under the FAA, "arbitration should be compelled if three elements are present: (1) an enforceable written agreement to arbitrate, (2) a dispute within the scope of the arbitration agreement, and (3) a refusal to arbitrate." *Scheurer v. Fromm Family Foods LLC*, 863 F.3d 748, 752 (7th Cir. 2017) (citing *Zurich American Ins. Co. v. Watts Industries, Inc.*, 417 F.3d 682, 687 (7th Cir. 2005)). As the party seeking arbitration, Defendant bears the burden of proving that Plaintiffs "agreed to arbitrate the claim[s] [they] assert[] here." *Melvin v. Big Data Arts, LLC*, 553 F. Supp. 3d 447, 450 (N.D. Ill. 2021); see also *Zurich American Ins. Co. v. Watts Industries, Inc.*, 466 F.3d 577, 580 (7th Cir. 2006); *Wilcosky v. Amazon.com, Inc.*, 517 F. Supp. 3d 751, 759 (N.D. Ill. 2021). "To decide this question, courts apply an evidentiary standard similar to the one that applies at summary judgment, meaning that if the party seeking arbitration offers sufficient evidence to allow a factfinder to conclude that the parties agreed to arbitrate, the party opposing

arbitration must identify facts showing a genuine dispute as to the existence of the agreement." *Melvin*, 553 F. Supp. 3d at 450 (citing *Tinder v. Pinkerton Security*, 305 F.3d 728, 735 (7th Cir. 2002)). "[O]nce an enforceable arbitration contract is shown to exist, questions as to the scope of arbitrable issues should be resolved in favor of arbitration." *Scheurer*, 863 F.3d at 752 (citing *Moses H. Cone*, 460 U.S. at 24-25); see also *Gore*, 666 F.3d at 1032 ("Once it is clear, however, that the parties have a contract that provides for arbitration of some issues between them, any doubt concerning the scope of the arbitration clause is resolved in favor of arbitration as a matter of federal law." (citing *Moses H. Cone*, 460 U.S. at 24-25)); *Bigger v. Facebook, Inc.*, 947 F.3d 1043, 1051 (7th Cir. 2020).

Here, the parties' primary dispute concerning arbitration centers on whether Defendant, as a non-signatory to Plaintiffs' agreements to arbitrate, has any right to compel arbitration of Plaintiffs' claims against it. The FAA does "not alter background principles of state contract law regarding the scope of agreements"—"including the question of who is bound by them." *Arthur Andersen v. Carlisle*, 556 U.S. 624, 630 (2009). A "nonparty's right to enforce an arbitration agreement is governed by state law." *Sosa v. Onfido, Inc.*, 8 F.4th 631, 637 (7th Cir. 2021) (citing *Arthur Andersen*, 556 U.S. at 630-31); see also *A.D. v. Credit One Bank, N.A.*, 885 F.3d 1054, 1060 (7th Cir. 2018). While the particulars vary by state, "'traditional principles' of state law" generally "allow a contract to be enforced by or against nonparties to the contract through 'assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel.'" *Arthur Andersen*, 556 U.S. at 631 (quoting 21 R. Lord, Williston on Contracts § 57:19, p. 183 (4th ed. 2001)).

Under the FAA, "parties may agree to have an arbitrator decide not only the merits of a particular dispute but also 'gateway' questions of 'arbitrability,' such as whether the parties have

agreed to arbitrate or whether their agreement covers a particular controversy." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529 (U.S. 2019) (quoting *Rent-A-Center, West, Inc. v. Jackson*, 562 U.S. 63, 67 (2010)). "To be sure, before referring a dispute to an arbitrator, the court determines whether a valid arbitration agreements exists." *Id.* at 530. "But if a valid agreement exists, and if the agreement delegates the arbitrability issue to an arbitrator, a court may not decide the arbitrability issue." *Id.*

"When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability)" the Court "should apply ordinary state-law principles that govern the formation of contracts." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). An "important qualification, applicable when courts decide whether a party has agreed that arbitrators should decide arbitrability," is that "Courts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakeabl[e]' evidence that they did so." *Id.* (quoting *AT&T Technologies, Inc. v. Communications Workers*, 475 U.S. 643, 649 (1986)); see also *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83-84 (2002); *In re Dealer Management Systems Antitrust Litigation*, 2020 WL 832365, at *4–5 (N.D. Ill. Feb. 20, 2020). "In this manner the law treats silence or ambiguity about the question '*who* (primarily) should decide arbitrability' differently from the way it treats silence or ambiguity about the question '*whether* a particular merits-related dispute is arbitrable because it is within the scope of a valid arbitration agreement'— for in respect to this latter question the law reverses the presumption." *First Optics*, 514 U.S. at 944-45. When the delegation clause is clear and unmistakable, the court must compel arbitration, even if it "thinks that the argument that the arbitration agreement applies to a particular dispute is wholly groundless." *Henry Schein*, 139 S. Ct. at 529; see also *Telephone Investments USA, Inc. v. Lumen Technologies, Inc.*, 2022 WL 2828751, at *4 (N.D. Ill. July 20, 2022).

