# EXHIBIT 41

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JUSTIN O'CONNOR, STANISLAW, ZIELINSKI, DANIEL FAIR, BRYAN JASON STEEN, WILLIAM FIEDLER, SMITH, MICHAEL BARCELONA, ROBERT MARINO, BRIAN DOUGHERTY, SUSAN HELLER, VICTOR ORNDORFF, and MICHAEL MCDONALD on behalf of themselves and all others similarly situated,

Plaintiffs,

vs

FORD MOTOR COMPANY,

Defendant.

_______________________________/

Case No. 1:19-cv-05045

Consolidated with Case Nos. 20-cv-1981, 20-cv-2095 20-cv-2612 and 21-cv-6540

Judge Robert M. Dow, Jr.
Magistrate Judge Maria Valdez

The Videotaped Deposition Pursuant to FRCP 30(b)(6)

DEPONENT: WILLIAM MARTIN "BUZZ" RILEY

Sheraton Novi Hotel

21111 Haggerty Road

Novi, MI 48375

Commencing at 9:04 a.m.

Thursday, March 23, 2023

Before Robin D. Gadwa, CSR 2607, RPR, FPR, FAPR

APPEARANCES:

MR. JOHN R. FABRY
The Carlson Law Firm
1717 North Interstate Highway 35, Suite 305
Round Rock, Texas 78664
(512) 671-7277
jfabry@carlsonattorneys.com
Appearing on behalf of the Plaintiffs.

MR. LELAND BELEW (Via Zoom)
Milberg Coleman Bryson Phillips Grossman
227 West Monroe Street, Suite 2100
Chicago, Illinois 60606
(312) 224-8685
lbelew@milberg.com
Appearing on behalf of the Plaintiffs.

MR. TYLER LITKE (Via Zoom)
Milberg Coleman Bryson Phillips Grossman
405 East 50th Street
New York, New York 10022
(212)594-5300
mbreit@milberg.com; ctorres@milberg.com; tlitke@milberg.com
Appearing on behalf of the Plaintiffs.

APPEARANCES CONTINUED:

MS. CINDY CARANELLA KELLY
MR. STEPHEN THOMASCH (Via Zoom)
Kasowitz Benson Torres LLP
1633 Broadway
New York, New York 10019
(212)506-1700
ckelly@kasowitz.com; sthomasch@kasowitz.com

Appearing on behalf of the Defendant.

MS. JODI MUNN SCHEBEL
Bowman and Brooke, LLP
101 West Big Beaver Road, Suite 1100
Troy, Michigan 48084
(248)205-3300
jodi.schebel@bowmanandbrooke.com

Appearing on behalf of the Defendant.

LEGAL VIDEOGRAPHER: MARC MYERS

TABLE OF CONTENTS


| WILLIAM MARTIN "BUZZ" RILEY | PAGE |
|---|---|
| Direct Examination By Mr. Fabry: | 6 |
| Cross-Examination By Ms. Kelly: | 70 |
| Redirect Examination By Mr. Fabry: | 71 |
| CERTIFICATE OF NOTARY | 73 |


INDEX OF EXHIBITS


| Exhibit No. | | PAGE |
|---|---|---|
| 178 | Executive Summary, 10R80: 3-5 Shift Quality, Design for Six Sigma, "6-Panel", Black Belt: Shannon Money, Project Champion: Kara Kennedy, Design Owner: Kara Kennedy, Master Black Belt: Damien Baldwin, Organization/Location: TDE/Livonia, Bates Stamp FORD_O'CONNOR_000032829-000032862 | 20 |

Thursday, March 23, 2023
9:04 a.m.

THE VIDEOGRAPHER: We're now on the record. My name is Marc Myers. I am the videographer for Golkow Litigation Services. Today's date is March 23rd, 2023. The time is now 9:04 a.m.

This video deposition is being held in Southfield, Michigan, in the matter of O'Connor et al versus Ford Motor Company pending in the Northern District of Illinois, Eastern Division Court. The deponent 30(b)(6) Corporate Rep William Riley.

At this time, will the attorneys please identify themselves for the record and the court reporter, Robin Gadwa, please swear in the witness.

MR. FABRY: John Fabry with the Carlson Law Firm on behalf of the Plaintiffs.

MS. KELLY: Cindy Kelly, Kasowitz Benson Torres on behalf of Ford Motor Company and the witness.

MS. SCHEBEL: Jodi Schebel, Bowman and Brooke on behalf of Ford Motor Company and the witness.

MR. FABRY: Mr. Riley, will you raise your right hand, please?

COURT REPORTER: Do you solemnly swear or affirm the testimony you are about to give is the

truth, the whole truth and nothing but the truth, so help you God?

THE WITNESS: I do.

WILLIAM MARTIN "BUZZ" RILEY

having been first duly sworn, was examined and testified on her oath as follows:

DIRECT EXAMINATION

BY MR. FABRY:

Q Could we have your full name, please?

A William Martin Riley.

Q For the record, we're here pursuant to Federal Rule of Civil Procedure 30(b)(6) to ask questions about matters listed in Topic Number 7 in the Deposition Notice. Topic Number 7 is the ability of seals in the 10R80 transmission to achieve and maintain engagement with their sealing surfaces including, but not limited to, the effect of groove surface finish on the ability of seals to create and hold pressure. The effect of vibrations within the transmission from rotating components and road surface roughness on the seals' ability to maintain pressure. The effect on the seals' ability to achieve and maintain pressure during flexing of the input shaft due to its length, material properties and the several passages drilled along its axis. And the ability of the main fluid pump to

deliver sufficient fluid volume to cause seals to shuttle or move axially within their bores to create a seal against the groove surface when three or four clutch hydraulic circuits are being pressured simultaneously.

Mr. Riley, do you understand that you are here to fully answer questions on the matters in Topic Number 7?

A I do.

Q And my understanding is that you retired as an employee of Ford Motor Company in March of 2020; is that correct?

A Correct.

Q And even though you are no longer employed by Ford, you agreed to be designated by Ford to testify on behalf of Ford on Topic 7?

A I did, yes.

Q Are you being compensated for your time today?

A Uhm, I believe so. Uhm, I haven't discussed that at all with Ford.

Q Okay. Why do you believe that you will be compensated for your time in the deposition today?

A I -- I -- correct that. I don't know that I am being compensated. Uhm, it wasn't, it wasn't a matter of my, uh, it wasn't an important consideration in my

being here today or not.
Q Would it be fair to say you volunteering your time to help Ford by testifying in this case today?
A Yes.
Q And you are aware you could have declined to be the designated witness for Ford today?
A Yes.
Q And if you had declined, Ford would have designated and prepared someone else to testify today?
A I believe that's a correct statement.
Q What has Ford and its attorneys done to make sure that you are able to fully answer questions on Topic Number 7 today?
MS. KELLY: Objection.
A Simply reviewed the, the information you had went over earlier this morning in paragraph -- the information in Paragraph 7 and, uhm, and we reviewed, uhm, information regarding this to prepare myself for the, uh, the deposition.
BY MR. FABRY:
Q How much time did you spend reviewing information about Topic Number 7 to prepare for your deposition today?
A Uhm, between 15 and 20 hours.
Q Now, yesterday you appeared for a deposition in your

individual capacity; correct?
A Yes.
Q And yesterday as I recall your testimony you said you spent about 15 to 20 hours preparing for that deposition. Do you recall that?
A Yes.
Q And as a matter of clarification, did you spend 15 to 20 hours preparing for each deposition or is it a 15 to 20 hours total preparing for your deposition yesterday as well as your 30(b)(6) deposition today?
A Total.
Q Did you talk to anyone other than Ford's lawyers to prepare to answer questions on Topic Number 7 today?
A We had a discussion with Nick Yost, who is the current Ford Technical Specialist. And it was less than a hour of discussion. Just to find out --
MS. KELLY: Sorry, I am just going to direct the witness not to disclose the content of those conversations. Because they were attended and directed by Counsel.
MR. FABRY: I'll ask the question. You can make the objection.
BY MR. FABRY:
Q What did you and Mr. Yost discuss to prepare to -- prepare for your deposition today on Topic Number 7?

