**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **JUSTIN O'CONNOR, et al.,** on behalf of himself and all others similarly situated, | ) ) ) | |
| | ) | |
| **Plaintiffs,** | ) | **No. 19-cv-5045** |
| | ) | |
| v. | ) | **Judge Jeffrey I. Cummings** |
| | ) | |
| **FORD MOTOR CO.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiffs Michael Barcelona, Susan Heller, Bryan Smith, Jason Steen, and Stanislaw Zielinski (collectively, "plaintiffs") bring this putative class action against defendant Ford Motor Company ("defendant" or "Ford") for damages allegedly arising out of defendant's sale and lease of 2017 to 2020 Model Year Ford F-150 trucks with defective 10-speed automatic transmissions. The parties have filed competing motions for class certification and for denial of class certification, along with a panoply of motions seeking to exclude certain expert testimony pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals*, *Inc.*, 509 U.S. 579 (1993).

In this Opinion, the Court addresses the pending *Daubert* motions targeting the parties' technical experts, namely defendant's motion to exclude the testimony of Michael Stapleford, (Dckt. #296), and plaintiffs' motions to exclude the testimony of Matthew Fyie, (Dckt. #282), and Casey Wagoner, (Dckt. #286).[1] For the reasons set forth below, defendant's motion to

---

[1] A listing of all filings related to these motions can be found in the parties' February 12, 2025 joint status report, (Dckt. #421).

exclude the testimony of Michael Stapleford, (Dckt. #296), is granted in part and denied in part; plaintiffs' motion to exclude the testimony of Matthew Fyie, (Dckt. #282), is denied; and plaintiffs' motion to exclude the testimony of Casey Wagoner, (Dckt. #286), is granted.

## I.    RELEVANT BACKGROUND[2]

Again, plaintiffs Barcelona, Heller, Smith, Steen, and Zielinski bring this putative class action on behalf of all similarly situated individuals who purchased or leased Ford's 2017 to 2020 Model Year F-150 trucks equipped with a 10-speed "10R80 Transmission" that suffers from an alleged defect (hereinafter, the "Class Vehicles").  According to plaintiffs, from the beginning of Ford's development of its 10R80 Transmission – which served to replace Ford's 6-speed "6R80 Transmission" – "Ford has been aware of harsh, jerky, erratic, lunging, hesitating, and otherwise inconsistent shifting in the 10R80 Transmission, but has been unable to resolve these malfunctions caused by the 'Defect.'"  (Dckt. #325 at 8).  In plaintiffs' view, "the Defect is the inability of the Transmission's internal seals to maintain the intended and necessary pressure on either side of the seal to ensure secure and timely engagements of each clutch required for a specific gear."  (Dckt. #325 at 8).  For its part, Ford denies that there is any such defect in its 10R80 Transmission.

In their pending motion for class certification, plaintiffs ask the Court to certify a class on behalf of similarly situated individuals in their respective states, *i.e.*, Massachusetts (Barcelona), New York (Heller), California (Smith and Steen), and Zielinski (Illinois).  Specifically, plaintiffs seek to represent:

> All persons in [**STATE**] who formerly or currently own or leased one or more 2017-2020 Model Year F-150 truck equipped with a 10R80 10-speed automatic transmission.

---

[2] The Court presumes familiarity with the facts of this case and includes only those facts that are relevant to the *Daubert* motions currently before the Court.

(Dckt. #325 at 8-9). On behalf of these putative class members, plaintiffs bring claims for breach of implied and express warranty, fraudulent omission, and violation of consumer protection statutes.

In their competing submissions regarding class certification, the parties vehemently dispute (among many other disputes) whether plaintiffs have adduced evidence sufficient to show that the Class Vehicles suffer from a common defect to satisfy the requirements for class certification under Rule 23. In support of their positions, the parties rely heavily on their respective technical experts and they seek to exclude, in whole or in part, the opinions of the other side's experts.

## II. LEGAL STANDARD

The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *See Haley v. Kolbe & Kolbe Millwork Co.*, 863 F.3d 600, 611 (7th Cir. 2017). Pursuant to Rule 702,

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Rule 702 delegates to district courts the responsibility of ensuring that expert testimony is both reliable and relevant. *Daubert*, 509 U.S. at 598. When fulfilling this gatekeeping role, courts in the Seventh Circuit evaluate: "(1) the proffered expert's *qualifications*; (2) the *reliability* of the

3

expert's methodology; and (3) the *relevance* of the expert's testimony." *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017) (emphasis added).

Regarding the first prong, a witness may be qualified to testify based on relevant knowledge, skill, experience, training, or education. Fed.R.Evid. 702, advisory committee notes. "The Court 'must look at each of the conclusions [an expert] draws individually to see if he has the adequate education, skill, and training to reach them.'" *Webster Bank, N.A. v. Pierce & Assocs. P.C.*, No. 16-cv-2522, 2020 WL 616467, at *3 (N.D.Ill. Feb. 10, 2020), *quoting Hall v. Flannery*, 840 F.3d 922, 926 (7th Cir. 2016). As to the second prong, expert opinions are sufficiently reliable when they are based on sound methodology and can be properly applied to the facts. *Daubert*, 509 U.S. at 592-93. This inquiry is "'necessarily flexible' and the court has broad latitude in its determination of reliability." *Est. of Damiani v. Allen*, 4:16-cv-00053-RLY-DML, 2018 WL 4095080, at *5 (S.D.Ind. Aug. 28, 2018), *quoting Robinson ex rel. Irwin v. City of Madison*, No. 15-cv-502-jdp, 2017 WL 564682, at *8 (W.D.Wisc. Feb. 13, 2017). Finally, to be relevant, expert testimony must "help the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702.

The proponent of the expert bears the burden of establishing the admissibility of his opinions by a preponderance of the evidence. *Varlen Corp. v. Liberty Mut. Ins. Co.*, 924 F.3d 456, 459 (7th Cir. 2019); Fed.R.Evid. 702. Whether to admit expert testimony rests within the discretion of the court. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997). Importantly, "[t]he rejection of expert testimony is the exception rather than the rule." *Joseph v. Carnes*, No. 13-CV-2279, 2015 WL 2091903, at *1 (N.D.Ill. Apr. 30, 2015), *quoting Spearman Indus. v. St. Paul Fire & Marine Ins. Co.*, 128 F.Supp.2d 1148, 1150 (N.D.Ill. 2001).

When an "expert's report or testimony is critical to class certification," the district court "must make the necessary factual and legal inquiries and decide all relevant contested issues prior to certification." *Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 815, 817 (7th Cir. 2010). "An expert's testimony is critical if it is 'important to an issue decisive for the motion for class certification.'" *In re Turkey Antitrust Litig.*, No. 19 C 8318, 2025 WL 264021, at *7 (N.D.Ill. Jan. 22, 2025), *quoting Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 812 (7th Cir. 2012). Because the opinions of the technical experts are critical to the parties' dispute regarding whether a common defect in the Class Vehicles supports class certification, the Court proceeds with a full analysis of the parties' putative technical experts under *Daubert* and Rule 702 prior to certification.

## III. ANALYSIS

### A. Defendant's Motion to Exclude the Testimony of Michael Stapleford

In support of their position that the Class Vehicles suffer from a common defect, plaintiffs retained mechanical engineer Michael Stapleford to provide forensic consulting services to investigate plaintiffs' complaints of vehicle malfunctions related to the 10R80 Transmission. (Dckt. #296-2 at 3). Ford now seeks to exclude certain of Stapleford's opinions as unreliable and/or inadmissible *ipse dixit*[3] or state of mind testimony. For the reasons that follow, Ford's motion, (Dckt. #296), is granted in part and denied in part.

