**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **JUSTIN O'CONNOR, *et al.*, on** | ) | |
| **behalf of himself and all others** | ) | |
| **similarly situated,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **No. 19-cv-5045** |
| | ) | |
| **v.** | ) | **Judge Jeffrey I. Cummings** |
| | ) | |
| **FORD MOTOR CO.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Michael Barcelona, Susan Heller, Bryan Smith, Jason Steen, and Stanislaw Zielinski (collectively, "plaintiffs") bring this putative class action against defendant Ford Motor Company ("defendant" or "Ford") for damages allegedly arising out of defendant's sale and lease of 2017 to 2020 Model Year Ford F-150 trucks with defective 10-speed automatic transmissions. The parties have filed competing motions for class certification and for denial of class certification, along with a panoply of motions seeking to exclude certain expert testimony pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals*, *Inc.*, 509 U.S. 579 (1993).

In this Opinion, the Court addresses the pending *Daubert* motions targeting the parties' warranty experts, namely plaintiffs' amended motion to exclude the testimony of Nathan Soderborg, (Dckt. #306), and defendant's motion to exclude the testimony of Frank Bernatowicz, (Dckt. #302).[1] For the reasons set forth below, plaintiffs' motion to exclude the testimony of

---

[1] A listing of all filings related to these motions can be found in the parties' February 12, 2025 joint status report, (Dckt. #421).

Nathan Soderborg, (Dckt. #306), is granted in part and denied in part, and defendant's motion to exclude the testimony of Frank Bernatowicz, (Dckt. #302), is granted in part and denied in part.

## I. RELEVANT BACKGROUND[2]

Plaintiffs bring this putative class action on behalf of all similarly situated individuals who purchased or leased Ford's 2017 to 2020 Model Year F-150 trucks equipped with a 10-speed "10R80 Transmission" that suffers from an alleged defect (hereinafter, the "Class Vehicles"). According to plaintiffs, from the beginning of Ford's development of its 10R80 Transmission—which served to replace Ford's 6-speed "6R80 Transmission"—"Ford has been aware of harsh, jerky, erratic, lunging, hesitating, and otherwise inconsistent shifting in the 10R80 Transmission, but has been unable to resolve these malfunctions caused by the 'Defect.'" (Dckt. #325 at 8). In plaintiffs' view, "the Defect is the inability of the Transmission's internal seals to maintain the intended and necessary pressure on either side of the seal to ensure secure and timely engagements of each clutch required for a specific gear." (Dckt. #325 at 8). For its part, Ford denies that there is any such defect in its 10R80 Transmission.

Plaintiffs have moved this Court to certify a class on behalf of similarly situated individuals in their respective states, *i.e.*, Massachusetts (Barcelona), New York (Heller), California (Smith and Steen), and Zielinski (Illinois). Specifically, plaintiffs seek to represent:

> All persons in [**STATE**] who formerly or currently own or leased one or more 2017-2020 Model Year F-150 truck equipped with a 10R80 10-speed automatic transmission.

---

[2] The Court presumes familiarity with the facts of this case and includes only those facts that are relevant to the *Daubert* motions currently before the Court.

(Dckt. #325 at 8-9). On behalf of these putative class members, plaintiffs bring claims for breach of implied and express warranty, fraudulent omission, and violation of consumer protection statutes.

In their competing submissions regarding class certification, the parties vehemently dispute (among many other disputes) whether plaintiffs have adduced evidence sufficient to show that the Class Vehicles suffer from a common defect to satisfy the requirements for class certification under Rule 23. In support of their positions, the parties rely in part on their respective warranty experts, and they now seek to exclude, in whole or in part, the opinions of the other side's experts.

## II. LEGAL STANDARD

The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *See Haley v. Kolbe & Kolbe Millwork Co.*, 863 F.3d 600, 611 (7th Cir. 2017). Pursuant to Rule 702,

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Rule 702 delegates to district courts the responsibility of ensuring that expert testimony is both reliable and relevant. *Daubert*, 509 U.S. at 598. When fulfilling this gatekeeping role, courts in the Seventh Circuit evaluate: "(1) the proffered expert's *qualifications*; (2) the *reliability* of the

3

expert's methodology; and (3) the *relevance* of the expert's testimony." *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017) (emphasis added).

Regarding the first prong, a witness may be qualified to testify based on relevant knowledge, skill, experience, training, or education. Fed.R.Evid. 702, advisory committee notes. "The Court 'must look at each of the conclusions [an expert] draws individually to see if he has the adequate education, skill, and training to reach them.'" *Webster Bank, N.A. v. Pierce & Assocs. P.C.*, No. 16-cv-2522, 2020 WL 616467, at *3 (N.D.Ill. Feb. 10, 2020), *quoting Hall v. Flannery*, 840 F.3d 922, 926 (7th Cir. 2016). As to the second prong, expert opinions are sufficiently reliable when they are based on sound methodology and can be properly applied to the facts. *Daubert*, 509 U.S. at 592-93. This inquiry is "'necessarily flexible' and the court has broad latitude in its determination of reliability." *Est. of Damiani v. Allen*, 4:16-cv-00053-RLY-DML, 2018 WL 4095080, at *5 (S.D.Ind. Aug. 28, 2018), *quoting Robinson ex rel. Irwin v. City of Madison*, No. 15-cv-502-jdp, 2017 WL 564682, at *8 (W.D.Wisc. Feb. 13, 2017). Finally, to be relevant, expert testimony must "help the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702.

The proponent of the expert bears the burden of establishing the admissibility of his opinions by a preponderance of the evidence. *Varlen Corp. v. Liberty Mut. Ins. Co.*, 924 F.3d 456, 459 (7th Cir. 2019); Fed.R.Evid. 702. Whether to admit expert testimony rests within the discretion of the court. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997). The Court notes that "[t]he rejection of expert testimony is the exception rather than the rule." *Joseph v. Carnes*, No. 13-CV-2279, 2015 WL 2091903, at *1 (N.D.Ill. Apr. 30, 2015), *quoting Spearman Indus. v. St. Paul Fire & Marine Ins. Co.*, 128 F.Supp.2d 1148, 1150 (N.D.Ill. 2001).

