IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JUSTIN O'CONNOR, *et al.*, on behalf of himself and all others similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | No. 19-cv-5045 |
| v. | ) ) | Judge Jeffrey I. Cummings |
| FORD MOTOR CO., | ) ) | |
| Defendant. | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Plaintiffs Michael Barcelona, Susan Heller, Bryan Smith, Jason Steen, and Stanislaw Zielinski (collectively, "plaintiffs") bring this putative class action against defendant Ford Motor Company ("defendant" or "Ford") for damages allegedly arising out of defendant's sale and lease of 2017 to 2020 Model Year Ford F-150 trucks with defective 10-speed automatic transmissions. The parties have filed competing motions for class certification and for denial of class certification, along with a panoply of motions seeking to exclude certain expert testimony pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals*, *Inc.*, 509 U.S. 579 (1993).

In this Opinion, the Court addresses the pending *Daubert* motions targeting the parties' damages experts, namely defendant's motions to exclude the testimony of Steven Gaskin, (Dckt. #290), and Colin Weir, (Dckt. #293), and plaintiffs' motion to exclude the testimony of David Harless, (Dckt. #284).[1] For the reasons set forth below, Ford's motion to exclude the expert

---

[1] A listing of all filings related to these motions can be found in the parties' February 12, 2025 joint status report, (Dckt. #421).

testimony of Gaskin is denied, Ford's motion to exclude the expert testimony of Weir is granted

in part and denied in part, and plaintiffs' motion to exclude the testimony of Harless is denied.

## I.      RELEVANT BACKGROUND[2]

Plaintiffs bring this putative class action on behalf of all similarly situated individuals

who purchased or leased Ford's 2017 to 2020 Model Year F-150 trucks equipped with a 10-speed

"10R80 Transmission" that suffers from an alleged defect (hereinafter, the "Class Vehicles").

According to plaintiffs, from the beginning of Ford's development of its 10R80 Transmission—

which served to replace Ford's 6-speed "6R80 Transmission"—"Ford has been aware of harsh,

jerky, erratic, lunging, hesitating, and otherwise inconsistent shifting in the 10R80 Transmission,

but has been unable to resolve these malfunctions caused by the 'Defect.'" (Dckt. #325 at 8).  In

plaintiffs' view, "the Defect is the inability of the Transmission's internal seals to maintain the

intended and necessary pressure on either side of the seal to ensure secure and timely

engagements of each clutch required for a specific gear." (Dckt. #325 at 8).  For its part, Ford

denies that there is any such defect in its 10R80 Transmission.

Plaintiffs have moved this Court to certify a class on behalf of similarly situated

individuals in their respective states, *i.e.*, Massachusetts (Barcelona), New York (Heller),

California (Smith and Steen), and Zielinski (Illinois).  Specifically, plaintiffs seek to represent:

> All persons in [**STATE**] who formerly or currently own or leased one or more 2017-
> 2020 Model Year F-150 truck equipped with a 10R80 10-speed automatic
> transmission.

---

[2] The Court presumes familiarity with the facts of this case and includes only those facts that are relevant
to the *Daubert* motions currently before the Court.

(Dckt. #325 at 8-9). On behalf of these putative class members, plaintiffs bring claims for breach of implied and express warranty, fraudulent omission, and violation of consumer protection statutes.

Plaintiffs seek compensatory damages and injunctive relief. With respect to compensatory damages, plaintiffs have presented two potential theories for recovery. First, plaintiffs maintain that putative class members overpaid for their vehicles because of Ford's non-disclosure of the alleged defect. (*See* Dckt. #63 ¶10 ("Had Plaintiffs and Class Members known about the Transmission Defect at the time of sale or lease, as well as the associated costs related to the Transmission Defect, Plaintiffs would not have purchased the Class Vehicles or would have paid less for them.")). Under plaintiffs' "overpayment" model of damages, class members would recover the difference between the price they paid for their vehicles at the point of sale and the value of those vehicles *without* the defect. Alternatively, plaintiffs present a "proxy" model of damages "whereby the sum of the costs of the parts and labor required to replace a 10R80 Transmission can be used to approximate, or as a proxy for, the damage inflicted on Class Members from buying a Class Vehicle with a defective Transmission." (Dckt. #367 at 40).

In their competing submissions regarding class certification, the parties dispute whether plaintiffs' purported damages are capable of measurement on a class-wide basis as is required to receive certification of a Rule 23(b)(3) class action seeking damages on a class wide basis. *See Comcast Corp. v. Behrend*, 569 U.S. 27, 34–36 (2013). In support of their positions, the parties rely on their respective damages experts, and they now seek to exclude the opinions of the other side's experts.

## II.   LEGAL STANDARD

The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  *See Haley v. Kolbe &*

*Kolbe Millwork Co.*, 863 F.3d 600, 611 (7th Cir. 2017).  Pursuant to Rule 702,

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Rule 702 delegates to district courts the responsibility of ensuring that expert testimony is both

reliable and relevant.  *Daubert*, 509 U.S. at 598.  When fulfilling this gatekeeping role, courts in

the Seventh Circuit evaluate: "(1) the proffered expert's *qualifications*; (2) the *reliability* of the

expert's methodology; and (3) the *relevance* of the expert's testimony."  *Gopalratnam v. Hewlett-*

*Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017) (emphasis added).

Regarding the first prong, a witness may be qualified to testify based on relevant

knowledge, skill, experience, training, or education.  Fed.R.Evid. 702, advisory committee notes.

"The Court 'must look at each of the conclusions [an expert] draws individually to see if he has

the adequate education, skill, and training to reach them.'"  *Webster Bank, N.A. v. Pierce &*

*Assocs. P.C.*, No. 16-cv-2522, 2020 WL 616467, at *3 (N.D.Ill. Feb. 10, 2020), *quoting Hall v.*

*Flannery*, 840 F.3d 922, 926 (7th Cir. 2016).  As to the second prong, expert opinions are

sufficiently reliable when they are based on sound methodology and can be properly applied to

4

the facts. *Daubert*, 509 U.S. at 592–93. This inquiry is "'necessarily flexible' and the court has broad latitude in its determination of reliability." *Est. of Damiani v. Allen*, 4:16-cv-00053-RLY-DML, 2018 WL 4095080, at \*5 (S.D.Ind. Aug. 28, 2018), *quoting Robinson ex rel. Irwin v. City of Madison*, No. 15-cv-502-jdp, 2017 WL 564682, at \*8 (W.D.Wisc. Feb. 13, 2017). Finally, to be relevant, expert testimony must "help the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702.

The proponent of the expert bears the burden of establishing the admissibility of his opinions by a preponderance of the evidence. *Varlen Corp. v. Liberty Mut. Ins. Co.*, 924 F.3d 456, 459 (7th Cir. 2019); Fed.R.Evid. 702. Whether to admit expert testimony rests within the discretion of the court. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997). The Court notes that "[t]he rejection of expert testimony is the exception rather than the rule." *Joseph v. Carnes*, No. 13-CV-2279, 2015 WL 2091903, at \*1 (N.D.Ill. Apr. 30, 2015), *quoting Spearman Indus. v. St. Paul Fire & Marine Ins. Co.*, 128 F.Supp.2d 1148, 1150 (N.D.Ill. 2001).

