**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **JUSTIN O'CONNOR, *et al.*, on behalf of himself and all others similarly situated,** | ) | |
| **Plaintiffs,** | ) | **No. 19-cv-5045** |
| **v.** | ) | **Judge Jeffrey I. Cummings** |
| **FORD MOTOR CO.,** | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Stanislaw Zielinski, Bryan Smith, Jason Steen, Michael Barcelona, and Susan Heller bring this putative class action against defendant Ford Motor Company ("Ford") for damages arising out of Ford's sale and lease of 2017 to 2020 Model Year Ford F-150 trucks equipped with an allegedly defective 10-speed "10R80 Transmission." According to plaintiffs, from the beginning of Ford's development of its 10R80 Transmission—which served to replace Ford's 6-speed 6R80 Transmission—"Ford has been aware of harsh, jerky, erratic, lunging, hesitating, and otherwise inconsistent shifting in the 10R80 Transmission, but has been unable to resolve these malfunctions caused by the 'Defect.'" (Dckt. #325 at 8).

In their motion for class certification, plaintiffs describe the "Defect" as "the inability of the Transmission's internal seals to maintain the intended and necessary pressure on either side of the seal to ensure secure and timely engagements of each clutch required for a specific gear." (Dckt. ##325 at 8 n.1; 445 at 3 (re-affirming this description of the Defect)). For its part, Ford denies that there is any defect, let alone a defect resulting from a common cause, that exists in

the 10R80 Transmission that was installed in the tens of thousands of vehicles purchased by the putative class members.

As described in more detail below, this putative class action litigation has been presided over by three judges over the seven years that it has been pending. At the time the case was re-assigned to this Court, the parties had recently completed extensive fact and expert discovery and had just begun briefing class certification and accompanying *Daubert* motions. Since that time, the Court has considered and resolved Ford's partial motion to dismiss regarding plaintiffs' claims under the Magnuson-Moss Warranty Act, (Dckt. #423), Ford's motion for judgment on the pleadings regarding plaintiff Barcelona's claim under the Massachusetts Consumer Protection Law, (Dckt. #450), and eight *Daubert* motions concerning the parties' experts, (Dckt. ##425, 453, 457).

Now before the Court is plaintiffs' fully briefed motion for class certification, along with the extensive supplemental authority cited by both sides, and related briefing.[1] Plaintiffs move the Court to certify a class on behalf of similarly situated individuals "who formerly or currently own or leased one or more 2017-2020 Model Year F-150 truck equipped with a 10R80 10-speed automatic transmission," and to certify this class in the individuals' respective states: namely, Illinois (Zielinski), California (Smith and Steen), Massachusetts (Barcelona), and New York

[1] As the Court previously noted in its January 31, 2025 order, (Dckt. #418), the Court terminated Ford's motion to *deny* class certification on the ground that it was unnecessary under the circumstances and "served to double the parties' allotted pages of briefing and (at least in part) resulted in duplicative submissions." (Dckt. #418 at 1). Nonetheless, because Ford's motion to deny certification fell "within the confines of the [prior] Court's scheduling order (which set a deadline for the filing of "*motions* concerning class certification," (Dckt. #249)), as promised, the Court has considered all of the briefs and submissions associated with Ford's motion to deny certification when determining whether class certification is appropriate here.

(Heller). (Dckt. #325 at 8–9).[2] As outlined in further detail below, plaintiffs bring various claims for breach of implied and express warranty, fraudulent omission, and violation of various state consumer protection laws on behalf of these putative class members.

After due consideration, the Court denies plaintiffs' motion for class certification, (Dckt. #312). The Court first finds that plaintiffs' warranty-related claims are precluded by the class action waiver applicable to all class members. Next, with respect to the non-warranty-related claims, the Court finds that plaintiffs have failed to present sufficiently persuasive evidence to show that the class vehicles suffer from a common defect attributable to a common cause, and that this shortcoming renders them unable to meet the commonality requirement of Rule 23. Finally, plaintiffs have also failed to satisfy the predominance requirement of Rule 23 for certain of their non-warranty-related claims.

# I. BACKGROUND

## A. Relevant Factual Background

### 1. Basic development and release of the 10R80 Transmission

Ford started the initial design work for the 10R80 Transmission in 2011. (Dckt. #329-1 at 6). The design of the 10R80 was intended to improve fuel economy and reduce greenhouse gas emissions relative to Ford's 6R80 transmission. (*Id.*). Ford maintains that the 10R80 was "tested extensively prior to the start of production," which included running over 800 Computer-Aided Engineering (CAE) models to optimize the design, and more than four million miles of testing. (*Id.*). Ford released the 10R80 to market in November 2016. (Dckt. #330 at 14). It was the first 10-speed automatic transmission, and, according to Ford, it "significantly improved fuel

[2] Although plaintiffs previously expressed an intent to seek certification of a nationwide class, plaintiffs have since expressly confirmed that they "do not seek to certify a nationwide class." (Dckt. 367 at 51).

efficiency, acceleration, and towing capacity, provided more accurate and quicker shifting, and reduced weight" relative to the 6R80. (*Id*. (cleaned up)).

### 2. The putative class vehicles and the "New Vehicle Limited Warranty"

The putative class vehicles—namely, the 2017-2020 Ford F-150 trucks equipped with a 10R80—include four primary engine types, two drivetrain types, and three cab styles. (Dckt. #330 at 16 n.3). According to plaintiffs, the number of Class Vehicles in each proposed state subclass are as follows: Illinois: 43,355; California: 94,629; Massachusetts: 19,496; and New York: 51,159, for a total of 208,639 vehicles. (Dckt. #325 at 23).

The putative class vehicles are all covered by a "New Vehicle Limited Warranty" (the "Warranty") that provides coverage for five years or 60,000 miles for the 10R80 and other powertrain components. (Dckt. ##329-29 (2017), 330-30 (2018), 330-31 (2019) and 330-32 (2020)). The Warranty also includes a class action waiver, which provides: "You may not bring *any warranty-related claim* as a class representative, a private attorney general, a member of a class of claimants or in any other representative capacity." (*Id*. at 12 in each respective warranty (emphasis added)).

### 3. The experiences of the named plaintiffs

According to plaintiffs, each of them purchased an F-150 equipped with the 10R80 Transmission. (Dckt. #325 at 25–26). Each has also purportedly experienced the Defect—"including suffering the specific malfunctions resulting from the Defect, seeking and (sometimes) receiving attempted repairs to address the harsh, jerky, inconsistent, lunging, and hesitating shifting caused by the Defect, and continuing to harbor concerns about their Vehicles—which are consistent with the absent Class Members' experiences." (*Id.*).

The named plaintiffs described their respective experiences with the Defect as follows.

**Plaintiff Barcelona:**

> **Q.** What do you mean . . . by rough shifting.
>
> **A.** The vehicle, you could feel it shift. It could be a jerk associated with that. But it was not a smooth shift . . . There was a noticeable what sounds like a – can only describe it as a clunk . . . a metal sound that came from the rear end of the vehicle . . .
>
> **Q.** [I]t's both the rough shift and the clunking at your vehicle's drive train?
>
> **A.** Yes.

(Dckt. #325 at 26 (citing Dckt. #316-5 (Barcelona Dep. Tr.) at 150:12–14, 151:4–9, 157:22–24)). Barcelona further testified that in addition to a clunking while accelerating and moving, he noticed "clunking after the vehicle has come to a stop." (Barcelona Dep. Tr. at 17:11–17).

**Plaintiff Heller:**

In a complaint filed with the NHTSA, plaintiff Heller described her issues as follows:

> Loud clunk when starting [the] truck and drive shaft moves. Brought to dealer twice, July & Oct. 2018 they found nothing. When at a [stop] light/sign, it hesitates when ready to proceed, transmission is not engaging right away, it's delayed. Very dangerous.

(Dckt. #325 at 26 (citing Dckt. 316-18 (Heller NHTSA report))). At her deposition, Heller elaborated by explaining that she experiences "clunking" when she starts the car in the parked position, which does not interfere with her driving the car, and, lately, occurs maybe twice a year. (Dckt. #329-15 (Heller Dep. Tr.) at 103:3–8).

**Plaintiff Steen:**

> **Q.** When you reference "the transmission defect," what exactly are you referring to?
>
> **A**. The shifting. It all happens really all of the sudden. . . . the truck is – it acts like it's moody. It'll lunge forward, and then it'll randomly [] rattle, and then make a clunk noise when it shifts sometimes. . . .

> **Q.** So we have the moody shifting, the lunging, the rattle, and the clunk noise; is that right?
>
> **A.** Correct.

(Dckt. #325 at 26 (citing Dckt. #316-8 (Steen Dep. Tr.) at 174:11–24)). Steen further testified that his vehicle experienced a rattle when driving around 25 miles per hour, and would "slam into gear" when shifting from "fourth to fifth gear, making a clunk sound," and feels "jerky on acceleration and deceleration." (Steen Dep. Tr. 182:21–183:17).

> **Plaintiff Smith:**
>
> **Q.** And does your vehicle unexpectedly jerk?
>
> **A.** Yeah. Surge[s] and jerk[s] when it's doing the shifting . . . so if I'm in one gear and it goes to neutral, then my vehicle slows down. It then goes back into another gear or the same gear [and] the vehicle moves forward unexpectedly. So in a jerking or surging manner.

(Dckt. #325 at 27 (citing Dckt. #316-9 (Smith Dep. Tr.) at 177:13–22)). Smith further testified that he hears a "loud clunk" when the truck is turned off and turned back on, and that it slips out of gear when he is "driving on the highway and passing." (Smith Dep. Tr. at 20:2–7).

> **Plaintiff Zielinski:**
>
> **Q.** What do you mean by 'slips gears'?
>
> **A.** When you slip, like, you feel[] like something is – you can see the high rotation when you look at the RPM gauge, and the car is still mak[ing] some little noises, but it [is] not speeding up, and suddenly, like, it jerk (indicating) any then you start driving. That's all.
>
> **Q.** So is it a jerky shift?
>
> **A.** Yeah, I would say so.

(Dckt. #325 at 26 (citing Dckt. #316-7 (Zielinski Dep. Tr.) at 107:12–22)). Zielinski also testified that his truck has "an intermittent clunking noise when the engine reaches 2,000 RPM,"

a "high-pitched whine [when] shifting gear[s]," a rattling noise when he releases the gas pedal, and he once experienced loss of power. (Zielinski Dep. Tr. at 96:16–97:9, 113:2–20).