### III.     Analysis

As noted above, the FAA requires the Court to compel arbitration if: 1) there is a written agreement to arbitrate; 2) the dispute is within the scope of the arbitration agreement; and 3) there has been a refusal to arbitrate.  *Scheurer*, 863 F.3d at 752.  In this case, there is no dispute that Plaintiffs are parties to written agreements to arbitrate, or that Plaintiffs have refused to arbitrate with Defendant.  Plaintiffs argue that Defendant's motions to compel must be denied because although Plaintiffs may have agreed to arbitrate with the dealers from whom they purchased their vehicles, the agreements do not grant this Defendant any right to demand arbitration of Plaintiffs' claims.  See [110] at 12-13.  Plaintiffs also argue that Defendant should be judicially estopped from asserting that it is an affiliate of Ford Credit because it has taken the position in other litigation that the two companies are distinct legal entities.  See *id.* at 10-11.

### A.     Who Decides Arbitrability

The Court must begin by determining whether either or both of these issues should be decided by an arbitrator.  "[I]f a valid agreement exists, and if the agreement delegates the arbitrability issue to an arbitrator," the Court "may not decide the arbitrability issue."  *Henry Schein*, 139 S. Ct. at 530.  In its first motion to compel arbitration [95], Defendant does not specifically address whether its standing to enforce the financing agreement is for the Court or the arbitrator to decide; it appears to assume this is for the Court and argues that it has standing as an "affiliate" of Barcelona, Dougherty, Marino, McDonald, and Orndorff to enforce the arbitration agreement.  See [98] at 14-16.  Defendant then argues in a short section at the end of its brief that the parties have delegated to the arbitrator the issue of "whether the agreement covers the dispute."  [98] at 19.  In response, Plaintiffs argue that the Court must decide whether the arbitration clause applies to their claims because they "specifically challenge the delegation clause in the financing

7

agreements" on the basis that "the parties to this litigation – Plaintiffs and Ford Motor Company – never agreed to arbitrate anything, or to delegate the issue of arbitration to the arbitrator." [110] at 18. Rather, Plaintiffs contend, "[t]he plain language of the Agreement evidences only an intent to arbitrate arbitrability between Plaintiffs and the Seller/Creditor/Lessor referenced in the agreements." *Id*. In its reply, Defendant's position shifts, asserting not only that the arbitrator must decide issues of arbitrability generally, but also that the specific "'question of whether a purported nonsignatory can enforce an arbitration agreement concerns a question of arbitrability and, thus, must be decided by the arbitrator.'" [120] at 18 (quoting *Grabowski v. PlatePass, LLC,* 2021 WL 1962379, at *3 (N.D. Ill. May 17, 2021)). In its subsequently filed motion to compel arbitration of the Dastolfos' claims, Defendant asserts that all issues of arbitrability, including in particular whether Defendant as a non-signatory has a right to compel arbitration, must be decided by the arbitrator.

Setting aside for a moment the standing issue, the Court agrees with Defendant that, in general, Plaintiffs' arbitration agreements delegate issues of "arbitrability" to the arbitrator. The arbitration provision provides broadly that either party "may choose at any time … to have any Claim related to this contract decided by arbitration," including any "claims regarding the interpretation, scope, or validity of this provision, or arbitrability of any issue except for class certification." See, e.g., [96-1] at 8. Each agreement also adopts the rules of the selected arbitration provider, such as the AAA (except where they conflict with the agreement). This robust designation clause and incorporation of AAA rules are two factors that courts often cite in favor of finding that the parties agreed to arbitrate arbitrability. See *Telephone Investments*, 2022 WL 2828751, at *4. While the Seventh Circuit "has not decided whether an arbitration agreement's incorporation of the AAA Rules qualifies as a 'clear and unmistakable' agreement to arbitrate

arbitrability," the eight circuits to have addressed it "all answered that question in the affirmative," *Vergara v. Nintendo of America Inc.*, 2020 WL 2571903, at *3 (N.D. Ill. May 21, 2020) (collecting cases), and "the consensus view among district courts in this circuit and among the other appellate circuits holds that reference to or incorporation of AAA rules constitutes clear and unmistakable evidence to delegate arbitrability to an arbitrator." *Telephone Investments*, 2022 WL 2828751, at *4 (collecting cases); see also, e.g., *Sha-Poppin Gourmet Popcorn LLC v. JPMorgan Chase Bank, N.A.*, 553 F. Supp. 3d 452, 457–58 (N.D. Ill. 2021); *In re Dealer Management Systems Antitrust Litigation*, 2020 WL 832365, at *4–5 (N.D. Ill. Feb. 20, 2020); *Ali v. Vehi-Ship, LLC*, 2017 WL 5890876, at *3–4 (N.D. Ill. Nov. 27, 2017); *Yellow Cab Affiliation, Inc. v. New Hampshire Ins. Co.*, 2011 WL 307617, at *4 (N.D. Ill. Jan. 28, 2011). Thus, assuming Defendant has standing to enforce the arbitration agreements, those agreements delegate to the arbitrator any other disagreements concerning arbitrability.