MS. KELLY: Objection. I direct the witness not to answer on the basis of privilege.

MR. FABRY: I assume that's attorney/client privilege you are claiming?

MS. KELLY: Yes, sir, it is.

BY MR. FABRY:

Q Did you review documents to prepare to answer questions on Topic Number 7 today?

A Uhm, yes.

Q How were the documents that you reviewed selected?

MS. KELLY: Objection.

A They, they were selected, uh, by the attorneys.

BY MR. FABRY:

Q To clarify and confirm, all of the documents that you reviewed in preparation for your deposition today as well as your deposition yesterday were selected and presented to you by Ford's attorneys; is that correct?

A Correct.

Q Did you ask Ford to talk to anyone else in addition to Ford's lawyers and Nick Yost to prepare for your deposition today?

A No.

Q Did you ask to talk to Nick Yost to prepare for your deposition today?

A Uhm, yes, uh, to -- yes.

Q And why did you ask to talk to Nick Yost to help you prepare for your deposition today?
A Uhm, to see if any -- if there had been any, uh, changes or developments in, uh, in the seals since I had left Ford.
Q And did you learn from Nick Yost in your approximately one-hour meeting that there had been any changes or developments in seals since you had left Ford in March of 2020?
A Uhm, there is -- nothing has been, uh, changed to production hardware, or the production seals.
Q Did you learn anything else from Nick's -- from Nick Yost about changes or developments in seals at Ford since you left in March of 2020?
A Nothing that hasn't already been re-- reviewed or explored while I was an employee of Ford.
Q Did you discuss anything that was -- let me -- let me rephrase that and see -- make sure I understand what you are saying.
First, there have been no changes to production hardware and seals in 10R80 transmissions since you left Ford in March of 2020; is that correct?
A Correct.
Q And there has been no new development, development efforts, investigations, regarding seals for the 10R80

transmission since you left in March of 2020?
MS. KELLY: Object to the form.
A Uhm, so, there's, there's been no new investigation -- there's been investigations but nothing of, uhm, no new developments shall we put it. Things that they are looking at are very similar, if not identical, to what the seal team that I led had -- has already investigated.
BY MR. FABRY:
Q Okay. Describe the investigations that have occurred at Ford regarding seals since you left in March of 2020?
A So there has been --
MS. KELLY: Objection to form. Go ahead.
A So there's been another round of investigations to investigate, uhm, interferences on the seal ring, which has been explored in the past, and it's documented.
BY MR. FABRY:
Q Have there been any other investigations at Ford regarding seals since you left in March of 2020 other than interferences?
MS. KELLY: Object to the form.
A There was, there's another study done on, uh, surface finish optimization for the PEEK seal ring.

BY MR. FABRY:
Q Okay. We have interferences and surface finish optimization for PEEK seal rings. Have there been any other investigations at Ford regarding seals for the 10R80 transmission since you left in March of 2020?
MS. KELLY: Object to the form.
A Not that was discussed.
BY MR. FABRY:
Q What was the result of the investigation regarding interferences on seals in the 10R80 transmission?
A That they are having difficulty installing those seals into -- in a production environment which is, isn't a new finding, uhm, they're still -- they're still investigating that. That is a, a, a hard stop, if you will, uhm, of being able to use solid seal rings with interference with them.
Q Okay. As I understand your testimony, the investigation into interferences on seal rings in the 10R80 transmission is ongoing at Ford today?
A That's my understanding.
Q And could you explain what you mean by that's a, that's a hard stop?
A So, so, it's a, uhm, it's a physical production assembly risk to, to have interferences in solid seals because, uhm, they can be damaged during installation.

It's one of the reasons why in Ford's design rules, uhm, we say that, that the solid seals should be designed without interference.

And as a point of clarification, this added interferences is an extremely small increase, uhm, the, uh, if you were to look at the proposed seal ring design changes that is being investigated, uhm, roughly 50 percent of the seal rings that, in the new design, actually have interference greater than what is already in production parts today.

So it's a very small increase and they are already running into assembly issues as I understand it. So it's the, it's the reason I say why I say it's a hard stop. Because it, it exposes, uh, potentially exposes, uhm, approaching transmissions to have damaged seal rings in them.

Q And let me see if I can restate this back to you to make sure I understand what you mean by hard stop.

When you say hard stop, it's a increasing interference on seal rings for the 10R80 transmission, is a hard stop, you don't want to do it, Ford doesn't want to do it because of the assembly risk problems that go along with it; is that correct?

MS. KELLY: Object to the form.

A So, in the -- as we discussed yesterday, in the design

rules there's two reasons for not using interference. One being assembly, risk of assembly damage. The second is, uh, permanent thermal deformation to solid seals with interference. It could occur in a transmission.

BY MR. FABRY:

Q And those risks during assembly could result in performance problems in the transmission; is that correct?

MS. KELLY: Object to the form.

A Uhm, it's possible, yes, that's why those rules say --

BY MR. FABRY:

Q Including shifting issues; correct?

MS. KELLY: Object to the form.

A Uhm, I can't -- so the damage, uh, may or may not result in shift performance. It would result in damage to the seals. Damage is a, damage has various degrees of severity.

BY MR. FABRY:

Q Right. And you would agree on behalf of Ford that Ford wants to avoid damage during assembly to avoid potential shifting issues; correct?

MS. KELLY: Object to the form.

A Ford does not want to put damaged parts during assembly clearly.

BY MR. FABRY:
Q Because they could cause performance issues?
MS. KELLY: Object.
BY MR. FABRY:
Q You agree with that on behalf of Ford?
MS. KELLY: Object to the form.
A It is possible. Again, the degree of damage would determine whether it resulted in some performance issue.
BY MR. FABRY:
Q Isn't it true that in the development of the seal rings for the Ford 10R80 transmission that the design specification was line-to-line?
A Yes.
Q And doesn't line-to-line mean no interference?
A It's re -- it's referred to as zero MMC condition. There's any number of, uh, any number of ways people describe zero interference.
Q Why did Ford decide to investigate increasing the interference on the seal rings for the 10R80 transmission?
A Uhm, to, to -- as we discussed yesterday, the, uh, pressure graphs that the calibrators are reviewing where the pressure on one side of the seal ring is being decreased and increased on the other side of the

William Martin "Buzz" Ripley, 30B6

seal ring. Uhm, the calibrators occasionally see a slight increase or decrease in pressure. And their desire is that, that occasional incident doesn't happen. Pursuit of excellence.
Q Let's talk about the surface finish optimization for PEEK seal rings.
What -- isn't it true that in the development of the Ford 10R80 transmission PEEK seal rings were investigated and rejected?
A They were, uhm, investigated. The, uhm, a PEEK seal ring in the 10R80 transmission in the F10 position has always been in production, is always part of the transmission design.
Q Then let me -- I guess, first of all, confirm my question. Thank you for the clarification.
The rest of the seal rings inside the 10R80 transmission are solid PTFE; correct?
MS. KELLY: Object to the form.
A Uh, correct.
BY MR. FABRY:
Q And at one point in the development of the 10R80 transmission were PEEK seals investigated for those other seals within the transmission and rejected?
MS. KELLY: Object to the form.
A Uhm, the use of PEEK seal rings in, in, uhm, in the

F2, F7 and F8 location was only discussed. The surface hardness on those seal ring interfaces is in, is, uhm, isn't capable of using PEEK seal rings. It's not hard enough.
BY MR. FABRY:
Q And the investigation at Ford regarding surface finish optimization for PEEK seal ring, is that for the PEEK seal ring that has always been a part of production, 10R80 transmission?
MS. KELLY: Object to the form.
A Uhm, the surface finish that Nick is investigating was, as I understood it, was simply in that location.
BY MR. FABRY:
Q Okay. And just to confirm the other side of it, this isn't a new investigation about surface finish optimization to replace the PTFE seals that are in production transmissions with PEEK seals; is that correct?
A That's correct.
Q And what is the goal of trying to -- of investigating surface finish optimization for the PEEK seal ring in the 10R80 transmission?
A Uhm, the -- so, in the, uh, manufacturing of the current F10 seal ring location, my understanding is a -- the manufacturer is make -- is proposing machine

changes in the validation of those machining changes. Uhm, Nick's investigation says that they would, that the -- the .03 filter should be used instead of the filter that is on the specification.