#### 1. Stapleford's Experience and Expert Reports

Stapleford holds a Bachelor of Science in mechanical engineering from California State Polytechnic University and, since 2010, has served as the president of JCB Engineering

---

[3] *Ipse dixit* has been defined as "[s]omething asserted but not proved." *Ipse dixit*, Black's Law Dictionary (11th ed. 2019).

Consultants, Inc. (Dckt. #296-2 at 29). Stapleford's professional experience includes "failure analysis and testing for motor vehicle system functionality, structural integrity, and vehicle safety." (*Id*. at 4). Stapleford regularly test drives cars and trucks and testifies in legal proceedings as to the condition of vehicle systems, including the transmission. (*Id*.). Part of Stapleford's practice is to "test the performance of the vehicle, how the vehicle responds to a driver's inputs, and whether poor performance or response of the vehicle systems constitutes a safety hazard." (*Id*.).

Plaintiffs retained Stapleford to investigate their complaints of "malfunctions of the 10R80 transmissions that affect drivability and safety," including "early shifting, delayed shifting, surging, shift-shock (a harsh 'bump' or 'bang'), or clunk, during up-shifting and down-shifting, as well as gear-hunting (where the transmission continues to shift gears and cannot hold a particular gear)." (*Id*. at 3). Plaintiffs also asked Stapleford to determine a "reasonable and logical way of removing the Defect [i.e., the 10R80 Transmission] from the Class Vehicles, and to estimate the cost of doing so." (*Id*. at 25). To accomplish these tasks, Stapleford reviewed discovery documents, including Ford's internal documents and deposition transcripts, and reviewed various online sources, including listings for costs of transmission parts, and YouTube videos of 10R80 Transmission re-builds posted by mechanics and repair shops. (*Id*. at 36-45).

Stapleford also performed vehicle testing and test drives on the F-150 trucks owned by plaintiffs Steen, Smith, and Barcelona. For each of the test drives, Stapleford set up GoPro cameras to capture various views during the drive (*e.g.*, the driver's right foot, the instrument cluster, and/or out the windshield). (*Id*. at 11). Stapleford also connected each truck to a Ford IDS diagnostic system through the Diagnostic Link Connector. (*Id*.). During each test drive, Stapleford recorded certain data through the "Datalogger" function of the IDS system, including

accelerator pedal position, engine load, engine RPM, vehicle speed, gear commanded, and current gear engaged. (*Id*. at 11-12). According to Stapleford, he was able to replicate each of the plaintiffs' malfunction complaints during the test drives of their vehicles. Specifically, each truck experienced symptoms of lagging and surging, delayed shifting, gear hunting, and shift-shock, albeit it to varying degrees, and he included in his opening report specific data from the Datalogger that he maintains corroborates the symptoms he observed. (*Id*. at 11-19).

Based on Stapleford's experience, research, review of documents, particularly Ford's own internal documents, and test drives, he offered the following opinions (in his report and at his deposition) relevant to Ford's motion to exclude:

(1) "There is evidence to support that vibrations . . . are causing intermittent or random leakage in seals," (Dckt. #296-2 at 24), which in turn, "is the mechanism that results in . . . the shifting concerns." (Dckt. #296-4 at 247) (hereinafter, the "**Defect Opinion**").[4]

(2) "The defects of the 10R80 transmission cause malfunctions in the operation of the transmission that can present safety issues for drivers of Class Vehicles, such as giving the feeling of loss of power during delayed shift events, making it difficult to maneuver in crowded traffic conditions, as well as giving the false impression of being struck by another vehicle during shift shock events." (Dckt. #296-2 at 27) (hereinafter, the "**Safety Opinion**").

(3) "It is evident from Ford's internal documents and witness testimony that Ford was aware of issues related to leakage of seals in the 10R80 transmission, and vibrations along the main shaft, and that these caused the kinds of malfunctions experienced by Plaintiffs, throughout the development of the 10R80, and even after its release to the market." (Dckt. #296-2 at 19) (hereinafter, the "**Knowledge Opinion**").

(4) A "reasonable and logical way of removing the Defect from the Class Vehicles," is to "retrofit Class Vehicles with the 6R80 Transmission." (Dckt. #296-2 at 25) (hereinafter, the "**Replacement Opinion**").

---

[4] This is *Ford's* description of Stapleford's Defect Opinion in its motion to exclude, however, as argued by plaintiffs, and explained in more detail below, *infra* at III(A)(3), this description misrepresents the full nature of Stapleford's Defect Opinion.

(5)    The estimated cost of replacing the 10R80 Transmission with the 6R80 Transmission is $7579.79 for 2WD trucks and $8938.24 for 4WD trucks. (Dckt. #296-2 at 25) (hereinafter, the "**Cost Opinion**").

Stapleford also prepared a rebuttal report, (Dckt. #296-3), in response to the opening report of Ford's technical expert Matthew Fyie. In addition to refuting Fyie's findings, Stapleford reiterated his Defect and Safety Opinions in his rebuttal report.

In its motion to exclude, Ford does not argue that Stapleford is unqualified or that his report is irrelevant. Instead, Ford asks the Court to exclude each of Stapleford's opinions, arguing that they are either unreliable, and/or inadmissible *ipse dixit* or state of mind testimony. Because Ford's arguments primarily fall under the reliability prong, the Court begins there.

### 2.    Standard for Determining the Reliability of Expert Testimony

Under Seventh Circuit precedent, "courts should evaluate the reliability of a qualified expert's testimony by considering, amongst other factors: (1) whether the proffered theory can be and has been tested; (2) whether the theory has been subjected to peer review; (3) whether the theory has been evaluated in light of potential rates of error; and (4) whether the theory has been accepted in the relevant scientific community." *Gopalratnam*, 877 F.3d at 779 (cleaned up). The Seventh Circuit has also endorsed six additional factors from the advisory notes of the 2000 amendment to Rule 702, that bear on the reliability of an expert's testimony, namely:

(5) whether maintenance standards and controls exist; (6) whether the testimony relates to matters growing naturally and directly out of research they have conducted independent of the litigation, or developed expressly for purposes of testifying; (7) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion; (8) whether the expert has adequately accounted for obvious alternative explanations; (9) whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting; and (10) whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.

*Gopalratnam*, 877 F.3d at 779-80.  It is well-settled, however, that "this list is neither exhaustive nor mandatory."  *Id*. at 780; *see also Krik v. Exxon Mobil Corp.*, 870 F.3d 669, 674 (7th Cir. 2017) ("Despite the list, we have repeatedly emphasized that no single factor is either required in the analysis or dispositive as to its outcome.") (cleaned up).  "Instead, 'a trial court *may* consider one or more of the more specific factors that *Daubert* mentioned when doing so will help determine that testimony's reliability.'"  *Gopalratnam*, 877 F.3d at 780 (emphasis in original) (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999)); *see also Krik*, 870 F.3d at 674 ("The district court may apply these factors flexibly as the case requires.").