When an "expert's report or testimony is critical to class certification," the district court "must make the necessary factual and legal inquiries and decide all relevant contested issues prior to certification." *Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 815, 817 (7th Cir. 2010). "An expert's testimony is critical if it is 'important to an issue decisive for the motion for class certification.'" *In re Turkey Antitrust Litig.*, No. 19 C 8318, 2025 WL 264021, at *7 (N.D.Ill. Jan. 22, 2025), *quoting Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 812 (7th Cir. 2012). Because the opinions of the warranty experts are critical to the parties' dispute regarding whether a common defect in the Class Vehicles supports class certification, the Court proceeds with a full analysis of the parties' putative warranty experts under *Daubert* and Rule 702 prior to deciding whether class certification is warranted.

## III. ANALYSIS

### A. Plaintiffs' Motion to Exclude the Expert Opinions and Testimony of Nathan Soderborg.

In support of its position that plaintiffs lack admissible evidence to show that the putative class vehicles suffer from any defect, Ford retained Nathan Soderborg, Ph.D., to "evaluate warranty claim data to assess information and trends in claims related to harsh shifting" in the Class Vehicles. (Dckt. #302-2). Plaintiffs now seek to exclude certain of Soderborg's opinions as unreliable, irrelevant, or otherwise admissible. For the reasons that follow, plaintiffs' motion, (Dckt. #306), is denied.

#### 1. Soderborg's experience and expert reports.

Soderborg holds a Bachelor of Science in Mathematics from Brigham Young University, a Master of Science in Engineering and Management from the Massachusetts Institute of Technology, and a Doctor of Philosophy in Mathematics from the University of Michigan. (Dckt. #302-2 at 8). Soderborg currently serves as the Principal Scientist in the Data Scientist

5

practice of Exponent, Inc, which provides engineering, scientific, environmental, and health consulting services. (*Id*.). In his practice, he provides consulting services related to quality, statistics, risk analysis, process improvement, reliability engineering, and mathematical modeling across a variety of industries. (*Id*.).

Prior to joining Exponent, Soderborg worked for Ford for seventeen years in "supervisory and technical leader roles related to reliability, design, and manufacturing quality." (*Id*.). At Ford, Soderborg "frequently used and analyzed warranty data to help engineers make decisions about fixing problems and improving new designs." (*Id*.). He also served as the primary architect of Ford's Design for Six Sigma methodology and deployment, which helps organizations respond to the customer, analyze product risks, and prevent failure modes through the application of engineering and statistical methods. (*Id*.).

Ford retained Soderborg to "evaluate warranty claim data to assess information and trends in claims related to harsh shifting" in 2017-2020 Model Year ("MY") F-150 vehicles equipped with 10R80 transmissions (excluding Raptors), which Soderborg calculated to include 1,568,351 vehicles with varying engine type, drivetrain, and body/cab style. (*Id.* at 7, 9–12). To do so, Soderborg reviewed available warranty data, vehicle production and registration data, technical service bulletins, consumer feedback (e.g., National Highway Traffic Safety Administration (NHTSA) vehicle owner complaints), along with the expert report of plaintiffs' technical expert, Michael Stapleford. (*Id*. at 7).

Soderborg first reviewed the warranty data provided by Ford, which included "spreadsheets covering claims related to 2017-2020 MY F-150 trucks and 2009-2012 MY F-150 trucks with 6R80 transmissions." (*Id*. at 12). The warranty data includes information typically required for reliability analysis, including, *inter alia*, VIN, MY, descriptive vehicle and engine

6

characteristics, vehicle production and warranty start dates, dealership information, repair date, vehicle months in service and mileage, Customer Concern Code ("CCC"), customer comments, and dealership technician comments. (*Id*.). For his analysis, Soderborg extrapolated from the warranty data the claims that he designated as "in-scope," which included claims in the following two categories: (1) records related to claims made during the standard Powertrain 60 Month/60,000 mile warranty period; and (2) records for which the CCC, customer comments, or technician comments indicated a harsh shift. (*Id*. at 14).

Soderborg then analyzed warranty claims over time for the F-150 vehicles. His analysis was based on "vehicle age as measured by months in service," which he described as a "standard reliability-based approach to warranty analysis in the automotive industry." (*Id*. at 17). For each model year, the analysis presented an estimated cumulative distribution function (CDF) for warranty repairs. (*Id*.). The CDF is a curve that plots the "estimated probability that a randomly selected unit will be subject to a warranty repair by a given time in service and provides the ability to visualize trends in claim rates as a function of time in service." (*Id*.). Soderborg calculated estimated CDF curves using the Kaplan-Meier (K-M) methodology, which he described as "a standard method in reliability analysis for estimating the CDF for time to first replacement of a unit." (*Id*.).

Based on his analysis of the in-scope claims, Soderborg opined that (i) less than 1% of vehicles had more than one in-scope warranty claim; (ii) the owners of 95.3% of MY 2017 Class Vehicles and 93.3% of 2018 MY Class Vehicles did not bring their vehicles in for an in-scope warranty claims in the first 60,000 miles or 60 months of service; and (iii) claim rates varied across engine type, drivetrain, and body/cab style. (*Id*. at 17–23). Soderborg also compared the in-scope claim rates during the first three years of the 10R80's release against the first three years

7

of the 6R80 release, which demonstrated lower in-scope claims for the 10R80 than for the 6R80. (*Id.* at 21–22). Finally, Soderborg compared the 10R80 in-scope claims with NHTSA data and determined that the F-150 warranty claims for the 10R80 did not stand out as excessive compared to its competitors. (*Id.* at 24–27).

Based on his experience and his analysis of the warranty data and other data and documents, Soderborg offered the following opinions placed at issue by plaintiffs' motion to exclude:

(1) Based on warranty data from Ford, for MY 2017-2020 F-150 trucks with 10R80 transmissions, first time harsh-shift warranty claim rates vary substantially across Engine type, Drivetrain type, and Body/Cab style.

    a. Rates for trucks with the 3.0L Diesel engine are clearly higher and grow at a steeper rate than rates for trucks with other types of engines.

    b. For each MY, claim rates for 4x2 vehicles grow substantially slower than rates for 4x4 vehicles

    c. For each MY, claim rates for Regular Cab vehicles grow substantially slower than rates for Super Cab vehicles, and rates for Super Cab vehicles grow noticeably slower than rates for Super Crew vehicles **(hereinafter, "Opinion No. 1").**

(2) Based on warranty data from Ford, the 6R80 transmission did not perform better than the 10R80 transmission in its first three model years after launch. Across MYs 2009-2011, 6R80 harsh shift warranty claims started out growing at a much faster rate than MY 2017-2019 10R80 harsh shift warranty claims. After 60 MIS [months in service], MY 2017 harsh shift warranty claim rates are about 3 percentage points better than MY 2009 rates; MY 2018 rates are about 1.5 percentage points better than MY 2010 rates; and MY 2019 rates are trending to be about 1.5 percentage points better than MY 2011 rates **(hereinafter, "Opinion No. 2").**

(*Id.* at 28).