When an "expert's report or testimony is critical to class certification," the district court "must make the necessary factual and legal inquiries and decide all relevant contested issues prior to certification." *Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 815, 817 (7th Cir. 2010). "An expert's testimony is critical if it is 'important to an issue decisive for the motion for class certification.'" *In re Turkey Antitrust Litig.*, No. 19 C 8318, 2025 WL 264021, at \*7 (N.D.Ill. Jan. 22, 2025), *quoting Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 812 (7th Cir. 2012). Because the opinions of the damages experts are critical to the parties' dispute regarding whether plaintiffs' damages are capable of measurement on a class-wide basis, the Court proceeds with a full analysis of the parties' putative damages experts under *Daubert* and Rule 702 prior to deciding whether class certification is warranted.

### III.    ANALYSIS

#### A.    Ford's Motions to Exclude the Opening Expert Opinions and Testimony of Steven Gaskin and Colin Weir

In support of their position that plaintiffs' purported damages are capable of measurement on a class-wide basis, plaintiffs retained Steven Gaskin and Colin Weir to work in tandem to present a methodology for calculating class-wide damages.  Ford seeks to exclude both Gaskin's and Weir's opening expert reports and testimony (and, as discussed in more detail below, certain of Weir's rebuttal opinions) as unreliable, irrelevant, unhelpful, or otherwise improper.

##### 1.    Gaskin's and Weir's Experience

Steven Gaskin is an "independent survey expert" who holds Bachelor of Science and Master of Science degrees in Management from the Massachusetts Institute of Technology. (Dckt. #290-2 at 3).  He served as a Principal at Applied Marketing Science, Inc. from 2004–2020.  (*Id*.).  He has served as an expert witness in numerous legal disputes, and is often called upon to "project what customers would have done in different market scenarios and to measure price premia of product features or reduction in market value due to the absence or defective performance of product features, often through conjoint analysis."  (*Id*.).  He has extensive experience in developing, testing, and analyzing surveys, and in interpreting qualitative and quantitative research about consumer attitudes, intensions, and behavior.  (*Id*.).

Colin Weir holds a Bachelor of Arts degree in Business Economics from The College of Wooster and a Master of Business Administration from Northeastern University.  (Dckt. #290-3 at 3).  His graduate studies included training on conjoint analysis software, and he engages in continuing education in advanced conjoint design, execution, and analysis.  (*Id*. at 4).  Weir currently serves as the president of Economics and Technology, Inc., a research and consulting firm specializing in economics, statistics, regulation, and public policy.  (*Id*. at 3).  He has

consulted and served as an expert witness on a variety of consumer and products cases, including those in which he participated in the design, execution, and/or economic suitability of conjoint surveys.  (*Id*.).

Ford does not take issue with the qualifications of Gaskin and Weir to render their various opinions, nor will the Court given their relevant education and extensive experience.

## 2.  Gaskin's and Weir's Expert Reports and Testimony

Plaintiffs asked Gaskin and Weir to propose a methodology to assess class-wide damages. Specifically, plaintiffs retained Gaskin to "design and describe a market research survey and analysis that would enable [him] to assess the reduction in market value (measured in dollars and/or percentage terms) that would result from disclosure of the Automatic Transmission Defect."  (Dckt. #290-2 at 4).  Based on his expertise and experience, and through consultation with Weir, Gaskin selected "choice-based conjoint" ("CBC") analysis as the most appropriate survey methodology.  (*Id*. at 5).  The "general idea behind conjoint analysis is that the market value for a particular product is driven by features, or descriptions of features, embodied in that product."  (*Id*. at 8).  Gaskin describes conjoint analysis as a "tool that enjoys wide use and acceptance in the field of market research," and he maintains that he has used this method successfully in other litigation, including other automobile defect cases, where the objective was to determine the relative market value of a product with or without a particular product feature or given the disclosure or non-disclosure of a product defect at the time of purchase.  (*Id*. at 5, 6–8).

Gaskin sets forth the survey he proposes to run to estimate the reduction in the market value of the Class Vehicles with the purported transmission defect compared to those same vehicles with a transmission not subject to the defect.  In short, Gaskin intends to present survey respondents with twelve choice tasks, each containing a set of three different, hypothetical

7

product profiles. (*Id*. at 25). Product profiles will be composed of eight attributes in the survey: (i) Make/Model; (ii) Trim Level; (iii) Automatic Transmission; (iv) Cab Type; (v) Bed Length; (vi) Driver's Seat; (vii) Door Latches; and (viii) Price, and respondents will be advised to assume that all other features are identical. (*Id*. at 12, 20 n.23 ). Three of the eight vehicle attributes— the automatic transmission, driver's seat, and door latches—are allegedly defective. (*Id*. at 14– 15). With respect to the automatic transmission attribute, respondents will be presented with two options to select from: (1) the included automatic transmission may cause the vehicle to "shift gears harshly and erratically, causing the vehicle to jerk, lunge, clunk, and hesitate between gears;" and (2) that the included automatic transmission works "reliably when shifting between gears." (*Id*. at 14, 22). The other two defective attributes, *i.e.*, the driver's seat and door latches, are included as "distractors" to "make it less clear which is the main feature of interest in the survey." (*Id*. at 15).

Gaskin proposes that he will pretest the survey on twenty respondents to "identify and correct possible issues with the survey." (*Id*. at 16-17). After finalizing the survey based on the pretest, he will "target respondents who are United States residents 18 years of age or older who indicate they have purchased or leased a new or used Ford F-150 of model years 2017 to the present, as well as respondents who have purchased or leased a new or used competitive pickup truck from the same model years." (*Id*. at 17). To do so, he will contract with "a leading Internet survey panel company, which has pre-recruited potential respondents who indicate their willingness to participate in consumer surveys." (*Id*.). After additional pre-screening procedures and validation, the survey will be administered (in the manner set forth in detail in the report) to at least 300 people. (*Id*. at 17–19).

After administration of the survey, Gaskin will run a regression of responses to determine the value placed on each attribute, known as a "partworth." (*Id*. at 26–27). Using a Market-Based method, Gaskin will then use the partworths to simulate a market in which all customers react to the same choice set of products and prices. (*Id.* at 28). Through further analysis, Gaskin will ultimately determine the reduction in market value (in dollars) for a vehicle with the transmission defect, which he will then present on a percentage basis as well. (*Id*. at 29–30).

As for Weir, he intends to rely on Gaskin's calculation of the reduction in value (based on the proposed survey results) to calculate class-wide overpayment damages using historical sales data of the Class Vehicles. Before doing so, Weir articulates why, in his economist opinion, (1) the conjoint survey is an appropriate tool; (2) Gaskin's survey design will be fully capable of measuring the reduction in economic value of the Class Vehicles at the time and point of sale as a result of the Defect; and (3) the survey properly accounts for supply side considerations. (Dckt. #290-3 at 6–15).

Next, Weir explains that he will use a "straightforward" calculation "based upon a common methodology" to assess class-wide overpayment damages, wherein the percentage reduction in value figure (from Gaskin) is multiplied by the total number of Class Vehicles sold and the average purchase price per vehicle. (*Id*. at 16). According to Weir, this method "will be used to calculate damages to the Class in the aggregate, using the same common formula . . . the results of the proposed Gaskin survey" and "[n]o individualized inquiry will be required." (*Id*. at 17).