**B. Procedural Background**

In 2019, Illinois plaintiff Justin O'Connor filed this action on behalf of himself and a putative class. Upon filing, the case was assigned to Judge Robert M. Dow. In July 2020, the Executive Committee reassigned three related, higher-numbered cases (Case Nos. 20-cv-1981, 20-cv-2095, and 20-cv-2612) to Judge Dow for consolidation with O'Connor's case. On August 7, 2020, Judge Dow granted Ford's motion to dismiss in the lead case, but granted plaintiffs leave to file a consolidated complaint.

Plaintiffs filed their Consolidated Amended Class Action Complaint (the "Consolidated Complaint") on September 25, 2020. (Dckt. #63). Ford again moved to dismiss. On October 19, 2021, Judge Dow granted in part and denied in part Ford's motion to dismiss the Consolidated Complaint in a detailed Memorandum Opinion and Order. (Dckt. #83). Subsequently, the case was assigned to Judge Elaine Bucklo.

The parties proceeded with extensive fact and expert discovery under the careful supervision of Magistrate Judge Maria Valdez, and discovery closed in September 2023. The parties' class certification and multitude of *Daubert* motions followed, and, amidst their briefing, the case was re-assigned to this Court. This Court has since fully resolved the parties' eight *Daubert* motions that it found "critical" to class certification, (*see* Dckt. ##425 (technical experts), 453 (warranty experts), 457 (damages experts)), along with other motions, including Ford's partial motion to dismiss for lack of subject matter jurisdiction, (*see* Dckt. #423), and Ford's motion for judgment on the pleadings, (*see* Dckt. #450).

### C. Plaintiffs' Remaining Claims and Requests for Relief

After two rounds of motions to dismiss, arbitrations for certain plaintiffs' claims, and sanctions-related motion practice, plaintiffs' claims have been winnowed down considerably since the outset of this case, and even since the filing of the class certification motions. Once more, the remaining plaintiffs are Zielinski (IL), Smith (CA), Steen (CA), Barcelona (MA), and Heller (NY), and their claims are as follows:

#### 1. Plaintiffs' warranty-related claims

Plaintiffs assert the following warranty-related claims. First, in Count 1, plaintiffs Zielinski, Steen, Barcelona, and Heller bring claims for breach of express warranty in violation of the Illinois, California, Massachusetts, and New York statutes, respectively, that codify §2-313 of the Uniform Commercial Code ("UCC"). This count "is based on [Ford's] alleged breach of its 'New Vehicle Limited Warranty,' which provides that 'authorized Ford Motor Company dealers will, without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in the factory-supplied materials of factory workmanship.'" (Dckt. #83 at 10 (citing Dckt. #63 at 63)). Similarly, in Count 8, plaintiff Steen alleges that Ford's breach of the New Vehicle Limited Warranty violates California's Song-Beverly Consumer Warranty Act, Cal. Civ. Code §§1790 *et seq.* ("SBCWA"). (Dckt. #63 at 77–80)

Second, plaintiffs assert claims for breach of implied warranty in violation of state laws codifying UCC §2-314. Specifically, in Count 2, plaintiffs Barcelona and Heller bring claims for breach of the implied warranty of merchantability under Massachusetts and New York law, respectively. Moreover, plaintiffs Smith and Steen bring claims for breach of implied warranty in violation of California's SBCWA (Count 9), and for breach of implied warranty of

merchantability in violation of California Commercial Code §2.314 (Count 10). Finally, all five remaining plaintiffs bring claims for Ford's alleged violation of the Magnuson-Moss Warranty Act, 15 U.S.C. §§2301 *et seq*. ("MMWA") in Count 3.

**2. Plaintiffs' non-warranty-related claims**

Plaintiffs also bring non-warranty-related claims for the violations of various state consumer protection laws. Specifically, in Counts 11 and 12, plaintiffs Smith and Steen bring claims for violation of California's Consumer Legal Remedies Act, Cal. Civ. Code §§1750 *et seq.* ("CLRA") and Unfair Competition Law, Cal. Bus. & Prof. Code §§17200 *et seq.* ("UCL"). In Count 16, Barcelona asserts a claim for violation of the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A ("Chapter 93A") and in Counts 18 and 19, Heller brings claims for violation of New York General Business Law Sections 349 (deceptive acts and practices) and 350 (false advertising). Lastly, in Count 5, plaintiff Heller brings a claim for fraudulent concealment under New York law.

**3. The relief sought by plaintiffs**

Plaintiffs seek compensatory damages and injunctive relief. With respect to compensatory damages, plaintiffs have presented two potential theories of recovery. First, plaintiffs assert that the putative class members overpaid for their vehicles because of Ford's nondisclosure of the alleged defect. (*See* Dckt. #63 ¶10 ("Had Plaintiffs and Class Members known about the Transmission Defect at the time of sale or lease, as well as the associated costs related to the Transmission Defect, Plaintiffs would not have purchased the Class Vehicles or would have paid less for them.")). Under plaintiffs' "overpayment" model of damages, class members would recover the difference between the price they paid for their vehicles at the point of sale and the value of those vehicles without the defect. Alternatively, plaintiffs present a

"proxy" model of damages "whereby the sum of the costs of the parts and labor required to replace a 10R80 Transmission can be used to approximate, or as a proxy for, the damage inflicted on Class Members from buying a Class Vehicle with a defective Transmission." (Dckt. #367 at 40).

Finally, plaintiffs seek "injunctive relief as permitted by law or equity," including enjoining Ford from continuing its alleged unlawful practices, and ordering Ford "to engage in a corrective recall campaign." (Dckt. #63 at 125).

## II. STANDARD FOR CLASS CERTIFICATION

Class actions, which are an exception to "the usual rule that litigation is conducted by and on behalf of the individual named parties only," are governed by Federal Rule of Civil Procedure 23. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011). Under Rule 23, plaintiffs seeking class certification must first demonstrate that: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a); *Jacks v. DirectSat USA, LLC*, 118 F.4th 888, 896 (7th Cir. 2024).

"Once a class satisfies Rule 23(a), it must also fit into one of three types of class actions enumerated in Rule 23(b)." *Svoboda v. Amazon.com Inc.*, 168 F.4th 956, 961 (7th Cir. 2026). Relevant to the parties' submissions here are Rule 23(b)(2) and (b)(3). Under Rule 23(b)(2), "a class action may be maintained" if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Where "certification is sought under Rule 23(b)(3), common questions of law or fact must predominate over individual

inquiries, and class treatment must be the superior method of resolving the controversy." *Eddlemon v. Bradley Univ.*, 65 F.4th 335, 338 (7th Cir. 2023) (cleaned up).

It is well-settled that "Rule 23 is 'more than a mere pleading standard.'" *Howard v. Cook Cnty. Sheriff's Off.*, 989 F.3d 587, 597 (7th Cir. 2021), *quoting Wal-Mart*, 564 U.S. at 350. Thus, as the Seventh Circuit has explained:

> [when] evaluating the Rule 23 factors, a court does not take the plaintiffs' allegations at face value. Instead, the court must go beyond the pleadings and, to the extent necessary, take evidence on disputed issues that are material to certification. This will often entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped. Still, a court's preview of the merits must remain tethered to its Rule 23 analysis. The merits themselves are not on the table at this early stage. Rule 23 does not permit courts to engage in free-ranging merits inquiries at the certification stage.

*Howard*, 989 F.3d at 597–98 (cleaned up).

As such, "[p]laintiffs bear the burden of demonstrating that they meet Rule 23's certification requirements by a preponderance of the evidence." *Jacks*, 118 F.4th at 895; *Priddy v. Health Care Serv. Corp.*, 870 F.3d 657, 660 (7th Cir. 2017) ("The plaintiff bears the burden of proving by a preponderance of the evidence all necessary prerequisites to the class action."). If they make such a showing, "the class *must* be certified, even if it is sure to fail on the merits." *Simpson v. Dart*, 23 F.4th 706, 711 (7th Cir. 2022). On the other hand, failure on the part of the moving party to meet any one of the requirements of Rule 23(a) or (b) precludes class certification. *Patterson v. Gen. Motors Corp.*, 631 F.2d 476, 480 (7th Cir. 1980).

Finally, "a district court has broad discretion to determine whether certification of a class-action lawsuit is appropriate." *Chavez v. Ill. State Police*, 251 F.3d 612, 629 (7th Cir. 2001). However, in exercising that discretion, "[a] district court must rigorously analyze the requirements of Rule 23." *Howard*, 989 F.3d at 598 (cleaned up). Indeed, "[t]he decision to certify a class or not can cause a considerable tilt in the playing fields of litigation and therefore

is not one to take lightly." *Chicago Tchrs. Union, Loc. No. 1 v. Bd. of Educ. of City of Chicago*, 797 F.3d 426, 433 (7th Cir. 2015). With these standards in mind, the Court proceeds with the required analysis.

## III. ANALYSIS

### A. Threshold Issues

Before reaching the requirements of Rule 23, the Court addresses two threshold issues that Ford maintains otherwise preclude class certification. Those issues are: (1) whether plaintiffs have standing to seek injunctive relief; and (2) whether plaintiffs' warranty-related claims are barred by the Warranty's class action waiver.[3]

#### 1. Ford's threshold standing argument is unavailing.

It is well settled that standing "'is a threshold question in every federal case because if litigants do not have standing to raise their claims the court is without authority to consider the merits of the action.'" *Ill. Conservative Union v. Illinois*, No. 20 CV 5542, 2021 WL 2206159, at *3 (N.D.Ill. June 1, 2021), *quoting Meyers v. Nicolet Rest. of De Pere, LLC*, 843 F.3d 724, 726 (7th Cir. 2016). This is so because "Article III of the Constitution limits federal judicial power to certain 'cases' and 'controversies,' and the 'irreducible constitutional minimum' of standing contains three elements." *Silha v. ACT, Inc.*, 807 F.3d 169, 172–73 (7th Cir. 2015), *quoting Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559–60 (1992). In particular, "a plaintiff must show (1) [she] has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged

---

[3] Ford raised two additional threshold issues that are now moot. Specifically, Ford argued that variations in state laws render the nationwide class unmanageable and also that plaintiffs failed to meet the MMWA's jurisdictional requirement of 100 named plaintiffs. But plaintiffs no longer seek a nationwide class, and the Court has separately resolved the MMWA jurisdictional issue. *See O'Connor v. Ford Motor Co.*, No. 19-CV-5045, 2025 WL 792725 (N.D.Ill. Mar. 12, 2025).

action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Env't. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000); *Silha*, 807 F.3d at 173.