This still leaves the thornier question of whether the arbitrator should also decide Plaintiffs' challenge to Defendant's standing to enforce the arbitration agreement. "[T]his presents a 'logical conundrum' because '[e]ven with a delegation clause, courts must determine whether a contract exists at all,' and '[i]f the nonsignatories are not parties to the contract, then the Plaintiff has no agreement with them.'" *Swiger v. Rosette*, 989 F.3d 501, 507 (6th Cir. 2021) (quoting *De Angelis v. Icon Ent. Grp. Inc.*, 364 F. Supp. 3d 787, 796 (S.D. Ohio 2019)); see also, e.g., *Janiga v. Questar Capital Corp.*, 615 F.3d 735, 741 (7th Cir. 2010) ("the court must decide whether a contract exists before it decides whether to stay an action and order arbitration"). But '[w]hether a nonsignatory can enforce the arbitration agreement is a question of the enforceability of the arbitration clause, as to that defendant.'" *Swiger*, 989 F.3d at 507. Given this logical conundrum, it is not surprising

that there is some inconsistency in the federal case law concerning who—the court or the arbitrator—decides a challenge to a non-signatory's standing to demand arbitration.

Some courts have held that whether a non-signatory to an arbitration agreement can compel arbitration is a question of arbitrability that the relevant agreements (worded similarly to the ones at issue here) delegates to the arbitrator. See, e.g., *Blanton v. Domino's Pizza Franchising LLC*, 962 F.3d 842, 844 (6th Cir. 2020) (holding that "the arbitrator should decide for itself whether [the non-signatory] can enforce the arbitration agreement," where employees and employer agreed to use AAA rules); *Eckert/Wordell Archs., Inc. v. FJM Props. of Willmar, LLC*, 756 F.3d 1098, 1100 (8th Cir. 2014) (holding that "whether a particular arbitration provision may be used to compel arbitration between a signatory and a nonsignatory is a threshold question of arbitrability," which the arbitration agreement delegated to the arbitrator); *Grabowski v. PlatePass, LLC*, 2021 WL 1962379, at *4 (N.D. Ill. May 17, 2021) ("the question of whether a purported nonsignatory can enforce an arbitration agreement concerns a question of arbitrability and, thus, must be decided by the arbitrator" (citing *Swiger*, 989 F.3d at 507; *Eckert/Wordell*, 756 F.3d at 1100)); *O'Connor v. BMW of N. Am., LLC*, 2020 WL 5260416, at *3 (D. Colo. July 23, 2020) (question of "whether a third-party falls within the scope of a valid agreement is fundamentally a question of arbitrability"). Other courts have held that the arbitrator decides a non-signatory's standing, but only where the party opposing arbitration does not specifically challenge the arbitration agreement's delegation clause, see *Swiger*, 989 F.3d at 506-507 (borrower's failure to specifically challenge arbitration agreement's delegation clause required district court to treat provision as valid and enforce it as written, even though borrower challenged enforceability of whole arbitration provision), or where the argument against standing applies to the whole arbitration agreement and not just the delegation provision, see *Lyman v. Ford Motor Company*, 2022 WL 856393, at *4 (E.D. Mich.

10

Mar. 22, 2022) ("[T]he basis of Plaintiffs' challenge–Defendant's standing to invoke the delegation provision–goes to the enforceability of the whole arbitration agreement. Therefore, it is an arbitrability issue that must go to the arbitrator to decide[.]").

Other courts treat a challenge to a non-signatory's standing to enforce an arbitration agreement as a challenge to contract formation, which must be decided by the Court. See *Newman v. Plains All Am. Pipeline, L.P.*, 23 F.4th 393, 398 (5th Cir. 2022) ("[W]e must decide whether Plains can enforce the Newman-Cypress arbitration agreement; not an arbitrator. ... When a court decides whether an arbitration agreement exists, it necessarily decides its enforceability between parties. Therefore, deciding an arbitration agreement's enforceability between parties remains a question for courts."); *Kramer v. Toyota Motor Corp.*, 705 F.3d 1127-28 (9th Cir. 2013) (in action brought by vehicle purchasers against Toyota, language in arbitration clause that "[e]ither you or we may choose to have any dispute between you and us decided by arbitration" evidenced "plaintiff's intent to arbitrate arbitrability with [their] dealership[s] and no one else"; "[g]iven the absence of clear and unmistakable evidence that Plaintiffs agreed to arbitrate arbitrability with nonsignatories, the district court had the authority to decide whether the instant dispute is arbitrable"); *Schoenfeld v. Mercedes-Benz USA, LLC*, 532 F. Supp. 3d 506, 510 (S.D. Ohio 2021) (holding that issue was for the court rather than the arbitrator to decide since, "[g]iven that Plaintiff and [the non-signatory seeking to compel arbitration] never agreed to arbitrate *any* claims that might arise between them, neither can it be said that they clearly and unmistakably agreed to delegate the question of arbitrability to an arbitrator").