In our design rule it does give that, uh, it does give that, uh, option to, to do that because, again, you are trying to validate a surface -- excuse me -- validate a machining operation as opposed to just making measurements.

Q Did you ask Ford to look at any documents in addition to those selected by Ford's lawyers for you to review to prepare to answer questions for Topic 7?

A No.

Q Does your work experience help you in providing information on the matters in Topic 7?

A I believe so.

Q And how does your work experience help you in providing information on the matters in Topic 7?

A I've been working in this field for 42 years. I worked in this field for 42 years. I, uhm, I believe I know an extensive amount of information regarding these seals.

Q I'm going to show you what I've got marked as Exhibit Number 178.

(Exhibit 178 was marked for identification)

BY MR. FABRY:
Q So the first matter we're going to discuss is Topic 7a, "The effect of groove surface finish on the ability of seals to create and hold pressure."
Uhm, as a general engineering principle, does Ford agree that groove surface finish affects the ability of seals to create and hold pressure in an automatic transmission?
MS. KELLY: Object to the form.
A Yes.
MR. FABRY: For the record Exhibit 178 is Bates numbers 32829 through 32862.
BY MR. FABRY:
Q And Exhibit 178 is an Executive Summary on 3-5 Shift Quality; is that correct?
A That is correct.
Q And what is an Executive Summary at Ford?
A Uhm, an Executive Summary would be a, a review with Ford leadership. This was presented to our Chief Engineer.
Q And if you look lower left on the first page of Exhibit 178, do you where it says "template"?
A Yes.
Q And the date there is 4-24-2013?
A That's the template date, yes.

Q Correct, okay. And there's a date over here in the right-hand corner that also says 4-24-2013. Do you see that?
A Yes.
Q If we turn to the next page, 32830, you are shown on this Team, W. Riley; correct?
A Correct.
Q And if we look in the lower right-hand corner it says "Date 7-28-2022"?
A Uhm-uhm.
Q Were you participating in this Executive Summary, uh, in July of 2022?
A Yes, I was.
Q If we could go to the next Page 32831. There's a box labeled "Trend Charts and Breakdown of Issues."
Do you see that?
A I do.
Q And it indicates "11 Warranty Claims"; correct?
A Correct.
Q And at Ford, Warranty Claims means that customers are seeking repairs of their vehicles under warranty; correct?
A Correct.
Q Next it lists "Two TVM transmissions identified by the Calibration Team."

What does that mean?
A Uhm, TVM is, uh, our transmissions, uhm, that are often being used to investigate potential design changes in production.
Q And the next line is "TBD transmissions identified during internal drives."
Is TBD the standard "to be determined"?
A Yes, it is.
Q And does that indicate that Ford was going to identify, uhm, transmissions for this investigation by internal drives by Ford employees?
MS. KELLY: Objection; form and scope.
A I think that is, uh, what is being indicated here, yes.
BY MR. FABRY:
Q Below that box, the first line is "Voice of the Customer: The transmission intermittently slips between third and fifth gear."
Did I read that correctly?
A That's correct.
Q And that means the customer, a Ford customer with a vehicle with the 10R80 transmission is complaining that the transmission intermittently slips between third and fifth gear; is that correct?
MS. KELLY: Objection.

A It is a voice -- what -- it's the voice of the customer.
BY MR. FABRY:
Q Below that line is "CTQ Statement." What's CTQ?
A CTQ stands for critical to quality.
Q And parenthetical, that's the customer requirement, correct?
A Yes, it says that on the document, customer requirement.
Q And this is what Ford is identifying as the customer's requirement; correct?
MS. KELLY: Objection; scope.
A Uhm, yes.
BY MR. FABRY:
Q And what's listed there is "Vehicle speed must be predictable and consistent during D3-D5 shifts at all times."
Did I read that correctly?
A You did.
Q And does Ford agree that Ford wants customers to have predictable consistent shifts between all gears at all times?
MS. KELLY: Objection; form, scope.
A Uhm, yes.

BY MR. FABRY:

Q And does Ford agree that if the customer does not have predictable consistent shifts, that could be a safety issue?

MS. KELLY: Objection; form. And objection to scope. It is outside the scope of what this witness is here to testify on.

A Uhm, it's, yeah, it's, it's too broad of a question for me to answer. You are asking if this, if the -- if this requirement isn't met, is it a -- as I understand your question -- you are asking me if this isn't met, uhm, could result in a safety issue. I can't -- I can't answer that question because there's too many, too many variables.

BY MR. FABRY:

Q Let me, uhm, narrow down the variables for you.

For example, if a Ford customer is accelerating to merge onto a highway during rush hour traffic and the transmission shifts are not consistent and predictable, could that cause a safety issue for the customer?

MS. KELLY: Objection to form and objection to scope. It is outside the scope of Topic 7. I'll give a little leeway, but I am not going to let him answer hypotheticals that have nothing to do with

Topic 7.
A Specific to the 3-5 shift, I will share with you that as it is stated in this document --
BY MR. FABRY:
Q I am just going to cut you off because my question is not specific to the 3-5 shift. I would like to be efficient with our time today if I could.
MS. KELLY: Objection. You are not letting the witness finish his answer.
A So, what I was going to try to, uhm, how I was going to try to --
MS. KELLY: Mr. Riley, you can wait for a new question that's in the scope.
THE WITNESS: Okay.
MR. FABRY: The question is pending. I'm waiting for a -- unless you are going to instruct him not to answer a question, then he's going to answer the question.
MS. KELLY: I am not instructing him not to answer. You said you wanted to cut him off. You said I'll cut you off there. So I assumed you were withdrawing the question.
MR. FABRY: No, I didn't withdraw it. I am re-asking it. I'm saying it doesn't have anything to do with 3-5 shifting.

MS. KELLY: Same objection.
BY MR. FABRY:
Q Do we need to repeat the question for you, Mr. Riley?
A Please do.
Q Okay.
MR. FABRY: Could you read back my last question, please?
(The pending question was read back as follows: "Question: Let me narrow down the variables for you. For example, if a Ford customer is accelerating to merge onto a highway during rush hour traffic and the transmission shifts are not consistent and predictable, could that cause a safety issue for the customer?")
MS. KELLY: Same objection. Outside the scope of Topic 7.
A So, again, it's too many, too many variables. This, this study, in this document, uhm, is addressing, uhm, if the pressure drops observed by calibrators is resulting in, uhm, an event where the 3-5 transmission intermittently slips, is that a safety issue? The shift still completes. That's not what is being described here. It's a intermittent slip that occurs occasionally.
So, that's, that's, that's the only way I can

answer your question from a safety standpoint of view, uhm...

BY MR. FABRY:

Q Let me rephrase the question.

A Go ahead.

Q Or maybe just try a different question. Is your testimony that an intermittent unexpected slip in the transmission is, as a Ford customer is accelerating to merge onto the highway, does not present a safety issue?

MS. KELLY: Objection. Outside the scope of this witness' testimony on Topic 7.

A Okay. That is my -- that is my response to you. My understanding of what this study was, why this study was conducted by Ford.

BY MR. FABRY:

Q Okay. My question was whether when a Ford customer driving a vehicle with a 10R80 transmission experiences unexpected intermittent slipping of the transmission while attempting to merge onto a highway in rush hour traffic could represent a, or present a safety issue for that Ford customer?

MS. KELLY: Objection; outside the scope; asked and answered.

A I have nothing further. You keep asking if it is a

safety issue. And this study is intended to address a customer satisfaction. There's nothing in this document that says that it is a, this condition is a safety issue.

BY MR. FABRY:

Q Okay. And I'm asking you as the designated representative for Ford on seals whether it is Ford's position that slipping of the transmission when a customer is attempting to merge onto a highway in rush hour traffic presents a safety issue?

MS. KELLY: Objection; outside the scope; asked and answered.