Ultimately, the focus in a *Daubert* inquiry "must be solely on principles and methodology, not on the conclusions that they generate."  *Daubert*, 509 U.S. at 595; *see also Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 806 (7th Cir. 2013) ("Reliability . . . is primarily a question of the validity of the methodology employed by an expert, not the quality of the data used in applying the methodology or the conclusions produced.").  "The district court usurps the role of the jury, and therefore abuses its discretion, if it unduly scrutinizes the quality of the expert's data and conclusions rather than the reliability of the methodology the expert employed."  *Manpower*, 732 F.3d at 806.

"This is not to say that an expert may rely on data that has no quantitative or qualitative connection to the methodology employed."  *Id.* at 808.  As the Seventh Circuit elaborated in *Gopalratnam*,

> Rule 702 explicitly requires that expert testimony be "based on sufficient facts or data."  In the "quantitative" sense, sufficient facts or data means that the expert considered sufficient data to employ the methodology . . .  To be "qualitatively" adequate, an expert must employ those kinds of facts or data on which experts in the field would reasonably rely.  We have recognized that the line between conclusions and methodology is not always an easy line to draw.  Conclusions and methodology are not entirely distinct from one another.  Trained experts commonly extrapolate from existing data.  Nevertheless, the critical inquiry is whether there is

9

a *connection* between the data employed and the opinion offered; it is the opinion connected to existing data only by the *ipse dixit* of the expert that is properly excluded under Rule 702. Said another way, there must be a rational connection between the data and the opinion.

877 F.3d at 781 (cleaned up with internal quotations and citations omitted).

### 3.    Ford's Motion to Exclude Stapleford's Defect Opinion is Denied.

Ford first argues that Stapleford's Defect Opinion must be excluded as unreliable. According to Ford, Stapleford opined in his opening report that "there are 'defects in the design' of the 10R80, without identifying a single root cause." (Dckt. #297 at 7). In Ford's view, it was only at his deposition when Stapleford "offered a new theory on the 'root cause' of the alleged shifting, when he opined that '*vibration* is causing the leakage.'" (*Id*.). Ford now asks the Court to exclude this vibration-related Defect Opinion because it is (1) unreliable; and (2) Stapleford failed to disclose the Defect Opinion in his expert reports. The Court quickly disposes of the latter objection and, like plaintiffs, finds that Ford's reliability objection is premised on its mischaracterization of Stapleford's report and deposition testimony with respect to his Defect Opinion.

To begin, whether under Ford's or plaintiffs' representation of Stapleford's Defect Opinion, there can be no dispute that in his opening report Stapleford specifically opined regarding the "effect of *vibration* in seal leakage and shift quality." (Dckt. #296-2 at 24 ("There is evidence to support that vibrations of the rotating components and assembles inside the transmissions are causing intermittent or 'random' leakage in seals"); *id*. at 8-9 (discussing vibrations)). Thus, Ford's argument that Stapleford failed to include his vibration-related Defect Opinion in his expert disclosures is simply incorrect.

Next, like plaintiffs, the Court finds that Ford misrepresents Stapleford's Defect Opinion as relating *solely* to vibrations. Instead, Stapleford's report – and subsequent deposition

testimony – identify vibration as just one of several factors contributing to plaintiffs' shifting problems. As plaintiffs describe in their motion for class certification, Stapleford opines in his report that:

> Leakage of hydraulic seals mounted on the mainshaft (which Ford calls the input shaft, or IPS) [is one of the issues apparent on the 10R80 that are causing the malfunctions suffered by Plaintiffs, and that,] Leaking seals allow the pressurized hydraulic fluid – or "oil" – to escape from the hydraulic circuit that the TCM/PCM is using to engage or disengage a gear, which both reduces the amount of oil and pressure available on that circuit and adds oil and pressure to a different circuit that the TCM/PCM does not intend to pressurize. The clutches then engage and disengage gears at an unexpected rate, and the sensors receive and transmit rotational speeds of components that do not match the expectation of the TCM/PCM, which then must adjust the pressures it is commanding in an attempt to achieve the driver's desired outcome. . . .

> [T]he situation is made worse by the fact that the leakage is not consistent, either by transmission temperature, by which seals are leaking at any point in time, or by the amount of leakage across the seals. This makes it impossible for software engineers to create programming instructions to reliably compensate for the leakage and allow the transmission to consistently achieve the driver's desired result. The leakage leads to the hydraulic control system not always being able to provide adequate volume or pressure of oil to the four clutches that need to be engaged to achieve any particular gear. . . . [B]ecause the seal leakage may occur at times not anticipated by the programming of the TCM/PCM, the affected vehicles will suffer the intermittent symptoms reported by owners . . .

> Vibration and flexing of the main shaft, which is unusually long and has all four planetary gearsets and four of the six clutches mounted on it, can cause the intermittent leakage that Ford's investigation could not otherwise explain. . . . These vibrations are likely associated with another mode of failure of the 10R80 transmission, which is the axial movement of the bushing mounted inside the C-DF drum.

(Dckt. #325 at 36-37, *quoting* Stapleford Report, (Dckt. #296-2), at 5-6). And, the Court does not agree, as Ford implies, that Stapleford's subsequent deposition testimony substantively alters or limits this Defect Opinion as *solely* relating to vibrations.

In any event, the Court finds that Stapleford's Defect Opinion is sufficiently reliable. As plaintiffs argue – and defendants do not dispute – Stapleford is qualified to offer his opinion

regarding the design of the 10R80 Transmission given his extensive experience as a mechanical engineer and in performing testing for motor vehicle system functionality, structural integrity, and vehicle safety. Moreover, Stapleford's Defect Opinion is reliable as it is grounded in his extensive experience, his review of Ford's internal documents and discovery in this case, and his own vehicle testing, with extensive data recording and collection. *See United States v. Pansier*, 576 F.3d 726, 737 (7th Cir. 2009) ("To determine reliability, the court should consider the proposed expert's full range of experience and training, as well as the methodology used to arrive [at] a particular conclusion.").

The remainder of Ford's objections to Stapleford's Defect Opinion regarding vibrations – such as his purported reliance on a YouTube video as evidence of vibration, or his failure to demonstrate that the vibrations affect *all* class vehicles – goes to the *weight* of his testimony, not its reliability, and must be left to the jury. *Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 765 (7th Cir. 2013) ("The district court's role as gatekeeper does not render the district court the trier of all facts relating to expert testimony . . . The jury must still be allowed to play its essential role as the arbiter of the weight and credibility of expert testimony.") (cleaned up).

### 4. Ford's Motion to Exclude Stapleford's Knowledge Opinion is Granted in Part and Denied in Part.

Next, Ford argues that Stapleford's Knowledge Opinion – *i.e.*, that Ford had "knowledge of the transmission defect," both during its development and after its release to market – must be excluded as improper state of mind testimony. The Court agrees, but only in part.

It is well settled that a "witness may testify as to his or her own state of mind. As to other persons, the witness generally may only testify as to another person's statements or conduct (to the extent not inadmissible hearsay), but not as to the other person's actual state of mind." *Fenje v. Feld*, 301 F.Supp.2d 781, 816 (N.D.Ill. 2003), *aff'd*, 398 F.3d 620 (7th Cir. 2005). Indeed,

"[c]ourts have typically barred expert opinions or testimony concerning a corporation's state of mind, subjective motivation, or intent." *Schall v. Suzuki Motor of Am., Inc.*, No. 4:14-CV-00074-JHM, 2020 WL 1159756, at *7 (W.D.Ky. Mar. 10, 2020) (cleaned up) (collecting cases). This is so because the "question of corporate motive, intent, knowledge or state of mind is one for the jury, not for an expert." *Clinton v. Mentor Worldwide LLC*, No. 4:16–CV–00319 (CEJ), 2016 WL 7491861, at *11 (E.D.Mo. Dec. 30, 2016).