In response to Soderborg's report, plaintiffs disclosed the rebuttal report of Frank Bernatowicz, discussed in more detail below. Soderborg then prepared a rebuttal report to the

Bernatowicz report, (Dckt. #302-3), in which he refuted Bernatowicz's opinions and opined further that:

> (11) The warranty claim set related to harsh shifting as broadly described by Plaintiffs' complaints results in a wide variety of customer concerns, conditions, and repairs that does not appear to be consistent with a single, uniform defect across all 10R80 transmissions **(hereinafter, "Opinion No. 11")**.

(Dckt. #302-3 at 21).

Plaintiffs now seek to exclude Opinion Nos. 1 and 2 as unreliable, irrelevant and/or misleading to the jury, and Opinion No. 11 as improper rebuttal testimony.

## 2. Standard for determining the reliability of expert testimony.

Under Seventh Circuit precedent, "courts should evaluate the reliability of a qualified expert's testimony by considering, amongst other factors: (1) whether the proffered theory can be and has been tested; (2) whether the theory has been subjected to peer review; (3) whether the theory has been evaluated in light of potential rates of error; and (4) whether the theory has been accepted in the relevant scientific community." *Gopalratnam*, 877 F.3d at 779 (cleaned up). The Seventh Circuit has also endorsed six additional factors from the advisory notes of the 2000 amendment to Rule 702, that bear on the reliability of an expert's testimony, namely:

> (5) whether maintenance standards and controls exist; (6) whether the testimony relates to matters growing naturally and directly out of research they have conducted independent of the litigation, or developed expressly for purposes of testifying; (7) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion; (8) whether the expert has adequately accounted for obvious alternative explanations; (9) whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting; and (10) whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.

*Gopalratnam*, 877 F.3d at 779–80. It is well-settled, however, that "this list is neither exhaustive nor mandatory." *Id*. at 780; *see also Krik v. Exxon Mobil Corp.*, 870 F.3d 669, 674 (7th Cir. 2017) ("Despite the list, we have repeatedly emphasized that no single factor is either required in

the analysis or dispositive as to its outcome.") (cleaned up). "Instead, 'a trial court *may* consider one or more of the more specific factors that *Daubert* mentioned when doing so will help determine that testimony's reliability.'" *Gopalratnam*, 877 F.3d at 780 (emphasis in original), *quoting Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999)); *see also Krik*, 870 F.3d at 674 ("The district court may apply these factors flexibly as the case requires.").

Ultimately, the focus in a *Daubert* inquiry "must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595; *see also Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 806 (7th Cir. 2013) ("Reliability . . . is primarily a question of the validity of the methodology employed by an expert, not the quality of the data used in applying the methodology or the conclusions produced.").[3] "District courts can 'usurp[ ] the role of the jury . . . if [they] unduly scrutinize[ ] the quality of an expert's data and conclusions rather than the reliability of the methodology the expert employed.'" *Gilbert v. Lands' End, Inc.*, 158 F.4th 839, 849 (7th Cir. 2025), *quoting Manpower*, 732 F.3d at 806.

"This is not to say that an expert may rely on data that has no quantitative or qualitative connection to the methodology employed." *Id.* at 808. As the Seventh Circuit elaborated in *Gopalratnam*,

> Rule 702 explicitly requires that expert testimony be "based on sufficient facts or data." In the "quantitative" sense, sufficient facts or data means that the expert considered sufficient data to employ the methodology . . . To be "qualitatively" adequate, an expert must employ those kinds of facts or data on which experts in the field would reasonably rely. We have recognized that the line between

---

[3] As the Seventh Circuit recently acknowledged, the December 2023 amendments to Rule 702 did "alter its reliability subsection to require that 'the expert's opinion reflect[ ] a reliable application of the principles and methods to the facts of the case.'" *Gilbert v. Lands' End, Inc.*, 158 F.4th 839, 848 n.3 (7th Cir. 2025), *quoting* Fed.R.Evid. 702. This amendment was made to clarify that "questions of the sufficiency of an expert's basis[ ]" go to admissibility just as with questions of "the application of the expert's methodology." *Id.*, *quoting* Fed. R. Evid. 702 advisory committee's note to 2023 amendment.

10

conclusions and methodology is not always an easy line to draw. Conclusions and methodology are not entirely distinct from one another. Trained experts commonly extrapolate from existing data. Nevertheless, the critical inquiry is whether there is a *connection* between the data employed and the opinion offered; it is the opinion connected to existing data only by the *ipse dixit* of the expert that is properly excluded under Rule 702. Said another way, there must be a rational connection between the data and the opinion.

877 F.3d at 781 (cleaned up).

### 3. Plaintiffs' request to exclude Opinion No. 1 is denied.

To reiterate, in Opinion No. 1, Soderborg opined that warranty claim rates for F-150 trucks with 10R80 transmissions "vary substantially" across engine type, drivetrain, and body/cab style. Soderborg elaborated further at his deposition that if "there are differences in rates by engine or by body style or drivetrain, there may not be a uniform defect." (Dckt. #340-4 at 233; *see also id*. at 234 ("I'm just opining that there is variation and that variation can be inconsistent with a uniform defect.")). Soderborg agreed that this inference would "require an engineering analysis to go along with [it]," and explained that he did not consult with an engineering expert further in his warranty analysis. (*Id*. at 235).

Plaintiffs ask the Court to exclude Opinion No. 1 as inadmissible because Soderborg "failed to connect his warranty analysis to facts at issue in this case—namely the existence of a defect—through the use of engineering principles and/or the opinion of a qualified engineering expert." (Dckt. #306 at 12). More specifically, plaintiffs argue that Opinion No. 1 is irrelevant, unreliable (because Soderborg is unqualified to offer it), and would otherwise mislead the jury. The Court disagrees for the following reasons.

At the outset, the Court notes that, at least in their motion to exclude itself, plaintiffs do not object to Soderborg's use of the K-M methodology to establish the CDF curves, nor do they

dispute Soderborg's statement as to this methodology as a "standard method in reliability analysis." The Court will not do so either.