Alternatively, Weir opines that class-wide damages could be assessed by using the estimated replacement cost set forth by plaintiffs' technical expert Michael Stapleford to replace a defective 10R80 transmission with one that is not defective. (*Id*.). To do so, Weir would

simply multiply the number of Class Vehicles by Stapleford's estimated cost to replace the transmission (for a 2WD or 4WD, as appropriate). (*Id*.).

For a variety of reasons, Ford now seeks to exclude the entirety of Gaskin's and Weir's opening expert reports and related testimony. The Court will address each in turn, but first reiterates the standard for reliability of expert testimony, including in the context of consumer surveys such as proposed here.

### 3. Standard for determining the reliability of expert testimony.

Under Seventh Circuit precedent, "courts should evaluate the reliability of a qualified expert's testimony by considering, amongst other factors: (1) whether the proffered theory can be and has been tested; (2) whether the theory has been subjected to peer review; (3) whether the theory has been evaluated in light of potential rates of error; and (4) whether the theory has been accepted in the relevant scientific community." *Gopalratnam*, 877 F.3d at 779 (cleaned up). The Seventh Circuit has also endorsed six additional factors from the advisory notes of the 2000 amendment to Rule 702, that bear on the reliability of an expert's testimony, namely:

> (5) whether maintenance standards and controls exist; (6) whether the testimony relates to matters growing naturally and directly out of research they have conducted independent of the litigation, or developed expressly for purposes of testifying; (7) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion; (8) whether the expert has adequately accounted for obvious alternative explanations; (9) whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting; and (10) whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.

*Gopalratnam*, 877 F.3d at 779–80. It is well-settled, however, that "this list is neither exhaustive nor mandatory." *Id*. at 780; *see also Krik v. Exxon Mobil Corp.*, 870 F.3d 669, 674 (7th Cir. 2017) ("Despite the list, we have repeatedly emphasized that no single factor is either required in the analysis or dispositive as to its outcome.") (cleaned up). "Instead, 'a trial court *may* consider

10

one or more of the more specific factors that *Daubert* mentioned when doing so will help determine that testimony's reliability.'" *Gopalratnam*, 877 F.3d at 780 (emphasis in original), *quoting Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999)); *see also Krik*, 870 F.3d at 674 ("The district court may apply these factors flexibly as the case requires.").

Ultimately, the focus in a *Daubert* inquiry "must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595; *see also Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 806 (7th Cir. 2013) ("Reliability . . . is primarily a question of the validity of the methodology employed by an expert, not the quality of the data used in applying the methodology or the conclusions produced.").[3] "District courts can 'usurp[ ] the role of the jury . . . if [they] unduly scrutinize[ ] the quality of an expert's data and conclusions rather than the reliability of the methodology the expert employed.'" *Gilbert v. Lands' End, Inc.*, 158 F.4th 839, 849 (7th Cir. 2025), *quoting Manpower*, 732 F.3d at 806.

"This is not to say that an expert may rely on data that has no quantitative or qualitative connection to the methodology employed." *Id.* at 808. As the Seventh Circuit elaborated in *Gopalratnam*,

> Rule 702 explicitly requires that expert testimony be "based on sufficient facts or data." In the "quantitative" sense, sufficient facts or data means that the expert considered sufficient data to employ the methodology . . . To be "qualitatively" adequate, an expert must employ those kinds of facts or data on which experts in the field would reasonably rely. We have recognized that the line between conclusions and methodology is not always an easy line to draw. Conclusions and methodology are not entirely distinct from one another. Trained experts commonly

---

[3] As the Seventh Circuit recently acknowledged, the December 2023 amendments to Rule 702 did "alter its reliability subsection to require that 'the expert's opinion reflect[ ] a reliable application of the principles and methods to the facts of the case.'" *Gilbert v. Lands' End, Inc.*, 158 F.4th 839, 848 n.3 (7th Cir. 2025), *quoting* Fed.R.Evid. 702. This amendment was made to clarify that "questions of the sufficiency of an expert's basis[ ]" go to admissibility just as with questions of "the application of the expert's methodology." *Id.*, *quoting* Fed.R.Evid. 702 advisory committee's note to 2023 amendment.

extrapolate from existing data. Nevertheless, the critical inquiry is whether there is a *connection* between the data employed and the opinion offered; it is the opinion connected to existing data only by the *ipse dixit* of the expert that is properly excluded under Rule 702. Said another way, there must be a rational connection between the data and the opinion.

877 F.3d at 781 (cleaned up).

"[C]ourts have generally found consumer survey evidence admissible under *Daubert* if a qualified expert testifies that the survey was conducted according to generally-accepted principles of survey research." *In re Fluidmaster, Inc., Water Connector Components Prods. Liab. Litig.*, No. 14-CV-5696, 2017 WL 1196990, at *28 (N.D.Ill. Mar. 31, 2017), *quoting Menasha Corp. v. News Am. Mktg. In-Store, Inc.*, 238 F.Supp.2d 1024, 1030 (N.D Ill. 2003). "A court assessing whether a survey employs a reliable methodology examines whether '(1) the 'universe' [of respondents] was properly defined; (2) a representative sample of that universe was selected; (3) the questions to be asked of interviewees were framed in a clear, precise and non-leading manner; (4) sound interview procedures were followed by competent interviewers who had no knowledge of the litigation or the purpose for which the survey was conducted; (5) the data gathered was accurately reported; (6) the data was analyzed in accordance with accepted statistical principles[;] and (7) objectivity of the entire process was assured.'" *Fluidmaster, Inc.* 2017 WL 1196990, at *28, *quoting LG Elecs. U.S.A., Inc. v. Whirlpool Corp.*, 661 F.Supp.2d 940, 952 (N.D.Ill. 2009)). Notwithstanding these criteria—which "generally address the weight a fact finder should give the survey," *LG Elecs.*, 661 F.Supp.2d at 952—"only in 'rare' situations will a proffered survey be "so flawed as to be completely unhelpful to the trier of fact and therefore inadmissible." *In re Fluidmaster*, 2017 WL 1196990, at *28, *quoting AHP Subsidiary Holding Co.*, 1 F.3d 611, 618 (7th Cir. 1993).

With this standard in mind, the Court turns to Ford's attacks on Gaskin's and Weir's proposed expert testimony.

> **4.** **Ford's request to exclude Gaskin's and Weir's testimony as irrelevant and unhelpful because the proposed conjoint survey has not yet been conducted is denied.**

At the outset, the Court rejects Ford's attempt to exclude Gaskin's and Weir's testimony in its entirety simply because discovery—which was not bifurcated—is now closed and Gaskin has not yet administered the survey (upon which Weir also intends to rely). This issue has been fully briefed in connection with plaintiffs' motion for post-certification implementation of damages model, (Dckt. #267), and the Court (then Judge Bucklo) previously ordered that any ruling on that motion is "deferred until after ruling on class certification." (Dckt. #327; *see also* Dckt. #418 (terminating plaintiffs' motion without prejudice for consideration after a ruling on class certification)).