Ford first argues that plaintiffs' request for certification fails because plaintiffs "lack standing to seek injunctive relief enjoining Ford from continuing its alleged unlawful practices." (Dckt. #330 at 27).[4] As Ford correctly notes, "[u]nlike with damages, a past injury alone is insufficient to establish standing for purposes of prospective injunctive relief." *Simic v. City of Chicago*, 851 F.3d 734, 738 (7th Cir. 2017). Instead, a plaintiff seeking prospective injunctive relief, "must face a 'real and immediate' threat of future injury as opposed to a threat that is merely 'conjectural or hypothetical.'" *Id.*, *quoting City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983). Furthermore, courts in this District have repeatedly held that "a consumer who learns of an alleged deception is not likely to suffer any future similar harm, so the consumer cannot obtain injunctive relief." *Gibson v. Eagle Fam. Foods Grp. LLC*, No. 122CV02147TWPMKK, 2023 WL 5574625, at *3 (S.D.Ind. Aug. 29, 2023) (citing cases).

Here, however, Ford's threshold standing argument conflates "the standing inquiry with the inquiry under Rule 23 about the suitability of a plaintiff to serve as a class representative." *Payton v. Cnty. of Kane*, 308 F.3d 673, 677 (7th Cir. 2002). As the Seventh Circuit explained in *Arreola v. Godinez*:

> Although the two concepts unfortunately are blurred at times, standing and entitlement to relief are not the same thing. Standing is a prerequisite to *filing suit,* while the underlying merits of a claim (and the laws governing its resolution) determine whether the plaintiff is *entitled to relief* . . . Article III requires that the plaintiff has suffered an injury in fact which is fairly traceable to the challenged

[4] Although plaintiffs expressed an intent in their complaint to seek class certification under "Federal Rules of Civil Procedure 23(a), (b)(2), and/or (b)(3)," (Dckt. #63 at 58), in their motion for class certification, plaintiffs proceed only under Rules 23(a) and (b)(3). Nonetheless, because plaintiffs engage with Ford's Rule 23(b)(2)-related arguments in response to the motion to deny class certification, the Court will address this standing issue at the outset.

> action of the defendant and likely, as opposed to merely speculative, to be redressed by a favorable decision. When deciding questions of standing, courts must look at the case as a whole, rather than picking apart its various components to separate the claims for which the plaintiff will be entitled to relief from those for which he will not. If the court becomes too enmeshed in the plaintiff's entitlement to relief, it will stray beyond the standing inquiry into the merits.

546 F.3d 788, 794–95 (7th Cir. 2008) (cleaned up).

As such, where, as here, plaintiffs alleged an "injury in fact" traceable to Ford's allegedly defective transmission that can be redressed by this lawsuit (namely, through an award of damages), they clearly have standing to bring this suit. *See Jorling v. Anthem, Inc.*, No. 1:09-CV-798-TWP-TAB, 2010 WL 5418878, at *5 (S.D.Ind. Dec. 23, 2010) ("Jorling has Article III standing to sue Defendants because he clearly alleges an injury traceable to the challenged conduct of Defendants which could be redressed by a favorable decision."). And, while it is true that plaintiffs "may no longer be entitled to all types of relief that [they] requested, the law does not preclude a plaintiff from filing suit simply because some forms of relief may be unavailable, or indeed because in the end he cannot prove that he is entitled to any relief." *Arreola*, 546 F.3d at 795. Of course, whether plaintiffs are "entitled to relief on any or all of th[eir] claims and whether [they] may serve as . . . adequate class representative[s] for others asserting such claims are separate questions." *Id*.

Simply put, plaintiffs have standing to proceed even presuming that they cannot obtain injunctive relief.

### 2. Plaintiffs' warranty-related claims are precluded by the Warranty class action waiver.

Next, Ford argues that all of plaintiffs' "warranty-related claims" are barred by the plain language of the Warranty's class action waiver, which, again, provides: "You may not bring any warranty-related claim as a class representative, a private attorney general, a member of a class

of claimants or in any other representative capacity." Ford—with support from case law interpreting identical waiver language—asserts that the class action waiver precludes certification of plaintiffs' warranty-related claims because it is neither procedurally nor substantively unconscionable, and is therefore enforceable under Illinois, California, Massachusetts, and New York law.

In response, plaintiffs do not even attempt to articulate why the class action waiver is unconscionable. Nor do they dispute that the class action waiver applies to all named plaintiffs and putative class members. On the contrary, plaintiffs concede as much. (*See* Dckt. #367 at 23 ("The same class action waiver is found in every warranty of the Class Vehicles.")). Instead, plaintiffs argue that Ford has potentially waived the application of the class action waiver by waiting until the class certification stage to seek resolution of the issue. (*Id*. at 24 ("Other than including this as an affirmative defense in its Answer . . . Ford has never sought to enforce, or even mention, the purported class action waiver.")). In plaintiffs' view, then, resolution of whether Ford waived the application of the waiver, and, even if it did not, whether the waiver is unconscionable, is a common question for all class members that can be resolved *after* certification, and further "demonstrates why class certification is appropriate." (*Id*. at 24–25).

The Court respectfully disagrees for the following reasons, and finds that the class action waiver is enforceable and precludes certification of plaintiffs' warranty-related claims.

**a. Ford did not waive the applicability of the class action waiver.**

To begin, contrary to plaintiffs' position, the Court does not agree that Ford has waived (or forfeited) the application of the class action waiver by raising it at this procedural juncture. As the Seventh Circuit has repeatedly explained, "forfeiture is the failure to make the timely assertion of a right, whereas waiver is the intentional relinquishment or abandonment of a known

right." *United States v. Knox*, 624 F.3d 865, 875 (7th Cir. 2010) (cleaned up). In this context, the Court's general waiver analysis "necessarily includes the concept of forfeiture." *Smith v. GC Servs. Ltd. P'ship*, 907 F.3d 495, 499 (7th Cir. 2018).

Here, it is undisputed that Ford initially asserted the class action waiver as an affirmative defense in its amended answer. (*See* Dckt. #132 at 76 ("The warranty-related class claims…are barred by the [class action waiver] in the warranty issued by Ford.")). This was the first logical juncture when the class action waiver could have been placed at issue given the procedural record before the Court. And, although plaintiffs take issue with Ford's failure to raise the class action waiver in their previously filed motions to dismiss, there was no procedural way to raise the class action waiver at that time since it was neither attached to plaintiffs' complaint nor central to plaintiffs' claims. *Cf. Mueller v. Apple Leisure Corp.*, 880 F.3d 890, 895 (7th Cir. 2018) (noting that it is "well-settled in this circuit that documents attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to [its] claim."). Even setting this procedural hurdle to the side, if Ford had asserted the class action waiver in its Rule 12(b)(6) motion to dismiss, the waiver would never have secured the dismissal of plaintiffs' warranty-related claims because it does not bar plaintiffs from asserting such claims on an *individual* basis.

In any event, given that Ford "raised its class-waiver defense in its answer to the plaintiffs' complaint and then again at class certification . . . as a general rule, it is not obvious that more would be required." *In re Marriott Int'l, Inc.*, 78 F.4th 677, 687 (4th Cir. 2023) ("*Marriott I*"); *see also Maldini v. Marriott Int'l, Inc.*, 140 F.4th 123, 131 (4th Cir. 2025) ("*Marriott II*") ("Marriott did not fail to raise its class-waiver defense at any point at which it was required to do so, and its invocation in opposition to class certification could not have

surprised the plaintiffs or deprived them of a fair opportunity to object."); *see also Moore v. Club Exploria*, LLC, No. 25-2721, --- F.4th ----, 2026 WL 2409841, at *6 (7th Cir. Aug. 18, 2026) (confirming that a defendant's "pleadings, conduct during class-related discovery, and arguments in opposition to class certification are relevant to the waiver decision"); *Anderson v. Ford Motor Co.*, No. 17-03244-CV-S-BP, 2020 WL 13538621, at *2 n.3 (W.D.Mo. Feb. 14, 2020) (rejecting plaintiff's assertion that Ford should have raised the class action waiver at the pleading stage and noting that plaintiff "offer[ed] no authority supporting her argument that Ford should be prohibited from making these assertions at [the class certification stage] of the litigation.").[5]

**b. The application of the class action waiver must be determined before class certification.**

Next, plaintiffs ask the Court to delay resolving the application of the class action waiver until *after* class certification. But why? Logically, an asserted waiver of any right should be tested at the time that right is asserted. The Fourth Circuit's holdings in *Marriott I* and *Marriott II* are consistent with this general principle, and the Court finds those decisions to be persuasive.

In *Marriott I*, the court set out to determine "whether the district court erred by certifying classes against Marriott without *first* addressing this class-action waiver defense." 78 F.4th at 685 (emphasis added). The Fourth Circuit answered that question with an emphatic "yes," reasoning as follows:

> [W]e agree with Marriott that the time to address a contractual class waiver is before, not after, a class is certified. Although it seems no court has had occasion

[5] Plaintiffs' authority in support of their waiver argument is distinguishable. For example, in *Smith v. GC Servs. Ltd. P'ship*, the Seventh Circuit held that a defendant waived the right to arbitrate where it "did not discover the existence of the arbitration agreement for eight months, and then . . . did not notify the court or move to compel arbitration for another five months." 907 F.3d 495, 502 (7th Cir. 2018). Notably, unlike here, the defendant in *Smith* did not raise the waived issue (there, arbitration) in any of its initial responsive pleadings or in its briefing on class certification. *Id*. at 498. Similarly, in *Simmons v. Ford Motor Co.*, the Court held that Ford waived the application of the class action waiver when its "Answer ma[de] no mention of the class action waiver provision of the warranty" and it first asserted the issue "almost three years after the class action suit was initiated." 592 F.Supp.3d 1262, 1282 (S.D.Fla. 2022).