The Court is guided by two recent Seventh Circuit decisions. In *K.F.C. v. Snap Inc.*, 29 F.4th 835 (7th Cir. 2022), the Seventh Circuit explained that "because arbitration is a matter of contract, judges must decide that a contract has been formed before they may order arbitration."

*Id.* at 837. The court reasoned that "[e]ven the most sweeping delegation cannot send the contract-formation issue to the arbitrator, because, until the court rules that a contract exists, there is simply no agreement to arbitrate." *Id.* It concluded that the plaintiff's argument—that it would be against public policy to enforce an arbitration agreement against her due to her youth—concerned the agreement's "validity, not its existence," because Illinois law treats contracts entered into by children as voidable rather than void. *Id.* at 838.

In *CCC Intelligent Solutions Inc. v. Tractable Inc.*, 36 F.4th 721, 723 (7th Cir. 2022)—which was decided shortly after the parties completed briefing the motions to compel—the Seventh Circuit affirmed the denial of a motion to compel arbitration that had been brought by a non-signatory to the arbitration agreement, Tractable. In its underlying opinion, the district court held that the dispute over "whether plaintiff agreed to arbitrate with Tractable" was "a dispute that 'can't logically be resolved by the arbitrators.'" *CCC Information Services Inc. v. Tractable Inc.*, 2019 WL 2011092, at *2 (N.D. Ill. May 7, 2019). The court reasoned that since the dispute went to "whether an agreement between plaintiff and Tractable exists at all," "[t]hat issue [w]as for the court to decide." *Id.* The district court then determined that Tractable was not a party to the arbitration agreement and had no rights under the agreement under agency or equitable estoppel theories. See *id.* at *3. In its opinion affirming the district court, the Seventh Circuit did not discuss the first step of the district court's analysis in any detail, but stated approvingly that the district court had "[a]ppl[ied] the rule that a judge must decide whether the parties have agreed to arbitrate." *CCC*, 36 F.4th at 723 (citing *AT&T Technologies*, 475 U.S. 643). It then affirmed the district court's conclusion that Tractable could not compel arbitration based on a contract to which it was not a party or a third-party beneficiary. *Id.* at 724.

Regardless of the somewhat muddled state of federal law, this Court is bound by *CCC* and *K.F.C.* Applying this precedent, the Court concludes that the issue of whether Defendant has any right as a non-signatory to compel arbitration with Plaintiffs goes to contract formation and must be decided by the Court. As the court held in *Giron v. Subaru of America, Inc.*, 2022 WL 17130869 (N.D. Ill. Nov. 21, 2022), "it is for this Court (not an arbitrator) to consider whether Illinois law allows [non-signatory] Subaru of America, Inc. to enforce the arbitration provision in the Financing Agreement between Grand Subaru, LLC and plaintiff" because "[t]he question of whether Subaru of America, Inc. can enforce the arbitration provision in a contract to which it is not a party is not different from the question of whether an agreement to arbitrate exists between the plaintiff and Subaru of America, Inc." *Id.* at * 4 (relying on *CCC*).

The Court also will resolve—and in short order—Plaintiffs' argument that Defendant should be barred by judicial estoppel from attempting to enforce the arbitration agreements due to its conduct in other, unrelated litigation. See [110] at 10-11. "Although the Seventh Circuit has not expressly so held, it has continued after *Moses Cone* and *Howsam* to address whether a party invoking an arbitration clause has waived arbitration through litigation conduct or delay." *Lukis v. Whitepages Inc.*, 535 F. Supp. 3d 775, 786–87 (N.D. Ill. 2021). The doctrine of judicial estoppel is designed to address situations where "a party succeeds on one legal position and later tries to reverse its position on the same issue." *Looper v. Cook Inc.*, 20 F.4th 387, 398 (7th Cir. 2021). Plaintiffs claim that this is what Defendant has done by asserting in this lawsuit that it is an "affiliate" of Ford Motor Credit Company, even though in other cases it has resisted parties' attempts to treat it as an "alter ego" of Ford Credit. [110] at 10. This argument misapprehends the alter ego theory, which courts use "as a means of 'piercing the corporate veil' for liability purposes." *Big Shoulders Capital LLC v. San Luis & Rio Grande Railroad, Inc.*, 13 F.4th 560 (7th