BY MR. FABRY:

Q This is one of those questions, Mr. Riley, where you can say, yes, that is Ford's position; you can say no, that is not Ford's position; or you can say I don't know what Ford's position is on it.

MS. KELLY: I object --

BY MR. FABRY:

Q Those are the potential answers to this question.

MS. KELLY: I object to your instruction and attempting to tell the witness how he can answer the question.

Mr. Riley, you can answer the question any way that you deem appropriate. I'll also object on

William Martin "Buzz" Riley, 30B6

the basis that you have already answered the question several times and it is outside the scope of your testimony.

BY MR. FABRY:

Q Are you going to answer my question, Mr. Riley?

A I believe I've already answered the question. Uhm, this study was conducted to, to determine if the clutch pressure drops, that were being observed on a calibration graph, contributed to intermittent slips on a 3-5 transmission. In, in that investigation, and in these, in the documents, the information recorded in this document, this is -- this is a, uhm, customer satisfaction investigation, not one where anyone ever said it was a safety issue. Or that this resulted or a customer, as far as I'm aware of, stated that this was a safety issue.

Q Uhm, and when you say that as far as you are aware of that any customers considered this to be a safety issue, are you saying that personally as William Riley, or are you speaking on behalf of Ford Motor Company in saying Ford Motor Company is not aware of any customers that consider slipping of the transmission to be a safety issue?

MS. KELLY: Objection. It's outside the scope of his testimony as a 30(b)(6) witness for Ford.

I've made that clear. So, to the extent that Mr. Riley is answering it is outside the scope of his testimony.

MR. FABRY: You made your objection. Stop talking.

MS. KELLY: Don't raise your voice at me. That's so inappropriate and unprofessional.

MR. FABRY: You've made your objection.

A I stated earlier that I am not aware.

BY MR. FABRY:

Q Okay. And you understand that you are here to testify on behalf of Ford Motor Company so I'm seeking clarification on this point. I need to know when I am asking these questions if you are speaking personally or if you are speaking on behalf of Ford.

MS. KELLY: Objection. Outside the scope.

BY MR. FABRY:

Q So let's, let's step back for a moment.

As I understand your testimony, and your clarification, when you say I am not aware of any customers stating that slipping of the transmission presents a safety issue; that's William Riley speaking personally, correct?

MS. KELLY: Objection.

BY MR. FABRY:

Q Is that correct?

A That was -- that is what I, what I stated, yes.

Q Okay. What is Ford Motor Company's position on whether customers believe that slipping of the transmission presents a safety issue?

MS. KELLY: Objection. Outside the scope of what this witness is here to testify on.

A So, I would defer your question to Systems Engineers. Again, in the -- in the work at Ford, uhm, this condition, and this, specifically why this study was conducted, uhm, it does not -- there is certainly no documentation that this is something that is a safety issue. Which we, which we, in Ford, uhm, are always consistent of.

BY MR. FABRY:

Q Confirming for the record that you are not prepared to answer my question today, and have therefore deferred the question to Systems Engineers; is that correct, Mr. Riley?

MS. KELLY: Objection.

A You are not satisfied with my statement and if you, if you believe that, a -- if you would like to have further conversation with someone in the Systems Engineering as the appropriate people to have a

discussion about.

BY MR. FABRY:

Q Okay. Uhm, it's, for me, an issue of making sure that the record is clear as to what questions you can and cannot answer, Mr. Riley.

A I understand.

Q So, uhm, this is, this is really another one of those yes/no questions and you said you would defer to Systems Engineer. I am trying to confirm that as to whether Ford Motor Company is aware that, for customers, slipping of the transmission could present a safety issue; that is not a question that you are prepared to answer today?

MS. KELLY: Objection; scope; asked and answered.

BY MR. FABRY:

Q Is that correct?

A I am -- you have asked if Ford considers slipping of the transmission to be a safety issue. I am unaware that this condition described in the document, you are having us discuss, is a safety issue. Never has been described to me as that. The people that are responsible for the, uh, shift performance of the transmission, is a Systems Engineering responsibility.

If my responses to you are inadequate, then

William Martin "Buzz" Ripley, 30B6

yes, I think that that's an appropriate thing to do, to have a discussion with them. Are they aware of any safety issues.

Q Okay. Let's go on to the next line which is "Cost of Poor Quality." That is customer sat -- excuse me -- is that customer satisfaction?

A Correct.

Q Going up -- backup a minute. Uhm, "Defect definition is time from F clutch pressure to drop to return to predicted levels during a D3-D5 shift exceeds maximum acceptable time of 80 seconds." That should really technically be 80 milliseconds, shouldn't it?

A That's correct.

Q If we go to 32833, please. On this page we see listed the "Critical parts involved in the 3-5 shift"; is that correct?

A Correct.

Q And the first one listed is "Input shaft F8 seals and grooves."

Did I read that correctly?

A Correct.

Q Next is "R2S3-F8 bore in F7 seals and grooves."

Did I read that correctly?

A Correct.

Q And R2S3 is ring gear 2, sun gear 3; correct?

A Correct.
Q And that's where the F8 seals, uhm, interface; is that right?
A It's an interface for the, uhm, the F -- shown here as the F8 bore. And it contains the gear -- the grooves for the, uhm, F7 seal.
Q Okay. Those are seals and grooves in the R2S3 shaft; correct?
A Correct.
Q The next line is "CD F7 -- F7 bore." That's the bore in the CDF drum with the F7 seals interface; is that right?
A That is correct.
Q And then "M/C for commanding pressures." What's M/C?
A That, that's a, the transmission module control.
Q Would another way to describe that be the solenoids and valve body which control pressure to activate C, F and D clutches?
A Uhm, I believe that's a fair statement, yes.
Q And then finally there's "ATF", and that's the abbreviation for automatic transmission fluid; correct?
A Yep.
Q And that would include the level, the temperature, the viscosity and the condition of the automatic

transmission fluid?
A Yes.
Q And then if we go to the next page, 32834. The first line is: "Why might 3-5 shift be so sensitive to crossleak?"
Did I read that correctly?
A Correct.
Q And that is -- can we describe that as a hypothesis for this study for the question to be answered?
MS. KELLY: Object to the form.
A It is, uhm, a statement of what the key contributors could be. It's what is -- what is being conveyed here.
BY MR. FABRY:
Q Okay. So if we go to the third bullet point down we see "Seal number 3 seals on the outer diameter and groove wall."
The next bullet point is "Seal number 3 must shuttle in groove for both F7 and F8 before building pressuring."
Next is "Seal shuttle conditions not ideal."
Did I read that correctly?
MS. KELLY: I believe it says -- objection. Misstates the document.
A It states it's -- it states that "seal shuttle

conditions not ideal." I believe that would be not ideal. It's a typographical --

BY MR. FABRY:

Q It's a typographical error?

A Yes.

Q And there's a note below, "There are other shifts which have cross leakage i.e. 8-9 shift with C/D adjacent at F2 position, but 3-5 shift is the most sensitive."

Did I read that correctly?

A Correct.

Q Is the Number 3 seal involved in the 8-9 shift?

A Uhm, that is a question for Systems Engineering. I'm not -- I don't recall, uhm, the uh, the specific rings that are engaged in these shifts.

Q Okay.

A They are all the same. From a sealing standpoint of view, the seals and interfaces are the same for any given, uh, ring location.

Q If we go to 32836, please. The statement in the upper right-hand corner is, "Because a transmission with a 3-5 shift issue could be replicated in different vehicles with different drivers and multiple measurement systems, the focus is the transmission system and components."

Did I read that correctly?

A That is the focus of this study, yes.

Q And from this statement, the 3-5 shift issue was replicated by multiple Ford employee drivers in multiple different vehicles; is that correct?

MS. KELLY: Object to the form.

A That is the statement, yes.

BY MR. FABRY:

Q With 10R80 transmissions?

A This is a 10R80 transmission.

Q What were the multiple measurement systems that were used to replicate the 3-5 shift issue?

A Uhm, multiple measurement systems, uhm, is not defined here. My understanding is the measurement system that we're, that this study, uhm, focused on was the, uh -- was calibrator, calibrator's information showing, uh, the events during the shift.