Under this well-settled principle then, the Court agrees that Stapleford's opinion regarding what Ford *knew* must be excluded as improper state of mind testimony. *See Ploss v. Kraft Foods Grp., Inc.*, 637 F.Supp.3d 561, 575 (N.D.Ill. 2022) (excluding expert's statements as to what the corporate defendant "knew"); *see also In re Takata Airbag Prod. Liab. Litig.*, No. 15-MD-02599, 2022 WL 18956175, at *4 (S.D.Fla. Dec. 28, 2022) ("The Court agrees that the experts' opinions containing testimony concerning the Defendants' knowledge, intent or motives are improper and must excluded."); *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prods. Liab. Litig.*, 978 F.Supp.2d 1053, 1087 (C.D.Cal. 2013) ("In his capacity as an expert, Loudon may not offer testimony regarding what Toyota did or did not know").

However, the majority of Stapleford's reports about Ford's "knowledge" consists of Stapleford simply describing and providing additional context – using his own experience and expertise – to documents available to Ford regarding purported problems with the 10R80 Transmission. Such testimony is "not testimony that goes to motive or intent" and "[e]xpert testimony on the state of scientific or industrial knowledge *available* to [defendant] is relevant to the issues of the existence of a design or manufacturing defect." *Schall*, 2020 WL 1159756, at *7 (emphasis added). Accordingly, Stapleford will not be excluded from offering testimony describing the information *available* to Ford regarding the 10R80 Transmission and its purported

13

defect.  *See In re Takata*, 2022 WL 18956175, at *4 (permitting experts to "opine as to what information was available and possessed by Defendants.").

### 5. Ford's Motion to Exclude Stapleford's Safety Opinion is Granted in Part and Denied in Part.

Ford also argues that Stapleford's Safety Opinion – *i.e.*, that shifting problems in the 10R80 Transmission could "cause safety concerns" and "cause drivers to feel unsafe," – must be excluded as inadmissible *ipse dixit*.[5]  According to Ford, because Stapleford himself acknowledged that he is unaware of any accidents resulting from operation of the 10R80 Transmission, he is left "without any data to support his opinion that the 10R80 is unsafe." (Dckt. #297 at 16).  In this regard, the Court disagrees.

An expert's *ipse dixit* is inadmissible because "[a]n expert who supplies nothing but a bottom line supplies nothing of value to the judicial process."  *Wendler & Ezra, P.C. v. Am. Int'l Grp., Inc.*, 521 F.3d 790, 791 (7th Cir. 2008), *quoting Mid-State Fertilizer Co. v. Exch. Nat'l Bank*, 877 F.2d 1333, 1339 (7th Cir. 1989).  Seventh Circuit "caselaw describes an expert's *ipse dixit* as occurring where 'there is simply too great an analytical gap between the data and the opinion proffered.'"  *United States v. Owens*, 18 F.4th 928, 941 n.5 (7th Cir. 2021), *quoting C.W.*

---

[5] *See also* Dckt. #296-2 at 4-5:

> "The drivability issues listed above can cause drivers to feel unsafe when driving their vehicles.  Examples of where the malfunctions would cause safety concerns are: delayed response from the transmission when accelerating feels to the driver like a loss of power, making them wary of driving on freeways where immediate power to merge or for passing may be required.  Also, while driving in heavy city traffic and having a need to change lanes quickly, maneuvering into small openings in next lane in anticipation of making a turn, the Class Vehicles react to accelerator inputs in a random way – sometimes with a delay that makes the driver feel he has lost power for moment, sometimes without a delay, and sometimes surging forward faster than the driver expects from the accelerator pedal input.  But with so many variations experienced in unpredictable combinations as to make the driver feel unsure about driving in tight traffic.  Separately, random shift-shock events may be perceived by a driver as having been struck by another vehicle or as a sign of imminent vehicle break-down.

*ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 832 (7th Cir. 2015). And, again, to identify improper *ipse dixit*, "[t]he critical inquiry is whether there is a connection between the data employed and the opinion offered; it is the opinion connected to existing data 'only by the *ipse dixit* of the expert' that is properly excluded under Rule 702." *Gopalratnam*, 877 F.3d at 781.

Here, Stapleford's opinion that the shifting problems in the 10R80 Transmission *could* cause safety concerns and *could* cause drivers to feel unsafe is not, as Ford contends, unsupported *ipse dixit.* Instead, Stapleford's Safety Opinion is grounded in his many years of experience conducting automotive defect and safety analysis, plaintiffs' own descriptions of the shifting problems they experienced, and, most importantly, Stapleford's own test drives of three of the Class Vehicles during which he experienced similar shifting problems. Simply put, Stapleford provides well beyond "a bottom line" to support his Safety Opinion, and his opinion is *not* based solely on subjective belief or speculation. *See Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761-62 (7th Cir. 2010).

The Court does agree, however, that, as with the Knowledge Opinion, Stapleford is not permitted to testify as to whether the plaintiffs, or any other putative class members, felt unsafe while driving the Class Vehicles because such testimony is inadmissible state of mind testimony. *See supra* at III(A)(4).

### 6. Ford's Motion to Exclude Stapleford's Replacement Opinion is Granted in Part and Denied in Part.

Next, Ford asks the Court to exclude Stapleford's Replacement Opinion, *i.e.*, that a "reasonable and logical way of removing the Defect from the Class Vehicles," is to "retrofit Class Vehicles with the 6R80 Transmission." (Dckt. #296-2 at 25). In Ford's view, Stapleford's Opinion is unreliable because he has "conducted no testing or analysis of his proposal to replace

the 10R80s in the putative class vehicles with 6R80s" and his "reports contain no substantive discussion of the merits of the proposed replacement." (Dckt. #297 at 18). The Court agrees.

According to Stapleford's opening report, "in light of Ford's apparent inability to fix the Defect in the 10R80s," Ford asked him to "determine a reasonable and logical way of removing the Defect from the Class Vehicles, and to estimate the cost of doing so." (Dckt. #296-2 at 25). However, nowhere in either his opening report or his rebuttal report does Stapleford provide *any* explanation as to why a "reasonable and logical way" of removing the defect is to retrofit Class Vehicles with the 6R80 Transmission. In fact, the only mention of the Replacement Opinion comes in the heading preceding Stapleford's analysis as to the *cost* of such a replacement, but not the propriety of the replacement itself. Because Stapleford's Replacement Opinion is not based on *any* methodology, let alone a reliable methodology, the Court will not permit Stapleford to testify that a "reasonable and logical way of removing the Defect from the Class Vehicles" is to "retrofit Class Vehicles with the 6R80 Transmission." *Korte v. Exxonmobil Coal USA, Inc.*, 164 Fed.Appx. 553, 557 (7th Cir. 2006) (affirming the exclusion of expert testimony where the expert "formed his opinion without sufficient scientific evidence confirming the validity of [the] premise.").