Moving to relevancy, Opinion No. 1 is plainly relevant here. To be relevant, testimony must "help the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702. This basic standard of relevance is "liberal" and includes evidence that has "'any tendency to make the existence of any fact that is of consequence to the determination of the action more probably or less probably than it would be without the evidence.'" *Schuring v. Cottrell, Inc.*, 244 F.Supp.3d 721, 732 (N.D.Ill. 2017), *quoting Daubert*, 509 U.S. at 587; *Stuhlmacher v. Home Depot U.S.A., Inc.*, 774 F.3d 405, 409 (7th Cir. 2014) ("An expert's testimony qualifies as relevant under Rule 702 so long as it assists the jury in determining any fact at issue in the case."). "In other words, '[w]here an expert's hypothetical explanation of the possible or probable causes of an event would aid the jury in its deliberations, that testimony satisfies Daubert's relevancy requirement." *Mohr v. WeatherTech*, No. 17-CV-04451, 2023 WL 11951483, at *6 (N.D.Ill. Mar. 2, 2023), *quoting Stuhlmacher*, 774 F.3d at 409.

Here, plaintiffs allege that the Class Vehicles suffer from a common defect in the 10R80 transmission that causes harsh shifting. Soderborg's analysis of warranty claims and repairs related to customer complaints of *harsh shifting* is plainly relevant to determining whether a common defect does or does not exist in the Class Vehicles and meets the liberal standard of relevance under Rule 702. *See, e.g.*, *Schuring*, 244 F.Supp.3d at 732; *United States v. Jones*, No. 16-CR-0553 (AJN), 2018 WL 1115778, at *9 (S.D.N.Y. Feb. 27, 2018) (noting the "low bar" for relevancy under Rule 702).

Next, contrary to plaintiffs' assertion, Soderborg is qualified to give Opinion No. 1 and the related testimony—which is limited to an analysis of warranty claims related to harsh shifting

across the Class Vehicles and inferences therefrom—even without a technical engineering background. As Rule 702 makes clear, an expert may be qualified through "knowledge, skill, experience, training, or education." Fed.R.Evid. 702. As Ford argues, and plaintiffs do not dispute, Soderborg is undoubtedly qualified to provide a statistical analysis of warranty claims given his education, and his current and past experience, particularly his seventeen years at Ford in "supervisory and technical leader roles" during which he "frequently used and analyzed warranty data to help engineers make decisions about fixing problems and improving new designs." (Dckt. # 302-2 at 7). Given this experience, the Court finds nothing unqualified (or otherwise unreliable) about Soderborg's opinion that—based on his statistical analysis—there was a substantial variation in warranty claims across engine type, drivetrain, and body/cab style which *may* (or, ultimately, may *not* be) inconsistent with a uniform defect in the 10R80 Transmission. *See Simmons v. Ford Motor Co.*, No. 18-CV-81558-RAR, 2022 WL 168540, at *4–5 (S.D.Fla. Jan. 18, 2022) (declining to exclude warranty expert testimony after concluding that his expert had gained the requisite expertise based on his "knowledge, skill, [and] experience" and finding his analysis "utilizing a percentage-based calculation [was] sufficiently reliable under *Daubert*"); *see also Kumho*, 526 U.S. at 156 ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience.").

Finally, for similar reasons, Soderborg's Opinion No. 1 and the related testimony will not substantially mislead the jury. *See Daubert*, 509 U.S. at 595 (the court should exclude expert testimony "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury."), *quoting* Fed.R.Evid. 403. Indeed, plaintiffs

13

will be free to cross-examine Soderborg regarding the basis for his purportedly "generic" inference that a variation in warranty claims can suggest a lack of uniform defect.

For all of these reasons, the Court, in its discretion, denies plaintiffs' request to exclude Opinion No. 1.

### 4.   Plaintiffs' request to exclude Opinion No. 2 is denied.

In Opinion No. 2, Soderborg opined that based on his analysis of the warranty data, the 6R80 transmission (the predecessor to the 10R80) did not perform better than the 10R80 transmission in its first three model years after launch, at least with respect to warranty claims. Specifically, Soderborg opined that "[a]fter 60 MIS, MY 2017 harsh shift warranty claim rates [for the 10R80] are about 3 percentage points better than MY 2009 rates [for the 6R80]; MY 2018 rates [for the 10R80] are about 1.5 percentage points better than MY 2010 rates [for the 6R80]; and MY 2019 rates [for the 10R80] are trending to be about 1.5 percentage points better than MY 2011 rates [for the 6R80]."  (Dckt. #302-2 at 28).

Plaintiffs now ask the Court to exclude Opinion No. 2, arguing that: (1) Soderborg relied on unreliable data to assess the 6R80 warranty claims because, by his own admission, he excluded raptors and certain data may have been lost due to a technical 6R80 "database issue that resulted in missing harsh-shift related claims," beginning with repair dates in January 2014, (Dckt. #302-2 at 22 n. 24); and (2) Soderborg failed to show that the 6R80 transmission is an adequate benchmark for comparison to the 10R80 transmission.  Again, the Court disagrees.

First, plaintiffs' attack on the exclusion of Raptors or any missing data in Soderborg's Opinion No. 2 analysis goes to the quality of Soderborg's data rather than the reliability of his methodology.  As the Seventh Circuit has held, "district courts can "usurp[ ] the role of the jury . . . if [they] unduly scrutinize[ ] the quality of an expert's data and conclusions rather than the

reliability of the methodology the expert employed." *Gilbert v. Lands' End, Inc.*, 158 F.4th at 849, *quoting Manpower*, 732 F.3d at 806. The Court declines to usurp that role here based solely on plaintiffs' complaints that Soderborg failed to use a more fulsome data set, which goes to the weight of his testimony, and not to its admissibility. *See, e.g.*, *Corzo v. Brown Univ.*, No. 22 C 125, 2025 WL 2753400, at *7 (N.D.Ill. Sept. 29, 2025) ("[W]hether Singer used the wrong data, or even incorrect or incomplete data, goes to the weight to be afforded to his model.").