Because, at this stage, the Court has not foreclosed plaintiffs from *ever* administering Gaskin's proposed survey, the Court (consistent with the holdings of multiple other district courts) will not exclude Gaskin's and Weir's testimony at this time solely because the survey has not yet been administered. *See, e.g.*, *Lessin v. Ford Motor Co.*, No. 19-CV-01082-AJB-AHG, 2024 WL 5007092, at *3 (S.D.Cal. Oct. 31, 2024) ("Ford's assertion that Gaskin's and Weir's current opinions should be excluded because they have not been conducted nor finalized is unpersuasive and contrary to case law."); *Benson v. Newell Brands, Inc.*, No. 19 C 6836, 2021 WL 5321510, at *5 (N.D.Ill. Nov. 16, 2021) (rejecting defendants' criticisms of an unperformed survey noting that, "[t]his argument misses the mark because plaintiffs' burden at this juncture is not to prove their case . . . it is to show that there is a method of estimating damages that applies class-wide and that method measures damages attributable to plaintiffs' theory of liability."); *see*

*also Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 760 (7th Cir. 2014) ("In determining whether to certify a . . . class the court should begin with a rigorous analysis into whether the plaintiffs' damages are *susceptible of measurement across the entire class*.") (cleaned up and emphasis added).

> **5.** **Ford's request to exclude Gaskin's and Weir's testimony for failure to consider supply-side factors is denied.**

Next, Ford maintains that Gaskin and Weir's proposed conjoint survey is unreliable because it fails to account for necessary supply-side factors. Relying on the fundamental economic tenant that "market value" of a good is determined by the interaction of both supply and demand, Ford maintains that Gaskin and Weir's proposed survey and analysis ignore supply-side factors, (*e.g.*, production costs, profit margins, manufacturing capacitors), and thus fail to reliably determine the market price in the but-for world. In response, plaintiffs maintain that Gaskin and Weir *did* account for supply-side factors sufficient to pass muster under *Daubert*. Like many courts of late, the Court agrees.

Indeed, as courts have recently acknowledged, "conjoint analyses can adequately account for supply-side factors—and can therefore be utilized to estimate price premia without running afoul of *Comcast*—when (1) the prices used in the surveys underlying the analyses reflect the actual market prices that prevailed during the class period; and (2) the quantities used (or assumed) in the statistical calculations reflect the actual quantities of products sold during the class period." *Lessin*, 2024 WL 5007092, at *4, *quoting Hadley v. Kellogg Sales Co.*, 324 F.Supp.3d 1084, 1105 (N.D.Cal. 2018).[4]

---

[4] The Court acknowledges that the 9th Circuit recently reversed in part the District Court's opinion on summary judgment and class certification in *Lessin v. Ford. See Lessin v. Ford Motor Co.,* Case No. 25-2211, 2026 WL 382608 (9th Cir. Feb. 11, 2026). That opinion, however, did not address the District Court's *Daubert* opinion, which remains persuasive authority.

Here, Gaskin and Weir purport to do just that, explaining that the "price range to be used in the survey will reflect the actual market prices that prevailed during the Class period; and (2) the quantity of Class Vehicles to be used (or assumed) in the damages calculation will reflect the actual quantity of such during the Class Period." (Dckt. #290-2 at 13; *see also* Dckt. #290-3 at 15 (Weir's consideration of supply-side factors in the relevant market)). Given Gaskin's and Weir's proposal, and a line of cases supporting plaintiffs' position in almost identical circumstances (even in consideration of a split in authority), the Court simply "cannot conclude that [p]laintiffs have failed to wholesale consider supply-side considerations" such that exclusion is required. *Lessin*, 2024 WL 5007092, at *5; *see also Benson v. Newell Brands, Inc.*, No. 19-CV-06836, 2025 WL 3454980, at *5 (N.D.Ill. Dec. 1, 2025) (collecting cases and declining to exclude expert testimony); *Hawes v. Macy's Stores W., Inc.*, No. 1:17-cv-754, 2022 WL 194407, at *6 (S.D.Ohio Jan. 22, 2022) (explaining that "the clear trend in the federal courts cuts against striking [an expert] report" where the *Daubert* motion is "based on an alleged failure to consider supply-side considerations"); *Stevens v. Ford Motor Co.*, No. 2:18-CV-00456, 2022 WL 19978265, at *12 (S.D.Tex. Sept. 29, 2022) ("After review, the Court agrees with Plaintiffs and finds that Mr. Gaskin's and Mr. Weir's reports adequately consider supply-side factors."); *In re Fisher-Price Rock 'N Play Sleeper Mktg., Sales Pracs. & Prods. Liab. Litig.*, 567 F.Supp.3d 406, 415 (W.D.N.Y. 2021) ("What these two lines of cases indicate is that there is a legitimate difference of opinion, both among judges and experts, about the significance of supply side information in calculating loss of value . . . A difference in opinion is not a basis for exclusion of an expert opinion under *Daubert* standards.").[5]

---

[5] Notably, even in *In re Gen. Motors LLC Ignition Switch Litig.*, 407 F.Supp. 3d 212, 233 (S.D.N.Y. 2019), relied on by Ford, the court described the issue as "a close one."

Of course, Ford's remaining arguments as to the type of data Gaskin and Weir used to determine market prices or whether their consideration of supply-side factors was necessarily sufficient goes to the weight of their testimony not the admissibility. *Lessin*, 2024 WL 5007092, at *5 ("Ford may dispute whether these opinions and the considerations of supply-side factors are sufficient, but the Court finds these disagreements go to the merit of the issue and the weight of the competing expert opinions."); *see also Johnson v. Glock, Inc.*, No. 20-CV-08807-WHO, 2024 WL 4479863, at *17 (N.D.Cal. Sept. 30, 2024) ("Disputes between the experts on whether specific supply-side factors were appropriately considered or improperly ignored go to weight, not admissibility.").

For these reasons, the Court will not exclude Gaskin's and Weir's testimony for failure to consider supply side factors.

> **6.     Ford's request to exclude Gaskin's report and testimony (and Weir's reliance thereon) because Gaskin purportedly fails to incorporate generally-accepted principles of survey research is denied.**

Next, Ford argues that Gaskin's proposed survey is unreliable because he: (1) fails to use a representative sample; (2) uses biased responses that are not clear, precise, and non-leading; (3) cherry-picks data; and (4) fails to simulate a reasonable market. For the following reasons, the Court disagrees.

> **a.     Representative sample**

"Selecting the right universe of respondents significantly affects the probative value of a consumer survey," because an "erroneous or undefined universe diminishes the survey's reliability." *Zarinebaf v. Champion Petfoods USA Inc.*, No. 18 C 6951, 2022 WL 910638, at *4 (N.D.Ill. Mar. 29, 2022) (cleaned up). "Once the universe is defined, a sample population must be selected that accurately represents the universe." *Id*.