> to expressly hold as much, that is the consensus practice. Courts consistently resolve the import of class waivers at the certification stage – before they certify a class, and usually as the first order of business.
>
> . . .
>
> We think this is the only approach consistent with the nature of class actions and the logic of class waivers. Under Rule 23, certification is the key moment in class-action litigation: It is the "sharp line of demarcation" between "an individual action seeking to become a class action and an actual class action." *Shelton v. Pargo, Inc.*, 582 F.2d 1298, 1304 (4th Cir. 1978). But by signing a valid and enforceable class waiver, as alleged here, a plaintiff promises not to cross that line – to give up, in exchange for some contractual benefit, the right to proceed by way of an "actual class action." *See Laver v. Credit Suisse Sec. (USA), LLC*, 976 F.3d 841, 846 (9th Cir. 2020) ("A class action waiver is a promise to forgo a procedural right to pursue class claims."). If that "sharp line" is to be maintained, then a district court simply cannot certify a class at the behest of plaintiffs who have promised to stay on the "individual action" side of it.

*Id*. at 686–87; *see also Marriott II*, 140 F.4th at 131 (confirming that class certification is "precisely the stage . . . at which a district court should consider the effect of a class-action waiver.").

For these reasons, the Court finds that the appropriate time to resolve the application of the class action waiver is now, and it thus proceeds to address that issue. *See, e.g.*, *Ray v. Atl. Union Bank* No. 3:25CV132, 2026 WL 1998758, at *4 (E.D.Va. July 10, 2026) ("[A] court must address a contractual class waiver claim before, not after, a class is certified."); *Malone v. ASAP Trans Corp.*, No. 22 CV 3572, 2025 WL 2977781, at *5 (N.D.Ill. Oct. 22, 2025) (rejecting plaintiffs' request to certify first and then consider any implications of class action waivers after); *cf. McCabe v. Ford Motor Co.*, No. CV 23-10829-FDS, 2026 WL 822262, at *8 (D.Mass. Mar. 25, 2026) (agreeing that the application of a class action waiver "must be resolved prior to class certification," but declining to reach the issue where, unlike here, discovery had not been completed); *Fahy v. Minto Dev. Corp.*, 722 F.Supp.3d 784, 807 (N.D.Ill. 2024) ("Because the

plaintiffs have *not* filed a motion for class certification, this Court will defer consideration of the enforceability of the class action waiver.") (emphasis added).[6]

**c. Plaintiffs have not shown that the class action waivers are unconscionable.**

Under the law of Illinois, California, Massachusetts, and New York, a contract provision (such as the Waiver) is enforceable unless it is unconscionable or against public policy. *See, e.g.*, *Rattunde v. Scores Chicago Gentleman's Club*, No. 23 C 14706, 2024 WL 4555336, at *5 (N.D.Ill. Oct. 23, 2024) ("In Illinois, a contract is not enforceable if it is unconscionable.") (citing *Razor v. Hyundai Motor Am.*, 854 N.E.2d 607, 622 (Ill. 2006)); *Ramirez v. Charter Commc'ns, Inc.*, 551 P.3d 520, 529 (Cal. 2024)); *McInnes v. LPL Fin., LLC,* 994 N.E.2d 790, 798 (Mass. 2013) ("[C]ontracts [of adhesion] are enforceable unless they are unconscionable, offend public policy, or are shown to be unfair in the particular circumstances."); *U1it4Less, Inc. v. FedEx Corp.*, No. 11-CV-1713 KBF, 2015 WL 3916247, at *4 (S.D.N.Y. June 25, 2015). "A determination of whether a contractual clause is unconscionable is a matter of law, to be decided by the court." *Razor*, 854 N.E.2d at 622; *DeLeon v. Verizon Wireless, LLC*, 143 Cal.Rptr.3d 810, 821 (Cal.App.Ct. 2012) ("Unconscionability is a question of law.").

The party asserting unconscionability—here, plaintiffs—bears the "heavy" burden of showing the same. *King's Choice Neckwear, Inc. v. Pitney Bowes, Inc.*, No. 09 CIV. 3980 (DLC), 2009 WL 5033960, at *6 (S.D.N.Y. Dec. 23, 2009). Under California, Massachusetts, and New

[6] In response to this line of authority, plaintiffs cite *Herkert v. MRC Receivables Corp.*, 254 F.R.D. 344, 350 (N.D.Ill. 2008), for the proposition that the "presence of class action waivers do not necessarily preclude class certification." (Dckt. #367 at 23). But in *Herkert*, there was only a "*possibility* that some of the putative class members" could have unique defenses, including "agreements containing or not containing class action waivers." *Herkert*, 254. F.R.D at 250 (emphasis added). Here, on the other hand, plaintiffs themselves concede that the "same class action waiver is found in every warranty of the Class Vehicles," and thus, unlike in *Herkert*, the application of the class action waiver defense is not a mere possibility; rather, it is a certainty. (Dckt. #367 at 23).

York law, a plaintiff asserting unconscionability must show both procedural and substantive unconscionability. *Ramirez*, 551 P.3d at 530 (California); *Machado v. System4 LLC*, 218, 28 N.E.3d 401, 414 (Mass. 2015) (Massachusetts); *King's Choice*, 2009 WL 5033960, at *6 (New York). Under Illinois law, a "contractual provision may be unconscionable on either procedural or substantive grounds, or a combination of both." *Patterson v. Respondus, Inc.*, 593 F.Supp.3d 783, 809 (N.D.Ill. 2022), (citing *Razor*, 854 N.E.2d at 622). "Procedural unconscionability refers to a situation where a term is so difficult to find, read, or understand that the plaintiff cannot fairly be said to have been aware he was agreeing to it, and also takes into account a lack of bargaining power." *Niiranen v. Carrier One, Inc.*, No. 20-CV-06781, 2022 WL 103722, at *7 (N.D.Ill. Jan. 11, 2022) (cleaned up). "On the other hand, substantive unconscionability concerns the actual terms of the contract and examines the relative fairness of the obligations assumed." *Id.*

For the following reasons, plaintiffs have fallen far short of meeting their burden to show that the class action waiver is unconscionable here.

As an initial matter, plaintiffs did not even *attempt* to articulate why the waiver is unconscionable in response to Ford's argument. Instead, plaintiffs simply asked the Court to delay resolution of this issue until after class certification. By failing to substantively respond, plaintiffs have waived any such argument. *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver."). This alone could end the Court's unconscionability inquiry.

Nonetheless, for purposes of completeness, the Court notes that multiple courts have rejected the assertion that class action waivers identical to the Waiver are unconscionable. For example, in *Rathmann*, the plaintiff argued that the identical Ford class action waiver was

unconscionable and thus unenforceable. *Rathmann v. Ford Motor Co.*, No. 621CV00610ADAJCM, 2023 WL 6150270, at *2 (W.D.Tex. Aug. 25, 2023), *report and recommendation adopted*, No. 621CV00610ADAJCM, 2023 WL 6150787 (W.D.Tex. Sept. 20, 2023). The court disagreed, concluding that the waiver was neither substantively nor procedurally unconscionable.

Specifically, with respect to substantive unconscionability, the *Rathmann* court was "not persuaded that the waiver violates public policy or is so inequitable that it shocks the conscience." 2023 WL 6150270, at *3. As for procedural unconscionability, the *Rathmann* court reached four conclusions. First, "the parties' unequal bargaining power alone does not make the agreement unconscionable." *Id.* at *4. Second, the warranty booklet was "readily available on [Ford's] website." *Id.* at *5. Third, the class action waiver was (as here) in "the only multi-page gray textbox in the warranty booklet"; the waiver was in the third section of twelve, titled "Limitations and Disclaimers," which was bolded, capitalized, and underlined. *Id.* As such, plaintiff's argument that Ford "hid or buried the waiver" was unavailing. *Id.* Fourth, adhesion contracts were not "inherently unconscionable" under Texas law. *Id.* For all of these reasons, the *Rathmann* court concluded that plaintiff had failed to carry his "very high burden" to show the class waiver was unconscionable, and the waiver thus precluded class certification of plaintiff's warranty-related claims. *Id*. A district court in Missouri reached the same result regarding the same Ford class action waiver. *See Anderson v. Ford Motor Co.*, No. 17-03244-CV-S-BP, 2020 WL 13538621, at *3 (W.D.Mo. Feb. 14, 2020), *adhered to on reconsideration*, No. 17-03244-CV-S-BP, 2020 WL 13538613 (W.D.Mo. Sept. 21, 2020) (finding the class action waiver neither procedurally nor substantively unconscionable).

These rulings are not surprising. Indeed, the class action waiver does not impact the efficacy of the warranty itself, the vehicle owner's right to seek repairs under the warranty, or the vehicle owner's right to bring an individual warranty-related claim in court. Moreover, the waiver does not bar a disappointed vehicle owner from bringing a class action regarding any consumer protection or other non-warranty-related claim that they may have; rather, it only applies to warranty-related claims.

In sum: plaintiffs have waived their opposition to Ford's arguments on the class action waiver. Even if they had not done so, plaintiffs have not articulated *any* reason for finding the waiver unconscionable under Illinois, California, Massachusetts, or New York law. Nor have they attempted to distinguish this case from the holdings in *Rathmann* and *Anderson* interpreting the same Ford waiver. As such, plaintiffs have clearly failed to meet their burden to show that the class action waiver is unconscionable, and the Court will enforce it.

**d. The class action waiver precludes certification of plaintiffs' warranty-related claims.**

The Court must next determine *which* of plaintiffs' claims are covered by the class action waiver. For its part, Ford maintains that the class action waiver serves to preclude certification of plaintiffs' express warranty, implied warranty of merchantability, MMWA, *and* state consumer protection claims. In Ford's view, then, plaintiffs have "effectively conceded that only Heller's fraudulent omission claim is outside the scope of the waiver." (Dckt. #384 at 12). Again, plaintiffs have not responded to this point, thereby waiving any such argument, and it would thus likely be in the Court's discretion to simply accept Ford's argument concerning the applicability of the waiver to all but Heller's remaining fraud claim. Nonetheless, the Court disagrees, in part, with Ford's position.