Cir. 2021). In general (although the test varies by state), before a court will pierce the corporate veil "(1) there must be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist; and (2) circumstances must exist such that adherence to the fiction of a separate corporate existence would sanction a fraud, promote injustice, or promote inequitable consequences." *In re Wolf*, 644 B.R. 725, 748 (N.D. Ill. 2022) (applying Illinois law). Plaintiffs point to no evidence suggesting that Defendant has ever maintained that it and Ford Credit are the same company or that one company is a "mere instrumentality" of the other. *ABN AMRO, Inc. v. Capital Int'l Ltd.*, 595 F. Supp. 2d 805, 854 (N.D. Ill. 2008). If that were Defendant's position, Defendant would not be invoking its rights as an "affiliate" of Ford Credit under the arbitration agreements, but rather would be claiming that it *is* Ford Credit. In short, Defendant has not taken inconsistent positions, and therefore judicial estoppel has no application here.

To the extent that the parties' briefs raise any other arguments concerning arbitrability, those are for the arbitrator to decide.

### B.     Defendant's Standing to Enforce Plaintiffs' Arbitration Agreements

Having resolved the threshold "who decides" questions, the Court turns to whether Defendant, as a non-signatory to the arbitration agreements, has standing to require Plaintiff to arbitrate. This is a question of state law, and therefore the Court considers the Plaintiffs' claims state by state. The Court's "task is to determine how the state's highest court would rule." *Rodas v. Seidlin*, 656 F.3d 610, 626 (7th Cir. 2011). "If the state's supreme court has not yet addressed the issue, the federal court should 'consult and follow the decisions of intermediate appellate courts' to predict how the supreme court would act given the chance, unless 'there is a convincing reason to predict the state's highest court would disagree.'" *In re Zimmer, NexGen Knee Implant*

14

*Products Liability Litigation*, 884 F.3d 746, 751 (7th Cir. 2018) (quoting *ADT Sec. Servs., Inc. v. Lisle-Woodridge Fire Prot. Dist.*, 672 F.3d 492, 498 (7th Cir. 2012)). "And absent 'any authority from the relevant state courts, [the federal court] ... shall examine the reasoning of courts in other jurisdictions addressing the same issue and applying their own law for whatever guidance about the probable direction of state law they may provide.'" *Id.* (quoting *Pisciotta v. Old Nat'l Bancorp*, 499 F.3d 629, 635 (7th Cir. 2007)).

### 1.    Barcelona and Marino – Massachusetts

Defendant maintains that "courts in each of the respective states where Plaintiffs purchased or leased their vehicles routinely allow a non-signatory affiliate of the contracting party to compel arbitration where the arbitration agreement includes a direct reference to 'affiliates.'" [98] at 10. In support of their request to compel the two Massachusetts Plaintiffs, Barcelona and Marino, to arbitrate, Defendant cites a single case, *Barbosa v. Midland Credit Mgmt., Inc.*, 2019 WL 3781629, at *5 (D. Mass. July 3, 2019), *aff'd,* 981 F.3d 82 (1st Cir. 2020), in which the affiliates of an assignee were allowed to enforce an arbitration provision.

The Court finds *Barbosa* of limited usefulness in predicting how the Massachusetts Supreme Court would rule, because the contracts at issue there were governed by Delaware law. See 2019 WL 3781629, at *1; see also *Barbosa v. Midland Credit Management, Inc.*, 981 F.3d 82, 87 n.7 (1st Cir. 2020). And unlike Barcelona and Marino's agreements, the arbitration agreement in *Barbosa* gave "you or us" the right to demand arbitration and defined "us" to include Barclays' affiliates. 2019 WL 3781629, at *4. The Court finds more applicable guidance in *Landry v. Transworld Systems Inc.*, 149 N.E.3d 781, 786 (Mass. Sup. 2020), which the parties do not cite. In *Landry*, the Massachusetts Supreme Judicial Court "acknowledged six theories under which a nonsignatory may enforce a contract, such as an arbitration agreement, against a signatory: "(1)

15

incorporation by reference; (2) assumption; (3) agency; (4) veil-piercing/alter ego; (5) equitable estoppel, and (6) third-party beneficiary." *Id*. The defendant in that case was debt collector Transworld, which claimed to be a third-party beneficiary to an arbitration agreement contained in a car rental agreement between the plaintiff and Enterprise Rent-A-Car. The court explained that "[u]nder Massachusetts law, a nonsignatory seeking to enforce an arbitration agreement as a third-party beneficiary must point to 'clear[ ] and definite[ ]' evidence of the parties' intent that it benefit from the provision." 149 N.E.3d 781 (Mass. Sup. 2020) (quoting *Constantino v. Frechette*, 897 N.E.2d 1262 (Mass. App. 2008)). The court continued that "[f]or evidence of intent to include Transworld as a third-party beneficiary to be considered 'clear and definite,' there must, at a minimum, be no ambiguity in the arbitration provision as to whether Transworld could enforce it." *Id*. at 789. "Contractual language is ambiguous 'if it is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one.'" *Id*. (quoting *James B. Nutter & Co. v. Estate of Murphy*, 88 N.E.3d 1133 (Mass. Sup. 2018)).