Q And is the diagram to the left of that statement underneath the heading "3-5 shift time unacceptable due to F clutch pressure drop" a listing of all the potential transmission components being considered as the cause of the 3-5 shift issue?

MS. KELLY: Objection; scope.

A It is, uh, a documentation of all the different component -- components or attributes that could

William Martin "Buzz" Ripley, 30B6

contribute to this F clutch pressure drop that was being investigated.

BY MR. FABRY:

Q And from this diagram, have the operator, the environment and the measurement been ruled out as causes of the 3-5 shift issue?

MS. KELLY: Objection; scope.

A I don't -- I think it's incorrect to say that it was ruled out. It's not a, it's not a subject of this discussion. Or I mean of this investigation, apologize.

BY MR. FABRY:

Q And below that "The Team agreed to a Best-of-Best/Worst-of-Worst strategy; correct?

A That is correct.

Q And that's defined the critical component or assembly causing the 3-5 shift issue; correct?

A Correct.

Q And if we go to 32839, please. And a, a good shift is -- excuse me -- a good shift is defined by Ford as less than 80 milliseconds in the 10R80 transmission; is that correct?

MS. KELLY: Objection; scope.

A It is -- that is the target set by the calibrators.

BY MR. FABRY:
Q And a poor shift is one that is greater than 100 milliseconds; is that correct?
MS. KELLY: Objection; scope.
A Uhm, the, for the purposes of this study, uhm, as is stated in this document, 80, 80 milliseconds is the target. And anything greater than that, uhm, I think would be considered or is termed here poor shift.
BY MR. FABRY:
Q And in this study changing seals on the input shaft did not improve the Worse-of-Worst transmission; correct?
A That is correct.
Q Let's go to 32841. And this study has the list of possible components contributing to the 3-5 shift issue been narrowed down to the input shaft, seals and wall surface finish?
MS. KELLY: Objection; scope.
A It says, uhm, because the transmission, a transmission with a 3-5 shift issue could be replicated, our final studies were, were focused on seals and wall surface finish as potential contributors to, you know, based on the BOB-WOW swap, yes.
BY MR. FABRY:
Q Okay. Looking at the chart at 32841, isn't it true

that the shaded areas are indicated to be the components under consideration at this point in the study?

MS. KELLY: Objection; scope.

A Uhm, the, yes. The input shaft, the statement on the bottom, "Input shaft has greatest influence on BOB-WOW swap." And seal and sealing surface grooves were what the team elected to further investigate.

BY MR. FABRY:

Q If we look at 32843. The area of focus at this point in the study is the "Input Shaft Groove Wall Surface Finish." Is that right?

A It is the area of focus because seals had been -- seals, uhm, using different seals, we were unable to improve shift time. So, yes, surface finish then was the only remaining KPIV open for investigation.

Q And thank you for bringing that. What is, what does KPIV stand for?

A Uhm, Key Product Input Variable. It's an acronym for design -- for different design inputs.

Q And at this point, the team is looking at the contact area, peaks on seal and, volume under the contact area of the seal; is that right?

A No. It's looking at the surface finish of the groove wall. Which, in the manufacturing of -- the machining

of these shaft grooves, that groove wall is the same across the entire groove area regardless of the seal.
Q So, where it says here "contact area peaks on seal," what was really intended there was peaks on the shaft?
MS. KELLY: Objection.
BY MR. FABRY:
Q Do you see where I'm at under "Traces, factors that could prevent proper sealing to groove wall"?
A So the contact area is the area where the seal ring groove contacts the, uh, radial wall of that groove.
They are also saying the volume under the contact area, which would be -- it's a volume, so it, uh, for lack of, uhm -- so my interpretation of that is, the volume -- the volume that exists between the seal ID and the groove OD.
Q Let's go to 32851, please. Does this provide a visual depiction of what we're discussing with the Worst-of-Worst seals having a larger volume underneath the seal?
MS. KELLY: Object to the form.
A Yes, the second bullet point, "Volume of oil between seal and the wall." So, yeah, it's, the volume -- I stand corrected. This, this is stating the, uh, volume of oil that is, uhm, in the valleys of a surface. Correction, yeah, of the surface -- of the

radial wall.

BY MR. FABRY:

Q And in this study, a smoother input shaft wall gave Best-of-Best results and the rougher input shaft wall gave Worst-of-Worst results; is that correct?

A Correct.

Q If we go to 32853, "Conclusions" are "Input shaft has largest effect on 3-5 shift. IPS groove wall surface finish is a KPIV."

Did I read that correctly?

A That's correct.

Q And did Ford, as a result of this study, work to improve the smoothness of the input shaft groove wall?

MS. KELLY: Objection; scope.

A The investigation -- there were investigations as to whether the surface finish could be improved.

BY MR. FABRY:

Q And what was the result of the investigations to improve the surface finish?

A The shaft supplier conducted a study on the cutting tool geometry. And it determined that the cutting tool geometry, uhm, resulted in a, a slight improvement in surface finish. However, it was not a tool geometry that could be implemented in, in a cutting operation. Which isn't unusual in a

manufacturing operation.
Q Okay. I understand.
A So if I could add some --
Q Can I just confirm the last point before you add?
A Go ahead, go ahead.
Q The manufacturer of the input shaft was able to improve surface finish?
A Incrementally.
Q However --
MS. KELLY: Let him finish.
BY MR. FABRY:
Q However, the method of improving that surface finish was not something that could be implemented in production manufacturing of input shafts; is that a correct statement?
MS. KELLY: Objection; scope.
A So, the incremental improvement in surface finish achieved by a tool geometry change resulted in a tool life that isn't -- it would not, uh, it wasn't feasible to use. In other words, if you tried to improve -- if you tried to improve the surface finish and the tool you were using to cut broke immediately, regardless of whether you improved that surface finish or not, I think you would agree that, that tool geometry is not, uh, viable for use.

BY MR. FABRY:
Q Okay. Let me just restate to confirm. The input shaft manufacturer was not able to improve surface finish on input shafts for the 10R80 transmission in a way that could be manufactured for production of vehicles; is that a fair statement?
MS. KELLY: Objection; scope.
A They were unable to create a tool geometry that improved the surface finish that was viable.
MS. KELLY: Is this a good time for a break?
MR. FABRY: Sure.
THE VIDEOGRAPHER: Going off the record at 10:18 a.m.
(Recess)
THE VIDEOGRAPHER: We're back on the record at 10:35 a.m.
BY MR. FABRY:
Q Mr. Riley, I am going to hand you Exhibit 125.
A Before you do that, I would just like to clarify for the record the dates on this document, uhm...
Q Let's, let's be clear on the record. We are talking about Exhibit Number 178, Bates Numbers 32829 through 32862.
And, Mr. Riley, you want to clarify your prior testimony regarding this Exhibit?

A Clarify the date on this, yes. The -- so if you look at 32830, and all the pages following that, it says 7-28-2002. So this study actually was completed, to my recollection, in 2019, uhm, and clearly I did not do any additional work in 2022.

Q How is it that you were able to recall that this study was completed in 2019?

A I was a member of this team and also participated in the presentation of this information.

Q So it is purely from memory that you were recalling now that this study was completed in 2019 and presented by you in 2019?

A Yes.

Q When in 2019?

A Uhm, it -- from recollection, it would have been the third quarter of 2019.

Q Is there a reason that Exhibit 178 does not have a project completion date that is accurate on it?

MS. KELLY: Objection.

A It's missing the date.

BY MR. FABRY:

Q Would there be any other records or documents that would allow us to verify the completion date to narrow it down from potentially third quarter of 2019?