This ruling should not surprise plaintiffs in light of their clarification in their class certification brief, in which they explained:

> Plaintiffs do not advocate for a replacement of the 10R80—indeed, Plaintiffs contend (and the evidence reveals) that the Defect is present in all 10R80 Transmissions, and Ford is unable to remedy the Defect, so a 10R80 replacement would be ineffective . . . Instead, as an additional measure by which the factfinder can determine the damage done to Class Members by Ford's acts and omissions, Plaintiffs submitted evidence demonstrating the approximate cost of removing the defective 10R80 Transmission, in exchange for another. As explained, *Plaintiffs' use of the 6R80 transmission to approximate these costs was not because they believe it is a satisfactory "replacement,"* but because it was the predecessor transmission equipped in the Class Vehicles and the 6R80 and 10R80 occupy the

16

> same volume of space—see Exh. 95 at ¶44.a.; ECF no. 296-4 (Stapleford Depo.) at 165:18-167:22; 169:16-170:10—which means there is sufficient data regarding the installation of an alternative transmission (the 6R80) to reliably calculate a proxy replacement cost.

(Dckt. #367 at 40) (emphasis added). In other words, plaintiffs are not purporting to offer Stapleford's Replacement Opinion for the proposition that the 6R80 is an appropriate replacement for the 10R80 Transmission; instead plaintiffs rely on his testimony in support of their proxy model of damages. [6] In this regard, the Court *will* permit Stapleford to offer testimony as to the similarities and differences between the 6R80 and the 10R80 Transmissions, and plaintiffs are free to argue how such testimony is applicable to its proxy model of damages.

### 7.    Ford's Motion to Exclude Stapleford's Cost Opinion is Denied.

Finally, Ford argues that Stapleford's Cost Opinion, *i.e.*, the estimated cost of replacing the 10R80 Transmission with the 6R80 – which, again is offered as relevant to plaintiffs' damages and *not* in support of an actual replacement – should be excluded as unreliable. In doing so, however, Ford attacks only Stapleford's data, and not his methodology. Specifically, Ford argues that Stapleford failed to account for and distinguish costs between all engine types and failed to include labor prices beyond just the West Coast. As plaintiffs' correctly note,

---

[6] Stapleford himself acknowledged the limits of his Replacement Opinion when he testified as follows at his deposition:

> Q:    Okay. All right. Is it correct that in Paragraph 41 of your report, you state "A reasonable and logical way of removing the defect from the class vehicles is to retrofit the class vehicles with the 6R80 22 transmission?"
>
> * * *
>
> A:    Fair enough. And I told you earlier that when we got to this, that there is probably less here than you realize. So I was asked to see what could we do to just get rid of it. And I said "Let's put the old transmission back in." "Okay. Mr. Stapleford, what would that cost?" "Well, here is your rough estimate." So that's really the limit of that discussion right there.

(Dckt. #296-4 at 166-67).

however, these attacks go to the weight of Stapleford's opinion and not to its reliability, and are best left for cross-examination and the finder of fact's consideration. *See Manpower*, 732 F.3d at 806.

For all of these reasons, defendant's motion to exclude the testimony of Michael Stapleford, (Dckt. #296), is granted in part and denied in part.

### B. Plaintiffs' Motion to Exclude Certain Opinions of Matthew Fyie

For its part, Ford designated one of its employees, Matthew Fyie, as a technical expert regarding the 10R80 Transmission. Fyie submitted both an opening report, (Dckt. #282-2), and a rebuttal report, (Dckt. #282-3), in response to Stapleford's reports. Plaintiffs now ask the Court to strike just two of Fyie's opinions as unreliable and irrelevant. For the following reasons, plaintiffs' motion, (Dckt. #282), is denied.

### 1. Fyie's Experience and Expert Reports

Fyie received a Bachelor of Science in mechanical engineering from GMI Engineering & Management Institute in 1997 and a Master of Science in Mechanical Engineering from the University of Michigan in 2003. (Dckt. #282-2 at 15). Fyie has worked at Ford in one capacity or another since 1992. (*Id*.). Throughout his career at Ford, Fyie has designed, developed, and tested automatic transmissions; designed and released components for automatic transmissions; worked in calibration engineering with responsibility for calibrating the shift quality of Ford vehicles; held roles in testing, computer-aided design, computer-aided engineering analysis; and supervised engineers responsible for component design and development for automatic

transmissions. (*Id.* at 3). Since 2012, Fyie has worked in Ford's Design Analysis Department in roles as both an engineer and a manager.[7]

In this case, Ford asked Fyie to provide information and opinions related to the design and development of the 10R80 Transmission used in the Class Vehicles, including explaining features in the design of the 10R80 Transmission and the reasons behind those features. In his opening report, (Dckt. #282-2), Fyie described the components, development, and testing of Ford's 10R80 Transmission. Fyie also relied on and submitted the vehicle inspections of plaintiffs' vehicles and an exemplar vehicle performed by another of Ford's putative technical experts, Casey Wagoner, at Fyie's direction.

Based on Fyie's experience and review of the evidence, including interviews with the design team, documents produced in discovery, and Wagoner's vehicle inspection reports, Fyie opined, *inter alia*, that: (1) the 10R80 Transmission in the Class Vehicles "was appropriately designed, tested and manufactured and met the general state of the art for design and performance standards in the industry;" and (2) plaintiffs' vehicles that had been inspected are "all operating as designed," have "no issues with the transmission performance," and are operating comparably to the exemplar vehicle. (Dckt. #282-2 at 9-12). In his rebuttal report, (Dckt. #282-3), Fyie disputed many of Stapleford's opinions, and continued to assert that the 10R80 Transmission was appropriately designed and tested.

---

[7] Although plaintiffs appear to take a jab at Fyie's current role at Ford to the extent that it involves simply "writing reports, testifying in lawsuits against Ford, and signing affidavits and declarations in lawsuits against Ford," (Dckt. #282 at 4), plaintiffs do not argue that Fyie is unqualified to render the opinions offered, and they might face an uphill battle to do so. *See United States v. Protho*, 41 F.4th 812, 823 (7th Cir. 2022) ("Fyie has a master's degree in mechanical engineering from the University of Michigan and has worked for Ford for nearly 30 years. Fyie's position, engineering education, and nearly three decades at Ford make him abundantly qualified to opine on the appearance and identity of Ford's products.").

Plaintiffs now ask the Court to exclude only Fyie's opinions that the 10R80 Transmission is (1) "state of the art;" and (2) was "appropriately designed and tested."[8] According to plaintiffs, these opinions are both irrelevant and unreliable and, therefore, must be excluded under Rule 702 and *Daubert*. The Court disagrees.

### 2. Plaintiffs' Motion to Exclude Fyie's Opinions that the 10R80 Transmission was State of the Art and Appropriately Designed and Tested as Irrelevant is Denied.

The Court quickly disposes of plaintiffs' relevancy objections. Again, to be relevant, testimony must "help the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702. This basic standard of relevance is "liberal" and includes evidence that has "'any tendency to make the existence of any fact that is of consequence to the determination of the action more probably or less probably than it would be without the evidence.'" *Schuring v. Cottrell, Inc.*, 244 F.Supp.3d 721, 732 (N.D.Ill. 2017), *quoting Daubert*, 509 U.S. at 587; *see also Stuhlmacher v. Home Depot U.S.A., Inc.*, 774 F.3d 405, 409 (7th Cir. 2014) ("An expert's testimony qualifies as relevant under Rule 702 so long as it assists the jury in determining any fact at issue in the case."). "In other words, '[w]here an expert's hypothetical explanation of the possible or probable causes of an event would aid the jury in its deliberations, that testimony satisfies *Daubert*'s relevancy requirement." *Mohr v. WeatherTech*, No. 17-CV-04451, 2023 WL 11951483, at *6 (N.D.Ill. Mar. 2, 2023), *quoting Stuhlmacher*, 774 F.3d at 409.