Furthermore, and more importantly, Soderborg did not simply ignore the missing data and proceed with his analysis without consideration as plaintiffs imply. Instead, recognizing that the lost data would have the "*greatest* effect on MY 2012," he omitted any comparison between the 6R80 and the 10R80 for MY 2012 and MY 2020. (Dckt. #302-2 at 22 n. 24 (emphasis added)). Any attack on the scope of his analysis for only three years (as opposed to more) or on the accuracy and strength of the data he relied on for those three years is better left for cross-examination and the finder of fact. *See In re Allstate Corp. Secs. Litig.*, No. 16 C 10510, 2022 WL 842737, at *9 (N.D.Ill. Jan. 10, 2022) ("It is for the fact finder to determine whether Leverty's choice of data inputs render his analysis either more or less persuasive than that which is offered by Defendants.").

Plaintiffs' attack on Soderborg's use of the 6R80 as a proper benchmark for comparison in warranty claims likewise goes to the weight of the testimony and not to its admissibility. *See e.g., DeLong Co. v. Syngenta AG*, No. 23-CV-321-JDP, 2024 WL 1343592, at *12 (W.D.Wis. Mar. 29, 2024) ("The court will not exclude Carter's opinions based on his choice of a benchmark period" and defendant is free to raise it other criticisms of [the expert's benchmark period, during cross examination."); *Elorac, Inc. v. Sanofi-Aventis Canada, Inc.*, No. 14 C 1859, 2017 WL 3592775, at *11 (N.D.Ill. Aug. 21, 2017) ("The Court concludes that [the expert] was

qualified to perform this analysis and his analysis is reliable in this respect; if he erred by choosing the wrong benchmark product, [defendant] may attempt to so demonstrate on cross-examination, but it provides no reason to bar his testimony.").  Moreover, at a minimum, plaintiffs themselves relied on the 6R80 as a benchmark/proxy for their own proposed replacement cost damages.  (*See* Dckt. #367 at 40 ("[A]s an additional measure by which the factfinder can determine the damage done to Class Members by Ford's acts and omissions, Plaintiffs submitted evidence demonstrating the approximate cost of removing the defective 10R80 Transmission, in exchange for another.")).  As such, Soderborg's reliance on the same benchmark should not surprise plaintiffs and plaintiffs are free to attack the propriety of the benchmark during cross-examination.

For all of these reasons, the Court, in its discretion, denies plaintiffs' request to exclude Opinion Nos. 1 and 2 in Soderborg's opening report.  The Court addresses plaintiffs' request to exclude Soderborg's Opinion No. 11 (in his rebuttal report) below.

**B.      Ford's Motion to Exclude the Expert Opinions and Testimony of Frank Bernatowicz.**

Plaintiffs retained Frank Bernatowicz to "analyze and rebut the opinions" of Soderborg. (Dckt. #302-4 at 2).  Ford now seeks to exclude the entirety of Bernatowicz's report, arguing that he is unqualified and that, even if he were qualified, his opinions are otherwise inadmissible because they are unreliable, irrelevant, and/or speculative.  For the reasons that follow, Ford's motion is granted in part and denied in part.

**1.   Bernatowicz's experience and expert report.**

Bernatowicz holds a Bachelor of Science in Electrical Engineering from the University of Illinois, a Master of Business Administration from Loyola University, and has been a Certified Public Accountant since 1984.  (Dckt. #302-4 at 3).  From 1976 to 1984, he served as a testing

16

engineer and project manager for the Commonwealth Edison Company where he was involved in the management and construction of over 75 air and water quality projects. (*Id*.). Bernatowicz has also held leadership positions in various accounting and consulting firms since 1984, including at Ernst & Young and PricewaterhouseCoopers. (*Id*. at 3–4). Currently, Bernatowicz serves as the founder and managing partner of the FAB Group. (*Id*. at 3). The FAB Group is a consulting firm providing economic, valuation, accounting, and financial advisory to companies in a variety of matters, including litigation, bankruptcy, crisis management and general advisory services. (*Id*.).

Since 1984, Bernatowicz asserts that he has regularly served as an expert witness on economic, valuation, financial, and accounting issues in a variety of litigation matters, including class action disputes involving automobiles and components and various defect and warranty claims related thereto. (*Id*. at 4–5). He further attests that he has consulted "on other disputes and claims related [to] warranty data and consumer insights and/or complaints in the automative supply chain as well as various other industries." (*Id*. at 4).

Plaintiffs retained Bernatowicz to analyze and rebut the opinions of Soderborg. To do so, Bernatowicz set out each of Soderborg's opinions in his opening report, and then offered his own rebuttal opinions in response, which, as relevant to Ford's motion to exclude, are as follows.

First, in response to Soderborg Opinion No. 1—that warranty claim rates vary substantially across engine type, drivetrain, and body/cab style—Bernatowicz asserts (improperly) that Soderborg's calculations are unreliable because they are based on "estimated *future* rates using the [K-M] statistical model," the reliability of which he maintains has not been established in this application, (hereinafter the "**Unreliable Modeling Opinion**")[4] (emphasis

---

[4] For consistency, the Court classifies Bernatowicz's opinions in the same manner as Ford did in its motion to exclude.

added). (*Id*. at 6–7). Bernatowicz repeats his critique of Soderborg's purported reliance on estimated future/forecasted rates throughout his report. Moreover, Bernatowicz contends that it was arbitrary for Soderborg to consider the substantial variances in the warranty claim rates across drivetrain and engine types and body/cab style, (hereinafter, the "**Arbitrary Distinction Opinion**"). (*Id*. at 8).

Next, in response to Soderborg's Opinion No. 2—that the 6R80 Transmission did not perform better than the 10R80 Transmission—Bernatowicz takes issue with Soderborg's use of the 6R80 Transmission as a benchmark. Specifically, Bernatowicz maintains that it is his "understanding" that the 6R80 Transmission was the subject of at least one significant transmission recall, and, as such, Soderborg's "failure to recognize how inappropriate and problematic the use of the admittedly defective 6R80 as a benchmark upon which to compare the 10R80 is speculative and unreliable," (hereinafter, the "**Reasonable Benchmark Opinion**"). (*Id*. at 9).

Bernatowicz also opines that Soderborg's analysis is based on incomplete data because he: (1) omitted certain Customer Care Codes that could be related to the complained of defect; (2) failed to account for under-reported warranty claims, particularly given evidence in the record that customers were dissuaded from bringing in their vehicles; and (3) does not include all sources of customer contact with the dealers and manufacturer, (hereinafter, the "**Underreporting Opinion**"). (*Id*. at 14).