Here, as described above, Gaskin intends to "target respondents who are United States residents 18 years of age or older who indicate they have purchased or leased a new or used Ford F-150 of model years 2017 to the present, as well as respondents who have purchased or leased a new or used competitive pickup truck from the same model years." (Dckt. #290-2 at 17). To do so, he will contract with "a leading Internet survey panel company, which has pre-recruited potential respondents who indicate their willingness to participate in consumer surveys." (*Id.*). As such, contrary to Ford's position, Gaskin proposes a "relevant universe to this case" and his plan to use a survey panel company could, in fact, "increase the impartiality of the survey" as opposed to render it unreliable. *Uncommon, LLC v. Spigen, Inc.*, 305 F.Supp.3d 825, 850 (N.D.Ill. 2018), *aff'd*, 926 F.3d 409 (7th Cir. 2019). Indeed, as plaintiffs correctly note, this "is not a case where [Gaskin] simply interviewed a few thousand random people from across the country," but instead he proposes to focus "on a narrow group of individuals" that recently purchased a Class Vehicle or a competitor vehicle. *Zarinebaf*, 2022 WL 910638, at *4. This proposed representative sample is sufficiently reliable to withstand Ford's attack under *Daubert* and Ford's objections in this regard go to the weight of Gaskin's testimony, not its admissibility.

Similarly, it is of no moment that Gaskin articulated at his deposition (and not expressly in his report) that he intended to use his proposed nationwide sample to support damages for each of the putative state subclasses.[6] As Gaskin testified, in his opinion, his proposed analysis to calculate class-wide damages—premised on nationwide MSRPs—is equally applicable to each putative state subclass, and the existence of state subclasses would not change his proposed survey or expected results. (*See, e.g.*, Dckt. #290-5 at 213 ("I'm doing a nationwide sample. So if it's -- I don't believe [state subclasses are] relevant since . . . nationwide members set a

---

[6] Plaintiffs are no longer seeking certification of a nationwide class in this matter.

17

nationwide market price, which is what an MSRP is.  So I think that it wouldn't really have an effect on my results or my survey."); 214 ("Q: So, essentially, you're saying that if there is, for example, a ten percent reduction in price nationwide, that ten percent reduction would also apply to each state class? A: That's what I'm saying because it's a nationwide number."); & 214–15 ("Q. Do you believe that consumers in one state may have different preferences than consumers in another state? A: They might, but since prices are set nationwide, my analysis takes that into account.  I'm not sure that there's much difference on an automatic transmission defect; to me, I don't see why there would be.")).

In this regard, this case is distinguishable from *In re Emerson Elec. Co. Wet/Dry Vac Mktg. & Sales Litig.*, No. 4:12MD2382 HEA, 2021 WL 5003102 (E.D.Mo. Oct. 28, 2021), relied on by Ford.  There, the court excluded expert testimony where the expert originally conducted an analysis for a nationwide class but, after remand from the 8th Circuit, the focus shifted to statewide classes and the expert indicated that modifications to his original report would be required.  *Id*. at *2.  Here, in contrast, Gaskin was seemingly "aware of the state subclasses when he generated his survey and opinions," and—more importantly—he "does not indicate modifications are necessary."  *In re Coffee*, No. 21-00828-CV-W-BP, 2024 WL 4068778, at *6 (W.D.Mo. July 31, 2024) (distinguishing *In re Emerson* on the same grounds).  So, while Ford is free to cross-examine Gaskin regarding the application of his nationwide analysis to the statewide classes, the Court will not exclude it as unreliable.  *See Sanchez-Knutson v. Ford Motor Co.*, 181 F.Supp.3d 988, 995 (S.D.Fla. 2016) (finding that Ford's challenge that Gaskin used a national sample rather than a Florida sample goes to the weight of his testimony not its admissibility).

18

### b. Biased responses

Next, Ford argues that Gaskin's proposed survey is unreliable because of the attributes he chose to include and his use of "*may*" in his description of (and choice responses related to) the alleged defect.  (*See* Dckt. #291-2 at 22 (describing the alleged defect as one that "*may* cause the automatic transmission to shift gears harshly and erratically and "*may or may not* be" able to be repaired or covered by warranty; *id*. (including "may" in the choice set related to the transmission defect)).  Not only has Gaskin sufficiently articulated the manner in which he selected his attributes, Ford's objections along these lines—including to the purported ambiguous use of the word "*may*"—do not render the survey unreliable.  *See, e.g.*, *Johnson*, 2024 WL 4479863, at *16 ("[Defendants] may challenge Gaskin at trial on why he included or excluded different attributes.  But Gaskin's showing is sufficient at this juncture."); *Johnson v. Nissan N. Am., Inc.*, 2022 WL 2869528, at *8 (N.D.Cal. July 21, 2022) (noting that "in general, purported flaws in survey design and attribute selection will usually go to the weight a jury accords the survey, not whether the jury can be shown it in the first place" and further that "[c]ourts have generally rejected similar linguistic challenges under *Daubert.*"); *Cardenas v. Toyota Motor Corp.*, No. 18-CV-22798-CIV-FAM, 2021 WL 6926418, at *20 (S.D.Fla. Aug. 12, 2021) ("Toyota's attack in this regard relies heavily on the evidence that the odor occurred in low prevalence and on criticism that Gaskin failed to quantify the likelihood that odor 'may' occur.  This criticism goes to weight, not admissibility").

### c. Cherry-picked data

Next, Ford takes issue with Gaskin's proposal to calculate eight separate overpayment figures, but then to "cherry-pick the lowest figure as the overpayment premium, under the guise of being 'conservative.'"  (Dckt. #291 at 18).  But, where, as here, Gaskin "relied on principals

and methods widely accepted in the relevant scientific community and reliably applied those principals and methods, the Court will . . . not exclude Mr. Gaskin's and Mr. Weir's opinions based on Ford's 'cherry-picking' argument." *Stevens*, 2022 WL 19978265, at \*13 (rejecting a similar *Daubert* attack); *see also Cardenas*, 2021 WL 6926418, at \*20 ("Defendants may argue to the jury the incongruence in Gaskin's results, but I find he has disclosed a methodology that is reliable, testable, tethered to the facts and evidence in this case, and ultimately, admissible.").

### d. Reasonable market

Finally, Ford maintains that Gaskin's proposed survey fails to simulate any actual market because his proposal "consists of only one make/model of the putative class vehicles—two hypothetical Ford F-150s, identical in all aspects except for the presence or absence of the alleged defect." (Dckt. #291 at 18). But, again, this too can be raised on cross-examination and does not alone warrant exclusion. *See Cardenas*, No. 2021 WL 6926418, at \*\*17–20 (rejecting attacks on expert's failure to offer a true "but-for market simulation").

In sum: the Court concludes that Ford's "attacks on the survey's design go to the weight of the evidence, not its admissibility," *Benson*, 2025 WL 3454980, at \*7, and, contrary to Ford's assertion, this is simply not one of the "rare" cases where the combination of methodological issues renders Gaskin's proposed survey—and Weir's reliance thereon—unreliable. *See, e.g.*, *In re Fluidmaster,* 2017 WL 1196990, at \*31; *see also Uncommon*, 305 F.Supp.3d at 850 ("Courts rarely exclude consumer surveys from evidence, since most 'shortcomings' go to 'the proper weight of the survey' rather than admissibility."); *Vanzant v. Hill's Pet Nutrition Inc.*, No. 17 C 2535, 2023 WL 6976988, at \*5 (N.D.Ill. Oct. 23, 2023) ("The Court is satisfied that this is not one of those 'rare' situations when the proffered survey is so flawed as to be completely unhelpful to the trier of fact and therefore inadmissible.") (cleaned up).