At the outset, the Court agrees that the plain language of the class action waiver precludes certification of plaintiffs' claims for breach of express and implied warranties. This includes plaintiffs' claims for breach of express warranty (Count 1), breach of implied warranty of merchantability (Count 2), violation of the MMWA (Count 3), and violation of California's SBCWA (Counts 8, 9, and 10). *See, e.g.*, *McCabe*, 2026 WL 822262, at *5–6 (confirming that the language of the class action waiver would apply to both express and implied warranty claims); *Rathmann*, 2023 WL 6150270, at *2 (concluding that the "plain language of the waiver" clearly extended to plaintiff's express and implied warranty claims, and claims under the MMWA); *Tucker v. Ford Motor Co.*, No. 4:22-CV-00430-AGF, 2023 WL 2662887, at *11 (E.D.Mo. Mar. 28, 2023) ("The warranty waiver as to class claims in this case does not distinguish between express and implied warranties, and the Court cannot read such a distinction into the contract.").

However, the Court rejects Ford's argument that the class action waiver should be applied to bar class certification of the entirety of plaintiffs' remaining claims under various state consumer protection laws. Based on the Court's review of plaintiffs' consumer protection claims, even those that relate, at least in part, to a warranty (*see, e.g.*, Counts 11 and 12) also go beyond just the warranty and arise under the broader scope of the consumer protection laws at issue.[7] Of course, any portion of plaintiffs' consumer protection-related claims grounded in warranty-related theories of recovery is also barred by the class action waiver.

[7] The Court acknowledges that the *Rathmann* court did apply the waiver to the plaintiff's claim for violation of the Texas Deceptive Trade Practices Act, but there it appears that the claim under the consumer protection statute was "based on a warranty." *Rathmann*, 2023 WL 6150270, at *2. Moreover, the Court acknowledges that the *Rathmann* court declined to apply the class action waiver to "any asserted California claims." *Id*. But this was based on: (1) defendant's concession there (unlike here) that it had "never sought to apply the waiver to California claims"; and (2) reliance on the since-abrogated *Discover Bank v. Superior Ct.*, 113 P.3d 1100, 1112 (Cal. 2005), for the proposition that "class action waivers are unconscionable as contracts of adhesion." *Id*; *but see AT&T Mobility LLC v. Concepcion*, 563

For all of these reasons, and in light of the class action waiver, plaintiffs' motion for class certification is denied with respect to the warranty-related claims pled in Counts 1, 2, 3, 8, 9, and 10 (and any warranty-related theories of liability within the scope of plaintiffs' consumer protection claims), and the Court need not consider whether plaintiffs satisfy Rule 23 with respect to these claims. *See Kaspers v. Comcast Corp.*, 631 Fed.Appx. 779, 784 (11th Cir. 2015) ("[B]ecause we have concluded that the class-action waiver was valid, the district court did not need to consider the requirements for class certification under Rule 23."); *Crews v. TitleMax of Delaware, Inc.*, No. 1:22-CV-00168, 2023 WL 2652242, at *4 (M.D.Pa. Mar. 27, 2023) ("Because [plaintiff] and the purported class members have waived their right to pursue a class action in their loan agreements, the court concludes that they cannot bring a class action under Rule 23."); *Archer v. Carnival Corp. & PLC*, No. 2:20-CV-04203-RGK-SK, 2020 WL 6260003, at *8 (C.D.Cal. Oct. 20, 2020) ("[Because] [t]he Court has already found that the Plaintiffs' Motion for Class Certification is barred by the [class action waiver] . . . the Court does not need to address whether Plaintiffs satisfy [the requirements of Rule 23].").

### B. Plaintiffs Fail to Satisfy the Commonality and Predominance Requirements of Rule 23 with Respect to the Remaining Non-Warranty-Related Claims.

Remaining in play following the application of the class action waiver are: Heller's claims for fraudulent concealment under New York Law (Count 5) and for violation of New York General Business Law Sections 349 (deceptive acts and practices) and 350 (false advertising) (Counts 18 and 19, respectively); Smith and Steen's claims for violation of California's CLRA

---

U.S. 333 (2011) (abrogating *Discover Bank* proposition in connection with waivers in arbitration agreements). Although California courts continue to take a hard stance against contracts of adhesion outside of arbitration agreements, again, plaintiffs have not argued why the class action waivers are unconscionable under *any* state law, and courts "do not sit to make arguments for a party that the party, itself, did not make." *Sapia v. Bd. of Educ. of City of Chicago*, 329 F.R.D. 585, 587 (N.D.Ill. 2019) (citing *Sanchez v. City of Chicago*, 700 F.3d 919, 934 (7th Cir. 2012)).

and UCL (Counts 11 and 12, respectively); and Barcelona's claim for violation of Chapter 93A (Count 16).

Once more, plaintiffs seek certification under Rules 23(a) and 23(b)(3) of classes of all persons in each respective state who formerly or currently own or leased one or more 2017-2020 Model Year F-150 truck equipped with a 10R80 10-speed automatic transmission. According to plaintiffs, the number of class members (tens and tens of thousands in each state and over 200,000 total) renders joinder of each impracticable; (2) plaintiffs and their attorneys are adequate to represent the class; (3) plaintiffs' experiences are typical of other class members; and (4) there are many common questions, including (a) whether the 10R80 Defect exists in the Class Vehicles; (b) whether, and when, Ford learned of the Defect; (c) whether Ford concealed the Defect; (d) whether the 10R80 Defect is material to class members; and (e) whether, and to what extent, the Defect caused economic harm to class members; and (5) that these common questions predominate over individual inquiries. (*See generally* Dckt. #325).

In response, Ford argues, among other things, that the lack of commonality and predominance defeats certification. The Court agrees on both scores, and it thus begins and ends with these factors.

**1. The commonality requirement of Rule 23**

Again, Rule 23(a)(2) requires plaintiffs to establish that there are questions of law or fact common to the class. A question satisfies this commonality requirement "if the same evidence will suffice for each member to make a *prima facie* showing on the question or the issue is susceptible to generalized, class-wide proof," and "determination of the question's truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Schroeder v. Progressive Paloverde Ins. Co.*, 146 F.4th 567, 573 (7th Cir. 2025) (cleaned up). A

question is not common, however, if the answer requires "evidence that varies from member to member." *Speerly v. Gen. Motors, LLC*, 143 F.4th 306, 318 (6th Cir. 2025) (en banc), *quoting Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016). Indeed, "[d]issimilarities within the proposed class are what have the potential to impede the generation of common answers." *Howard*, 989 F.3d at 598 (cleaned up).

Moreover, as the Sixth Circuit recently articulated, "a court may not simply ask whether generalized questions yield a common answer . . . [because] [t]hat would undermine the bedrock principle that courts must identify common questions with respect to concrete elements of each claim." *Speerly*, 143 F.4th at 318. As such, plaintiffs may not simply assert that "whether a defect exists in each transmission" is a common question susceptible to answer in "one stroke" because this is "not necessarily so in the context of the relevant elements of each claim." *Id*. (finding that questions such as "whether the transmissions have shift and shudder defects; whether GM knew about them; and whether the defects are material" did "not suffice" as common questions to support certification).

Ultimately, to determine "which issues are common, individual, and predominant," the court must "circumscrib[e] the claims and break[] them down into their constituent elements." *Santiago v. City of Chicago*, 19 F.4th 1010, 1018 (7th Cir. 2021); *Schroeder*, 146 F.4th at 574, ("[A] court can only assess commonality and predominance after 'identifying the relevant elements of each cause of action.'"), *quoting Speerly*, 143 F.4th at 318. As a result, district courts must "begin [the class certification analysis] by identifying the elements of the plaintiff's various claims." *Simpson*, 23 F.4th at 713. The Court now turns to this inquiry.

**2. The elements of plaintiff's remaining claims**

Consistent with *Schroeder*, *Santiago*, and *Speerly*, plaintiffs have identified common questions that relate to at least one element of their remaining non-warranty-related claims.

In particular, plaintiff Heller's claim for fraudulent concealment under New York law requires her to show that: (1) Ford made a misrepresentation or a material omission of fact which was false and which Ford knew to be false; (2) the misrepresentation or omission was made for the purpose of inducing her to rely upon it; (3) she justifiably relied on the misrepresentation or material omission; (4) injury; and (5) Ford had a duty to disclose the material information. *Bannister v. Agard*, 125 A.D.3d 797, 798, 5 N.Y.S.3d 114 (2d Dep't 2015). Plaintiffs assert that "establishing the Defect is central to Plaintiffs' claim for fraudulent concealment in New York, because it contains a requirement that the defendant had a duty to disclose material information, namely, the Defect." (Dckt. #325 at 34).

Plaintiffs' consumer protection claims under New York, California, and Massachusetts law require them to prove that they sustained an injury on account of one of the following types of misconduct:

> (1) materially misleading consumer orientated conduct, *see Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 124 (2d Cir. 2017); New York General Business Law ("GBL") §349;
>
> (2) deceptive or materially misleading advertisement, *see Scott v. Bell Atl. Corp.*, 282 A.D.2d 180, 183, 726 N.Y.S.2d 60, 63 (2001), *aff'd as modified sub nom. Goshen v. Mut. Life Ins. Co. of New York*, 98 N.Y.2d 314, 774 N.E.2d 1190 (2002); N.Y. GBL §350;
>
> (3) unfair methods of competition involving a misrepresentation or omission that plaintiffs relied upon, *see Hammerling v. Google LLC*, 615 F.Supp.3d 1069, 1081 (N.D. Cal. 2022); CLRA §1770(a); and UCL §17200; and

(4) unfair methods of competition or deceptive acts or practices that are immoral, unethical, oppressive, or unscrupulous, *see Gattineri v. Wynn MA, LLC*, 93 F.4th 505, 511 (1st Cir. 2024); Chapter 93A.[8]

Plaintiffs assert that one or more elements of each of these consumer protection claims that they seek to bring on behalf of the proposed class requires them to "establish the existence of the Defect." (Dckt. #325 at 35).