The court determined that Transworld could not meet this burden, because "[t]he arbitration provision in question contains competing language regarding the parties who may enforce it." *Id*. In particular, the second sentence of the arbitration provision stated that "Renter and [Enterprise] agree to arbitrate any and all claims ... <u>against each other</u>," suggesting that "the only claims that are subject to arbitration are those brought by a renter, such as Landry, against Enterprise, or vice versa." *Id*. However, the next sentence "seemingly contradict[ed] this position by stating that all claims brought against Enterprise's 'employees, agents, affiliates or representatives' also are subject to arbitration," and a third section provided that arbitration may occur if "Enterprise and the Renter" failed to resolve the dispute within 30 days. *Id*. The court concluded that "notwithstanding an isolated reference in the arbitration provision to claims against

'employees, agents, affiliates or representatives,' multiple sections of the arbitration provision suggest that only claims between a renter and Enterprise are subject to arbitration" and therefore, "[i]n light of these competing provisions, reasonable minds surely could differ as to whether the arbitration provision is applicable to claims brought against Transworld." *Id.* at 789; see also *Steel-Rogers v. Global Life Science Solutions USA, LLC*, 2022 WL 3916362 (D. Mass. Aug. 30, 2022) (under Massachusetts law, non-signatory employer was not third-party beneficiary of arbitration agreement between employee and temporary staffing agency and therefore could not compel arbitration because, although agreement required arbitration for claims that arose between employee and agency's "related and affiliated companies" and the employee treated the employer and staffing agency as a single entity in her complaint, a court "could find that 'related and affiliated companies' is ambiguous because it's meaning [is] reasonably susceptible to both its colloquial definition and its definition in a commercial context" and employer had "not shown a total lack of ambiguity").

As in *Landry*, Barcelona's and Marino's agreements to arbitrate refer to "affiliates" only in the definition of "claims." And unlike in *Barbosa*, the parties are not defined to include affiliates. The Court is therefore hesitant to conclude that there is a "total lack of ambiguity" concerning the parties' intent to allow affiliates to compel arbitration. Although one reasonable interpretation is that affiliates are entitled to compel arbitration of claims brought against them, the California district court in *Ruderman v. Rolls Royce Motor Cars, LLC*, 511 F. Supp. 3d 1055, 1058–59 (C.D. Cal. 2021), identified another interpretation of contractual language, nearly identical to that at issue here, which reasonably intelligent persons might also accept:

> The reference to "affiliates" upon which Rolls-Royce hangs its hat is in the definition of Claim: " 'Claim' broadly means any claim, dispute, or controversy ... between me and you or your employees, officers, directors, affiliates, successors or assigns. So far, so good, for Rolls-Royce; the drafter of the contract clearly

> intended to include Rolls-Royce in identifying which claims could be arbitrated.
> But Rolls-Royce is clearly *not* included in the class of litigants who may compel
> arbitration: "Either *you or I* may choose to have any dispute between us decided by
> arbitration and not in a court or by jury trial. Rolls-Royce does not establish that
> the signatories of the contract intended to include Rolls-Royce in the "you or I"
> who may compel arbitration. … Rolls-Royce is therefore not an intended
> beneficiary of the contract, and it may not compel arbitration on this argument.

See also *Almada v. BMW of North America, LLC*, 2021 WL 1156850, at *4 (C.D. Cal. Feb. 11,

2021) (denying car manufacturer's motion to compel and explaining that the definition of

"claim"—which included "affiliates," "assigns," and "third-party"— "only identifies which claims

may be arbitrated and what the subject matter of those claims may be").

In a footnote, Defendant argues in the alternative that it may compel the Massachusetts

Plaintiffs to arbitrate based on equitable estoppel. See [98] at 17 n.16. Defendant cites a New

York district court case, *Gilbert v. Dell Techs., Inc.*, 415 F. Supp. 3d 389, 398 (S.D.N.Y. Nov. 11,

2019), for the proposition that under Massachusetts law, "a nonsignatory may compel arbitration

under equitable estoppel when the party's claims are intimately founded in and closely related to

an agreement which also mandates arbitration." Defendant does not elaborate on how it meets this

standard, other than to say generally that "the doctrine of equitable estoppel … requires arbitration

because Plaintiffs' claims are closely intertwined with their financing agreements and because of

the corporate relationship between Ford and Ford Credit." [98] at 17 n.16. *Gilbert* relies on

*Machado v. System4 LLC*, 28 N.E.3d 401, 409–10 (Mass. 2015), which explains in the sentence

that follows the one quoted by Defendant that "[t]he plaintiff's actual dependence on the

underlying contract in making out the claim against the nonsignatory defendant is therefore always

the *sine qua non* of an appropriate situation for applying equitable estoppel." *Id*. at 409 (quoting

*Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 449 Fed. Appx. 704, 710 (10th Cir. 2011)).