A That would be a question for, uhm, a question for

either Shannon or the Black Belt Team. It doesn't have a date on here is all I'm trying to point out.
Q When you say Shannon, that would be Shannon Money?
A Shannon, yeah, Money.
Q And the Black Belt Team is Kara Kennedy, Damien Baldwin and Shannon Money?
A Damien Baldwin would be -- would have been the Master Black Belt for this project.
Kara's -- Kara is a, a Systems Supervisor. Excuse me, she's a Systems Manager.
Q So it -- even though the next page lists a number of names on the team, including you, the Black Belt Team is technically Shannon Money and Damien Baldwin?
A Correct. They are the Black Belts that conducted this study. Is the leaders of this study, if you will.
Q While we're on this, the upper right-hand part of the page says "Design For Six Sigma, 6-Panel." Can you explain what that means, please?
MS. KELLY: Objection; scope.
A Uhm, it's a, this is a, again, PowerPoint template. That title you will see on, uhm, on these types of documents prepared by the, uh, Black Belt Team.
The "Design for Six Sigma" is a term that's been used in the industry for many, many years. Ever since Mr. Deming was introduced to the automotive

industry.

BY MR. FABRY:

Q So as you sit here today, you can't give me any further explanation on the meaning behind "Design for Six Stigma" or the quotation "6-Panel"?

MS. KELLY: Objection; scope.

A So "Design for Six Sigma," it's a, a quality, uh, term that was coined by Dr. Deming, used in the industry quite a bit. Six Sigma is a -- refers to statistical, a specific set of statistical tools for analysis.

BY MR. FABRY:

Q All right. Can we move on to the next exhibit, now?

A Please.

Q Here's Exhibit 125.

MS. KELLY: Sorry.

MR. FABRY: We had it -- gave you a copy yesterday.

MS. KELLY: Oh, thanks.

BY MR. FABRY:

Q Exhibit 125 is Bates Number 68566 through 68570. And if I could direct your attention to the E-Mail from Ken Sovel, and it begins on the first Page 68566 and continues on to 68567.

MS. KELLY: And if you could just wait a moment to ask a question until I find this document in

the stack from yesterday.

MR. FABRY: Of course.

MS. KELLY: Thank you. I have it thank you. And what page did you direct the witness to?

MR. FABRY: 68566.

MS. KELLY: Thank you.

MR. FABRY: First page. E-Mail from Ken Sovel at the bottom of the page.

BY MR. FABRY:

Q Are you with me, Mr. Riley?

A Uh-huh.

Q And if we look at the sentence that begins "OC/32F." Are you with me?

A Yes.

Q 32F, that would represent 32 degrees Fahrenheit, would it not?

A Yes.

Q "120 KPA leak from C to F circuit." What does that mean, please?

A Uhm, that is a calibrator's terminology. That should be -- it's, it's really the pressure in, in circuit C to F. Not a leakage.

Q And the next sentence is "Ratio flares in steady state third." What does that mean, please?

A I would have to defer that to Mr. Sovel. Ratio flares

William Martin "Buzz" Ripley, 30B6

is a, again, usually the pressure variation that calibrators see, uhm, that we've -- and we've discussed before, what that looks like.

Q And then the next sentence is "C leaking into F causing harsh start feel with excess tie-up on 3-4." What does that mean, please?

A So he is referring to the, uh, it's -- it's the C and F hydraulic circuits are rising and falling, uhm, he is seeing a pressure that isn't, uh, a consistent slope in their, in their instrumentation, documentation. And he's, he, uh, is surmising that that is causing a, uh, as he terms it, "excess tie-up on 3-4."

Q Could you explain that terminology; what's an "excess tie-up on 3-4"?

A Uhm, I would have to -- I would have to defer that to, uhm, the calibrators. That is not a term that, uhm, I typically, uh, am aware of. I believe, I believe it is the completion of a shift.

Q And if we go to, continuing the same E-Mail on the next page, the sentence begins "10C;" would you agree that Mr. Sovel had switched to Celsius and that's 10 degrees Celsius?

MS. KELLY: Objection; scope.

A No, it's something -- yes. He has changed his, his

uhm, units of measurement from Fahrenheit to Centigrade but this is a different pressure condition than was previously -- than previous, uh, than we were previously discussing. It went from 120 KPA to 75 KPA.

BY MR. FABRY:

Q Understood. I was just asking you about the very first letters there.

A It appears that he is changed his unit of measurement for temperature from Fahrenheit to Centigrade.

Q And 10 degrees centigrade is the equivalent to 50 degrees Fahrenheit; is that correct?

MS. KELLY: Objection; scope.

A Yes.

BY MR. FABRY:

Q Thank you. The sentence continues, "C losing 75 KPA into F circuit." Could you explain what that means, please?

MS. KELLY: Objection; scope.

A Uhm, it's again a, a description of -- I don't see the events here, so, I'm not familiar with losing. It kind of is describing information from a, a calibration instrumentation data graph.

BY MR. FABRY:

Q The next sentence is "C leaking into F causing

overboost and harsh apply."

Could you explain what that means, please?

MS. KELLY: Objection.

A It is a, uhm, it is a description of, uhm, what's going on is instrumentation in the transmission. I am not a, I'm not a Systems or Calibration Engineer. So these terms, uhm, if you are looking for clarification, should be discussed with Systems and Calibrators. They are not component engineering terminology.

BY MR. FABRY:

Q Is C leaking past the seal into F at 50 degrees causing overboost in a harsh application of the shift?

MS. KELLY: Objection; scope. The witness has repeatedly indicated that these are outside the scope of his testimony.

MR. FABRY: Yeah, I guess if you keep telling him it's outside of his scope, then he'll keep repeating that, won't he.

MS. KELLY: Objection.

BY MR. FABRY:

Q Do you need me to repeat the question?

A He's, he's, he's describing, uhm, an event from his, uh, from his, uh, data. That's what he is doing.

Q And is the --

A Beyond that, beyond that I am not qualified to -- I don't work in the calibration or systems engineering realm. So to, to be very clear, they are the people that would have to respond to those questions.

MS. KELLY: I would like to just make a statement to address your accusation. In fact, I did not make a scope objection when you first started questioning the witness and did not make a scope objection until the witness himself made clear that this was outside the scope of seals.

MR. FABRY: Have you finished?

MS. KELLY: I have, thank you.

MR. FABRY: Thank you.

BY MR. FABRY:

Q Is there a seal between C and F, Mr. Riley?

A C and F is a circuit, hydraulic circuit as I understand it.

Q Is there a seal between C and F?

A Uhm, C and F are -- so from the sealing standpoint of view, these are hydraulic circuits. There are seals in those hydraulic circuits, yes.

Q And is Mr. Sovel indicating that in his testing there is leakage past the seal between C and F causing overboost in harsh apply?

MS. KELLY: Objection.

William Martin "Buzz" Riley, 30B6

A He is, uh, surmising that leakage is occurring, uhm -- his data is based on pressure, not actual leakage, not actual leak measurements. In the component world, uhm, in the, in the testing that is done on seals, uhm, we measure leakage. And as we provided information yesterday that, uhm, that leakage is, uhm, close to zero in most of these applications.

BY MR. FABRY:

Q Let's go to Exhibit 124, please. I don't believe we used this one yesterday and I only have the one copy for the witness.

MS. KELLY: Give us a moment so we can pull up the document.

MR. FABRY: Of course. For the record Exhibit 124 is Bates Numbers 68554 through 68557.

May I proceed?

MS. SCHEBEL: I haven't sent it yet. It is just going through cyberspace.

MS. KELLY: Thanks. You can go ahead.

BY MR. FABRY:

Q Mr. Riley, if we look at 68554, bottom of the page, there's an E-Mail from you dated February 13, 2020. You with me?

A Yes.

Q The E-Mail goes over to the following page. Starting

at the beginning is the statement, "After four years of stating that this is a seal ring issue, perhaps it is time to step back and ask what other components or design issues in the system might be causing the intermittent crosstalk hydraulic circuit shift issues."

Did I read that correctly?

A You did.

Q And does Ford agree that as of February 13, 2020, there were intermittent shift issues occurring in the 10R80 transmission?

MS. KELLY: Objection; scope.

A No. The statement is very clear, uhm, and the calibrators and I were very clear in these, in just looking through these E-Mails. This is intermittent crosstalk. Not -- that doesn't imply that it's causing a shift quality issue. This is a, this is again more discussion, as I shared with you of, uh, engineering teams working towards perfection. Not necessarily addressing an issue. Not necessarily working on a, an issue.