Here, Fyie's opinions that the 10R80 Transmission was state of the art and appropriately designed and tested are undoubtedly relevant to the core issue in this case, *i.e.*, whether the 10R80 Transmission in the Class Vehicles suffers from a common defect. *See Alarid v. Biomet,*

---

[8] In their reply brief, plaintiffs also purport to attack Fyie's opinion that the 10R80 Transmission was appropriately "manufactured." (Dckt. #352 at 14). But plaintiffs did not raise this argument in their motion and, as such, it is waived. *White v. United States*, 8 F.4th 547, 552 (7th Cir. 2021) (arguments raised for the first time in a reply brief are waived).

*Inc.*, No. 14-CV-02667-REB-NYW, 2016 WL 11671352, at *2 (D.Colo. Feb. 4, 2016) (noting

that "an opinion that a product was the state-of-the-art tends to negate an inference that it was

defective by suggesting that there was no safer design feasible at the time"). Simply put, Fyie's

opinions could ultimately assist the finder of fact in resolving the core issue in this case and they

therefore surmount the low bar for relevancy. *See United States v. Jones*, No. 16-CR-0553

(AJN), 2018 WL 1115778, at *9 (S.D.N.Y. Feb. 27, 2018) (noting the "low bar" for relevancy

under Rule 702). Any argument to the contrary – and, notably, plaintiffs essentially present none

beyond those discussed in the context of reliability below – is without merit.

> **3.      Plaintiffs' Motion to Exclude Fyie's Opinions that the 10R80
>          Transmission was State of the Art and Appropriately Designed and
>          Tested as Unreliable is Denied.**

Next, plaintiffs argue that Fyie's opinions that the 10R80 Transmission was state of the

art and appropriately designed and tested are unreliable and must be excluded. As outlined

above, expert opinions are sufficiently reliable when they are based on sound methodology and

can be properly applied to the facts. *Daubert*, 509 U.S. at 592-93; *Manpower, Inc.*, 732 F.3d at

806 ("Reliability . . . is primarily a question of the validity of the methodology employed by an

expert, not the quality of the data used in applying the methodology or the conclusions

produced."). Applying those principles here, the Court finds that Fyie's opinions – all of which

are grounded in his decades of experience in the design and manufacture of automatic

transmissions, his interview with design team members, his review of Ford's internal

communications and documents regarding the 10R80 Transmission, and Wagoner's vehicle

testing – are sufficiently reliable to overcome plaintiffs' *Daubert* challenge.

### a. Fyie's opinion that the 10R80 Transmission was state of the art is reliable.

In his report, Fyie opined that the 10R80 Transmission met the "general state of the art for design and performance standards," noting that it "was the first production 10-speed planetary automatic transmission in the industry, and it was introduced on Ford's highest-volume vehicle." (Dckt. #282-2 at 6). According to Fyie, the 10R80 Transmission was designed to improve fuel economy and reduce greenhouse gases for Ford vehicles, and he describes in detail the numerous design features of the 10R80 Transmission that optimize efficiency. (*Id.*). When questioned about his state of the art opinion at his deposition, Fyie conceded that he did not base the opinion on the general state of the art for design standards in the automotive industry (as he was not aware that such a standard even exists). (Dckt. #346-2 at 56). However, Fyie explained further that to render this opinion, he conducted a comparative analysis between the features of the 10R80 Transmission and the other comparable transmission products and technologies in the market and ultimately concluded that the 10R80 Transmission was the first to market offering the 10-speed, planetary transmission. (*Id*. at 60). Fyie also testified that the 10R80 Transmission "has over 20 patents applied to it." (*Id*.).

As Ford argues, Fyie's articulated comparative analysis, combined with his extensive experience in transmission design and familiarity with the automotive market and industry standards, is sufficiently reliable to pass muster under *Daubert* and Rule 702. *Metavante*, 619 F.3d at 761; *Pansier,* 576 F.3d at 737. "To the extent [plaintiffs] dispute[] that [the 10R80 Transmission] is 'state of the art,' [they] may take that up on cross examination." *Davis v. Johnson & Johnson*, No. 2:20-CV-02635-HLT, 2022 WL 2116224, at *4 (D.Kan. June 9, 2022).

**b.** **Fyie's opinion a that the 10R80 Transmission was appropriately designed and tested is reliable.**

Similarly, the Court finds that Fyie's opinion that the 10R80 Transmission was appropriately designed and tested is sufficiently reliable. As with Stapleford's opinion that the 10R80 Transmission was *not* appropriately designed and suffers from a defect, Fyie's opinion that the 10R80 Transmission *was* appropriately designed is grounded in his own extensive design and testing experience, his interviews with design team members, his review of Ford's internal documents, and Wagoner's vehicle inspection reports of plaintiffs' vehicles and the exemplar vehicle.

Specifically, as Fyie explained at his deposition, to render his opinions as to the testing and design of the 10R80 Transmission, he interviewed at least five of Ford's design and development employees who were involved in the design of the 10R80 Transmission, reviewed the design itself, including all related computer-aided design and dimensional-management work, and examined and confirmed that all required approvals were procured. (Dckt. #346-2 at 37-8, 40-42). In addition, Fyie reviewed the design changes that were implemented pre-production in response to specific issues. (*Id*. at 42-43). Fyie also explained in his opening report that the 10R80 Transmission was tested extensively prior to the start of production, with over 800 Computer-Aided Engineering models run, and more than 4 million miles of testing. (Dckt. #282-2 at 6). In his rebuttal report, Fyie further elaborated that the 10R80 Transmission underwent extensive pre-launch testing, all of which was completed in accordance with Ford's internal requirements before the scheduled launch. According to Fyie, the 10R80 Transmission "unequivocally passed all of Ford's necessary quality testing prior to launch" in light of Ford's issuance of the OKTB certification, which would not be issued unless the vehicle "passed the necessary quality testing." (Dckt. #282-3).

The Court finds that Fyie's explanation of how he formulated these opinions is sufficient to establish that they are admissible. *See, e.g., Owens*, 18 F.4th at 941 (finding the district court properly relied on expert testimony about the nature of a program based on his experience "developing and working with the program"); *Obrycka v. City of Chicago,* No. 07 C 2372, 2011 WL 2456539, at *10 (N.D.Ill. June 16, 2011) ("comfortably conclud[ing]" that the experts "personal knowledge, experience and training, as well as the work he undertook to prepare his expert report for this case, provide[d] a reliable basis in the knowledge and experience of [the relevant] discipline.") (citation omitted). Of course, the appropriate weight to afford Fyie's testimony regarding the 10R80 Transmission design is left for the jury.

For all of these reasons, plaintiffs' motion to exclude certain opinions of Matthew Fyie, (Dckt. #282), is denied.