Finally, Bernatowicz set out to conduct his own analysis of Ford's warranty data and the NHTSA complaints. His analysis revealed that: (1) transmission claims for MY 2017–MY 2020 10R80 vehicles ranged from 3.8% (for a portion of 2020) to 8.7%, with an average of 6.6% (*id*. at 10); (2) 20% of all MY 2017–MY 2020 10R80 vehicles had one or more visits for

transmission claims, (*id*. at 11); (3) Ford's overall warranty claim-rates are "among the highest compared to other auto manufacturers" according to his review of "Warranty Week" newsletters, (*id*. at 11); and (4) based on his review of the NHTSA complaints, the F-150 "ranks near the top in overall [NHTSA] complaints" and either "#1" or "#2" in Powertrain complaints depending on the selected models used for comparison, (*id*. at 14–16, 17), (hereinafter, the "**Comparative Analysis Opinion**").

Ford now moves the Court to exclude the entirety of Bernatowicz's report and testimony, arguing that he is unqualified to offer opinions on warranty claims, and that, even if he were qualified, his opinions are otherwise inadmissible because they are unreliable, irrelevant, and/or speculative.

### 2. Bernatowicz is qualified to opine on Ford's warranty claim rates.

Ford first argues that Bernatowicz is generally unqualified to render any of his warranty-related opinions in response to Soderborg's report because he lacks relevant education or experience in reliability and warranty analysis, statistics (including the K-M Model used by Soderborg), and the 10R80 Transmission. The Court disagrees.

As stated above, a witness may be qualified by "knowledge, skill, experience, training, or education." Fed.R.Evid. 702. To determine whether an expert is qualified in this regard, the court must ask "not whether an expert witness is qualified in general, but whether his qualifications provide a foundation for [him] to answer a specific question." *Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010); *see also Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir. 1990) ("Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony."). Nonetheless, "[t]he requirement that an expert be

qualified by knowledge, skill, experience, education or training should not be viewed as being particularly rigorous," *Arrington v. City of Chicago*, No. 17 C 04839, 2022 WL 2105871, at *6 (N.D.Ill. June 10, 2022), and "a witness may qualify as an expert even if the opposing party can point to deficiencies in his or her qualifications." *Traharne v. Wayne/Scott Fetzer Co.*, 156 F.Supp.2d 697, 706 (N.D.Ill. 2001).

Here, Bernatowicz, an engineer and accountant by education and trade, has served as a consultant or expert in over 500 matters, including approximately a dozen class actions specific to the automatic industry. Though it appears he most often served as a damages expert in those cases, Bernatowicz testified at his deposition that warranty analysis was often an "integral component" of his damages analysis and that an "analysis of warranty claims" is "part and parcel of all of these suits." (Dckt. #302-5 at 21, 26). The Court finds that Bernatowicz's experience analyzing similar data sets in automotive cases, along with his education and other experience, demonstrates that he is, at a minimum, qualified to offer his opinions in response to Soderborg's analysis of Ford's warranty claims data. *Simmons v. Ford Motor Co.*, No. 18-CV-81558-RAR, 2022 WL 168540, at *5 (S.D.Fla. Jan. 18, 2022) ("[T]he Court is satisfied that Dr. Taylor is qualified to perform the relatively simple statistical analysis in this case and is well beyond 'minimally qualified' to analyze and opine on the warranty rates of Class Vehicles.").

And—contrary to Ford's assertion—it is of no moment that he does not have extensive training in statistics, specific experience with Ford's warranty claims system, or even with the 10R80 Transmission itself, particularly given that neither Soderborg nor Bernatowicz purport to offer a technical opinion. *See, e.g.*, *Fox v. Gen. Motors LLC*, No. 1:17-CV-209-MHC, 2019 WL 3483171, at *8 (N.D.Ga. Feb. 4, 2019) ("Using statistical tools to analyze a dataset is a common practice in many fields; one does not need a degree in statistics to be able to understand and

apply basic statistical concepts."); *Sloan v. Gen. Motors LLC*, No. 16-CV-07244-EMC, 2020 WL 1955643, at *37 (N.D.Cal. Apr. 23, 2020) ("The fact that he has not applied his modeling techniques, statistical examinations, or other mathematical analyses to warranty data specifically does not establish he is unqualified to do so."); *Johnson v. Ridge Tool Mfg. Co., Inc.*, No. 21 C 1939, 2025 WL 2430567, at *3 (N.D.Ill. Aug. 22, 2025) ("True, he may not have actual experience with the particular machine in this case, but he need not be the best expert in the field in order to be qualified.").

For these reasons, Ford's request to exclude Bernatowicz's report and testimony based on his qualifications alone is denied and the Court turns to each of his specific opinions in dispute.

### 3. Ford's request to exclude Bernatowicz's Unreliable Modeling Opinion is granted.

In response to Soderborg's Opinion No. 1—that warranty claim rates vary substantially across engine type, drivetrain, and body/cab style—Bernatowicz asserted that Soderborg's calculations are unreliable because they are based on "estimated *future* rates using the [K-M] statistical model," the reliability of which he maintains has not been established in this application. It is now undisputed that this Unreliable Modeling Opinion was based on Bernatowicz's mistaken belief that Soderborg's analysis included *forecasted* claim rates. Accordingly, with no objection from plaintiffs, Bernatowicz is barred from offering any testimony regarding the unreliability of "estimated future rates." (*See* Dckt. #339 at 10 (conceding as such)).

Furthermore, because Bernatowicz's critique of Soderborg's use of the K-M statistical model in his report was fully grounded in his misunderstanding of its application, Bernatowicz is barred from offering any additional critique of the K-M model that was not previously disclosed in his report (even if such a critique was later offered at his deposition). *See Chiriboga v. Nat'l*

*R.R. Passenger Corp.*, No. 08 C 7293, 2011 WL 2295281, at *5 (N.D.Ill. June 9, 2011) ("A party may not cure deficient expert reports by supplementing them with later deposition testimony."). Indeed, "[a]llowing an expert to offer new opinions at deposition would create chaos, inject uncertainty, invite sandbagging, and undermine the whole point of disclosure requirements mandated by the Federal Rules. *See, e.g.*, *Wilda v. JLG Indus.*, Inc., No. 16-CV-10088, 2021 WL 496338, at *4 (N.D.Ill. Feb. 10, 2021).