20

### 7. The remainder of Ford's request to exclude Weir's expert report and testimony is denied.

Apart from attacking Weir's testimony as improperly based on Gaskin's purportedly unreliable (and yet to be administered) survey, Ford also argues that Weir's opening report and testimony must be excluded because: (1) his proposed overpayment opinion is based on unreliable inputs to the extent he intends to rely on dealer invoice data and MSRPs for the purchase price (instead of what customers actually paid) and failed to account for leased vehicles; (2) his overpayment opinion impermissibly parrots and attempts to bolster Gaskin's opinion; and (3) his replacement cost opinion cannot reasonably calculate class wide damages. For the following reasons, the Court disagrees.

First, like other courts, the Court rejects Ford's attack on Weir's proposal to use dealer invoice data and MSRPs both in the Gaskin survey and in Weir's overpayment calculation that follows. *Chapman v. Gen. Motors LLC*, No. 219CV12333TGBDRG, 2023 WL 2745161, at *12 (E.D.Mich. Mar. 31, 2023) ("[I]n the absence of information about actual transaction prices, which is unavailable, the use of averages derived from sources such as MSRPs and dealership invoices is a reasonable proxy measure."); *Johnson*, 2022 WL 2869528, at *7 ("The MSRP is an appropriate price for an expert to use in this [conjoint survey] model: it is a price the expert has decided is reasonably calculated to capture an objective value for the car in the real-world under prevailing market conditions.").[7] Ford will be free to cross-examine Weir on this point and the fact-finder can proceed as appropriate. Similarly, the Court finds Ford's concern regarding

---

[7] Ford attempts to distinguish the holding in *Johnson*, by arguing that the Court only addressed Gaskin's use of MSRPs and not Weir's use of MSRPs in his analysis. But the defendant in *Johnson* filed a combined motion attacking both Gaskin's and Weir's expert reports and testimony, not solely Gaskin's, and the Court thus does not limit *Johnson's* holding in this regard.

Weir's proposal as to how to calculate purchase price for *leased* vehicles goes to weight, not admissibility.[8]

Second, the Court disagrees that Weir's expert report and testimony serve only to parrot and bolster Gaskin's expert opinions. Indeed, Weir and Gaskin—who bring different areas of expertise—worked in tandem to present a methodology for calculating class-wide damages. This approach does not alone require exclusion as improper bolstering.

Finally, Ford argues that Weir's replacement cost opinion—which relies on plaintiffs' technical expert Michael Stapleford's proposed cost to replace the 10R80 with the 6R80—is unreliable because Stapleford's cost to replace input is itself unreliable. But, the Court has already rejected this argument when it denied Ford's request to exclude Stapleford's cost opinion as unreliable, (*see* Dckt. #425 at 17–18), and Ford's remaining objection as to Weir's proposal for addressing the costs for the 2WD and 4WD vehicles can be addressed on cross-examination.

For all of these reasons, Ford's request to exclude the opening reports and testimony of Gaskin and Weir is denied. The Court addresses Ford's request to exclude certain of Weir's rebuttal opinions below.

### B. Plaintiffs' Motion to Exclude the Expert Report and Testimony of David Harless.

For its part, Ford retained damages experts David Harless and Peter Rossi. Plaintiffs now seek to exclude Harless' report and testimony for a number of reasons.[9] First, plaintiffs seek to bar Harless' testimony criticizing Gaskin and Weir's conjoint analysis, arguing that he is

---

[8] To the extent that plaintiffs ultimately seek leave for additional discovery in the way of leasing contracts, the Court will resolve the propriety of that request at that time, not in the instant *Daubert* context.

[9] Plaintiffs have not separately moved to exclude Rossi's testimony. Instead, plaintiffs ask that if the Court excludes any portion of Harless' testimony, any of Rossi's testimony reliant thereon should also be excluded.

22

unqualified to do so and any such testimony is outside the scope of his assignment.  Plaintiffs also ask the Court to exclude Harless' testimony regarding used vehicle pricing data, arguing that his testimony is unreliable, will not assist the trier of fact, confuses the issues, and will mislead the trier of fact.  For the reasons that follow, plaintiffs' motion is denied.

### 1.      Harless' Experience

Harless received a Ph.D in Economics from Indiana University in 1988.  (Dckt. #342-1 at 5).  From 2005 to 2023, Harless served as a professor of economics at Virginia Commonwealth University.  (*Id*. at 62).  Harless' research specialties are applied econometrics, health economics, and economic analysis of behavior under risk and uncertainty.  (*Id*. at 5).  Harless has authored or co-authored over 50 articles in peer-reviewed academic journals, including four articles specifically addressing topics concerning motor vehicles, and has served as the primary advisor on methodology on over 33 doctoral committees.  (*Id*.)

### 2.      Harless' Expert Reports and Testimony

#### a.      Opening Report

Ford initially retained Harless to "evaluate Plaintiffs' claims concerning diminution in value and ascertainable loss of money, property, and or/loss in value of their Class Vehicles and to determine whether there was any class-wide economic damage or loss due to the alleged failure to disclose the alleged transmission defect."  (Dckt. #342-1 at 7).  To do so, in short, Harless compared depreciation of *used vehicle prices* for the putative class vehicles against (1) F-150s equipped with 6R80s, and (2) competitive pickup trucks from other manufacturers.  (*Id*.).

As Ford concisely summarizes in its response:

Dr. Harless' analysis "assume[d] that Plaintiffs' claims are true" such that they "would have substantially changed their choices and/or their willingness to pay for the subject vehicles if the alleged defect had been disclosed."  Dr. Harless explained that, "[u]nder this assumption, this disparity (prices actually paid versus prices they

would have paid under a hypothetical disclosure) should subsequently impact used vehicle prices as information about the alleged defect became known." Dr. Harless explained that used vehicle prices "reflect the attributes of those vehicles, both positive and negative, whether or not acknowledged by the manufacturer." Dr. Harless further explained that "academic research demonstrates that used vehicle prices reflect differences in reliability and maintenance costs, and this occurs even though no manufacturer acknowledges its vehicles are less reliable or more costly to maintain than competitor vehicles in the same market category." Thus, if Plaintiffs' claims of unmerchantability were accurate, Dr. Harless' analyses should have reflected unusual depreciation rates for the vehicles—regardless of whether Ford acknowledged the purported defect

(Dckt. #343 at 8 (cleaned up), *quoting* Harless' opening report)).

Ultimately, however, Harless' analysis, using both intra-model and inter-model comparisons, revealed that during the relevant time frame, "vehicle prices are never observed to fall relative to comparison vehicles as implied by Plaintiffs' allegations." (Dckt. #342-1 at 8–9). In Harless' view then, this is "strong real-world evidence that the market value of vehicles they received was not less than the market value of the vehicles for which they bargained." (*Id*. at 9).

As relevant to Ford's request to exclude certain of Weir's rebuttal opinions, Harless further opined that vehicle warranties only have value because consumers *expect* defects. (*Id*. at 29 ("If consumers did not expect defects, then warranties would have no value.")).