**3. Plaintiffs have failed to provide sufficient evidence to support their theory of a common defect, thus falling short of the commonality requirement.**

Given the elements of the remaining claims, plaintiffs and Ford agree that plaintiffs will need to establish that the 10R80 suffers from a common defect to prevail on these claims. (*See, e.g.*, Dckt. #325 at 31 (plaintiffs conceding that "[w]hether or not the Defect exists in the Class Vehicles is a question central to each of [their] claims"); Dckt. #330 at 31 (defendant arguing that "[e]vidence of a common defect is the 'glue' necessary to bind the proposed class together"); *see also Klein v. Dr. Ing. h.c.F. Porsche AG*, No. 2:20-CV-10079-MWC-JPR, 2025 WL 2992172, at *7 (C.D.Cal. Oct. 22, 2025) ("The theory of harm underlying Plaintiffs' claims is that class members suffered injury because class members purchased a vehicle that contained an undisclosed defect."); *Butler v. Porsche Cars N. Am., Inc.*, No. 16-CV-2042-LHK, 2017 WL 1398316, at *6 (N.D.Cal. Apr. 19, 2017) ("[A]s Plaintiff and Porsche acknowledge, the existence of a defect in all Class Vehicles is an essential element of the class's . . . claims."). Ford argues, however, that plaintiffs do not—and cannot—adduce sufficient evidence of a common defect to satisfy their burden under Rule 23. The Court agrees.

[8] Barcelona has dismissed his Chapter 93A claim to the extent it was solely derivative of his previously dismissed fraud claim but expressed an intent to otherwise proceed under an implied warranty of merchantability or an independent violation theory of liability. (*See* Dckt. #450). Given the Court's ruling as to the applicability of Barcelona's class action waiver, he is left to proceed only under an independent violation theory of liability under Chapter 93A.

At the outset, the Court begins with the Supreme Court's reminder in *Wal-Mart Stores, Inc. v. Dukes*, that it "is easy to misread" the language of Rule 23(a)(2) "since any competently crafted class complaint literally raises common 'questions." 564 U.S. at 349 (cleaned up). While "[i]t's true that even a single common question will do . . . superficial common questions—like whether each class member . . . suffered a violation of the same provision of law—are not enough." *Jamie S. v. Milwaukee Pub. Schs.*, 668 F.3d 481, 497 (7th Cir. 2012). "Instead, the Supreme Court has said and the Seventh Circuit has reiterated that commonality requires the plaintiff to demonstrate that class members have suffered the same injury at the hands of the same defendant." *Cates v. Whirlpool Corp.*, No. 15-CV-5980, 2017 WL 1862640, at *18 (N.D.Ill. May 9, 2017) (cleaned up). Indeed, plaintiffs must show that "the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members." *McCaster v. Darden Restaurants, Inc.*, 845 F.3d 794, 800 (7th Cir. 2017). "The critical point is 'the need for *conduct* common to members of the class." (*Id.*).

In this context, this requirement necessarily requires plaintiffs "to put forth sufficient evidence of a defect common in *all* [Class Vehicles]," *Cates*, 2017 WL 1862640, at *16, and a failure to "clearly articulate what, precisely, is defective about" the product precludes certification. *Butler*, 2017 WL 1398316, at *7. However, showing the existence of a common defect is not enough. *See Speerly*, 143 F.4th at 318 (holding that the district court's finding that there were "three readily discernable common questions," including "whether the transmissions have shift and shudder defects" did "not suffice" to establish commonality) (cleaned up).

Plaintiffs must also show that the common defect has a common cause. *See, e.g.*, *Cholakyan v. Mercedes-Benz, USA, LLC*, 281 F.R.D. 534, 552 (C.D.Cal. 2012) ("Assuming *arguendo* that class vehicles experience water leaks, and that the leaks have a propensity to cause

electrical malfunctions, the crucial question that must be answered is why each class member's vehicle experienced water leaks.") & at 553 ("Cholakyan's failure to identify a single part or system that is the cause of the water leaks defeats commonality."); *Klein*, 2025 WL 2992172, at *8, *quoting Butler*, 2017 WL 1398316, at *7 ("Courts have declined to certify classes for claims related to a design defect where, for example, 'Plaintiff has failed to clearly articulate what, precisely, is defective about the wiring harness's design.'"). The presence of more than one cause for a defect defeats commonality because there will not be a common answer as to why each class vehicle was defective. *See Speerly*, 143 F.4th at 319 ("The class must trace the [common] question to a legally salient element in each cause of action and show that common proof will provide yes-or-no answers to that factual/legal question."); *Cholakyan*, 281 F.R.D. at 551 ("It is insufficient to merely allege any common question, for example, 'Were Plaintiffs passed over for promotion? Instead, they must pose a question that will produce a common answer to the crucial question why was I disfavored.").

Here, in their motion for certification, plaintiffs define the purported common defect as "the inability of the Transmission's internal seals to maintain the intended and necessary pressure on either side of the seal to ensure secure and timely engagements of each clutch required for a specific gear." (Dckt. 325 at 1 n.1). Plaintiffs purport to present evidence of this common defect and its common cause, primarily through expert testimony, and Ford's internal documents, including technical service bulletins, and Ford offers its own evidence in rebuttal.

**a. The testimony of plaintiffs' expert Michael Stapleford is entitled to little weight.**

Plaintiffs retained mechanical engineer Michael Stapleford to provide forensic consulting services to investigate plaintiffs' complaints of vehicle malfunctions related to the 10R80 Transmission. (Dckt. #296-2 at 3). Plaintiffs instructed Stapleford to investigate, among other

things, their complaints of "malfunctions of the 10R80 transmissions that affect drivability and safety," including "early shifting, delayed shifting, surging, shift-shock (a harsh 'bump' or 'bang'), or clunk, during up-shifting and downshifting, as well as gear-hunting (where the transmission continues to shift gears and cannot hold a particular gear)." (*Id.*) To do so, Stapleford reviewed discovery documents, including Ford's internal documents and deposition transcripts, and various online sources, such as YouTube videos of 10R80 Transmission re-builds posted by mechanics and repair shops. (*Id.* at 36–45).

Stapleford also performed vehicle testing and test drives on the F-150 trucks owned by plaintiffs Steen, Smith, and Barcelona, which consisted strictly of a driving test and no testing of the transmission itself. Notably, Stapleford did not test drive the vehicles of Zielinski and Heller. Nor did he recognize the named plaintiffs' differing descriptions of their shifting problems with their vehicles, and his failure to do so is of significance given the variations between each named plaintiff's account of the problems they experienced. *Supra* at Section I(A)(3); *see Speerly*, 143 F.4th at 318 (noting that the question of whether "a problem in each transmission amount[s] to a defect that makes the car unfit for its ordinary purpose . . . might *not* be common because some class members' transmission problems might not seriously disrupt the safety and comfort of each class vehicle") (emphasis in original) & at 329 ("What of the fact that shift defect experiences ran the gamut, from nothing at all, to a 'hesitat[ion] while accelerating, . . . to a 'light punch in the arm' while upshifting, . . ., to a dangerous 'lurch[ing] forward' when entering second gear.") (cleaned up).

Based on Stapleford's experience, research, review of documents, particularly Ford's own internal documents, and his test drives, he offered a number of explanations for the design "issues apparent on the 10R80" leading to malfunctions, including: (1) "Leakage of hydraulic

seals"; (2) the "historically high" number of clutches; (3) "vibration and flexing" of the "unusually long" mainshaft; and (4) crowded "[h]ydraulic circuits." (Dckt. #296-2 at 5–9, 25–26).

Specifically, Stapleford explained that:

- "Leakage of hydraulic seals mounted on the mainshaft" is one of the issues apparent on the 10R80 that are causing the malfunctions suffered by Plaintiffs;

- "Vibration and flexing of the main shaft, which is unusually long and has all four planetary gearsets and four of the six clutches mounted on it, can cause the intermittent leakage that Ford's investigation could not otherwise explain. . . . These vibrations are likely associated with another mode of failure of the 10R80 transmission, which is the axial movement of the bushing mounted inside the C-DF drum;"

- "Evidence of vibrations being one of the causes of intermittent, or random leakage of the seals at the F7 location can be seen in some stills of one of the transmission tear-down videos listed in Exhibit D of this report – URL: https://www.youtube.com/watch?v=SKZIfgWP9M0"

(*Id*. at 5–6).

In another section of his report, titled "The Effect of Vibration on Seal Leakage and Shift Qualify," Stapleford again cited a YouTube video. (Dckt. #296-2 at 24 ("As shown in the stills from the transmission teardown video above, there is evidence to support that vibrations of the rotating components and assemblies inside the transmission are causing intermittent or 'random' leakage in seals mounted in the mainshaft and the R2S3 shaft.")). In addition, although Stapleford continued to maintain in his rebuttal report that "leakage across the solid seals" is a "major cause of erratic, mis-timed and harsh shifting," he acknowledged that "*other conditions* within the transmission may exacerbate the [leakage defect]." (Dckt. #296-3 at 4–5 (emphasis added)).

At his deposition, Stapleford elaborated that "vibration is causing the leakage," which in turn "is the mechanism that results . . . in the shifting concerns." (Dckt. #296-4 (Stapleford Dep. Tr.) at 247; *see also id*. at 161 ("Q: Okay. Is it your opinion that the vibrations of the rotating components inside the 10R80 transmission cause any seal leakage? A: Yes."). Stapleford further testified that the "leading theory going forward" is that vibration caused by the defective design of the transmission is causing the malfunctions." (*Id*. at 243; *see also id*. at 247–48 ("The root cause would be vibration, leakage, shifting.")). And, although he testified that he developed this theory himself based on the entirety of the evidence before him, including Ford's internal documents, he conceded that he conducted "no tests" to confirm any such vibrations.

Instead, Stapleford relied on a YouTube video of a disassembled 10R80 transmission from an unknown vehicle with an unknown year of manufacture that (according to the video narrator and Stapleford) showed signs of wear and "confirmed" his vibration theory. (*Id*. at 94–95, 230). This YouTube video, which shows the narrator handling the components of the disassembled 10R80, provides no indication of *what* type of vehicle[9] the 10R80 came from, and it is thus unknown whether it was even initially installed and removed from an F-150 of one of the same model years as the putative class vehicles. Nor is it possible to determine from the video the amount of wear and tear the vehicle underwent before the 10R80 was removed and dissembled. Stapleford does not discuss how (if at all) these unknown but seemingly significant variables affected his consideration of the video, and his failure to do so undermines the persuasiveness of his reliance on it.

[9] Ford installed the 10R80 transmission in multiple vehicles other than the F-150s, including Expeditions, Mustangs, Rangers, Transits, and Lincoln Navigators. *See Dolan v. Ford Motor Co.*, 832 F.Supp.3d 546, 554 (E.D.Va. 2026).