Defendant does not explain, and the Court does not see, how Plaintiffs' claims could be

characterized as actually depending on Plaintiffs' finance agreements. Plaintiffs are not suing for breach of the agreements and their claims are not contingent on the agreements. The Court therefore concludes that Defendant has not shown that it has a right to compel the Massachusetts Plaintiffs to arbitrate and denies that part of Defendant's motion.

### 2. Dougherty and the Dastalfos – New Jersey

Defendant cites four New Jersey federal district court cases for the proposition that, "under New Jersey law, a non-signatory affiliate of the contracting party has the right to compel arbitration where the arbitration agreement includes a direct reference to 'affiliates.'" Three of the cases— *Harris v. Midland Credit Mgmt., Inc*., 2016 WL 475349, at *1−2 (D.N.J. Feb. 8, 2016), *Clemons v. Midland Credit Mgmt., Inc*., 2019 WL 3336421, at *4 (D.N.J. July 25, 2019), and *Hejamadi v. Midland Funding, LLC*, 2022 WL 970248, at *6 (D.N.J. Mar. 31, 2022)—involved a non-signatory debt servicer, Midland Credit Management, seeking to compel arbitration under an agreement between its affiliate, Midland Funding, and a credit card holder. In each case, the agreement contained an arbitration clause that had been assigned to Midland Funding, which the court found that Midland Credit Management also could enforce because the agreement defined the claims subject to arbitration to include "Claims that relate directly to us, a parent company, affiliated company, and any predecessors and successors ... [and] also Claims for which we may be directly or indirectly liable, even if we are not properly named at the time the Claim is made." *Harris*, 2016 WL 475349, at *1. This precedent is persuasive authority that favors Defendant, but it is not a definitive statement of New Jersey law because the federal district court did not claim to be interpreting New Jersey law; rather, *Harris* was interpreting a contract governed by "the laws applicable to national banks, and, where no such laws apply, by the laws of the State of Nevada,"

2016 WL 475349, at *2, n.3; the contract in *Clemons* was governed by Delaware law, 2019 WL 3336421, at *3, n.4; and *Hejamadi* does not identify the governing law, 2022 WL 970248, at *6.

Nonetheless, the Court finds this case law persuasive, and sees no reason—based on either the case law identified by the parties or the Court's own (admittedly non-exhaustive) research—to conclude that New Jersey's highest court would decline to follow it. Although there are a few outliers, the majority of courts to have considered very similar contractual language have compelled arbitration. Plaintiffs rely primarily on cases out of the Ninth Circuit, applying California law to arbitration agreements like the ones at issue here. Other than *Ruderman* and *Almada* (discussed in the preceding section), the courts considering whether a car manufacturer can compel arbitration under a contract between the dealer and the car buyer/leasor make a distinction between contracts that define "claim" to include claims by/against affiliates and contracts that do not—invoking arbitration where affiliates are expressly included and denying it where they are not. See, e.g., *Hajibekyan v. BMW of North America, LLC*, 839 Fed. App'x 187 (9th Cir. 2021) (affirming grant of defendant car manufacturer's motion to compel arbitration under a lease agreement that encompassed "any claim, dispute or controversy ... between me and you or your employees, officers, directors, *affiliates*, successors or assigns" (emphasis in original)); *Ngo*, 23 F.4th at 946–47 (denying car manufacturers motion to compel arbitration and distinguishing *Hajibekyan* on the basis that "[h]ere, arbitrable disputes do not include those involving BMW Bank of North America's assignees and affiliates, only those involving the *dealership's* assignees"); *Jurosky v. BMW of North America, LLC*, 441 F. Supp. 3d 963, 975 & n.5 (S.D. Cal. 2020) (vehicle manufacturer failed to demonstrate that it was third party beneficiary to plaintiff's arbitration agreement with dealer, as required to enforce arbitration clause; distinguishing district court case "finding that automobile manufacturers were third-party

beneficiaries" on the basis that the arbitration clause there covered "affiliates"); *Zeto v. BMW of North America, LLC*, 2020 WL 6708061 (S.D. Cal. Nov. 16, 2020) (granting car manufacturer's motion to compel where arbitration clause added term "affiliate"); *Rizvi v. BMW of N. Am., LLC*, 2020 WL 2992859, at *3 (N.D. Cal. June 4, 2020) (same); *Messih v. Mercedes-Benz USA, LLC*, 2021 WL 2588977, at *7 (N.D. Cal. June 24, 2021) (same).