BY MR. FABRY:

Q The first bullet point is, "Seal ring designs were optimized four years ago to reduce seal ring leakage from 100 milliliters minimum to zero milliliters

William Martin "Buzz" Ripley, 30B6

minimum across all temperature pressures."
Did I read that correctly?
A That is -- yes -- that is the work that was done for solid seal optimization we discussed yesterday. Part of the, on the -- part of the Ford 10R80 DVP&R or DVP&R component engineering.
Q The next bullet point is, "There is no difference in seal ring performance between PTFE, PEEK or PA."
Did I read that correctly?
A Correct.
Q And I don't believe we've discussed PA. What is PA?
A PA is polyacrylate, commonly known as nylon.
Q When were PA, or what is commonly known as nylon, seals investigated with respect to the 10R80 transmission?
A Uhm, so the question from the Systems, the systems and calibrators, uh, has always been on all -- any other, uh, design changes that could be explored for seals. PEEK was a discussion for seal material candidates ever since the, the uh, first discussions of, of, uhm, 10R80 transmissions because some, some people have experienced with PEEK seal rings and some don't.
PA is the material we talked about yesterday where FNOK came up with a new novel material for seal rings. Uhm, it was investigated and not pursued by

Ford because it did not offer any performance improvement.

Q And, in fact, if I remember the discussion correctly, that new material had increased leakage over the solid rings that were in the production 10R80 transmission; is that right?

A That's correct. The, uh, data was based on -- just for clarification -- the performance data was based on component level testing.

Q The next bullet point is, "There is no physics based analysis that explains why the seal ring systems randomly leak then suddenly stop leaking during a crosstalk hydraulic event."

Did I read that correctly?

A That's correct.

Q Do you agree on behalf of Ford that seal ring systems in the 10R80 transmission as of February 2020 randomly leaked then stopped during a crosstalk hydraulic event?

MS. KELLY: Objection.

A As I've, as I've clarified, randomly leaked is a term that the calibrators use. But what they are actually measuring is pressure. In the component level testing that was conducted, we do not see this pressure change, and therefore, it's -- we, uh, we, as

component engineers are, are questioning whether it's an actual physical fluid leak as one would say or, uhm, not. So I'm using the word leak in my E-Mail simply as, that's, that's the terminology that my audience is using.

So, again, we're referring to this crosstalk event where pressure, for a very brief period of time, momentarily increases or decreases by a small amount of pressure.

BY MR. FABRY:

Q The next bullet point is, "Seal ring interface optimization did not improve shift performance in either the 10R80 or 10R140."

Did I read that correctly?

A Correct.

Q And the E-Mail goes on to suggest that, quote, "Continued focus on seals may not get us the solution we have all sought."

Did I read that correctly?

A Correct.

Q And has Ford looked elsewhere regarding this shift issue since February 13, 2020?

MS. KELLY: Objection.

A Uhm, I'm not -- I'm not at -- employed at Ford after this, this month.

BY MR. FABRY:
Q You are Ford's --
A Correct, but --
MS. KELLY: Let him finish his answer, please.
A So I was, if I could finish, I was going to say, yes, we had the discussion with Nick where they are looking at, if increasing the interference on the seal ring addresses this crosstalk pressure fluctuation, if you will, that the calibrators have been observing.
BY MR. FABRY:
Q Does Ford believe that reflashing the 10R80 transmission will resolve the seal ring systems on the 10R80 that randomly leak then stop during a crosstalk hydraulic event?
MS. KELLY: Objection; form; scope.
A I don't believe the data supports that. The reflash of the, uhm, TCM adaptive learning tables is, uhm, a shift strategy not -- and it's not a, it is -- I -- I don't believe it has any impact on this crosstalk issue, and we have no data that exhibits or ever suggested that.
BY MR. FABRY:
Q Matter B for the deposition today is the "Effective vibrations within the transmission from rotating

components and road surface roughness on the seals' ability to maintain pressure."

What, if anything, has Ford done to investigate the effect of vibrations within the 10R80 transmission from rotating components on the seals' ability to maintain pressure?

A I would have to say extensive. Uhm, so we have all of the, all of the component level testing done on, on, uh, bench testing. We have all of the transmission testing that's done during validation and bench testing. And then you have all of the vehicle level testing conducted. I am -- I am unaware of any vibration event, as you describe it, resulting in a shift, uh, quality issue or a completing a shift.

Q Okay. As a point of clarification, when you say "I am unaware" are you testifying that Ford is unaware of any vibration issue impacting the ability to maintain pressure in the 10R80 transmission?

A Yes.

Q And the second part of Matter B is, relates to road surface roughness?

A Uh-huh.

Q May very well be the same answer, but I just want to be thorough on this. What, if anything, has Ford done to investigate the effect of road surface roughness

vibrations on the 10R80 transmission ability to seal and maintain pressure?

A So in vehicle level testing Ford conducts -- and these transmissions are now in multiple vehicles. They have gone through vehicle level testing done on all, uh, types of surfaces that the particular vehicle could be, uh, uh, used on, uhm, and there's been no, no documentation of any event that would cause that.

In addition to that, I will just share that both the engine and transmission are isolated in these vehicles, uhm, as, as I think most every modern vehicle architecture includes, they are isolated with, uh, Elastomeric mounts that are intended to isolate the road-borne vibration.

Q Does Ford agree as a matter of general engineering principles that vibrations within an automatic transmission can affect the seals' ability to maintain pressure?

A Theoretically, uhm, a vibration event that would cause a seal to leak, uhm, it would be very noticeable to anybody. So, just trying to give you the information to say that vibrations in, in the 10R80 transmission, it's certainly never been, uh, we've certainly never seen any seal leakage of any type from any seal that would have resulted in a leak and requiring it to be

investigated.

Q Matter C is "The effect on the seals' ability to achieve and maintain pressure during flexing of the input shaft due to its length, material properties, and the several passages drilled along its axis."

What if anything has Ford done to investigate the effect of flexing of the input shaft on the seals' ability to achieve and maintain pressure in 10R80 transmissions?

A Uhm, so, the shaft in DVP&R and the Shaft Engineers should be consulted on the specific tests that are done to ensure shafts do not flex and, uh, deflect and things of that nature.

From a sealing standpoint of view, Seal Engineers regularly participate in teardowns of transmissions. And one of our, one of our requirements is to inspect seals and their interfaces for evidence of wear which, in this case, uh, a deflection or vibration, if you will, would have -- it would have -- the reason why we do that is to determine is there any of those conditions in existence.

To, to -- during my tenure on that 10R80 transmission, I personally inspected hundreds of these seals, specifically the seal rings. They contain no

wear. They contain no wear on their sealing surfaces.
So there's no, uh, there's no, uh, engineering data
that would support that, this condition that you are
concerned about of, of occurring.
Q Does Ford agree as a matter of a general engineering
principle that flexing of the input shaft can
negatively affect the seals' ability to achieve and
maintain pressure in an automatic transmission?
MS. KELLY: Objection.
A Uhm, that's a -- so, shaft deflection is, uhm, clearly
not a condition you want to have. You -- I believe
the question should be posed to the Shaft Engineers
who are responsible for those components.
BY MR. FABRY:
Q Well, the question is about sealing. And I actually
think we agree on this one, when you are explaining
deflection and searching for wear?
A Yes.
Q Okay.
A We're looking --
MS. KELLY: Let him finish his question.
BY MR. FABRY:
Q Maybe I just change the terminology a little bit.
Does Ford agree that deflection of the input shaft can
cause wear on seals that negatively affects the seals'

ability to achieve and maintain pressure in an automatic transmission?

MS. KELLY: Objection.

A So, the -- it -- we do not want to see shaft deflection. To prevent wear, which, uhm, which -- whether that wear is to the degree of causing a pressure loss or not. Again, that's on open-ended question in that respect.

So, yes, to wear, we, we do not want to see wear in these components from shaft deflection.

BY MR. FABRY:

Q Can shaft deflection cause leakage past seals before there's an actual visible wear on the seals?

MS. KELLY: Object to the form.