### C.      Plaintiffs' Motion to Exclude the Rebuttal Report of Casey Wagoner

As described above, at Fyie's direction, Casey Wagoner performed inspections of the vehicles owned by plaintiffs Barcelona, Heller, Steen, Smith, and Zielenski, and of an exemplar vehicle provided by Ford. Wagoner's vehicle inspection reports were relied upon and disclosed by Fyie in his opening report and his rebuttal report. Subsequently, Ford asked Wagoner to review and, if appropriate, respond to Stapleford's expert reports, and Wagoner's purported "rebuttal" report followed, (Dckt. #286-1). Plaintiffs now ask the Court to exclude Wagoner's report in its entirety as unreliable, improper rebuttal, and duplicative of Fyie's report. For the reasons set forth below, plaintiffs' motion, (Dckt. #286), is granted.

### 1.      Wagoner's Experience and Rebuttal Report

Wagoner holds a Bachelor of Science in automotive technology from Southern Illinois University and has been certified as an ASE Certified Master Technician. (Dckt. #286-1 at 3).

Since 2012, Wagoner has been employed by Design Research Engineering as a Project Engineer. (*Id.*). In that role, he has inspected more than 100 vehicles and vehicle systems and performed drive analyses on vehicles to evaluate the performance and operation of various components and systems. (*Id.*). From 2010 to 2012, Wagoner worked at the Ford Technical Assistance Hotline assisting dealership technicians in their diagnoses of difficult or unusual customer concerns, including automatic transmission concerns. (*Id.*).

Again, Ford asked Wagoner to review and, if appropriate, respond to Stapleford's opening and rebuttal report. In the "rebuttal" report that followed, Wagoner described his relevant experience, described each of the plaintiff's shifting complaints, and then regurgitated the findings of his prior inspections of plaintiffs' vehicles and the exemplar vehicle that were previously relied upon by Fyie. In response to Stapleford's reports, Wagoner comments only generally throughout his rebuttal report that: (1) Stapleford did not perform inspections on all of the vehicles that Wagoner did (and thus did not refute Wagoner's findings); (2) Wagoner "did not experience the types of shift events" experienced by Stapleford; and (3) Stapleford mischaracterized Wagoner's attempts to perform certain maneuvers during his inspection of plaintiff Steen's vehicle, for which Stapleford was present.

Wagoner then offers the following "Conclusions from Vehicle Inspections:"

> ***In summary, during my inspection of Plaintiffs' vehicles, I did not experience any of the shifting issues identified by Mr. Stapleford in his opening or rebuttal reports, and I did not experience loss of power in any of the vehicles***. With the exception of the engine noises noted in Mr. Smith's engine area, and the engine misfires present in Mr. Barcelona's, ***all of the vehicles inspected operated in a manner similar to the exemplar vehicle used as the baseline for these inspections. In my opinion, if the vehicles are operated with normal, and not erratic, accelerator pedal application with more moderate changes in acceleration demands, the transmission will perform smoothly and not be perceived as losing power or shifting harshly.*** Each vehicle was driven long and far enough to allow the engine and transmission sufficient time to cool down (depending on when the vehicle was delivered and the inspection started) and heat up to operating

temperature during the course of the evaluation. A reasonable mix of driving scenarios was conducted to simulate an owner's day-to-day experience.

(Dckt. #286-1 at 9) (emphasis added). Plaintiffs now ask the Court to exclude Wagoner's report as unreliable, improper rebuttal, and duplicative. Because the Court finds that the report is improper rebuttal, it starts there.

### 2. Plaintiffs' Motion to Exclude Wagoner's Report as Improper Rebuttal is Granted.

Rule 26(a) defines a rebuttal expert as one whose testimony is "intended solely to contradict or rebut evidence on the same subject matter identified by another party." Fed.R.Civ.P. 26(a)(2)(C)(ii). "The proper function of rebuttal evidence is to contradict, impeach or defuse the impact of the evidence offered by an adverse party." *Peals v. Terre Haute Police Dep't*, 535 F.3d 621, 630 (7th Cir. 2008); *Ernst v. City of Chicago*, No. 08 C 4370, 2013 WL 4804837, at *3 (N.D.Ill. Sept. 9, 2013) (noting that the "obvious" and "most useful" thing for a rebuttal expert to do is to address the opposing expert's "points, either in sequence or by identifying them and critiquing them."). "Testimony offered only as additional support to an argument made in a case in chief, if not offered to contradict, impeach or defuse the impact of the evidence offered by an adverse party, is improper on rebuttal." *Id.*; *see also Africano v. Atrium Med. Corp.*, No. 17 CV 7238, 2019 WL 5085338, at *1-2 (N.D.Ill. Oct. 10, 2019), *objections overruled*, No. 17 CV 7238, 2020 WL 5691596 (N.D.Ill. Sept. 3, 2020) ("Evidence that is only offered as additional support of a party's argument and that does not contradict any evidence introduced by the opposing party is not proper rebuttal.") (cleaned up).

"[T]he measure of proper rebuttal is not whether it offers support for arguments that could have been raised in the case-in-chief, but whether it directly refutes arguments offered by the opposition." *Africano*, 2019 WL 5085338, at *2 (citing *Pantaleo v. Hayes*, No. 08 CV 6419,

2011 WL 2517265, at *1 (N.D.Ill. June 23, 2011)); *Bakov v. Consol. World Travel, Inc.*, No. 15 C 2980, 2019 WL 1294659, at *11 (N.D.Ill. Mar. 21, 2019) ("Rule 26 does not automatically exclude evidence that an expert could have included in his original report") (cleaned up). Consequently, "the mere fact that opinions offered in a rebuttal report touch upon the same subjects covered in an initial expert report does not require that the rebuttal be stricken." *Cage v. City of Chicago*, No. 09 C 3078, 2012 WL 5557410, at *5 (N.D.Ill. Nov. 14, 2012), *quoting Green v. Kubota Tractor Corp.*, No. 09 CV 7290, 2012 WL 1416465, at *5 (N.D.Ill. Apr. 24, 2012).

Thus, when evaluating whether a rebuttal report is appropriate, the "'focus is not on the similarity between the initial and rebuttal reports, but rather on whether the opinions expressed in a rebuttal report rebut the same subject matter identified in the other party's expert report.'" *Cage*, 2012 WL 5557410, at *5, *quoting Green*, 2012 WL 1416465, at *5. As another judge in this District explained:

> The sequence of disclosures of experts' opinions envisions a winnowing process, not an expansion. By way of example, a plaintiff's initial (sometimes referred to as "affirmative") expert report may identify opinions #1, #2, and #3. Subsequently, a defendant's expert report (sometimes referred to as "response reports") may rebut opinions #1, #2, and #3, but also add opinions #4, #5, and #6. That defendant's expert report is a proper rebuttal in that it contradicts the first three opinions. But that defendant's expert report may also be an appropriate initial expert report by presenting opinions #4, #5, and #6. Under these circumstances, Rule 26(a)(2)(D)(ii) envisions that the plaintiff be given the opportunity to provide – if it chooses – a rebuttal expert to contradict opinions #4, #5, and #6. But what is not permissible is allowing plaintiff to now—by way of a "rebuttal"—offer opinions #7, #8, and #9.

*McCann v. Cullinan*, No. 11 CV 50125, 2016 WL 4593835, at *3 (N.D.Ill. Sept. 2, 2016), *report and recommendation adopted sub nom. McCann v. Ogle Cty.*, No. 11 CV 50125, 2016 WL 5807922 (N.D.Ill. Oct. 5, 2016).