### 4. Ford's request to exclude Bernatowicz's Reasonable Benchmark Opinion is granted.

In rebutting Soderborg's report, Bernatowicz also attacked Soderborg's use of the 6R80 as a benchmark as "unreasonable" based on his "understanding that recalls of at least 1.3 million trucks with the 6R80 occurred" and the 6R80 was thus itself the "subject of unacceptable performance." (Dckt. #302-4 at 9). Ford seeks to exclude this opinion, arguing that it is improper *ipse dixit*.[5] The Court agrees.

"In an *ipse dixit* opinion, the expert asserts a 'bottom line' conclusion, but lacks any articulable facts to substantiate that conclusion or completely fails to explain the reasoning or methods employed to reach that conclusion." *In re Fluidmaster, Inc., Water Connector Components Prods. Liab. Litig.*, No. 14-cv-5696, 2017 WL 1196990, at *7 (N.D.Ill. Mar. 31, 2017). An expert's *ipse dixit* is inadmissible because "[a]n expert who supplies nothing but a bottom line supplies nothing of value to the judicial process." *Wendler & Ezra, P.C. v. Am. Int'l Grp., Inc.*, 521 F.3d 790, 791 (7th Cir. 2008), *quoting Mid-State Fertilizer Co. v. Exch. Nat'l Bank*, 877 F.2d 1333, 1339 (7th Cir. 1989). Seventh Circuit "caselaw describes an expert's *ipse dixit* as occurring where 'there is simply too great an analytical gap between the data and the

---

[5] *Ipse dixit* has been defined as "[s]omething asserted but not proved." *Ipse dixit*, Black's Law Dictionary (11th ed. 2019).

opinion proffered.'" *United States v. Owens*, 18 F.4th 928, 941 n.5 (7th Cir. 2021), *quoting C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 832 (7th Cir. 2015).

Here, Bernatowicz offers little to support his Unreasonable Benchmark opinion, let alone sufficient reasoning or methods employed to reach that opinion, even as a rebuttal. Simply put, apart from his citation to a Consumer Reports article regarding the recall, Bernatowicz offers no additional evidence, data, or methodology to support his conclusion that the 6R80 was "subject to unacceptable performance" and thus serves as an unreasonable benchmark. As such, the Unreasonable Benchmark Opinion is excluded as improper *ipse dixit*.[6]

### 5. Ford's request to exclude Bernatowicz's Underreporting Opinion is denied.

Next, Ford asks the Court to exclude Bernatowicz's Underreporting Opinion, in which he opined that Soderborg's dataset was incomplete because, among other things, he omitted certain potentially relevant Customer Care Codes, ignored the possibility of under-reported claims, and failed to include all sources of customer contact. According to Ford, this Underreporting Opinion is inadmissible because it is based upon speculation, unsupported assumptions, or conclusory allegations. The Court disagrees, particularly given Bernatowicz's disclosure as a rebuttal expert.

To begin, Rule 26(a) defines a rebuttal expert, such as Bernatowicz, as one whose testimony is "intended solely to contradict or rebut evidence on the same subject matter

---

[6] Ford also sought to exclude Bernatowicz's Arbitrary Distinction Opinion as improper *ipse dixit*. However, that request appears to be based on a misunderstanding of that Opinion itself. As plaintiffs explain, with this opinion, Bernatowicz simply attempted to articulate that Soderborg did not tie the variation across vehicle types to any specific engineering defect. Soderborg himself has conceded as much, and the Court will thus not exclude Berntaowicz's attack of Soderborg's report in this regard. (*See* Dckt. #340-4 at 234 ("I'm just opining that there is variation and that variation can be inconsistent with a uniform defect.")).

identified by another party."  Fed.R.Civ.P. 26(a)(2)(C)(ii).  "The proper function of rebuttal evidence is to contradict, impeach or defuse the impact of the evidence offered by an adverse party."  *Peals v. Terre Haute Police Dep't*, 535 F.3d 621, 630 (7th Cir. 2008); *Ernst v. City of Chicago*, No. 08 C 4370, 2013 WL 4804837, at *3 (N.D.Ill. Sept. 9, 2013) (noting that the "obvious" and "most useful" thing for a rebuttal expert to do is to address the opposing expert's "points, either in sequence or by identifying them and critiquing them.").

Here, through his Underreporting Opinion, Bernatowicz simply sets out to attack Soderborg's dataset as incomplete in an effort to defuse its impact.  And, contrary to Ford's assertion, Bernatowicz's efforts in this regard are not speculative or otherwise inadmissible.  For example, Bernatowicz points to specific Customer Care Codes that Soderborg excluded, including one that was applied to a named plaintiff in this case, the exclusion of which could have a significant impact on the weight Soderborg's analysis.  (*See e.g.,* Dckt #302-4 at 13 (noting that Soderborg did not include Code E29, which was assigned to plaintiff Barcelona)).  Bernatowicz further cites evidence in the record that Ford may have discouraged customers from bringing in their vehicles for repeat visits, which he maintains Soderborg failed to consider.  This is properly supported rebuttal, and the Court denies Ford's request to exclude the Underreporting Opinion.

### 6.  Ford's request to exclude Bernatowicz's Comparative Analysis Opinions is denied.

Finally, Ford takes issue with Bernatowicz's own analysis of the warranty claims data.  Bernatowicz conducted his own analysis of the warranty claims data and NHTSA complaints, and ultimately concluded that: (1) transmission claims for MY 2017–MY 2020 10R80 vehicles ranged from 3.8% (for a portion of 2020) to 8.7%, with an average of 6.6%, (*id.* at 10); (2) 20% of all MY 2017–MY 2020 10R80 vehicles had one or more visits for transmission claims, (*id.* at

11); (3) Ford's overall warranty claim-rates are "among the highest compared to other auto manufacturers" according to his review of "Warranty Week" newsletters, (*id*. at 11); and (4) based on his review of the NHTSA complaints, the F-150 "ranks near the top in overall [NHTSA] complaints" and either "#1" or "#2" in Powertrain complaints depending on the selected models used for comparison, (*id*. at 14–16, 17).