### b.    Harless' Rebuttal Report

In response to Harless' opening report, plaintiffs disclosed the separate rebuttal opinions of Weir and Adam Alter, in which they maintain, *inter alia*, that (1) plaintiffs' use of consumer surveys is superior to Harless' use of used vehicle values to determine the existence of and extent of damages; (2) Harless' analysis of used vehicle values contains flaws and that used vehicle prices cannot be used to infer point-of-sale damages; and (3) that Harless was incorrect in his conclusion that the existence of warranties on new and used vehicles means that the expectation of defects is reflected in new and used vehicle prices. (*See* Dckt. ##293-3 & 299-3). Harless

24

then issued his own rebuttal report, (Dckt. #342-2), in which he set out to rebut Weir's and Alter's claims. In doing so, and as relevant here, Harless explained why his use of used vehicle prices is superior to plaintiffs' use of proposed conjoint surveys.

Plaintiffs now argue that Harless is not qualified to comment on plaintiffs' conjoint analysis and damages model and that his reliance on used vehicle prices is unreliable.

### 3. Harless is qualified to offer his rebuttal opinion regarding the general propriety of plaintiffs' use of conjoint analysis as compared to his proposed analysis.

As stated above, a witness may be qualified by "knowledge, skill, experience, training, or education." Fed.R.Evid. 702. To determine whether an expert is qualified in this regard, the court must ask "not whether an expert witness is qualified in general, but whether his qualifications provide a foundation for [him] to answer a specific question." *Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010); *see also Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir. 1990) ("Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony."). Nonetheless, "[t]he requirement that an expert be qualified by knowledge, skill, experience, education or training should not be viewed as being particularly rigorous," *Arrington v. City of Chicago*, No. 17 C 04839, 2022 WL 2105871, at *6 (N.D.Ill. June 10, 2022), and "a witness may qualify as an expert even if the opposing party can point to deficiencies in his or her qualifications." *Traharne v. Wayne/Scott Fetzer Co.*, 156 F.Supp.2d 697, 706 (N.D.Ill. 2001).

Here, an economist by education and trade, Harless is certainly qualified to offer his opinion as to the appropriate method of measuring class-wide damages in this matter, notwithstanding the fact that he has never designed or conducted a conjoint analysis himself or

taught a class on the topic. This includes his rebuttal opinion that, in his view—and contrary to Weir's and Alter's opinions—evidence from revealed preferences (such as used vehicle prices) is more reliable and superior than the use of stated preferences (such as choices in surveys). Indeed, Harless explains that his opinion in this regard is supported by the "tens of mainstream economics textbooks" he has used in teaching economic theory at the introductory for more than 30 years teaching economics. (Dckt. #342-2 at 5). Moreover, Harless testified that "in the context of doing expert witness work," he has "examined, thought about, studied, and opined on conjoint analysis." (Dckt. #342-3 at 32–33; *see also* Dckt. #342-4 (Harless' declaration in another putative defect-related class action critiquing the use of conjoint analysis)).

The Court thus finds Harless' experience and familiarity with conjoint analysis sufficient to satisfy the not "particularly rigorous" standard outlined above, and will not exclude his rebuttal opinions as to conjoint analysis. *See In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 45 F.Supp.3d 724, 756 (N.D.Ohio 2014) (noting that "[c]onjoint analysis is a subdiscipline of economics" and finding expert's qualifications as an economist and econometrician—including being "familiar with conjoint analysis for years," authoring an article 30 years prior on conjoint analysis, and advising students on the topic—sufficient).[10]

However, to be clear, Harless' testimony is limited to the general principles described in his rebuttal opinion surrounding the use of conjoint analysis in this context—in direct response to Weir's and Alter's rebuttals—and he will *not* be permitted to specifically attack Gaskin's proposed survey where, as here, he has admitted that he was neither tasked with doing so, nor did

---

[10] Given Harless' stated experience in the principles of conjoint analysis, the Court distinguishes this case from *In re FCA US LLC Monostable Elec. Gearshift Litig.*, 382 F.Supp.3d 687, 694 (E.D.Mich. 2019), relied on heavily by plaintiffs, where the expert admitted that he was not an expert in conjoint analysis and never had performed such a task. Harless did not concede as much here and, in fact, expressed the opposite. (*See* Dckt. #342-3 at 34 ("I feel absolutely confident in my ability to evaluate what is the standard of practice for conjoint analysis, a survey or the analytical methods involved")).

he "study" the proposed survey.  (Dckt. #342-3 at 51).  Instead, that task will be left to Ford's other damages expert, Peter Rossi.

### 4. The remainder of plaintiffs' motion to exclude Harless' testimony is denied.

Next, plaintiffs take issue with Harless' use of used vehicle prices to assess class-wide damages *at the initial point of sale*, arguing that his method—which plaintiffs describe as calculating *price depreciation after the initial sale*—is irrelevant, unreliable, or otherwise improper.  The Court disagrees and finds that to the extent plaintiffs' remaining arguments have wings, those arguments go to weight.

To begin, underlying plaintiffs' remaining arguments is a statement made simply in a footnote of their motion that although they have expressly alleged in the operative pleading that "[a]s a result of the Transmission Defect, the value of the Class Vehicles has diminished, including without limitation the resale value of the Class Vehicles," (Dckt. #63 ¶190), they are no longer "pursuing claims that the Defect caused the resale value of the Class Vehicles to depreciate or diminish" while in their possession.  (Dckt. #284 at 5 n.1).  The Court is hesitant to exclude Harless' testimony based on this footnote representation alone.

In any event, with respect to relevancy, the Court finds the reasoning of the Court in *Rathmann v. Ford Motor Co.*, No. 621CV00610ADAJCM, 2023 WL 6122709, at *2–3 (W.D.Tex. July 10, 2023) to be persuasive.  There, interestingly, it was Ford taking issue with plaintiffs' expert's reliance on used car sales and, in doing so, relying heavily on *In re FCA US LLC Monostable Elec. Gearshift Litig* (as do plaintiffs here).  The *Rathmann* Court reasoned as follows:

> For support, Defendant cites *In re FCA US LLC Monostable Elec. Gearshift Litig.*, where the court excluded expert testimony because the expert failed to show that used car prices could accurately estimate point-of-sale damages.  Def.'s Mot. at 5;

*In re FCA US LLC Monostable Elec. Gearshift Litig.*, 382 F.Supp.3d 687, 696 (E.D. Mich. 2019) ("In this case, the defendant has not put forth any sufficiently reliable expert opinion that estimation of used car resale prices reliably can be applied to estimate point-of-sale damages."). In a similar situation, however, the Western District of Washington declined to exclude an expert's testimony that relied on used vehicle prices to measure damages for fraudulent concealment and consumer protection claims. *See Beaty v. Ford Motor Co.*, No. C17-5201 TSZ, 2021 WL 3109661, at *3 (W.D. Wash. July 22, 2021), *am.*, No. C17-5201 TSZ, 2023 WL 1879534 (W.D. Wash. Feb. 10, 2023) (citing *In re FCA US LLC Monostable Elec. Gearshift Litig.*, 382 F.Supp.3d at 696) ("Even assuming that Dr. McCrary's methodology cannot reliably calculate class members' original point-of-sale damages, . . . his analysis of resale data is nonetheless a reliable proxy to determine whether class members who later sold their Class Vehicles suffered any damages.") In *Beaty*, the court reasoned that the used vehicle price model was relevant because if there were no drop in used vehicle prices then "any alleged overpayment that these class members allegedly made at the original point of sale would have been passed on to the buyer of the used Class Vehicle, causing those class members to suffer no damages at all." *Id.*

Having considered the different approaches of courts on this issue, this Court finds that Dr. House's testimony is relevant. First, because whether used vehicle prices declined after the recall will be helpful in determining what damages occurred because of the overstated payload. *Beaty*, 2021 WL 3109661, at *3. Second, because any concerns Defendant has about Dr. House's reliance on used vehicle prices as a basis for damages goes to the weight of the evidence and Defendant can address these concerns at trial through vigorous cross-examination. *City of Allen, Tex. v. Time Warner Cable Tex., LLC*, No. 6:19-CV-345-ADA-JCM, 2021 WL 8442040, at *6 (W.D.Tex. Oct. 5, 2021) (citations omitted).