Plaintiffs urge the Court to focus on Stapleford's testimony that "leakage across the seals—i.e., the 'basic architecture of 3 sets of seals in series'—is the mechanism of the defect, and 'heavy rotating parts with internal lash that are rotating at a variety of relative speeds' (i.e. 'vibration') causes its intermittency." (Dckt. #379 at 10, *quoting* Stapleford Dep. Tr. at 246:18–23).[10] However, at other points in his deposition, Stapleford at times couched his "leading" theory in less certain terms and he continued to acknowledge that the issues that plaintiffs experienced could be caused by other problems. (Stapleford Dep. Tr. at 165:3–5 ("[T]he real problem is, as I said, the intermittent leakage, which I've determined is *most likely* caused by vibration."); 74:23–75:2 ("Due to the fact that there is excessive motion *probably due* to intermittent rotational vibrations, the seals do not properly keep the pressure on the proper size of the hydraulic circuits"); 58:18 ("Clunks can occur from lots of things in the vehicle"); & 65:10 (acknowledged that the engine itself could cause "lurching")).

Furthermore, the fact that the Court denied Ford's motion to exclude Stapleford's defect opinion under *Daubert*, (Dckt. #425), has no bearing on the weight that the Court will give his opinion when determining whether class certification is warranted. As the Seventh Circuit has explained, "in the context of expert evidence, Rule 23's 'rigorous analysis' requirement for class certification is not the same as the test for admissibility under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and its progeny." *Arandell Corp. v. Xcel Energy Inc.*, 149 F.4th 883, 894 (7th Cir.

[10] Although there is nothing inconsistent between Stapleford's leakage and vibration opinions (as recognized by the Court in denying in part Ford's motion to exclude, (Dckt. #425 at 10-12)), the two go hand-in-hand such that the Court cannot simply put aside Stapleford's testimony regarding vibrations being the root cause, and focus solely on the result, i.e. leakage.

2025).[11] "Expert evidence can be admissible under Rule 702 and *Daubert* but still fall short of proving the Rule 23 requirements for class certification." *Id*. (citing *Comcast*, 569 U.S. at 32–33, n.4) (distinguishing between admissibility and adequacy of evidence). "In other words, just because expert evidence is admissible does not mean that it will justify class certification." *Arandell*, 149 F. 4th at 894.

Moreover, nothing in the Court's prior *Daubert* opinion or the standard for certification under Rule 23 precludes the Court from considering the basis for Stapleford's overall defect opinion, including any underlying inputs for that opinion. On the contrary, courts can, and at times must, consider such evidence when determining the weight to give Stapleford's opinion. *Arandell Corp.*, 149 F.4th at 893–94 ("[T]he trial court is not permitted to duck hard questions by observing that each side has some support, or that considerations relevant to class certification also may affect the decision on the merits. Tough questions must be faced and squarely decided . . . even if the dispute regards expert evidence.") (cleaned up). *See also In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 323 (3d Cir. 2008), *as amended* (Jan. 16, 2009) ("Weighing conflicting expert testimony at the certification stage is not only permissible; it may be integral to the rigorous analysis Rule 23 demands.").

In sum: after considering the basis, inputs, and equivocal nature of Stapleford's opinion testimony, the Court finds that it lacks sufficient weight standing alone to allow the Court to find that plaintiffs have met their burden of establishing commonality by showing that the proposed class vehicles suffered from a common defect with a common cause.

[11] To this point, this Court expressly noted that it would not take certain of Ford's objections to Stapleford's opinion testimony (such as his "reliance on a YouTube video as evidence of vibration, or his failure to demonstrate that the vibrations affect all class vehicles") into consideration for its *Daubert* analysis because those objections went to the weight of his testimony and not to is reliability or admissibility. (Dckt. #425 at 12). It is now appropriate to consider the weight of Stapleford's testimony at this stage of the proceedings.

#### b. Ford's internal documents, technical service bulletins, and customer complaints regarding harsh shifting issues

In addition to Stapleford's opinion, plaintiffs rely heavily on Ford's internal documents, technical service bulletins, and customer complaints related to harsh shifting as support for their theory that seal leakage was a common defect in the 10R80.

**Ford's Internal Documents.** Plaintiffs are correct that Ford's internal documents reflect Ford's early and continued concerns of harsh shifting issues in the 10R80 throughout the development process, through production, after sale to the public, and beyond. (*See* Dckt. #325 at 9–15 (describing the concerns found in internal Ford documents related to harsh shifting over the years)). Indeed, it was apparent to Ford in the early development that the 10R80 would present unique challenges to the extent that it included "10 gears providing 90 possible shifts compared to 6 gears providing 30 possible shifts [in the 6R80] . . . [a] 360% increase in clutch transitions." (Dckt. #314-1 at 4). And there can be no dispute that one of those early identified challenges was the potential for seal leakage, including in Ford's originally designed interlocking (or "Z-Lock") seals, which Ford continued to investigate throughout development. (*See* Dckt. #314-4 (Ford employee acknowledging the possibility of seal leakage); #314-5 (2014 seal leakage testing results)).

Ultimately, in December 2015, Ford's investigation revealed "a below standard level of leakage in very cold conditions . . . which created calibration concerns." (Dckt. #329-3 at 6). As a result, Ford made the decision to replace the Z-Lock seals with solid seals. (*Id.*). According to Buzz Riley, the head of Ford's 10R80 seal team, testing of the replacement solid seals "had 'virtually zero' leakage at all temperatures and speed ranges. (*Id.*, *quoting* Dckt. #329-40 (Riley Dep. Tr.)). In light of Ford's switch to solid seals before production and the November 2016 release of the 10R80, plaintiffs' reliance on Ford's internal documents referencing issues with the

Z-Lock seals (which were not present in any class vehicles) to support their asserted common defect is misplaced.

Plaintiffs also rely on post-release internal Ford documents related to harsh shifting to provide evidentiary support for the existence of a common defect. For example, plaintiffs point to certain post-production documents reflecting that continued seal leakage could be a potential cause of harsh shifting even after the replacement of the seals. On the other hand, other post-release internal documents express doubt about such a cause. (*See* Dckt. #315-7 at 2–3) ("After four years of stating that this is a seal ring issue, perhaps it is time to step back and ask what other components or design issues in the system might be causing" harsh shifting.). Moreover, as Ford points out, (Dckt. #366 at 16), many of the internal documents relied on by plaintiffs for evidence of a common defect do not serve that intended purpose because they (a) relate to non-class vehicles, (Dckt. ##314-12 (referencing shifting problems in cars in Mexico and Canada); 314-17 (referencing Mustangs, not F-150s)); (b) identify various possible causes of the harsh shifting as opposed to simply the common defect advanced in plaintiffs' motion for class certification (describing three "hardware concerns" related to harsh shifting complaints); or (c) again, even disavow that seal leakage is the issue.

**Technical Service Bulletins**. Plaintiffs also rely on the ten technical service bulletins (or TSBs) released by Ford. A TSB is a publication that "Ford provides to dealership technicians to assist with diagnosis and repair of vehicles." (Dckt. #366 at 18); *Lopez v. Ford Motor Co.*, No. 24-CV-02155-BLF, 2026 WL 773095, at *3 (N.D.Cal. Mar. 19, 2026). While the issuance of a TSB may be "consistent with the existence of a common defect, [TSBs] do not by themselves provide evidence tying every [vehicle] in the class together." *Cates*, 2017 WL 1862640, at *13; *see also Klein*, 2025 WL 2992172, at *7 (expert's report similarly relied on a wide range of

TSBs). And, although most of the TSBs were undisputedly issued to address increasing complaints of harsh shifting, they address only "some" (and not all or even most) vehicles and they identify many possible causes for the issue, such as the "incompatibility of the adaptive calibration to adapt to hardware wear-in over time," (Dckt. ##320-12; 320-13; 320-14; 320-16), or "the software in the powertrain control module (PCM) or transmission control module (TCM), the transmission solenoid ID strategy, sticking valves in the main control valve body and/or axial movement of the CDF clutch cylinder sleeve." (Dckt. #320-19). But harsh shifting resulting from multiple causes, including causes other than the purported cause focused on by plaintiffs (namely, seal leakage caused by vibrations), does not support the existence of the common defect with a common cause.

**c. Evidence submitted by Ford undermines plaintiffs' theory of a common defect with a common cause.**

Ford relies on the opinion of its warranty expert, Nathan Soderborg, to support its argument that there is not a common defect with a common cause in the putative class vehicles. Ford tasked Soderborg with the assignment of "evaluat[ing] warranty claim data to assess information and trends in claims related to harsh shifting" in 2017-2020 Model Year F-150 vehicles (excluding Raptors) that are equipped with 10R80 transmissions, which Soderborg calculated to include 1,568,351 vehicles with varying engine type, drivetrain, and body/cab style. (Dckt. #302-2 at 7, 9–12).[12] To do so, Soderborg reviewed available warranty data, vehicle production and registration data, technical service bulletins, and consumer feedback (e.g., National Highway Traffic Safety Administration (NHTSA) vehicle owner complaints), along with the expert report of Stapleford. (*Id.* at 7).

[12] Both Soderborg and plaintiffs' warranty expert Frank Bernatowicz used nationwide sales data, presumably in light of plaintiffs' initial intent to seek certification of a nationwide class.

Soderborg first reviewed the warranty data provided by Ford, which included "spreadsheets covering claims related to 2017-2020 Model Year F-150 trucks and 2009-2012 MY F-150 trucks with 6R80 transmissions." (*Id.* at 12). The warranty data includes information typically required for reliability analysis, including VIN, Model Year, descriptive vehicle and engine characteristics, vehicle production and warranty start dates, dealership information, repair date, vehicle months in service and mileage, Customer Concern Codes, customer comments, and dealership technician comments. (*Id.*). For his analysis, Soderborg extrapolated from the warranty data the claims that he designated as "in-scope," which included claims in the following categories: (1) records related to claims made during the standard Powertrain 60 Month/60,000 mile warranty period; and (2) records for which the Customer Concern Code, customer comments, or technician comments indicated a harsh shift. (*Id.* at 14).