The Court agrees that this distinction is logical, because it gives effect to the contractual language defining "claims" broadly to include claims brought by and against affiliates. It is also consistent with the parties' broad agreement to arbitrate "*any* Claim related to this contract." Outside the Ninth Circuit, the trend also appears to be to allow affiliates to enforce contracts that are worded similarly to Plaintiffs'. Compare *Tyman v. Ford Motor Company*, 521 F. Supp. 3d 1222, 1229 (S.D. Fla. 2021) ("parent and affiliate companies can enforce arbitration agreements they did not sign where they fall within the scope of the provisions at issue"), and *Brown v. Sklar-Markind*, 2014 WL 5803135, at *1, 13 (W.D. Pa. Nov. 7, 2014) (signatory company's debt collector, employees, and lawyers entitled to compel arbitration under arbitration agreement that covered claims involving signatory's "employees, agents, successors, assigns, subsidiaries, or affiliates"), with *Schoenfeld*, 532 F. Supp. 3d at 511-12 (buyer's claims against automobile distributor were outside scope of arbitration provision in purchase agreement between buyer and dealership, where arbitration provision applied only to disputes between owner and dealership, its employees, successors, or assigns, and distributor did not fall into any category).

The Court is not persuaded by the Dastolfos argument that Defendant cannot invoke the arbitration agreement because "the contract expressly includes affiliates of the dealer (and no other affiliates)"—that is, "[t]he affiliate needs to be an affiliate of the dealer and not an affiliate of an affiliate" [140] at 14—and Defendant is an affiliate of Ford Finance and not the dealer. There is

nothing in the contractual language that compels this conclusion. As an assignee, Ford Finance stands in the shoes of the dealership. See *Sync Labs LLC v. Fusion Mfg.*, 2016 WL 6802479, at *8 (D.N.J. Nov. 16, 2016) ("It is a long-held ten[e]t of contract law that where an assignment is effective, the assignee stands in the shoes of the assignor and assumes all of his or her rights."), *aff'd*, 838 F. App'x 665 (3d Cir. 2020); see also N.J. Stat. 2A:25-1 (recognizing that "the assignee [of a contract] may sue thereon in his own name"). As an affiliate of the dealer's assignee, Defendant is also entitled to enforce the arbitration agreement under the bulk of authority considering the issue, which the Court finds persuasive because it gives effect to the "affiliate" language and is consistent with the broad wording of the agreement. For these reasons, the Court grants Defendant's motions to compel Dougherty and the Dastalfos to arbitrate.

### 3. McDonald – Texas

Defendant relies on *Kassell v. Crafton*, 2013 WL 6709447, at *12 (W.D. Tex. Dec. 18, 2013), to support compelling arbitration against McDonald. In *Kassell*, the district court held that the subsidiaries and affiliates of a bank were entitled to compel arbitration under an agreement between the bank and its customers, where the agreement "explicitly cover[ed] claims against the Bank and its 'parents, subsidiaries, and affiliates.'" *Id.* *11 & n.12. *Kassell* was applying California law, see *id.* at *4, so the Court gives this decision no particular weight in determining how the Texas Supreme Court would rule on the same issue. Plaintiffs do not cite any Texas precedent either, so the Court—not being aware of any on-point precedent based on its own non-exhaustive research—looks to "the reasoning of courts in other jurisdictions addressing the same issue and applying their own law." *In re Zimmer*, 884 F.3d at 751. The parties have provided the Court with no reason to doubt that the Texas Supreme Court would follow the majority of courts

22

that have considered similar contractual language, and therefore concludes that Defendant, as an affiliate of Ford Credit, is entitled to compel arbitration against McDonald.

### 4. Orndorff – Pennsylvania

In support of their motion to compel arbitration against Orndorff, Defendant cites *Hawthorne v. Fundamental Long Term Care Holdings, LLC*, 2013 WL 5273218, at *4 (W.D. Pa. Sept. 19, 2013), a federal district court case applying Pennsylvania law. In *Hawthore*, the court held that the parent companies, agents, and employees of a long-term care facility were entitled to enforce an arbitration agreement between the facility and plaintiff, where "[t]he arbitration agreement [wa]s expressly applicable to plaintiff's claims against the facility's parent entities, affiliates, owners, employees and agents." Plaintiffs have not offered any argument why the highest court in Pennsylvania would reach a different result, and therefore the Court will follow *Kassell* and the majority approach discussed above and grant Defendant's motion to compel arbitration against Orndorff.

## IV. Conclusion

For these reasons, Plaintiffs' motion to compel arbitration [95] is granted as to Dougherty, McDonald, and Orndorff and denied as to Barcelona, Fair, Marino and Smith; Plaintiff's motion to compel the Dastolfos to arbitrate [127] is granted. The claims of Dougherty, McDonald, Orndorff and the Dastolfos are stayed pending arbitration. See *Tice*, 288 F.3d at 318.

Dated: January 9, 2023

_____
Robert M. Dow, Jr.
United States District Judge