A The answer to that is no. Uhm, in the respect that in the design of these systems and components, the, the shaft is supported in multiple locations with bearings to, uhm, to, uh, ensure that deflection is not occurring. And again, to the extent of deflection, if it -- in order for it to have an impact on wear, it has to be pretty severe.

So the, the discussion of shaft deflection, uhm, is uh, is something that has never been observed, uhm, in the teardowns.

BY MR. FABRY:
Q Matter D is "The ability of the main fluid pump to deliver sufficient fluid volume to cause seals to shuttle or move axially within their bores to create a seal against the groove surface when three or four clutch hydraulic circuits are being pressured (sic) simultaneously."
What, if anything, did Ford do to investigate the ability of the main fluid pump in the 10R80 transmission to deliver sufficient fluid volume to cause seals to shuttle within their bores to create a seal against the groove surface when there or four clutch hydraulic circuits are being pressured (sic) simultaneously?
A So with respect to pumps, uhm, pump capacity, that again is a question to Pump Engineers. Uhm, certainly pump capacity is the consideration in any transmission design. Uhm, I, I have never -- never been, uhm, to the best of my knowledge, there's never been a shift event that occurred that was the cause of insufficient pump capacity.
And as you can see in the documentation we've, we've, we've looked at engineering data extensively. That, that, that event has never been documented.

Q And just to confirm, because you said to the best of, I believe you said to the best of my knowledge?
A As a Ford representative, yes. Thank you.
Q Okay. Uhm --
A I apologize for using that term, uhm, today. Yes.
Q So let me just confirm it and get it clear on the back-and-forth. Okay?
A Yeah.
Q Ford has never seen a shifting event that was caused by insufficient fluid volume to the seals; is that correct?
A That is correct.
Q Does Ford agree that, as a general engineering principle, that insufficient fluid volume will prevent seals from shuttling and sealing as needed in an automatic transmission?
MS. KELLY: Object to the form.
A It is not insufficient volume. It is insufficient pressure.
BY MR. FABRY:
Q And then let me rephrase the question to correct it.
Does Ford agree that insufficient fluid pressure will prevent seals from shuttling and sealing as needed in an automatic transmission?
MS. KELLY: Object to the form.

A Correct.

MR. FABRY: Can we take a short break?

MS. KELLY: Sure.

THE VIDEOGRAPHER: Going off the record at 11:20 a.m.

(Recess)

THE VIDEOGRAPHER: For those on Zoom, we're about to go on the record.

We're back on the record at 11:37 a.m.

BY MR. FABRY:

Q Mr. Riley, do you recall we talked a little bit today and a little bit more yesterday about TSBs, Technical Service Bulletins?

A Yes.

Q And what is the required basis at Ford for issuing a TSB?

MS. KELLY: Objection; scope. Outside the scope of Topic 7.

A I don't have anything to do with whether a TSB is issued or not.

BY MR. FABRY:

Q Have you ever participated in developing, uhm, any aspect of a TSB?

MS. KELLY: Objection; scope.

A Uhm, no. Other than providing engineering

information, no. TSB is something that's typically handled with Systems Engineering and with, uhm, with our Service Engineering groups.

BY MR. FABRY:

Q Okay. Would you take a look at Exhibit 124 again for a moment?

A Uh-huh.

Q And would it be fair to say that this E-Mail chain involves asking about looking at seals yet again in the 10R80 transmission?

MS. KELLY: Object to form.

A It is calibrators, again, expressing their, uhm, opinions that seal rings are what is causing their crosstalk event.

BY MR. FABRY:

Q And you respond telling everyone in no uncertain terms that everything that could be tried regarding seals has been tried and there's nothing else to be done with seals, they should be looking elsewhere. Is that correct?

MS. KELLY: Object to the form.

A I reviewed all of the -- my, my E-Mail is a response to, uhm, Todd Newman and Ken Sovel and others that reiterates that, uhm, after four years of investigating this crosstalk event during, during a

shift, corrective actions, uhm, that I'm reviewing here that we have done have resulted in no change. So I am asking, should we be looking for something, at something else, or some other root cause. Yes.

BY MR. FABRY:

Q And as I understand your testimony today, when you state that -- you've stated that when you use the term crosstalk hydraulic shift issues, you didn't really mean shift issues; and when you say leak, that doesn't really mean leak, you were tailoring your terminology to the calibrators. Did I understand that testimony correctly?

MS. KELLY: Objection.

A I was sharing with you that calibrators using the term leakage, uhm, is, uh, it is not a physical measurement of leakage. They are referring to pressure. That's what their data is based on their pressure, is pressure.

BY MR. FABRY:

Q And why didn't you in this E-Mail or -- why didn't you in this E-Mail correct the terminology of the calibration people so that the engineers could be speaking essentially the same language on this issue?

MS. KELLY: Objection.

A Uhm, so the calibrators have been using this

terminology leakage for many years. And as you've seen in the documentation. I'm just clarifying that when they see leakage, the actual measurement of leakage that they're referring to. After spending years on -- with my Calibration Team and when they refer to a leak, uhm, leakage event, uhm, they certainly been -- we've certainly corrected that in our discussions.

Sometimes you can't get somebody to change the way they, they talk. I'll leave it at that. We understand what we're talking about.

MR. FABRY: All right. Thank you, Mr. Riley. I don't have any further questions for you today.

MS. KELLY: Okay. Let's take a short break please. Just five minutes.

THE VIDEOGRAPHER: Going off the record at 11:43 a.m.

(Recess)

THE VIDEOGRAPHER: We're about to go on the record for everyone on Zoom.

We're back on the record at 11:50 a.m.

MS. KELLY: I just have a few questions for you, Mr. Riley.

CROSS-EXAMINATION

BY MS. KELLY:

Q Staying on Exhibit 124 that we were just discussing, do you recall that you were asked earlier about whether a reflash addressed the seal ring systems randomly leaking and then suddenly stopping leaking during a crosstalk hydraulic event?

A I do.

Q Do you believe that any TSB or any corrective action was necessary to address the seal ring systems randomly leaking and suddenly stopping leaking during a crosstalk hydraulic event?

A Uhm, I don't do -- I do not believe that a TSB or any corrective actions are going to address this crosstalk event as, as we've reviewed the data and the efforts on, uh, many engineers to address that.

Q Do you believe that a TSB or any corrective action was necessary to address any seal issues related to shift quality?

A No.

Q Why not?

A Uhm, the seal designs as, again, as we've reviewed, seal designs and the seal performance, uhm, has, has uhm, has provided, uh, has provided customers with shift quality that, uhm, has, has met the

requirements.
Q Do you believe that the seal designs or seal performance, uhm, have had any negative impact on shift quality?
A No.
Q And why not?
A There's no data to support that shift quality has been adversely impacted by the seal systems -- sealing systems designs.
Q Do you believe that the seal designs and seal performance have, in fact, been optimized by Ford?
MR. FABRY: Objection; leading.
A Yes, uhm, I believe I stated that to my, to -- certainly to my memory -- my colleagues in Ford in writing.
MS. KELLY: Nothing further.

REDIRECT EXAMINATION

BY MR. FABRY:
Q Mr. Riley, on the break, did you prepare those answers to those questions?
MS. KELLY: Objection.
A No.
MR. FABRY: We have nothing further. Thank you.
THE VIDEOGRAPHER: This concludes the

deposition. We're going off the record at 11:52 a.m.

CERTIFICATE OF NOTARY

STATE OF MICHIGAN )
) SS
COUNTY OF OAKLAND )

I, Robin D. Gadwa, Certified Shorthand Reporter, a Notary Public in and for the above county and state, do hereby certify that the above deposition was taken before me at the time and place hereinbefore set forth; that the witness was by me first duly sworn to testify to the truth, and nothing but the truth, that the foregoing questions asked and answers made by the witness were duly recorded by me stenographically and reduced to computer transcription; that this is a true, full and correct transcript of my stenographic notes so taken; and that I am not related to, nor of counsel to any of the parties, nor interested in the event of this cause.



ROBIN D. GADWA, CSR-2607, RPR, FPR, FAPR
Notary Public
Oakland County, Michigan
My commission expires: 12-08-2026