Applying these principles here, the Court finds that Wagoner's report is an improper rebuttal. Simply put, Wagoner fails to "contradict, impeach or defuse the impact of the evidence offered" by plaintiffs in Stapleford's reports.[9] *Peals*, 535 F.3d at 630. Instead, relying on the previously performed vehicle inspections of the plaintiffs' vehicles and the exemplar – relied on by Fyie in his opening and rebuttal reports – Wagoner's report serves solely to bolster Fyie's opinion that the plaintiffs' vehicles that had been inspected were "all operating as designed," have "no issues with the transmission performance," and are operating comparably to the exemplar vehicle. Indeed, in the above sequence, Ford offered opinions #1, #2, and #3 through Fyie's opening report and now essentially attempts to offer those same opinions – improperly couched as rebuttal to Stapleford – through Wagoner. But rebuttal expert testimony may not be used to simply bolster a previous expert opinion, and Wagoner's opinion does just that. *See McCann*, 2016 WL 4593835, at *3 ("These reports are not rebuttal expert opinions. Instead, they are merely untimely and addition[al] initial expert reports."); *Noffsinger v. The Valspar Corp.*, No. 09 C 916, 2011 WL 9795, at *6 (N.D.Ill. Jan. 3, 2011) (citing *Peals*, 535 F.3d at 630) ("A party may not offer testimony under the guise of 'rebuttal' only to provide additional support for his case.").

Ford seemingly recognized the possibility that this Court might find that Wagoner's report is improper rebuttal and asserts that the report should still be admitted as an opening

---

[9] Notwithstanding this finding, it is also questionable whether Wagoner *could* even contradict, impeach or defuse Stapleford's findings of shift problems during the vehicle test drives. As described above, during Stapleford's test drives, he employed cameras and the Ford IDS system to collect and record relevant data in an effort to corroborate the shifting problems he purportedly encountered. In contrast, Wagoner did not use cameras and, although he connected and monitored an IDS system during his test drives, he testified that he did not "record the data during the test drives" or use the IDS system "to determine whether a shift was smooth, or harsh, or firm." (Dckt. #344-6 at 62-63).

expert report – even if it is impermissible rebuttal – because its untimely disclosure is harmless. The Court disagrees.

When a party fails to provide expert disclosures in compliance with Rule 26(a), "the party is not allowed to use that information . . . unless the failure was substantially justified or is harmless." Fed.R.Civ.P. 37(c)(1); *Est. of Green v. City of Indianapolis*, 854 Fed.Appx. 740, 744 (7th Cir. 2021) ("[W]hen a party fails to timely disclose an expert witness . . . the exclusion of the witness's proposed testimony is automatic and mandatory, unless the proponent can show that the violation of Rule 26(a) was either justified or harmless.") (citing *Karum Holdings LLC v. Lowe's Cos.*, 895 F.3d 944, 951 (7th Cir. 2018)). "The burden to demonstrate substantial justification and the lack of harm is on the party who failed to make the required disclosure." *Id.*

The determination of whether a failure to comply with Rule 26(a) is harmless or justified is left to the broad discretion of the district court. *Westefer v. Snyder*, 422 F.3d 570, 584 n.21 (7th Cir. 2005) (citing *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003)). Although the court "need not make explicit findings regarding a justification or the harmlessness of the Rule 26 violation," the Seventh Circuit has indicated that the following factors should guide the court's discretion: "(1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date." *David*, 324 F.3d at 857.

Here, Ford does not even attempt to argue that its untimely disclosure of Wagoner's report as an initial report was substantially justified, nor could it. This is so because Wagoner's report is based *entirely* on the vehicle inspections performed in response to Fyie's opening report. Ford has no justification, let alone substantial justification, as to why it waited until rebuttal to

29

disclose Wagoner's purported opinions related to the previously performed inspections. *Finwall v. City of Chicago*, 239 F.R.D. 494, 503 (N.D.Ill. 2006), *objections overruled*, 239 F.R.D. 504 (N.D.Ill. 2006) (no substantial justification where party provided "no excuse or justification" for the untimely disclosure). Instead, Ford argues that its untimely disclosure is harmless, because: (1) plaintiffs proceeded with Wagoner's deposition in lieu of immediately moving to bar his report; (2) plaintiffs "could have sought leave to serve a sur-rebuttal" but did not do so; (3) the untimely disclosure will not affect trial because no trial date has been set; and (4) plaintiffs have not proffered evidence of Ford's bad faith. But these arguments miss the mark.

To begin, "[l]ate disclosure is not harmless within the meaning of Rule 37 simply because there is time to reopen discovery," and the court has a "legitimate interest in managing each case before it, including enforcing deadlines, to ensure prompt and orderly litigation." *Finwall*, 239 F.R.D. at 501. Accordingly, the fact that no trial date has been set, and the Court *could* re-open discovery is not dispositive of the issue. *Bowman v. Int'l Bus. Mach. Corp.*, No. 1:11-CV-0593-RLY-TAB, 2012 WL 6596933, at *4 (S.D.Ind. Dec. 18, 2012), *objections overruled*, No. 1:11-CV-0593-RLY-TAB, 2013 WL 1857192 (S.D.Ind. May 2, 2013) ("[T]he absence of a trial date does not necessarily render the belated expert replies harmless.").

Furthermore, Ford's very own assertion that it would have been within plaintiffs' province to seek leave to file a sur-rebuttal report to Wagoner's report speaks to the harm and surprise to plaintiffs. Indeed, although plaintiffs have deposed Wagoner and Stapleford has responded to Fyie's report (which relied on Wagoner's vehicle inspections), Stapleford has not been afforded the opportunity to rebut *Wagoner's* purported expert opinions based on his vehicle inspections. Allowing plaintiffs to do so now would add additional costs and further delay class certification and the ultimate resolution of this six-year-old case. *See Bowman*, 2012 WL

30

6596933, at *3–4 (concluding that the plaintiffs' untimely expert rebuttal reports were not harmless because "reopening discovery to redepose Plaintiffs' experts would create significant costs and would delay the resolution of the motion for class certification").

Finally, although the Court does not attribute Ford's untimely disclosure to bad faith, its disclosure of a rebuttal report based *entirely* on evidence previously available to and relied upon by Ford in Fyie's opening report remains unexplained and seems inexplicable. *See Stuhlmacher v. Home Depot USA, Inc*., No. 2:10 CV 467, 2012 WL 5866297, at *3 (N.D.Ind. Nov. 19, 2012) ("The plaintiffs waited until after the defendants disclosed their expert, and after they took the defendants' expert's deposition to "supplement" their own expert report to contradict the defense expert's opinion. This tactic undermines the court's authority to set forth the deadlines and order of production."). Within its discretion, the Court finds that Ford's untimely disclosure was not harmless.

For all of these reasons, plaintiffs' motion to exclude Wagoner's testimony, (Dckt. #286), is granted.[10]

## CONCLUSION

For the foregoing reasons, defendant's motion to exclude the testimony of Michael Stapleford, (Dckt. #296), is granted in part and denied in part; plaintiffs' motion to exclude the

---

[10] To be clear, plaintiffs did *not* object to Fyie's reliance on Wagoner's inspection reports for plaintiffs' vehicles or the exemplar vehicle – all of which were disclosed with Fyie's opening report (or, with respect to Smith's vehicle, in Fyie's rebuttal).

31

testimony of Matthew Fyie, (Dckt. #282), is denied; and plaintiffs' motion to exclude the

testimony of Casey Wagoner, (Dckt. #286), is granted.

**DATE:**    **March 12, 2025**

**Jeffrey I. Cummings**
**United States District Court Judge**