Ford takes various issues with these Opinions but—as with plaintiffs' attack on Soderborg's Opinion Nos. 1 and 2—the Court construes Ford's attack on Bernatowicz's Comparative Analysis Opinions as an attack on the propriety of his dataset. But again, Ford's attack in this regard goes to the weight of the testimony, not its admissibility. *Gilbert*, 158 F.4th at 849, *quoting Manpower*, 732 F.3d at 806, and, as it refrained from doing with Soderborg, the Court declines to usurp the role of the factfinder with respect to Bernatowicz. Furthermore, as the Seventh Circuit has noted, "[t]hat two different experts reach opposing conclusions from the same information does not render their opinions inadmissible," *Walker v. Soo Line R. Co.*, 208 F.3d 581, 589 (7th Cir. 2000), and Ford will be free to cross-examine Bernatowicz, as appropriate. *See Brown v. City of Chicago*, No. 19 CV 4082, 2024 WL 3791634, at *14 (N.D.Ill. Aug. 13, 2024) ("[D]isagreement is not a basis for exclusion; rather, Brown may cross-examine Marsh on these points and argue them to the jury.").

Accordingly, Ford's motion to exclude the Comparative Analysis Opinions is denied.

### C. Plaintiffs' Request to Exclude Soderborg Rebuttal Opinion No. 11 is Granted.

In response to Bernatowicz's report, Soderborg prepared his own rebuttal in which he asserted a number of responses to Bernatowicz's report, and formulated **Opinion No. 11**, which is as follows:

(11) The warranty claim set related to harsh shifting as broadly described by Plaintiffs' complaints results in a wide variety of customer concerns, conditions, and repairs that does not appear to be consistent with a single, uniform defect across all 10R80 transmissions.

(Dckt. #302-3 at 21).  Plaintiffs now argue that Opinion No. 11 must be excluded as improper rebuttal.  The Court agrees.

To reiterate, "[t]he proper function of rebuttal evidence is to contradict, impeach or defuse the impact of the evidence offered by an adverse party."  *Peals*, 535 F.3d at 630. "Testimony offered only as additional support to an argument made in a case in chief, if not offered to contradict, impeach or defuse the impact of the evidence offered by an adverse party, is improper on rebuttal."  *Id.* (emphasis added).

"[T]he measure of proper rebuttal is not whether it offers support for arguments that could have been raised in the case-in-chief, but whether it directly refutes arguments offered by the opposition."  *Africano v. Atrium Med. Corp.*, No. 17 CV 7238, 2019 WL 5085338, at *2 (N.D.Ill. Oct. 10, 2019), *objections overruled*, No. 17-CV-7238, 2020 WL 5691596 (N.D.Ill. Sept. 3, 2020) (citing *Pantaleo v. Hayes*, No. 08 CV 6419, 2011 WL 2517265, at *1 (N.D.Ill. June 23, 2011)); *Bakov v. Consol. World Travel, Inc.,* No. 15 C 2980, 2019 WL 1294659, at *11 (N.D.Ill. Mar. 21, 2019) ("Rule 26 does not automatically exclude evidence that an expert could have included in his original report") (internal quotation marks omitted).  Consequently, "the mere fact that opinions offered in a rebuttal report touch upon the same subjects covered in an initial expert report does not require that the rebuttal be stricken."  *Cage v. City of Chicago*, No. 09 C 3078, 2012 WL 5557410, at *5 (N.D.Ill. Nov. 14, 2012), *quoting Green v. Kubota Tractor Corp.*, No. 09 CV 7290, 2012 WL 1416465, at *5 (N.D.Ill. Apr. 24, 2012).  Indeed, rebuttal reports "may cite new evidence and data so long as the new evidence and data is offered to directly contradict or rebut the opposing party's expert."  *Withrow v. Spears,* 967 F.Supp.2d 982,

26

1002 (D.Del. 2013) (cleaned up); *Ernst v. City of Chicago,* No. 08 C 4370, 2013 WL 4804837, at

*2 (N.D.Ill. Sept. 9, 2013) (same).

Thus, when evaluating whether a proposed rebuttal report is appropriate, the "'focus is

not on the similarity between the initial and rebuttal reports, but rather on whether the opinions

expressed in a rebuttal report rebut the same subject matter identified in the other party's expert

report.'" *Cage*, 2012 WL 5557410, at *5, *quoting Green,* 2012 WL 1416465, at *5. As a

colleague in this District further elaborated:

> The sequence of disclosures of experts' opinions envisions a winnowing process,
> not an expansion. By way of example, a plaintiff's initial (sometimes referred to as
> "affirmative") expert report may identify opinions #1, #2, and #3. Subsequently, a
> defendant's expert report (sometimes referred to as "response reports") may rebut
> opinions #1, #2, and #3, but also add opinions #4, #5, and #6. That defendant's
> expert report is a proper rebuttal in that it contradicts the first three opinions. But
> that defendant's expert report may also be an appropriate initial expert report by
> presenting opinions #4, #5, and #6. Under these circumstances, Rule 26(a)(2)(D)(ii)
> envisions that the plaintiff be given the opportunity to provide—if it chooses—a
> rebuttal expert to contradict opinions #4, #5, and #6. But what is not permissible is
> allowing plaintiff to now—by way of a "rebuttal"—offer opinions #7, #8, and #9.

*McCann v. Cullinan*, No. 11 CV 50125, 2016 WL 4593835, at *3 (N.D.Ill. Sept. 2, 2016), *report*

*and recommendation adopted sub nom. McCann v. Ogle Cty.,* No. 11 CV 50125, 2016 WL

5807922 (N.D.Ill. Oct. 5, 2016).

Here, Soderborg's Opinion No. 11 plainly falls within the impermissible sequence of

rebuttal. Indeed, Soderborg himself testified at his deposition that Opinion No. 11 "is not exactly

a response to [Bernatowicz's] report" and is instead "something different." (Dckt. #340-4 at

299–300). And, while Ford attempts to shoehorn Opinion No. 11 in as a proper response to

plaintiffs' technical expert Stapleford's report, such an attempt is directly belied by Soderborg's

own statement in his rebuttal report that "[c]ounsel for Ford requested that I review the

Declaration of Frank Bernatowicz . . . and, if appropriate, provide a written response." (Dckt.

#302-3 at 6).  Given this record, allowing Opinion No. 11 to stand would plainly prejudice plaintiffs and their request to exclude Opinion No. 11 is granted.

## CONCLUSION

For all of these reasons, plaintiffs' motion to exclude the testimony of Nathan Soderborg, (Dckt. #306), is granted in part and denied in part, and defendant's motion to exclude the testimony of Frank Bernatowicz, (Dckt. #302), is granted in part and denied in part.


**DATE: February 4, 2026**

**Jeffrey I. Cummings**
**United States District Court Judge**