*Rathmann*, 2023 WL 6122709, at *2–3.

The Court finds this reasoning sound and agrees that Harless' testimony is relevant. *See also Simmons v. Ford Motor Co.*, No. 18-CV-81558-RAR, 2022 WL 168540, at *4 (S.D.Fla. Jan. 18, 2022). And, while plaintiffs may disagree with Harless, they are free to cross-examine him regarding his opinions.

Similarly, as for plaintiffs' remaining attacks on the reliability of Harless' opinion—such as the propriety of his input data (or purported lack thereof), and his assumptions and explanations as to how his analysis correlates to damages at the initial point of sale—these too go to the weight of Harless' testimony, not its admissibility. *See Rathman*, 2023 WL 6122709, at *3

28

("Defendant is free to cross-examine Dr. House at trial about whether CarGurus.com is an appropriate source, his choice of data points, and why Defendant's expert found Dr. House's results absurd.").  This is particularly so where, as here, plaintiffs have not persuasively attacked the reliability of Harless' methodology, i.e., a comparator-based analysis, including a regression model.

Finally, because the Court finds Harless' testimony to be sufficiently relevant and reliable, it does not agree that it will otherwise mislead or confuse the jury.

For all of these reasons, plaintiffs' motion to exclude the expert report and testimony of David Harless is denied.

### C.  Ford's request to exclude certain rebuttal opinions of Weir is granted.

In response to Harless' opinion that vehicle warranties have value because consumers essentially expect defects, Weir issued his rebuttal in which he opined, *inter alia*, that (1) warranties signal a lack of systemic defects, not an expectation of systematic defects (hereinafter, the "Warranty Opinion"); and (2) warranties are in effect a type of insurance, and reflect consumer risk aversion, not expectation of defects, (hereinafter, the "Insurance Opinion").  (Dckt #293-3 at 10–14).  In support of these opinions, Weir conducted a 21-person survey of owners of F-150 trucks and competing light duty trucks, which revealed that 100% of the subjects "indicated that they would not expect the transmission Defect in a light duty truck with a warranty."  (*Id*. at 10–11).  Ford asks the Court to exclude these two opinions, arguing that Weir's survey failed to comply with generally-accepted principles of survey research and that his Insurance Opinion is pure *ipse dixit*.[11]  The Court agrees only with respect to the Insurance Opinion.

---

[11] *Ipse dixit* has been defined as "[s]omething asserted but not proved."  *Ipse dixit*, Black's Law Dictionary (11th ed. 2019).

To begin, as with the attacks on Gaskin's survey, Ford's attacks on Weir's survey, *i.e.*, the small sample size, the purportedly unrepresentative sample, the type and order of questions, and the manner in which it was administered (by Mr. Weir himself), will go to its weight and not its admissibility. *See, e.g.*, *Araujo v. Coachella Valley Water Dist.*, No. 20-CV-01800-AJB-RBM, 2022 WL 4181004, at *9 (S.D.Cal. Sept. 12, 2022) ("[c]ourts regularly find that concerns that a survey's sample size is too small or unrepresentative do not preclude its admission, but go to the weight to be accorded the survey results."); *Nat'l Fin. Partners Corp. v. Paycom Software, Inc.*, No. 14 C 7424, 2015 WL 3633987, at *9 (N.D.Ill. June 10, 2015) ("The relatively small sample size may affect the weight the Court gives the survey but does not render the survey unreliable."); *see generally*, *Zarinebaf*, 2022 WL 910638, at *4 ("[T]echnical defects and study design choices may lessen the evidentiary weight to be afforded but do not leave the surveys so flawed as to be unreliable or unhelpful to a trier of fact."); *Uncommon,* 305 F.Supp.3d at 850 ("Courts rarely exclude consumer surveys from evidence, since most shortcomings go to the proper weight of the survey rather than admissibility.") (cleaned up). Accordingly, Ford may raise these issues on cross-examination.

The Court does agree, however, that Weir's rebuttal Insurance Opinion is improper *ipse dixit*. "In an *ipse dixit* opinion, the expert asserts a 'bottom line' conclusion, but lacks any articulable facts to substantiate that conclusion or completely fails to explain the reasoning or methods employed to reach that conclusion." *In re Fluidmaster*, 2017 WL 1196990, at *7. An expert's *ipse dixit* is inadmissible because "[a]n expert who supplies nothing but a bottom line supplies nothing of value to the judicial process." *Wendler & Ezra, P.C. v. Am. Int'l Grp., Inc.*, 521 F.3d 790, 791 (7th Cir. 2008), *quoting Mid-State Fertilizer Co. v. Exch. Nat'l Bank*, 877 F.2d 1333, 1339 (7th Cir. 1989). Seventh Circuit "caselaw describes an expert's *ipse dixit* as

occurring where 'there is simply too great an analytical gap between the data and the opinion proffered.'" *United States v. Owens*, 18 F.4th 928, 941 n.5 (7th Cir. 2021), *quoting C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 832 (7th Cir. 2015).

Here, Weir's opinion that warranties are in effect a type of insurance, and reflect consumer risk aversion, not expectation of defects, is improper *ipse dixit*. Although plaintiffs argue that the Insurance Opinion is supported at least "in part" by the results of the 21-person survey, Weir fails to properly explain the reasoning or methods linking the survey to this conclusion.[12] Accordingly, Ford's request to exclude Weir's Insurance Opinion is granted.

## CONCLUSION

For all of these reasons, Ford's motion to exclude the expert testimony of Gaskin, (Dckt. #290), is denied; Ford's motion to exclude the expert testimony of Weir, (Dckt. #293), is granted solely with respect to the rebuttal Insurance Opinion and is otherwise denied; and plaintiffs' motion to exclude the testimony of Harless, (Dckt. #284), is denied.

**DATE: March 2, 2026**

**Jeffrey I. Cummings**
**United States District Court Judge**

---

[12] In response to Ford's request, plaintiffs essentially only argue that to the extent Ford believes Weir's rebuttal opinions are conclusory, and provide nothing of value to the fact-finder, the same must be said of Harless' opinion that consumers presume that a warranty indicates the presence of a defect. But, as Ford notes, plaintiffs failed to raise this issue in their separate motion to exclude Harless' testimony.