Soderborg then analyzed warranty claims over time for the F-150 vehicles. Based on his analysis of the "in-scope claims," Soderborg opined that (1) less than 1% of vehicles had more than one in-scope warranty claim; (2) the owners of 95.3% of MY 2017 Class Vehicles and 93.3% of 2018 MY Class Vehicles did not bring their vehicles in for in-scope warranty claims in the first 60,000 miles or 60 months of service; and (3) claim rates varied across engine type, drivetrain, and body/cab style. (*Id.* at 17–23). Soderborg also compared the in-scope claim rates during the first three years of the 10R80's release against the first three years of the 6R80 release, which demonstrated lower in-scope claims for the 10R80 than for the 6R80. (*Id.* at 21–22).

Ford asserts that this evidence tends to show the *lack* of a common defect across all putative class vehicles.[13] *See Lessin v. Ford Motor Co.*, No. 25-2211, 2026 WL 382608, at *2

[13] It is of no moment that the Court excluded Soderborg's rebuttal expert opinion stating the same, because, by his own concession, it was improper rebuttal. (*See* Dckt. #453 at 27–28). The Court remains free to consider the data underlying that opinion, however, which was *not* excluded.

(9th Cir. Feb. 11, 2026) (confirming that evidence related to manifestation of the defect (there, a "shimmy") was relevant to certification and remanding for the district court "to evaluate whether the variable evidence of shimmy manifestation is fatal to certification of the putative classes."). The Court agrees and finds such data persuasive given that customers experiencing a troubling shifting problem (such as the Defect identified by plaintiffs) in their new vehicle would have an incentive to assert a warranty claim and to accurately describe the problem that they were experiencing to Ford's personnel. Similarly, the Ford technicians tasked with identifying and remedying that problem would likewise have no reason to misidentify the complaint or the corresponding codes.

**d. Plaintiffs have failed to show the existence of a common defect with a common cause in the proposed class vehicles.**

In sum: after due consideration of the totality of the evidence offered by the parties, the Court finds that plaintiffs have failed to put forth sufficient evidence of a defect in the 10R80 common to all class vehicles that can be attributable to a common cause. Having failed to do so, they have not met their burden to satisfy the commonality requirement of Rule 23(a)(2).

The decision in *Butler v. Porsche Cars* is instructive. In that case, the court denied class certification after finding that plaintiff had "failed to clearly articulate what, precisely," was defective about the wiring harness's design in the putative class vehicles, and the court took issue with plaintiff's expert's report to the extent that it identified "three factors as probable or possible contributors to the wiring harness defect." *Butler*, 2017 WL 1398316, at *7; *see also Klein*, 2025 WL 2992172, at *7 (denying class certification where plaintiffs failed to sufficiently articulate what was defective about the engine's design or the basis for their belief that the oil leak defect was present in all class vehicles, and because their expert's report identified multiple design defects that were the "root cause of the oil leakage sources"); *Cholakyan*, 281 F.R.D. at 553

(denying class certification where plaintiff's "failure to identify a single part or system that is the cause of the water leaks defeat[ed] commonality"); *see also Cates*, 2017 WL 1862640, at *21 ("[C]ertification is inappropriate in product-defect cases where the plaintiff has not tied together an entire product line comprised of similar—but not identical—products in a way that facilitates a "once-and-for-all decision" about the full line.") (citing *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1019 (7th Cir. 2002)).

Here, as in the above cases, the named plaintiffs (whose own descriptions of the shifting defects they experienced varied) have failed to clearly articulate, with persuasive evidentiary support, the precise nature of the defect. Moreover, Stapleford identified multiple potential design defects in the 10R80 that could have led to the purported harsh shifting of plaintiffs' vehicles. And although he zoomed in on a "leading"—though still only "likely"—theory, he "confirmed" his theory with a YouTube video featuring a disassembled 10R80 of unknown provenance and usage. Simply put, the Court cannot make the logical leap from Stapleford's opinion and the other evidence cited by plaintiffs and find by a preponderance of the evidence that there is a common defect with a common cause in the 10R80 transmissions that were installed in the 200,000 plus class vehicles, which span multiple model years, various engine types, drivetrain types, and cab styles. This is particularly so in consideration of Ford's warranty expert's opinion that the warranty rates vary across engine type, drivetrain, and body/cab style.

The record evidence in this case stands in contrast to other cases where plaintiffs successfully established commonality and obtained class certification after providing sufficiently persuasive evidence that the class vehicles suffered from a clearly defined common defect traceable to a common cause. *See, e.g., Quackenbush v. Am. Honda Motor Co., Inc.*, No. C 20-05599 WHA, 2021 WL 6116949, at *1, 3 (N.D.Cal. Dec. 27, 2021), *on reconsideration in part*,

No. C 20-05599 WHA, 2022 WL 1240866 (N.D.Cal. Apr. 27, 2022), *aff'd*, No. 24-23, 2025 WL 1009273, at *2 (9th Cir. Apr. 4, 2025) (certification of classes of Honda vehicle owners whose vehicles "began to rattle on start up" because of a defective part that Honda knew about before the first class vehicle was sold and continued to know was defective throughout the class period); *Hays v. Nissan N. Am., Inc.*, No. 4:17-CV-00353-BCW, 2021 WL 912262, at *1, 3-4 (W.D.Mo. Mar. 8, 2021) (certification of a class of Nissan vehicle owners whose vehicles had a common defect (rusty floorboards) that was caused by a common defect (floor panels that lacked a watertight seal)).[14] The record here would be analogous to *Quackenbush* and *Hays* if Ford had gone ahead and installed the 10R80 transmission into the class vehicles with the Z-Lock seals despite its knowledge that those seals had "a below standard level of leakage" that "created calibration concerns." (Dckt. #329-3 at 6). But that did not happen; instead, Ford replaced the Z-Lock seals with solid seals.

**4. The predominance requirement of Rule 23**

"Rule 23(b)(3)'s predominance requirement 'builds on commonality.'" *Svoboda*, 168 F.4th at 961, *quoting Eddlemon*, 65 F.4th at 338. "While commonality requires that common questions exist, predominance requires that they also predominate." *Svoboda*, 168 F.4th at 961. "As a result, predominance is far more demanding than commonality." *Howard v. Cook Cnty.*

---

[14] Plaintiffs also cited the district court's decision in *Speerly v. Gen. Motors, LLC*, 343 F.R.D. 493 (E.D.Mich. 2023), to support their commonality argument and their motion for class certification as a whole. There, plaintiffs brought a putative class action against General Motors for claims that (as here) related to their purchase of vehicles with allegedly defective transmissions. The district court granted class certification finding, among other things, that plaintiffs presented sufficient evidence "that one or more universal defects in the 8L transmission design exist, that both 'shudder' and 'hard shift' issues were identified by the defendant as having a common cause or causes, and that the problems are pervasive and reasonably expected to occur sooner or later in all class vehicles sold." *Id*. at 517. Plaintiffs also cited and sought to rely on the Sixth Circuit panel decision that affirmed the district court's class certification ruling. (Dckt. #407). However, the Sixth Circuit, sitting *en banc*, has since vacated the panel's decision and reversed the district court's grant of class certification. *Speerly v. Gen. Motors, LLC*, 143 F.4th 306, 318 (6th Cir. 2025) (en banc).

*Sheriff's Off.*, 989 F.3d 587, 607 (7th Cir. 2021). And because the requirements of commonality, predominance (and typicality) "overlap . . . they often rise or fall together." *Id.* Here, having failed to satisfy the requirements of commonality, plaintiffs naturally fail to satisfy the more demanding requirement of predominance.

Moreover, certain of plaintiffs' remaining claims would face additional "predominance pitfalls." *Speerly*, 143 F.4th at 326. As the Sixth Circuit recently explained, such "pitfalls" come into play for state law claims that require either (1) that "a product defect must manifest before a consumer may bring such a lawsuit" and/or (2) that "a consumer must show he actually relied on a merchant's misrepresentation or omission." *Id.* Here, this raises predominance issues for Heller's New York consumer protection claims (requiring manifestation) and fraudulent concealment claim (requiring reliance). *See Speerly*, 143 F.4th at 326–27 (recognizing that manifestation of the defect is required under New York consumer protection statutes) & 329 ("As with the consumer claims, reliance [in fraudulent concealment claims] typically creates "an insuperable barrier to class certification."); *see Tershakovec v. Ford Motor Co., Inc.*, 79 F.4th 1299, 1313–14 (11th Cir. 2023) ("Absent support for presuming reliance under New York law—of which we have been shown none—individualized issues prevent class treatment.").

In opposition to this point, plaintiffs rely on *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750 (7th Cir. 2014). There the Seventh Circuit found an "error of law" in the district court's finding that "showing reliance or causation—as required to establish liability—require[d] an investigation of each purchaser" and thus precluded commonality and predominance. *Id.* at 759. However, as another court has noted:

> What the Seventh Circuit did not do [in *Suchanek*] . . . was adopt the mirror-image of the district court's rule: that reliance issues can *never* predominate in a consumer fraud case. Otherwise, there would have been no need for the Seventh Circuit to remand with anything other than instructions to certify a class . . . Instead, the

> Seventh Circuit required that the district court undertake "rigorous" and nuanced analysis of these issues, rather than relying on a blanket "rule." *Id.* at 760. This Court has endeavored to do precisely that.

*In re Fluidmaster, Inc., Water Connector Components Prods. Liab. Litig.*, No. 14-CV-5696, 2017 WL 1196990, at *55 n.59 (N.D.Ill. Mar. 31, 2017).

**CONCLUSION**

In sum: for the reasons stated above, the Court finds in its discretion that plaintiffs have failed to satisfy their burden of showing by the preponderance of the evidence that class certification is appropriate under Rule 23. The Court's finding on this issue should not be understood as a declaration that Ford's 10R80 transmission is free of problems related to harsh shifting, and Ford would be hard pressed to argue otherwise in light of the record before the Court. Nor should anything in this Opinion be taken as a commentary on the merits of the named plaintiffs' individual claims. Instead, the Court finds only that plaintiffs cannot proceed with those claims on a class-wide basis. As such, plaintiffs' motion for class certification, (Dckt. #312), is denied. The parties are ordered to meet and confer regarding the next steps in this case, and an in-person status hearing is set for October 6, 2026 at 11:30 a.m.

**DATE: September 14, 2026**



**Jeffrey I. Cummings**
**United States District Court**